**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | |
|     Plaintiff, | |
|     v. | Civ. Action No. 19-810 (RBW) |
| UNITED STATES DEPARTMENT OF JUSTICE, | |
|     Defendant. | |

**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.1(c), Plaintiff Electronic Privacy Information Center ("EPIC") respectfully moves the Court to issue a preliminary injunction requiring Defendant U.S. Department of Justice ("DOJ") to comply with the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, by immediately processing and issuing a determination on EPIC's FOIA Request for records related to the Special Counsel's investigation of Russian interference in the 2016 U.S. presidential election. This injunction is necessary to vindicate EPIC's right to expedited processing of its FOIA Request under 5 U.S.C. § 552(a)(6)(E)(i) and 28 C.F.R. § 16.5(e)(1).

The full grounds for this Motion are set out in the accompanying Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction. EPIC contacted opposing counsel, who indicated that the DOJ opposes this Motion. Pursuant to Local Rule 65.1(d), and for the reasons set forth the Memorandum, EPIC requests that the Court schedule a hearing on this Motion at the Court's earliest convenience.

Respectfully Submitted,

MARC ROTENBERG, D.C. Bar #422825
EPIC President and Executive Director

ALAN BUTLER, D.C. Bar #1012128
EPIC Senior Counsel

/s/ John Davisson
JOHN DAVISSON, D.C. Bar #1531914
EPIC Counsel
davisson@epic.org

ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*

Dated: March 29, 2019

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ELECTRONIC PRIVACY INFORMATION CENTER,

    Plaintiff,

    v.

UNITED STATES DEPARTMENT OF JUSTICE,

    Defendant.

Civ. Action No. 19-810 (RBW)

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

SUMMARY .......................................................................................................................... 1

BACKGROUND .................................................................................................................. 2

I.     Russian Interference in the 2016 U.S. Presidential Election ................................... 2

II.    Criminal and Counterintelligence Investigations into Russian Election Interference ........ 5

III.   The Mueller Report and Other Special Counsel Records .................................... 10

IV.   EPIC's FOIA Request ....................................................................................... 12

V.    The DOJ's Failure to Expeditiously Search for and Release the Requested Records ....... 15

VI.   The Freedom of Information Act and Its Progeny ............................................ 16

ARGUMENT ...................................................................................................................... 17

I.     The Court Has Jurisdiction to Grant the Requested Relief ................................. 18

II.    EPIC Is Entitled to a Preliminary Injunction ................................................... 19

     A.    EPIC is likely to succeed on the merits of its claims. ........................... 20

     B.    EPIC will suffer irreparable harm if relief is not granted. ................... 25

     C.    The balance of the equities and the public interest favor relief. ........... 30

CONCLUSION .................................................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. DOJ*,
321 F. Supp. 2d 24 (D.D.C. 2004) ............................................................ 24

*Ahuruonye v. U.S. Dep't of Interior*, 3
12 F. Supp. 3d 1 (D.D.C. 2018) ............................................................... 19

*Al-Fayed v. CIA*,
254 F.3d 300 (D.C. Cir. 2001) ......................................................... 18, 21

*Byrd v. EPA*,
174 F.3d 239 (D.C. Cir. 1999) ................................................................ 25

*DOJ v. Tax Analysts*,
492 U.S. 136 (1989) ................................................................................ 25

*Edmonds v. FBI*,
No. CIV.A. 02-1294 (ESH), 2002 WL 32539613 (D.D.C. Dec. 3, 2002) ............................... 24

*Elec. Frontier Found. v. DOJ*,
563 F. Supp. 2d 188 (D.D.C. 2008) ......................................................... 24

*Elec. Frontier Found. v. Office of Dir. of Nat'l Intelligence*,
2007 WL 4208311 (N.D. Cal. Nov. 27, 2007) ......................................... 27

*EPIC v. DHS*,
No. 17-2047 (D.D.C. filed Oct. 4, 2017) ................................................. 29

*EPIC v. DOD*,
241 F. Supp. 2d 5 (D.D.C. 2003) ....................................................14, 15, 22

*EPIC v. DOJ*,
416 F. Supp. 2d 30 (D.D.C. 2006) ................................... 17, 18, 27, 30, 31

*EPIC v. FBI*,
No. 1:17-CV-00121 (TNM), 2018 WL 2324084 (D.D.C. May 22, 2018) ............................. 29

*EPIC v. Presidential Advisory Comm'n on Election Integrity*,
266 F. Supp. 3d 297 (D.D.C. 2017), *aff'd on other grounds*,
878 F.3d 371 (D.C. Cir. 2017) ................................................................ 26

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ................................................................ 31

*In re Report & Recommendation of June 5, 1972 Grand Jury Concerning*
*Transmission of Evidence to House of Representatives*,
370 F. Supp. 1219 (D.D.C. 1974), *aff'd sub nom. Haldeman v. Sirica*,
501 F.2d 714 (D.C. Cir. 1974) ............................................................ 12

*Judicial Watch, Inc. v. DHS*,
895 F.3d 770 (D.C. Cir. 2018) ............................................................ 25

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ............................................................... 31

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................................... 19

*NLRB v. Robbins Tire & Rubber Co.*,
437 U.S. 352 (1976) ..................................................................... 16, 32

*Oglesby v. Dep't of the Army*,
920 F.2d 57 (D.C. Cir. 1990) ............................................................. 18

*Payne Enters., Inc. v. United States*,
837 F.2d 486 (D.C. Cir. 1988) .......................................... 18, 23, 25, 33

*Protect Democracy Project v. DOD*,
263 F. Supp. 3d 293 (D.D.C. 2017) ............................................... 27, 31

*Pursuing America's Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ........................................................... 31

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ........................................................... 19

*United States v. Internet Res. Agency*,
No. 18-32 (D.D.C. Feb. 16, 2018) ...................................................... 27

*United States v. Netyksho*,
No. 18-215 (D.D.C. July 13, 2018) ..................................................... 27

*United States v. Stone*,
No. 19-18 (D.D.C. Jan. 24, 2019) ....................................................... 27

*Washington Post v. DHS*,
459 F. Supp. 2d 61 (D.D.C. 2006) ...................................................... 26

*Winter v. NRDC*,
555 U.S. 7 (2008) ............................................................................. 17

**Statutes**

5 U.S.C. § 552(a)(3)(A)................................................................................................ 25

5 U.S.C. § 552(a)(4)(A)(ii)(II)..................................................................................... 15

5 U.S.C. § 552(a)(4)(B) .......................................................................................... 17, 18

5 U.S.C. § 552(a)(6) ............................................................................................16, 19, 20

5 U.S.C. § 552(a)(6)(A)(i) ...................................................................................17, 18, 20

5 U.S.C. § 552(a)(6)(A)(ii) ................................................................................... 18, 21

5 U.S.C. § 552(a)(6)(B)(i) ........................................................................................... 20

5 U.S.C. § 552(a)(6)(C) ............................................................................................... 18

5 U.S.C. § 552(a)(6)(E) .......................................................................................... 16, 17

5 U.S.C. § 552(a)(6)(E)(i) ........................................................................................... 21

5 U.S.C. § 552(a)(6)(E)(ii)(II) ............................................................................... 18, 21

5 U.S.C. § 552(a)(6)(E)(iii) ................................................................................... 17, 21

5 U.S.C. § 552(a)(6)(E)(v) ........................................................................................... 17

5 U.S.C. § 552(a)(6)(E)(v)(II) ............................................................................21, 22, 23, 31

Electronic Freedom of Information Act Amendments of 1996,
   Pub. L. 104-231, 110 Stat. 3048 (1996) ............................................................. 17

**Regulations**

28 C.F.R. § 16.5(e)(1) ................................................................................................. 21

28 C.F.R. § 16.5(e)(1)(ii) ........................................................... 14, 16, 21, 22, 23, 31

28 C.F.R. § 16.5(e)(1)(iv)................................................................ 15, 16, 21, 23, 24

28 C.F.R. § 16.10(k)(1) ............................................................................................... 15

28 C.F.R. § 45.2(a) ........................................................................................................ 5

28 C.F.R. § 600.1 ................................................................................................... 12, 24

28 C.F.R. § 600.4(a) ...................................................................................................... 7

28 C.F.R. § 600.4(c) ..........................................................................................................11

28 C.F.R. § 600.6 ..............................................................................................................11

28 C.F.R. § 600.7(b) ..........................................................................................................11

28 C.F.R. § 600.8(a)(2) ......................................................................................................10

28 C.F.R. § 600.8(c) .....................................................................................................10, 25

28 C.F.R. § 600.9(a) .....................................................................................................11, 25

**Other**

Adam Edelman, *Trump says He Didn't Fire Comey 'Because of Russia,'
Contradicting Past Statements*, NBC News (May 31, 2018) ...................................6

Adam Goldman & Edward Wong, *Trump Installs a Critic of the Mueller
Investigation to Oversee It*, N.Y. Times (Nov. 7, 2018) ...........................................9

Allan Smith, *NBC News: First Democratic debate set for Miami,
June 26-27*, NBC News (Mar. 28, 2019) ..................................................................29

Andrew P. Napolitano, *Beyond the Barr Revelation*, Wash. Times
(Mar. 27, 2019) ........................................................................................................27

EPIC, *Democracy and Cybersecurity: Preserving Democratic Institutions*
(Feb. 4, 2019) ..........................................................................................................29

EPIC, *EPIC v. DHS* (Jan. 31, 2019) ..................................................................................30

EPIC, *EPIC v. FBI* (Russian Hacking) (Feb. 28, 2019) ....................................................29

Griffin Connolly, *Most Republicans Want to See the Full Mueller Report,
New Poll Finds*, Roll Call (Mar. 27, 2019) .............................................................32

House Permanent Select Committee on Intelligence, *Status of the Russia
Investigation (Minority Report)* (Mar. 13, 2018) .....................................................4

Indictment, *United States v. Internet Res. Agency*,
No. 18-32 (D.D.C. Feb. 16, 2018) .............................................................................4

Indictment, *United States v. Internet Research Agency LLC*,
No. 18-32 (D.D.C. Feb. 16, 2018) .............................................................................8

Indictment, *United States v. Netyksho*,
No. 18-215 (D.D.C. July 13, 2018) ...........................................................................8

Indictment, *United States v. Stone*,
No. 19-18 (D.D.C. Jan. 24, 2019) ...................................................................... 8

Jennifer Agiesta, *CNN Poll: Almost Everyone Wants a Public Report on
Mueller's Findings*, CNN (Feb. 7, 2019) .......................................................... 32

Letter from Donald J. Trump, President of the United States, to James B.
Comey, Dir., Fed. Bureau of Investigation (May 9, 2017) ................................. 6

Letter from Jefferson B. Sessions III, Att'y Gen., to Donald J. Trump,
President (Nov. 7, 2018) ..................................................................................... 9

Letter from Stephen E. Boyd, Asst. Att'y Gen., to Sen. Mitch McConnell
& Sen. Charles E. Schumer (Dec. 20, 2018) ..................................................... 9

Marc Rotenberg, *Americans Have a Right to Know What Intel Community
Knows on Russia*, The Hill (March 27, 2017) .................................................... 29

Memorandum from Steven A. Engel, Asst. Att'y Gen., to Emmet T. Flood,
Counsel to the President (Nov. 14, 2018) ........................................................... 9

Memorandum from William P. Barr to Rod Rosenstein, Deputy Attorney
General (June 8, 2018) ....................................................................................... 9

Office of the Dir. of Nat'l Intelligence, ICA 2017-01D, *Intelligence
Community Assessment: Assessing Russian Activities and Intentions
in Recent US Elections* (Jan. 6, 2017) .......................................................... 3, 4

Plea Agreement, *United States v. Cohen*,
No. 18-850 (S.D.N.Y. Nov. 29, 2018) ................................................................ 8

Plea Agreement, *United States v. Flynn*,
No. 17-232 (D.D.C. Dec. 1, 2017) ...................................................................... 7

Plea Agreement, *United States v. Gates*,
No. 17-201 (D.D.C. Feb. 23, 2018) .................................................................... 7

Plea Agreement, *United States v. Manafort*,
No. 17-201 (D.D.C. Sep. 14, 2018) .................................................................... 7

Plea Agreement, *United States v. Papadopolous*,
No. 17-182 (D.D.C. Oct. 5, 2017) ...................................................................... 8

Press Release, Rep. Jerrold Nadler et al., House Committee Chairs
Demand DOJ Release Full Mueller Report & Underlying Evidence
to Congress ....................................................................................................... 28

Press Release, U.S. Dep't of Justice, *Attorney General Sessions Statement on Recusal* (Mar. 2, 2017) .................................................................................5

Randall D. Eliason, *William Barr Has Some Explaining to Do*, Wash. Post (Mar. 27, 2019) .......................................................................................................26

*Remarks by President Trump Before Air Force One Departure*, The White House (Mar. 24, 2019) ..............................................................................................28

*Roll Call Vote 116th Congress - 1st Session*, U.S. Senate (Feb. 14, 2019) ...................9

Rosalind S. Helderman, Leslie Shapiro, & Chris Alcantara, *What We Learned About Trumpworld Outreach to Russia Since Mueller's Investigation Began*, Wash. Post (Feb. 19, 2019).......................................................5

*Russian Active Measures Investigation: Hearing Before the H. Permanent Select Comm. on Intelligence*, 115th Cong. (2017) (Statement of James B. Comey, Dir., Fed. Bureau of Investigation)..............................................................6

Scott Shane & Mark Mazzetti, *The Plot to Subvert an Election: Unraveling the Russia Story So Far*, N.Y. Times (Sep. 20, 2018)............................5

Senate Select Comm. on Intelligence, *The Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent U.S. Elections* (July 3, 2018) ...................................................................................4, 5

Statement of the Offense, *United States v. Papadopoulos*, No. 17-182 (D.D.C. Oct. 5, 2017)..........................................................................3

Steven Shepard, *Poll: Majority Wants Mueller Report Released to the Public*, Politico (Mar. 27, 2019) ........................................................................32

*The Debate About the Mueller Report*, N.Y. Times (Mar. 26, 2019)..........................26

*The Mueller Report's Fallout*, Wash. Post (Mar. 26, 2019).......................................26

Todd Ruger, *Lindsey Graham Wants Attorney General to Testify on Mueller Report*, Roll Call (Mar. 25, 2019)...................................................27

U.S. Dep't of Justice, *Special Counsel's Office* (Jan. 25, 2019) ...................................7

Vivian Salama & Kristina Peterson, *Trump Signals Support for Report's Release as Democrats Dispute 'Exoneration,'* Wall Street J. (Mar. 25, 2019)........................33

Zack Budryk, *Poll: 84 Percent Want Mueller Report Made Public*, The Hill (Mar. 26, 2019) ..........................................................................................32

**SUMMARY**

Few, if any, government documents in the recent history of the United States have commanded more attention than the "Mueller Report"—the Special Counsel's final report on Russian interference in the 2016 presidential election. Since the launch of the Special Counsel investigation, news organizations have published thousands of articles concerning the timing, contents, and possible implications of the Mueller Report. The "Mueller Report" became a common phrase before it even existed. And public interest dramatically intensified one week ago, when Attorney General William P. Barr formally acknowledged that the Department of Justice, after a two-year investigation, was in possession of the report. Yet the agency has made available only a four-page summary of a nearly 400-page report detailing the possible ties between the President of the United States and a foreign adversary. Though clear majorities of Americans in both political parties favor the release of the Mueller Report, the agency has withheld the document. The public, which funds the activities of our government and has the right to know about its activities, remains in the dark as to the most consequential government investigation in recent history.

The Electronic Privacy Information Center ("EPIC") aims to change that. In November 2018, EPIC filed a detailed Freedom of Information Act ("FOIA") Request for the Mueller Report and related records generated by the Special Counsel. Astonishingly, the Department of Justice ("DOJ") refused to process EPIC's FOIA Request or to grant expedited processing, a determination that EPIC was surely entitled to. The agency concluded, inexplicably, that disclosure of the requested records was of no special urgency or interest to the public. Nearly five months later, the agency has still not undertaken a search for responsive records, issued a final determination, or disclosed a single document in response to EPIC's FOIA Request. The failure

of the DOJ to expeditiously process EPIC's request violates the FOIA in numerous respects and entitles EPIC to relief from this Court.

Accordingly, EPIC now seeks a preliminary injunction ordering the agency to grant EPIC's request for expedited processing and to immediately process and issue a determination on EPIC's FOIA Request. The requirements for an injunction are easily satisfied: (1) EPIC is likely to succeed on the merits of its claim because the DOJ improperly denied expedited processing, failed to issue a determination within the statutory processing deadlines, and is unlawfully withholding responsive records; (2) EPIC will be irreparably harmed absent an injunction because the requested records are central to an unfolding national controversy that cannot be replayed; and (3) the balance of the equities and public interest heavily favor the requested injunction, which would merely require the DOJ to fulfill its statutory obligation to expeditiously process EPIC's FOIA Request for documents that are of extraordinary value to the public. The Court should order the DOJ to complete an immediate search for responsive records and to issue a determination without delay, as the FOIA commands.

## BACKGROUND

I.     **Russian Interference in the 2016 U.S. Presidential Election**

In 2016, the Russian government carried out a multi-pronged attack on the U.S. presidential election to destabilize U.S. democratic institutions and to aid the candidacy of Donald J. Trump. As explained in the declassified 2017 Intelligence Community Assessment ("ICA") on Russian election interference:

> We assess with high confidence that Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election, the consistent goals of which were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency. We further assess Putin and the Russian Government developed a clear preference for President-elect Trump. When it appeared to Moscow that Secretary Clinton was

> likely to win the election, the Russian influence campaign then focused on undermining her expected presidency.
>
> We also assess Putin and the Russian Government aspired to help President-elect Trump's election chances when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to him.

Office of the Dir. of Nat'l Intelligence, ICA 2017-01D, *Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent US Elections* 1 (Jan. 6, 2017) ("ICA").[1] The ICA—along with the reports, investigations, and prosecutions that have ensued—establishes that Russia interfered with the 2016 election on at least four fronts.

First, "Russia's intelligence services conducted cyber operations against targets associated with the 2016 US presidential election, including targets associated with both major US political parties." ICA at 2; *see also* Ex. 6, Letter from William P. Barr, Attorney Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, et al. at 2 (Mar. 24, 2019). These operations included the "exfiltrat[ion of] large volumes of data" from the Democratic National Committee ("DNC") and "the compromise of the personal e-mail accounts of Democratic Party officials and political figures." ICA at 2.

Second, Russian intelligence services "used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in cyber operations publicly and in exclusives to media outlets." *Id.* at 2–3; Ex. 6 at 2. These disclosures included data extracted by Russian intelligence from DNC networks. ICA at 3. Subsequent investigation has also revealed that senior Trump campaign officials engaged in multiple meetings with Russian intermediaries offering to provide "dirt" on Hillary Clinton, including "thousands of emails" obtained by Russia. Statement of the Offense ¶ 14, *United States v. Papadopoulos*, No. 17-182 (D.D.C. Oct. 5, 2017) ("The

---

[1] https://www.dni.gov/files/documents/ICA_2017_01.pdf.

Professor told defendant PAPADOPOULOS . . . that 'They [the Russians] have dirt on her'; 'the Russians had emails of Clinton'; 'they have thousands of emails.'");[2] *see also* House Permanent Select Committee on Intelligence, *Status of the Russia Investigation (Minority Report)* (Mar. 13, 2018), (noting that the "stated purpose" of "the June 9, 2016 Trump Tower meeting with Russian emissaries" was to "provide damaging information on Hillary Clinton").[3]

Third, "Russian intelligence accessed elements of multiple state or local electoral boards" in an ongoing effort to assess "US electoral processes and related technology and equipment." ICA at 3.

Fourth, "Russia's state-run propaganda machine—comprised of its domestic media apparatus, outlets targeting global audiences such as RT and Sputnik, and a network of quasi-government trolls—contributed to the influence campaign by serving as a platform for Kremlin messaging to Russian and international audiences." ICA at 3–4. As part of this propaganda push, the Russian government spent millions of dollars and employed hundreds of people to flood Facebook and Twitter with fraudulent users, posts, articles, groups, and targeted advertisements. Indictment ¶¶ 3–6, 10, *United States v. Internet Res. Agency*, No. 18-32 (D.D.C. Feb. 16, 2018).[4]

In the two years since the Intelligence Community Assessment was published, the ICA's findings have been repeatedly confirmed by federal inquiries and investigative reporting. *See, e.g.*, Senate Select Comm. on Intelligence, *The Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent U.S. Elections* (July 3, 2018);[5] Scott Shane & Mark Mazzetti,

---

[2] https://www.justice.gov/file/1007346/download.

[3] https://democrats-intelligence.house.gov/uploadedfiles/final_-_minority_status_of_the_russia_investigation_with_appendices.pdf.

[4] https://www.justice.gov/file/1035477/download.

[5] https://www.burr.senate.gov/imo/media/doc/SSCI%20ICA%20ASSESSMENT_FINALJULY3.pdf

*The Plot to Subvert an Election: Unraveling the Russia Story So Far*, N.Y. Times (Sep. 20, 2018);[6] Rosalind S. Helderman, Leslie Shapiro, & Chris Alcantara, *What We Learned About Trumpworld Outreach to Russia Since Mueller's Investigation Began*, Wash. Post (Feb. 19, 2019).[7] The Senate Intelligence Committee, after an "an in-depth review" of the ICA and associated intelligence, determined that "the conclusions of the ICA are sound" and noted "that collection and analysis subsequent to the ICA's publication continue to reinforce its assessments." Senate Select Comm. on Intelligence, *supra*, at 7.

## II.    Criminal and Counterintelligence Investigations into Russian Election Interference

On January 20, 2017—two weeks after the public release of the Intelligence Community Assessment—Donald J. Trump was inaugurated as the 45th President of the United States.

On March 2, 2017, then-Attorney General Jeff Sessions, who had been a prominent supporter of Mr. Trump during the campaign, recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States." Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement on Recusal (Mar. 2, 2017);[8] *see also* 28 C.F.R. § 45.2(a). As a result, the responsibilities of the Attorney General for any such investigation passed to the Deputy Attorney General.

On March 20, 2017, James B. Comey, then-Director of the Federal Bureau of Investigation ("FBI"), confirmed to the House Permanent Select Committee on Intelligence that the FBI was conducting an investigation into "the Russian government's efforts to interfere in the 2016 presidential election," including "the nature of any links between individuals associated with

---

[6] https://www.nytimes.com/interactive/2018/09/20/us/politics/russia-interference-election-trump-clinton.html.

[7] https://www.washingtonpost.com/graphics/2019/politics/mueller-report-primer/.

[8] https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal.

the Trump campaign and the Russian government and whether there was any coordination

between the campaign and Russia's efforts." *Russian Active Measures Investigation: Hearing*

*Before the H. Permanent Select Comm. on Intelligence*, 115th Cong. (2017) (Statement of James

B. Comey, Dir., Fed. Bureau of Investigation).[9] Mr. Comey noted that the investigation would

include "an assessment of whether any crimes were committed." *Id.*

On May 9, 2017, President Trump removed Director Comey from office and terminated

his employment. Letter from Donald J. Trump, President of the United States, to James B.

Comey, Dir., Fed. Bureau of Investigation (May 9, 2017).[10] Two days later, in a nationally

televised NBC News interview, President Trump stated:

> I was going to fire Comey knowing, there was no good time to do it. And in fact
> when I decided to just do it, I said to myself, I said you know, this Russia thing with
> Trump and Russia is a made up story, it's an excuse by the Democrats for having
> lost an election that they should have won.

Adam Edelman, *Trump says He Didn't Fire Comey 'Because of Russia,' Contradicting Past*

*Statements*, NBC News (May 31, 2018).[11]

On May 17, 2017, Deputy Attorney General Rod J. Rosenstein—in his capacity as Acting

Attorney General—appointed Robert S. Mueller III "to serve as Special Counsel for the United

States Department of Justice." Ex. 1, U.S. Dep't of Justice, Office of the Deputy Att'y Gen., Order

No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the

2016 Presidential Election and Related Matters ¶ (a) (May 17, 2017). Mr. Rosenstein authorized

Mr. Mueller to "conduct the investigation confirmed by then-FBI Director James B. Comey in

---

[9] https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation.

[10] https://www.gpo.gov/fdsys/pkg/DCPD-201700325/pdf/DCPD-201700325.pdf.

[11] https://www.nbcnews.com/politics/donald-trump/trump-says-he-didn-t-fire-comey-because-russia-contradicting-n878836.

testimony before the House Permanent Select Committee on Intelligence on March 20, 2017,"

including "any links and/or coordination between the Russian government and individuals

associated with the campaign of President Donald Trump"; "any matters that arose or may arise

directly from the investigation"; and "any other matters within the scope of 28 C.F.R. § 600.4(a)."

Ex. 1 ¶ (b). Mr. Rosenstein also authorized Mr. Mueller "to prosecute federal crimes arising from

the investigation of these matters" where "it is necessary and appropriate[.]" *Id.* ¶ (c).

    Over the course of Mr. Mueller's investigation, the Special Counsel brought criminal

charges against 34 individuals and three organizations. U.S. Dep't of Justice, *Special Counsel's*

*Office* (Jan. 25, 2019).[12] These include:

- Former National Security Adviser Michael Flynn, who pleaded guilty to making false

  statements to the FBI, Plea Agreement, *United States v. Flynn*, No. 17-232 (D.D.C.

  Dec. 1, 2017);[13]

- Former Trump campaign manager Paul Manafort, who was convicted of multiple

  counts of tax fraud and bank fraud, U.S. Dep't of Justice, *Special Counsel's Office*,

  *supra*, and pleaded guilty to conspiracy against the United States and other charges,

  Plea Agreement, *United States v. Manafort*, No. 17-201 (D.D.C. Sep. 14, 2018);[14]

- Former Trump deputy campaign manager Rick Gates, who pleaded guilty to

  conspiracy against the United States and making a false statement to the FBI, Plea

  Agreement, *United States v. Gates*, No. 17-201 (D.D.C. Feb. 23, 2018);[15]

---

[12] https://www.justice.gov/sco.

[13] https://www.justice.gov/file/1015121/download.

[14] https://www.justice.gov/file/1094151/download.

[15] https://www.justice.gov/file/1038801/download.

- Former Trump campaign foreign policy adviser George Papadopolous, who pleaded guilty to making false statements to the FBI, Plea Agreement, *United States v. Papadopolous*, No. 17-182 (D.D.C. Oct. 5, 2017);[16]

- Former Trump personal attorney Michael Cohen, who pleaded guilty to making false statements to Congress, Plea Agreement, *United States v. Cohen*, No. 18-850 (S.D.N.Y. Nov. 29, 2018);[17]

- Former Trump campaign advisor Roger Stone, who was indicted on charges of obstruction of justice, making false statements to Congress, and witness tampering, Indictment, *United States v. Stone*, No. 19-18 (D.D.C. Jan. 24, 2019);[18]

- The Internet Research Agency, Concord Management and Consulting LLC, Concord Catering, and thirteen Russian nationals, who are charged with conspiracy against the United States and related offenses for flooding social media platforms with fraudulent content to interfere with U.S. political processes, Indictment, *United States v. Internet Research Agency LLC,* No. 18-32 (D.D.C. Feb. 16, 2018);[19] and

- Twelve other Russian nationals, who are charged with conspiracy to commit computer crimes and other offenses for hacking Democratic Party computer networks and email accounts linked to the Clinton campaign, Indictment, *United States v. Netyksho*, No. 18-215 (D.D.C. July 13, 2018).[20]

---

[16] https://www.justice.gov/file/1007341/download.

[17] https://www.justice.gov/file/1115566/download.

[18] https://www.justice.gov/file/1124706/download.

[19] https://www.justice.gov/file/1035477/download.

[20] https://www.justice.gov/file/1080281/download.

On November 7, 2018, Attorney General Sessions resigned from office. Letter from Jefferson B. Sessions III, Att'y Gen., to Donald J. Trump, President (Nov. 7, 2018).[21] President Trump designated Matthew G. Whitaker, Chief of Staff to the Attorney General, to serve as Acting Attorney General. Memorandum from Steven A. Engel, Asst. Att'y Gen., to Emmet T. Flood, Counsel to the President, at 1 (Nov. 14, 2018).[22] Although Mr. Whitaker had been a prominent critic of Mr. Mueller's probe prior to assuming office, Adam Goldman & Edward Wong, *Trump Installs a Critic of the Mueller Investigation to Oversee It*, N.Y. Times (Nov. 7, 2018),[23] Whitaker "decided not to recuse himself from the Special Counsel investigation." Letter from Stephen E. Boyd, Asst. Att'y Gen., to Sen. Mitch McConnell & Sen. Charles E. Schumer at 2 (Dec. 20, 2018).[24]

In December 2018, President Trump nominated former Attorney General William P. Barr to serve again as Attorney General. Six months earlier, Mr. Barr had sent a memo to senior DOJ officials in which Barr strongly criticized the direction of the Special Counsel investigation and stated that Mr. Mueller's "obstruction theory" concerning President Trump's firing of Director Comey "should be rejected[.]" Memorandum from William P. Barr to Rod Rosenstein, Deputy Attorney General (June 8, 2018).[25] Mr. Barr was confirmed by the Senate as Attorney General on February 14, 2019. *Roll Call Vote 116th Congress - 1st Session*, U.S. Senate (Feb. 14, 2019).[26]

---

[21] https://int.nyt.com/data/documenthelper/475-jeff-sessions-letter-offering/optimized/full.pdf.

[22] https://www.justice.gov/olc/page/file/1110881/download.

[23] https://www.nytimes.com/2018/11/07/us/politics/whitaker-mueller-trump.html.

[24] https://int.nyt.com/data/documenthelper/551-senate-letter-re-acting-ag-eth/2ae5d0739b6be8f2ec12/optimized/full.pdf.

[25] https://int.nyt.com/data/documenthelper/549-june-2018-barr-memo-to-doj-mue/b4c05e39318dd2d136b3/optimized/full.pdf.

[26] https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=116&session=1&vote=00024.

**III.    The Mueller Report and Other Special Counsel Records**

On March 22, 2019, Attorney General Barr officially confirmed that the DOJ was in possession of "a 'confidential report explaining the prosecution or declination decisions' [Special Counsel Mueller] has reached, as required by 28 C.F.R. § 600.8(c)." Ex. 5, Letter from William P. Barr, Attorney Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, et al. at 1 (Mar. 22, 2019). This document, formally titled "Report on the Investigation into Russian Interference in the 2016 Presidential Election," Ex. 6 at 1, is widely referred to as the "Mueller Report." On March 24, 2019, Attorney General Barr sent a four-page letter to Congress broadly summarizing certain aspects of the Mueller Report. *Id.* However, the full report remains undisclosed. *See* Ex. 7, Letter from William P. Barr, Attorney Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, & Jerrold Nadler, Chairman, House Comm. on the Judiciary (Mar. 29, 2019).

There are several legal authorities under which the Special Counsel or Attorney General may issue a report or otherwise disclose information concerning the Special Counsel's investigation. First, as noted, the Special Counsel is required to provide the Attorney General with a report at the conclusion of the investigation under 28 C.F.R. § 600.8(c):

> **(c) Closing documentation.** At the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel.

Second, under 28 C.F.R. § 600.8(a)(2), the Special Counsel is required to provide annual status reports to the Attorney General:

> **(2)** Thereafter, 90 days before the beginning of each fiscal year, the Special Counsel shall report to the Attorney General the status of the investigation, and provide a budget request for the following year. The Attorney General shall determine whether the investigation should continue and, if so, establish the budget for the next year.

Third, under 28 C.F.R. § 600.7(b), the Attorney General may request an explanation for any investigative or prosecutorial step taken by the Special Counsel:

> **(b)** The Special Counsel shall not be subject to the day-to-day supervision of any official of the Department. However, the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued. In conducting that review, the Attorney General will give great weight to the views of the Special Counsel. If the Attorney General concludes that a proposed action by a Special Counsel should not be pursued, the Attorney General shall notify Congress as specified in § 600.9(a)(3).

Fourth, under 28 C.F.R. § 600.9(a), the Attorney General is required to notify certain members of Congress of key developments in the Special Counsel's investigation:

> **(a)** The Attorney General will notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress, with an explanation for each action —
>
> > **(1)** Upon appointing a Special Counsel;
> >
> > **(2)** Upon removing any Special Counsel; and
> >
> > **(3)** Upon conclusion of the Special Counsels investigation, including, to the extent consistent with applicable law, a description and explanation of instances (if any) in which the Attorney General concluded that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued.

Fifth, under 28 C.F.R. § 600.4(c), the Special Counsel may take "necessary action" to pursue penalties "outside the criminal justice system" in consultation with the Attorney General:

> **(c) Civil and administrative jurisdiction.** If in the course of his or her investigation the Special Counsel determines that administrative remedies, civil sanctions or other governmental action outside the criminal justice system might be appropriate, he or she shall consult with the Attorney General with respect to the appropriate component to take any necessary action. A Special Counsel shall not have civil or administrative authority unless specifically granted such jurisdiction by the Attorney General.

Sixth, the Special Counsel may use its "full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney," 28 C.F.R. § 600.6, to

transmit "report[s]," "recommendation[s]," or other "compilation[s] of information" to Congress via the grand jury process. *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219, 1221, 1226 (D.D.C. 1974), *aff'd sub nom. Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974). This procedure was used by Special Counsel Leon Jaworski in 1974 to convey "material in the Grand Jury's possession having a material bearing on matters within the primary jurisdiction of the United States House of Representatives Committee on the Judiciary relating to questions of impeachment." Report & Recommendation at 1, *In re Report & Recommendation*, 370 F. Supp. at 1221, 1226 (D.D.C. 1974) (capitalization altered).[27]

Finally, the Special Counsel and/or Attorney General may rely on their powers under 28 C.F.R. §§ 600.1 *et seq.* (and on other legal authorities) to disclose developments, evidence, findings, decisions, actions, or planned actions from the Special Counsel's investigation.

## IV.   EPIC's FOIA Request

On November 5, 2018, EPIC submitted a FOIA Request via fax to the DOJ's Office of Information Policy. Ex. 2, FOIA Request from EPIC to Douglas Hibbard, Chief, Initial Request Staff, Office of Info. Policy, Dep't of Justice (Nov. 5, 2018). EPIC, in its FOIA Request, sought fourteen categories of records related to the Special Counsel's investigation into Russian interference in the 2016 U.S. presidential election:

   (1)(a)    All "report[s]" and "closing documentation" prepared under 28 C.F.R. § 600.8(c), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

    (b)    All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" or "closing documentation" under 28 C.F.R. § 600.8(c);

---

[27] https://www.archives.gov/files/research/investigations/watergate/roadmap/docid-70105890.pdf.

(2)(a)   All "report[s]" concerning "the status of the investigation" prepared under 28 C.F.R. § 600.8(a)(2), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" concerning "the status of the investigation" under 28 C.F.R. § 600.8(a)(2);

(3)(a)   All records "expla[ining] . . . any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "explanation for any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b);

(4)(a)   All records prepared under 28 C.F.R. § 600.9(a) to "notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress" of a development in the Special Counsel investigation, whether or not such records were actually transmitted to any member of Congress;

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned notification under 28 C.F.R. § 600.9(a);

(5)(a)   All referrals by the Special Counsel, Attorney General, or Acting Attorney General for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c), whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned referral for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c);

(6)(a)   All "report[s]," "recommendation[s]," and other "compilation[s] of information" prepared for the eventual consideration of one or more members of Congress, whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report, recommendation, or compilation of the type described in Category (6)(a) of this request;

13

(7)(a)     All other reports summarizing or describing, for one or more persons outside of the Special Counsel's Office, (i) any of the Special Counsel's evidence, findings, decisions, actions, or planned actions, or (ii) any developments in the Special Counsel investigation; and

(b)     All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report of the type described in Category (7)(a) of this request.

Ex. 2 at 1–3 (some internal citations omitted). EPIC excluded from its FOIA Request records "which have already been disclosed to the public in their complete and unredacted form (i) in the course of an open judicial proceeding; (ii) available at https://www.justice.gov/sco; or (iii) available at https://www.justice.gov/news." Ex. 2 at 3.

EPIC sought expedited processing of its FOIA Request and explained how the request qualifies for expedition under two separate provisions of the DOJ's FOIA regulations. *Id.* at 11–12. First, EPIC explained that it is entitled to expedition of its FOIA Request under 28 C.F.R. § 16.5(e)(1)(ii) because "there is an 'urgency to inform the public about an actual or alleged federal government activity" and because EPIC "is primarily engaged in disseminating information." Ex. 2 at 11 (quoting 28 C.F.R. § 16.5(e)(1)(ii)). EPIC cited to the "voluminous press coverage of, and immense public interest in" these government activities, noting that "Americans are deeply concerned about the scope of Russian interference in the 2016 presidential election; the U.S. government's response to that interference; the involvement of particular individuals in that interference, including possibly President Trump; the susceptibility of U.S. election systems and democratic institutions to future foreign interference; and the integrity of the Special Counsel investigation itself." Ex. 2 at 11–12 (citations omitted). EPIC also stated that it is "an organization 'primarily engaged in disseminating information'"—and is thereby entitled to expedited processing of its FOIA Request—because EPIC qualifies as "'a representative of the news media.'" *Id.* (quoting *EPIC v. DOD*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003)).

Second, EPIC explained that it is entitled to expedition of its FOIA Request under 28 C.F.R. § 16.5(e)(1)(iv) because "EPIC's request involves '[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence.'" Ex. 1 at 12 (quoting 28 C.F.R. § 16.5(e)(1)(iv)). EPIC stated that "[i]n addition to the extraordinary media attention given to the work of the Special Counsel, the requested records concern the potential involvement of the President in a foreign campaign to influence an election that he won; the possible obstruction of justice by the President while in office; the federal government's capacity to defend U.S. election systems and democratic institutions against foreign attacks; and the discharge of a high-profile Special Counsel investigation." Ex. 2 at 12 (citations omitted).

Finally, EPIC explained that it is "entitled to receive the requested record[s] with only duplication fees assessed," Ex. 2 at 13 (citing 5 U.S.C. § 552(a)(4)(A)(ii)(II)), because EPIC is "a representative of the news media." *EPIC v. DOD*, 241 F. Supp. 2d at 11. EPIC stated that "'any duplication fees should also be waived because disclosure of the requested information . . . 'is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.'" Ex. 2 at 13 (quoting 28 C.F.R. § 16.10(k)(1)). EPIC described in detail how its FOIA Request satisfies the DOJ's three-factor test for a waiver of duplication fees. Ex. 2 at 13–14.

**V.      The DOJ's Failure to Expeditiously Search for and Release the Requested Records**

By letter dated November 15, 2018, the DOJ's Office of Information Policy acknowledged receipt of EPIC's FOIA Request "on behalf of the Special Counsel's Office." Ex. 3, Letter from Vanessa R. Brinkmann, Senior Counsel, Office of Info. Policy, Dep't of Justice, to Enid Zhou, EPIC Open Government Counsel, at 1 (Nov. 15, 2018). In the letter, the DOJ

admitted that it had "not yet completed a search to determine whether there are records within the scope of [EPIC's] request." *Id.* at 1.

The DOJ also stated that it was denying EPIC's request for expedited processing under both 28 C.F.R. § 16.5(e)(1)(ii) and 28 C.F.R. § 16.5(e)(1)(iv). Ex. 3 at 1. The DOJ claimed that it could not "identify a particular urgency to inform the public about an actual or alleged federal government activity [under 28 C.F.R. § 16.5(e)(1)(ii)] beyond the public's right to know about government activities generally." Ex. 3 at 1. To date, the DOJ has failed to conduct a search for records responsive to EPIC's FOIA Request or make a determination on EPIC's FOIA Request.

On December 21, 2018, EPIC submitted a FOIA Appeal to the Director of the Office of Information Policy concerning the DOJ's denial of expedited processing. Ex. 4, FOIA Appeal from EPIC to Director, Office of Info. Policy, Dep't of Justice (Dec. 21, 2018). EPIC reiterated the grounds for expedition set forth in EPIC's original FOIA Request. *Id.* at 4–7. To date, the DOJ has failed to make a determination on EPIC's FOIA Appeal.

On March 22, 2019, EPIC filed the instant FOIA lawsuit against the DOJ. Complaint, ECF No. 1. EPIC stated three claims for relief. First, EPIC charged that the DOJ had unlawfully failed to make a determination on EPIC's FOIA Request and FOIA Appeal within the timeframes set forth in 5 U.S.C. § 552(a)(6). Compl. ¶¶ 66–70. Second, EPIC charged that the DOJ had unlawfully denied expedited processing of EPIC's FOIA Request in violation of 5 U.S.C. § 552(a)(6)(E). Compl. ¶¶ 71–75. Third, EPIC charged that the DOJ had unlawfully withheld records responsive to EPIC's FOIA Request. Compl. ¶¶ 76–79.

## VI.   The Freedom of Information Act and Its Progeny

The FOIA's purpose is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 352, 261 (1976). Congress later passed

the Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, 110 Stat.

3048 (1996), that, *inter alia*, required that agencies process certain categories of documents on an

expedited basis. *Id.* § 8, 110 Stat. 3052 (codified at 5 U.S.C. § 552(a)(6)(E)). Typically, a FOIA

Request must be processed within twenty business days. 5 U.S.C. § 552(a)(6)(A)(i). However,

expedited processing is to be granted in cases where either the "failure to obtain requested records

. . . could reasonably be expected to pose an imminent threat to the life or physical safety of an

individual," or "with respect to a request made by a person primarily engaged in disseminating

information" there is an "urgency to inform the public concerning actual or alleged Federal

Government activity." 5 U.S.C. § 552(a)(6)(E)(v). In these cases, an agency must process the

FOIA request "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii). "Where an agency fails to

comply with the twenty-day deadline applicable to a standard FOIA request, the agency

'presumptively also fails to process an expedited request 'as soon as practicable." *EPIC v. DOJ*,

416 F. Supp. 2d 30, 39 (D.D.C. 2006).

## ARGUMENT

EPIC hereby moves the Court to issue preliminary injunction and order the Justice

Department to (1) grant EPIC's request for expedited processing, (2) immediately process and

make a determination on EPIC's FOIA Request, and (3) produce responsive records "as soon as

practicable." 5 U.S.C. § 552(a)(6)(E)(iii). This Court has jurisdiction under the FOIA to award

such relief. 5 U.S.C. § 552(a)(4)(B). And EPIC is entitled to a preliminary injunction because

EPIC is likely to succeed on the merits of its claims; because EPIC will suffer irreparable harm if

the DOJ is permitted to further defer action on EPIC's FOIA Request; and because the balance of

the equities and public interest favor the DOJ's expeditious processing of EPIC's request. *See*

*Winter v. NRDC*, 555 U.S. 7, 20 (2008). If there ever was a FOIA case that presented the

extraordinary circumstances to justify preliminary injunctive relief, the public release of the

Mueller Report is that case.

## I.      THE COURT HAS JURISDICTION TO GRANT THE REQUESTED RELIEF

The FOIA grants this Court jurisdiction to consider this matter and to grant appropriate

relief:

> On complaint, the district court of the United States . . . in the District of Columbia,
> has jurisdiction to enjoin the agency from withholding agency records and to order
> the production of any agency records improperly withheld from the complainant. In
> such a case the court shall determine the matter de novo.

5 U.S.C. § 552(a)(4)(B); *see also Al-Fayed v. CIA*, 254 F.3d 300, 304 (D.D.C. 2001). The statute

further provides:

> Any person making a request to any agency for records . . . shall be deemed to have
> exhausted his administrative remedies with respect to such request if the agency fails
> to comply with the applicable time limit provisions of this paragraph.

5 U.S.C. § 552(a)(6)(C); *see also Oglesby v. Dep't of the Army*, 920 F.2d 57, 62 (D.C. Cir. 1990)

("If the agency has not responded within the statutory time limits, then . . .  the requester may

bring suit."). "[T]he FOIA imposes no limits on courts' equitable powers in enforcing its terms

and unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the

FOIA, and the courts have a duty to prevent such abuses." *EPIC v. DOJ,* 416 F. Supp. 2d at 35

(citing *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)) (internal citations

omitted).

Here, the agency has failed to issue a determination on EPIC's FOIA Request within the

time limit of twenty working days established by 5 U.S.C. § 552(a)(6)(A)(i). The agency has also

failed to issue a determination on EPIC's appeal of the agency's denial of expedited processing

within the twenty-day limit of 5 U.S.C. § 552(a)(6)(A)(ii) and § 552(a)(6)(E)(ii)(II). All

applicable administrative remedies have therefore been exhausted, and EPIC's claim is ripe for adjudication.

## II.      EPIC IS ENTITLED TO A PRELIMINARY INJUNCTION

EPIC is entitled to a preliminary injunction because the DOJ's unlawful refusal to expeditiously process EPIC's FOIA Request causes EPIC irreparable harm and conflicts with the public interest. A plaintiff is entitled to a preliminary injunction upon demonstrating that "[1] that [the plaintiff] is likely to succeed on the merits, [2] that [the plaintiff] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [the plaintiff's] favor, and [4] that an injunction is in the public interest." *Ahuruonye v. U.S. Dep't of Interior*, 312 F. Supp. 3d 1, 9 (D.D.C. 2018) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). The final two elements of the preliminary injunction test "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). EPIC readily satisfies each of these factors.

First, EPIC is likely to succeed on its claims under the FOIA. The DOJ has violated the statutory deadlines set forth in 5 U.S.C. § 552(a)(6) by failing to make a determination on EPIC's FOIA Request and FOIA Appeal within twenty working days; the DOJ has unlawfully refused to conduct expedited processing of EPIC's FOIA Request notwithstanding the extraordinary public interest and urgency in disclosure of the requested records; and the DOJ has unlawfully withheld agency records.

Second, absent an injunction, EPIC will suffer irreparable harm from the DOJ's refusal to expeditiously process and make a determination on EPIC's FOIA Request. EPIC has a right to timely disclosure of information relevant to the ongoing debate over Russian election interference and the Special Counsel's investigation—a right that cannot be vindicated after the fact.

Third, the balance of the equities favors relief because EPIC has a strong interest in the expeditious processing of its FOIA Request, whereas other parties will bear no undue burden. The DOJ can hardly claim that compliance with its statutory obligation to expeditiously process a qualifying FOIA Request constitutes a hardship. Moreover, granting an injunction would be in the public interest. The FOIA was enacted to promote government transparency and to ensure that persons are able to participate in public debates in an informed manner. Absent expedited processing of EPIC's FOIA Request, a fully informed public debate will be impossible.

For these reasons, this Court should grant EPIC's motion and order the DOJ to make an immediate determination on EPIC's FOIA request.

## A.      EPIC is likely to succeed on the merits of its claims.

EPIC will almost certainly succeed on the merits of the three claims alleged in EPIC's Complaint. Thus, EPIC satisfies the first prong of the preliminary injunction test.

*First*, it is beyond dispute that the DOJ has violated the statutory processing deadlines set forth in 5 U.S.C. § 552(a)(6). Compl. ¶¶ 66–70. EPIC submitted its FOIA Request by fax on November 5, 2018. Ex. 2 at 1. Ten days later, the DOJ acknowledged that it had received EPIC's FOIA Request on November 5 and confirmed that the agency had "initiated" processing. Ex. 3 at 1–2. Today—March 29, 2019—is the 98th working day since the DOJ received EPIC's FOIA Request, yet the agency has failed to make a determination. The DOJ has therefore violated the deadlines set forth in 5 U.S.C. § 552(a)(6)(A)(i) (requiring an agency to make a determination within 20 working days) and 5 U.S.C. § 552(a)(6)(B)(i) (permitting an agency 10 additional working days to make a determination in "unusual circumstances").

The DOJ has also violated the statutory deadline for issuing a determination on EPIC's FOIA Appeal concerning expedited processing. EPIC submitted its FOIA Appeal by mail on December 21, 2018. Today—March 29, 2019—is approximately the 64th working day since the

DOJ received EPIC's FOIA Appeal, yet the DOJ has failed to make a determination. The DOJ

has therefore violated the deadline set forth in 5 U.S.C. § 552(a)(6)(A)(ii) (requiring an agency to

make a determination on "any appeal" within 20 working days) and 5 U.S.C. §

552(a)(6)(E)(ii)(II) (requiring "expeditious consideration of administrative appeals" concerning

expedited processing). Accordingly, EPIC is certain to prevail on its claim that the DOJ has failed

to comply with the FOIA's statutory deadlines.

*Second*, EPIC is likely to succeed on its claim that the DOJ unlawfully refused to process

EPIC's FOIA Request on an expedited basis. Compl. ¶¶ 71–75. Under 5 U.S.C. § 552(a)(6)(E)(i),

an agency must "provid[e] for expedited processing of requests for records— (I) in cases in which

the person requesting the records demonstrates a compelling need; and (II) in other cases

determined by the agency." A "compelling need" includes an "urgency to inform the public

concerning actual or alleged Federal Government activity" when the request is "made by a person

primarily engaged in disseminating information." 5 U.S.C. § 552(a)(6)(E)(v)(II); *accord* 28

C.F.R. § 16.5(e)(1)(ii). The DOJ also requires that FOIA requests "be processed on an expedited

basis whenever it is determined that they involve . . . [a] matter of widespread and exceptional

media interest in which there exist possible questions about the government's integrity that affect

public confidence." 28 C.F.R. §§ 16.5(e)(1), (e)(1)(iv). Although judicial review of an expedited

processing determination "shall be based on the record before the agency at the time of the

determination," 5 U.S.C. § 552(a)(6)(E)(iii), the Court must conduct its review de novo. *Al-Fayed*

*v. CIA*, 254 F.3d 300, 305 (D.C. Cir. 2001).

The administrative record that was before the DOJ—i.e., EPIC's FOIA Request—readily

demonstrates EPIC's entitlement to expedited processing. Specifically, EPIC is entitled to

expedited processing because it is an organization primarily engaged in disseminating information

seeking records that are urgently needed to inform the public about federal government activities.

*See* 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(1)(ii). As EPIC explained in its FOIA

Request, EPIC has previously been held to "satisf[y] the definition of 'representative of the news

media.'" Ex. 2 at 12 (quoting *EPIC v. DOD*, 241 F. Supp. 2d at 5). Accordingly, EPIC—the

*Electronic Privacy Information Center*—is primarily engaged in disseminating information.

The DOJ did not dispute that EPIC is a qualifying entity under 28 C.F.R. § 16.5(e)(1)(ii).

Instead, the agency rested its denial of expedited processing on the view that there was no

"particular urgency to inform the public about an actual or alleged federal government activity

beyond the public's right to know about government activities generally." Ex. 3 at 1. Yet EPIC's

FOIA Request provided abundant evidence to the contrary. Citing to the DOJ's Special Counsel

appointment order, public polling data, and exhaustive coverage by major news organizations,

EPIC explained:

> The actual federal government activities are (1) the Special Counsel's investigation of Russian interference in the 2016 U.S. presidential election, and (2) the U.S. government's response to Russian election interference, as reflected in the requested records of the Special Counsel. The requested records also pertain to President Trump's alleged obstruction of justice while in office.
>
> The urgency to inform the public about these government activities is clear from the voluminous press coverage of, and immense public interest in, Mr. Mueller's investigation and findings. Americans are deeply concerned about the scope of Russian interference in the 2016 presidential election; the U.S. government's response to that interference; the involvement of particular individuals in that interference, including possibly President Trump; the susceptibility of U.S. election systems and democratic institutions to future foreign interference; and the integrity of the Special Counsel investigation itself. The Mueller Report(s) and supporting materials are critical to the public's understanding of these issues.

Ex. 2 at 11–12 (internal citations omitted).

These facts unquestionably establish an urgency to inform the public about actual and

alleged government activities. Absent the records sought in EPIC's FOIA Request, the public will

be left with only a limited understanding of Russian interference in the 2016 presidential election

and the federal government's ability to counteract it—even as the 2020 election cycle gets underway. Moreover, "if production is unduly delayed, both [the plaintiff] and the public at large will be 'precluded . . . from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of' a high-profile government action"—namely, President Trump's firing of Director Comey and other acts by the President that may constitute obstruction of justice. *Protect Democracy Project, Inc. v. DOD*, 263 F. Supp. 3d 293, 299 (D.D.C. 2017). "Being closed off from such a debate is itself a harm in an open democracy." *Id.* at 300. The requested records are also vital to the public's understanding of the Special Counsel investigation itself, an "actual . . . government activity" that has routinely occupied the front pages of newspapers for nearly two years. 5 U.S.C. § 552(a)(6)(E)(v)(II). The public has a powerful interest in obtaining a full account of Mr. Mueller's investigation *now*, while the matter is still fresh—not months or years from now, when such "stale information [will be] of little value." *Payne Enters.*, 837 F.2d at 494. Thus, EPIC is entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(ii).

EPIC is also entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv) because the requested records concern a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." As EPIC explained in its FOIA Request:

> In addition to the extraordinary media attention given to the work of the Special Counsel, the requested records concern the potential involvement of the President in a foreign campaign to influence an election that he won; the possible obstruction of justice by the President while in office; the federal government's capacity to defend U.S. election systems and democratic institutions against foreign attacks; and the discharge of a high-profile Special Counsel investigation. These matters unquestionably bear on the integrity of the government and affect public confidence.

Ex. 2 at 12 (internal citations omitted). Among other sources, EPIC cited to a search results page from Google News identifying **<u>941,000 news articles</u>** containing the terms "Robert Mueller" and

"Russia." *Id.* Indeed, EPIC struggles to name an agency record that has been the subject of more "widespread and exceptional media interest" than the documents sought in this case. 28 C.F.R. § 16.5(e)(1)(iv). And the relationship of these records to "questions about the government's integrity that affect public confidence" is both indisputable and clearly articulated in EPIC's FOIA Request. *Id.*

For the DOJ to deny processing under 28 C.F.R. § 16.5(e)(1)(iv)—particularly without any substantive explanation—is therefore unlawful. *E.g.*, *Edmonds v. FBI*, No. CIV.A. 02-1294 (ESH), 2002 WL 32539613, at *3 (D.D.C. Dec. 3, 2002) (ordering expedited processing where the subject matter of plaintiff's request had "received extensive media coverage, including numerous newspaper articles in the printed press—*Associated Press*, *The Washington Post*, *Chicago Tribune*—and on TV"); *Elec. Frontier Found. v. DOJ*, 563 F. Supp. 2d 188, 189, 191 (D.D.C. 2008) (noting the DOJ's conclusion that a FOIA request "concerning the FBI's Investigative Data Warehouse" satisfied 28 C.F.R. § 16.5(e)(1)(iv)). "As DOJ's 'media specialists,' [the Office of Public Affairs] cannot simply turn a blind eye to the flurry of media attention" surrounding the records EPIC seeks. *ACLU v. DOJ*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004) (quoting 63 Fed. Reg. at 29,592). Thus, EPIC is likely to succeed on its claim that the DOJ unlawfully denied expedited processing of EPIC's FOIA Request.

*Third*, EPIC is likely to succeed on its claim that the DOJ has unlawfully withheld records responsive to EPIC's FOIA Request. Compl. ¶¶ 76–79. EPIC's FOIA Request reasonably described the records EPIC sought. Specifically, EPIC identified fourteen categories of records related to the Special Counsel's investigation into Russian election interference. Ex. 2 at 1–3. Each of those fourteen categories is defined by a type of disclosure the Special Counsel or Attorney General is authorized to make under 28 C.F.R. §§ 600.1 *et seq.* and related legal

authorities. The documents generated under these legal authorities are agency records subject to

the FOIA. *See DOJ v. Tax Analysts*, 492 U.S. 136, 144–45 (1989) (defining "agency records" as

materials "create[d] or obtain[ed]" by an agency and within an agency's control at the time the

request is made). In at least two instances, the DOJ has unequivocally confirmed the existence of

records responsive to EPIC's FOIA Request. *See* Ex. 5 at 1 ("I write to notify you pursuant to 28

C.F.R. § 600.9(a)(3) that Special Counsel Robert S. Mueller III has concluded his investigation of

Russian interference in the 2016 election and related matters."); Ex. 6 at 1 ("On Friday [March

22, 2019], the Special counsel submitted to me a 'confidential report explaining the prosecution

or declination decisions' he has reached, as required by 28 C.F.R. § 600.8(c)."). Nevertheless, the

DOJ has unlawfully failed to "make the [requested] records"—or any portion thereof—"promptly

available" in response to EPIC's FOIA Request. 5 U.S.C. § 552(a)(3)(A). EPIC is therefore likely

to succeed on its unlawful withholding claim.

Because EPIC will succeed on each of its three FOIA claims, EPIC has demonstrated a

likelihood of success on the merits sufficient for a preliminary injunction.

**B.      EPIC will suffer irreparable harm if relief is not granted.**

EPIC will suffer irreparable harm absent an order directing the DOJ to immediately

process and issue a determination on EPIC's FOIA Request. As the D.C. Circuit has emphasized,

"stale information is of little value[.]" *Judicial Watch, Inc. v. DHS*, 895 F.3d 770, 778 (D.C. Cir.

2018) (quoting *Payne Enters.*, 837 F.2d at 494); *see also Byrd v. EPA*, 174 F.3d 239, 244 (D.C.

Cir. 1999) ("Byrd's injury, however, resulted from EPA's failure to furnish him with the

documents until long after they would have been of any use to him."). Thus, "the non-disclosure

of information to which a plaintiff is entitled, under certain circumstances itself constitutes an

irreparable harm; specifically, where the information is highly relevant to an ongoing and highly

public matter." *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d

297, 319 (D.D.C. 2017), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017); *see also*

*Washington Post v. DHS*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Because the urgency with

which the plaintiff makes its FOIA request is predicated on a matter of current national debate,

due to the impending election, a likelihood for irreparable harm exists if the plaintiff's FOIA

request does not receive expedited treatment.").

It is beyond question that the records EPIC seeks are "highly relevant to an ongoing and

highly public matter." *EPIC v. Presidential Advisory Comm'n*, 266 F. Supp. 3d at 319. As noted,

the public and the news media have focused extraordinary attention on Russian election

interference; the Special Counsel investigation into such interference; the potential involvement

of the President in a foreign campaign to influence the 2016 election; and possible obstruction of

justice by the President while in office. The national debate over these subjects is playing out

*right now*, in the immediate aftermath of the Special Counsel's investigation. *See, e.g.*, *The*

*Debate About the Mueller Report*, N.Y. Times (Mar. 26, 2019);[28] *The Mueller Report's Fallout*,

Wash. Post (Mar. 26, 2019).[29] Yet EPIC, like every other member of the public, has been denied

access to the records most critical to that debate: the Mueller Report and related Special Counsel

documents. Until those records are disclosed, EPIC and the public are left to rely on the Attorney

General's four-page summary of the Mueller Report—a letter that has come under widespread

criticism for its selective presentation of information. *See, e.g.*, Randall D. Eliason, *William Barr*

*Has Some Explaining to Do*, Wash. Post (Mar. 27, 2019);[30] Andrew P. Napolitano, *Beyond the*

---

[28] https://www.nytimes.com/2019/03/26/opinion/letters/trump-mueller-barr.html.

[29] https://www.washingtonpost.com/opinions/the-mueller-reports-fallout/2019/03/26/af87b926-4f31-11e9-bdb7-44f948cc0605_story.html.

[30] https://www.washingtonpost.com/opinions/2019/03/27/william-barr-has-some-explaining-do/.

*Barr Revelation*, Wash. Times (Mar. 27, 2019).[31] Thus, absent the requested preliminary

injunction, EPIC will "be precluded . . . from obtaining in a timely fashion information vital to the

current and ongoing debate" concerning Russian election interference and the Special Counsel

investigation. *EPIC v. DOJ*, 416 F. Supp. 2d at 41. This harm to EPIC will be irreparable, as

"[o]ngoing public and congressional debates about issues of vital national importance cannot be

restarted or wound back.'" *Protect Democracy Project*, 263 F. Supp. 3d at 300 (quoting *Elec.*

*Frontier Found. v. Office of Dir. of Nat'l Intelligence*, 2007 WL 4208311, at *7 (N.D. Cal. Nov.

27, 2007)).

The records EPIC seeks are also highly relevant to specific events and proceedings that

are ongoing or imminent. First, the Mueller Report and related Special Counsel records would

provide EPIC with essential context concerning the still-active criminal cases brought by the

Special Counsel's office. *See, e.g.*, *United States v. Stone*, No. 19-18 (D.D.C. Jan. 24, 2019);

*United States v. Netyksho*, No. 18-215 (D.D.C. July 13, 2018); *United States v. Internet Res.*

*Agency*, No. 18-32 (D.D.C. Feb. 16, 2018).

Second, Congress is moving forward with its own investigations and oversight activities

concerning Russian election interference and the Special Counsel probe. *See, e.g.*, Todd Ruger,

*Lindsey Graham Wants Attorney General to Testify on Mueller Report*, Roll Call (Mar. 25, 2019)

("Senate Judiciary Chairman Lindsey Graham plans to call Attorney General William Barr to

testify in a public hearing about the Russia investigation and his conclusions that President

Donald Trump did not obstruct justice.");[32] Press Release, Rep. Jerrold Nadler et al., House

Committee Chairs Demand DOJ Release Full Mueller Report & Underlying Evidence to

---

[31] https://www.washingtontimes.com/news/2019/mar/27/beyond-the-barr-revelation/.

[32] https://www.rollcall.com/news/graham-wants-attorney-general-to-testify-on-mueller-report.

Congress (Mar. 25, 2019) ("Each of our committees is currently engaged in oversight activities that go directly to the President's conduct, his attempts to interfere with federal and congressional investigations, his relationships and communications with the Russian government and other foreign powers, and/or other alleged instances of misconduct.").[33] In particular, the chairpersons of six U.S. House committees have demanded to see the Mueller Report in full by April 2, 2019. Press Release, Rep. Jerrold Nadler et al., *supra*. Public access to the Mueller Report and related records is necessary to ensure that EPIC can follow, evaluate, and provide expert input concerning these congressional proceedings.

Third, President Trump has called for an investigation of the persons responsible for the "illegal" Special Counsel probe. As President Trump told reporters on March 24, 2019: "To be honest, it's a shame that your President has had to go through this for—before I even got elected, it began. And it began illegally. And hopefully, somebody is going to look at the other side. This was an illegal takedown that failed. And hopefully, somebody is going to be looking at the other side." *Remarks by President Trump Before Air Force One Departure*, The White House (Mar. 24, 2019).[34] Access to the Mueller Report is vital to assessing the validity of the President's demand for an investigation—*before* any such investigation begins.

And fourth, the Mueller Report and related records are critical to the public's understanding of the election interference techniques used by Russia, techniques that may be deployed again in the 2020 presidential election. The first scheduled presidential primary debate is less than three months away, yet EPIC and the public still do not know the full scope of Russian election interference uncovered by the Special Counsel investigation. Allan Smith, *NBC*

---

[33] https://oversight.house.gov/news/press-releases/house-committee-chairs-demand-doj-release-full-mueller-report-underlying.

[34] https://www.whitehouse.gov/briefings-statements/remarks-president-trump-air-force-one-departure-7/.

*News: First Democratic debate set for Miami, June 26-27*, NBC News (Mar. 28, 2019).[35] Prompt

access to this information is needed to ensure that the democratic process is not undermined in the

current election cycle.

Finally, absent an injunction, EPIC's mission of educating the public about threats to the

U.S. political system will be irreparably harmed. Two years ago, EPIC launched the Democracy

and Cybersecurity Project as a response to Russian interference in the 2016 election. *See* EPIC,

*Democracy and Cybersecurity: Preserving Democratic Institutions* (Feb. 4, 2019).[36] Since then,

EPIC has regularly used the FOIA to educate the public about the susceptibility of U.S.

democratic institutions to foreign cyberattacks and has made clear the public interest in disclosure

of information about Russian election interference. Marc Rotenberg, *Americans Have a Right to*

*Know What Intel Community Knows on Russia*, The Hill (March 27, 2017).[37] In *EPIC v. FBI*,

EPIC obtained records revealing the FBI's failure to follow its own victim notification procedures

in response to Russian cyberattacks against U.S. officials and political organizations. *EPIC v.*

*FBI*, No. 1:17-CV-00121 (TNM), 2018 WL 2324084 (D.D.C. May 22, 2018). EPIC published

these records on its website, garnering extensive media coverage in the process. *See* EPIC, *EPIC*

*v. FBI* (Russian Hacking) (Feb. 28, 2019).[38] In *EPIC v. DHS*, EPIC has obtained records detailing

the Department of Homeland Security's response to Russian cyberattacks on election

infrastructure. *EPIC v. DHS*, No. 17-2047 (D.D.C. filed Oct. 4, 2017). EPIC continues to publish

new records from the case on its website for the public's benefit. EPIC, *EPIC v. DHS* (Jan. 31,

---

[35] https://www.nbcnews.com/politics/2020-election/nbc-news-first-democratic-debate-set-miami-june-26-27-
n988481.

[36] https://epic.org/democracy/.

[37] http://thehill.com/blogs/pundits-blog/the-administration/325862-americans-have-a-right-to-know-what-intel-
community.

[38] https://epic.org/foia/fbi/russianhacking/.

2019).[39] EPIC is uniquely situated to perform the same public education function with respect to the Mueller Report and related Special Counsel records. However, the DOJ's unlawful refusal to expeditiously process EPIC's FOIA Request prevents EPIC from sharing information with the public at a critical moment in the national discourse, thereby causing EPIC irreparable harm.

Thus, the failure to enforce EPIC's statutory right to expedited processing would result in irreparable harm to EPIC. *See EPIC v. DOJ*, 416 F. Supp. 2d at 40–41 ("[T]he statutory right to expedition in certain cases underlined Congress' recognition of the value in hastening release of certain information . . . . [T]he loss of that value constitutes a cognizable harm. As time is necessarily of the essence in cases like this such harm will likely be irreparable.") (internal citations and quotation marks omitted).

C.      **The balance of the equities and the public interest favor relief.**

The balance of the equities and the public interest favor entry of the preliminary injunction that EPIC seeks. EPIC and the public both have a compelling interest in ensuring the immediate processing of EPIC's FOIA Request, whereas no parties will be harmed by EPIC's proposed order.

For the reasons identified above, EPIC has powerful equities in the disclosure of the requested records. EPIC has a clear interest in obtaining information relevant to the ongoing national debate over Russian election interference and the Special Counsel investigation. EPIC also has an equitable interest in obtaining the requested records prior to key imminent events, such the conclusion of the criminal cases brought by the Special Counsel and Congress's investigatory response to the Mueller Report. Finally, EPIC has a compelling interest in ensuring the timely dissemination of the requested records to the public at large.

---

[39] https://epic.org/foia/dhs/cybersecurity/russian-interference/.

The DOJ, meanwhile, cannot claim to be burdened by a requirement to comply with its statutory obligations. "[T]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citing *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511–12 (D.C. Cir. 2016); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). To the contrary: "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.*

Nor will other FOIA requesters will be unduly affected if this Court orders the DOJ to make an immediate determination on EPIC's FOIA Request. The expedited processing system envisions that some requests will be prioritized over others. In amending the FOIA to include an expedited processing provision, Congress recognized that there was "value in hastening release of certain information." *EPIC v. DOJ*, 416 F. Supp. 2d at 39. And indeed, EPIC's FOIA Request demonstrates a "compelling need" for the information by showing an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(1)(ii). EPIC's FOIA Request also involves a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(1)(ii); 28 C.F.R. § 16.5(e)(1)(iv). Thus, prioritizing EPIC's request would simply be in keeping with the intent of the expedited processing provision and the DOJ's FOIA obligation to make a determination within the statutory deadlines.

Granting EPIC's preliminary injunction would also serve the public interest. An agency's compliance with a mandatory statutory regime such as FOIA is "presumptively always in the public interest." *Protect Democracy Project*, 263 F. Supp. 3d at 301. Moreover, in enacting the

FOIA, Congress recognized that the public must be able to participate in debates over issues of national importance in an informed and meaningful way. *Robbins*, 437 U.S. at 242 ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."). The information EPIC seeks is absolutely essential to permit vigorous, informed public debate over the scope of Russian interference in the 2016 presidential election; the U.S. government's response to that interference; the involvement of particular individuals in that interference, including possibly President Trump; the susceptibility of U.S. election systems and democratic institutions to future foreign interference; and the integrity of the Special Counsel investigation itself.

Indeed, poll after poll has shown overwhelming support for public disclosure of the records EPIC seeks. *See, e.g.*, Griffin Connolly, *Most Republicans Want to See the Full Mueller Report, New Poll Finds*, Roll Call (Mar. 27, 2019) (finding 56% support for full release of the Mueller Report among Republicans and 84% among Democrats);[40] Zack Budryk, *Poll: 84 Percent Want Mueller Report Made Public*, The Hill (Mar. 26, 2019) (finding 84% support for release of the Mueller Report);[41] Steven Shepard, *Poll: Majority Wants Mueller Report Released to the Public*, Politico (Mar. 27, 2019) (finding 68% support for release of the Mueller Report);[42] Jennifer Agiesta, *CNN Poll: Almost Everyone Wants a Public Report on Mueller's Findings*, CNN (Feb. 7, 2019) (finding 87% support for release of the Mueller Report).[43] Even President

---

[40] https://www.rollcall.com/news/most-republicans-want-to-see-full-mueller-report-poll-finds.

[41] https://thehill.com/homenews/news/435881-poll-84-percent-want-to-see-mueller-report.

[42] https://www.politico.com/story/2019/02/27/mueller-report-release-public-support-poll-1188068.

[43] https://www.cnn.com/2019/02/07/politics/cnn-poll-russia-mueller-reportrelease/index.html.

Trump has stated that he supports such a release. Vivian Salama & Kristina Peterson, *Trump Signals Support for Report's Release as Democrats Dispute 'Exoneration,'* Wall Street J. (Mar. 25, 2019).[44]

This Court has repeatedly recognized that information must be provided in a timely fashion, or else it becomes useless to a public debate over an urgent issue of national importance. The D.C. Circuit has rightly said that "[s]tale information is of little value." *Payne Enters., Inc.*, 837 F.2d at 494. So too here. Both EPIC and the public have a right to full accounting of Russian election interference and the Special Counsel's investigation—not simply a four-page cover letter. The equities thus weigh heavily in EPIC's favor, entitling EPIC to a preliminary injunction.

## CONCLUSION

For the above reasons, this Court should grant EPIC's Motion for a Preliminary Injunction and order the DOJ to immediately process and make a determination on EPIC's FOIA Request.

Respectfully Submitted,

MARC ROTENBERG, D.C. Bar #422825
EPIC President and Executive Director

ALAN BUTLER, D.C. Bar #1012128
EPIC Senior Counsel

/s/ John Davisson
JOHN DAVISSON, D.C. Bar #1531914
EPIC Counsel
davisson@epic.org

ELECTRONIC PRIVACY INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)

---

[44] https://www.wsj.com/articles/trump-more-than-happy-for-release-of-full-mueller-report-white-house-says-11553520972.

(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*

Dated: March 29, 2019

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

ELECTRONIC PRIVACY INFORMATION CENTER,

    Plaintiff,

    v.

UNITED STATES DEPARTMENT OF JUSTICE,

    Defendant.

Civ. Action No. 19-810 (RBW)

---

**[PROPOSED] ORDER**

Upon consideration of Plaintiff's Motion for a Preliminary Injunction, Defendant's

Response thereto, and the entire record, it is

**ORDERED** that Plaintiff's Motion is **GRANTED**; and it is

**FURTHER ORDERED** that Defendant shall grant expedited processing of Plaintiff's

November 5, 2018 Freedom of Information Act request; and it is

**FURTHER ORDERED** that Defendant shall immediately process Plaintiff's Freedom of

Information Act request; and it is

**FURTHER ORDERED** that Defendant shall issue a determination on Plaintiff's

Freedom of Information Act request within ___ days of this order.


_____
REGGIE B. WALTON
United States District Judge

Dated: _____

# INDEX OF EXHIBITS

U.S. Dep't of Justice, Office of the Deputy Att'y Gen., Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017)........................................Ex. 1

FOIA Request from EPIC to Douglas Hibbard, Chief, Initial Request Staff, Office of Info. Policy, Dep't of Justice (Nov. 5, 2018)............................................................Ex. 2

Letter from Vanessa R. Brinkmann, Senior Counsel, Office of Info. Policy, Dep't of Justice, to Enid Zhou, EPIC Open Government Counsel (Nov. 15, 2018).................Ex. 3

FOIA Appeal from EPIC to Director, Office of Info. Policy, Dep't of Justice (Dec. 21, 2018)..................................................................................................................Ex. 4

Letter from William P. Barr, Attorney Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, et al. (Mar. 22, 2019)........................................................Ex. 5

Letter from William P. Barr, Attorney Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, et al. (Mar. 24, 2019)........................................................Ex. 6

Letter from William P. Barr, Attorney Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, & Jerrold Nadler, Chairman, House Comm. on the Judiciary (Mar. 29, 2019) ........................................................................................Ex. 7

# Exhibit 1



### Office of the Deputy Attorney General
#### Washington, D.C. 20530

## ORDER NO. 3915-2017

## APPOINTMENT OF SPECIAL COUNSEL
## TO INVESTIGATE RUSSIAN INTERFERENCE WITH THE
## 2016 PRESIDENTIAL ELECTION AND RELATED MATTERS

By virtue of the authority vested in me as Acting Attorney General, including 28 U.S.C. §§ 509, 510, and 515, in order to discharge my responsibility to provide supervision and management of the Department of Justice, and to ensure a full and thorough investigation of the Russian government's efforts to interfere in the 2016 presidential election, I hereby order as follows:

(a)　Robert S. Mueller III is appointed to serve as Special Counsel for the United States Department of Justice.

(b)　The Special Counsel is authorized to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including:

　　(i)　any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and

　　(ii)　any matters that arose or may arise directly from the investigation; and

　　(iii)　any other matters within the scope of 28 C.F.R. § 600.4(a).

(c)　If the Special Counsel believes it is necessary and appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters.

(d)　Sections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations are applicable to the Special Counsel.

_____5/17/17_____
Date

Rod J. Rosenstein
Acting Attorney General

# Exhibit 2

# epic.org

**Electronic Privacy Information Center**
1718 Connecticut Avenue NW, Suite 200
Washington, DC 20009, USA

+1 202 483 1140
+1 202 483 1248
@EPICPrivacy
https://epic.org

VIA FACSIMILE

November 5, 2018

Douglas Hibbard
Chief, Initial Request Staff
Office of Information Policy
Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, D.C., 20530-0001
Fax: (202) 514-1009

Dear Mr. Hibbard,

This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a), and is submitted on behalf of the Electronic Privacy Information Center ("EPIC") to the Department of Justice's ("DOJ") Office of Information Policy ("OIP").

EPIC seeks documents, in the possession of the agency, concerning the investigation by Special Counsel Robert S. Mueller into Russian interference in the 2016 United States presidential election and related matters.

<u>Documents Requested</u>

EPIC requests the following records concerning the Special Counsel investigation into Russian interference with the presidential election:[1]

(1)(a)   All "report[s]" and "closing documentation" prepared under 28 C.F.R. § 600.8(c), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" or "closing documentation" under 28 C.F.R. § 600.8(c);

(2)(a)   All "report[s]" concerning "the status of the investigation" prepared under 28 C.F.R. § 600.8(a)(2), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

---

[1] U.S. Dep't of Justice, Office of the Deputy Attorney General, Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017), https://www.justice.gov/opa/press-release/file/967231/download [hereinafter Appointment Order].

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" concerning "the status of the investigation" under 28 C.F.R. § 600.8(a)(2);

(3)(a) All records "expla[ining] . . . any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "explanation for any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b);

(4)(a) All records prepared under 28 C.F.R. § 600.9(a) to "notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress" of a development in the Special Counsel investigation, whether or not such records were actually transmitted to any member of Congress;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned notification under 28 C.F.R. § 600.9(a);

(5)(a) All referrals by the Special Counsel, Attorney General, or Acting Attorney General for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c), whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned referral for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c);

(6)(a) All "report[s]," "recommendation[s]," and other "compilation[s] of information" prepared for the eventual consideration of one or more members of Congress,[2] whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report, recommendation, or compilation of the type described in Category (6)(a) of this request;

(7)(a) All other reports summarizing or describing, for one or more persons outside of the Special Counsel's Office, (i) any of the Special Counsel's evidence, findings, decisions, actions, or planned actions, or (ii) any developments in the Special Counsel investigation; and

---

[2] *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219, 1221, 1226 (D.D.C. 1974), *aff'd sub nom. Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974).

(b)  All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report of the type described in Category (7)(a) of this request.

EPIC does not seek records which have already been disclosed to the public in their complete and unredacted form (i) in the course of an open judicial proceeding; (ii) available at https://www.justice.gov/sco; or (iii) available at https://www.justice.gov/news.

Background

EPIC's FOIA request, and the Special Counsel investigation to which it pertains, arise out of the Russian government's coordinated campaign to interfere with the 2016 U.S. presidential election.

*Russian Interference in the 2016 U.S. Presidential Election*

In 2016, the Russian government carried out a multi-pronged attack on the U.S. Presidential Election to destabilize U.S. democratic institutions and aid the candidacy of Donald J. Trump. As explained in the declassified 2017 Intelligence Community Assessment ("ICA") on Russian election interference:[3]

> We assess with high confidence that Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election, the consistent goals of which were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency. We further assess Putin and the Russian Government developed a clear preference for President-elect Trump. When it appeared to Moscow that Secretary Clinton was likely to win the election, the Russian influence campaign then focused on undermining her expected presidency.
>
> We also assess Putin and the Russian Government aspired to help President-elect Trump's election chances when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to him.[4]

The ICA—along with the reports, investigations, and prosecutions that have ensued—establishes that Russia interfered with the 2016 election on at least four fronts.

First, "Russia's intelligence services conducted cyber operations against targets associated with the 2016 US presidential election, including targets associated with both major

---

[3] Office of the Dir. of Nat'l Intelligence, ICA 2017-01D, *Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent US Elections* (Jan. 6, 2017), https://www.dni.gov/files/documents/ICA_2017_01.pdf [hereinafter *Intelligence Community Assessment*]; *see also* EPIC, *EPIC v. ODNI (Russian Hacking)* (Dec. 18, 2017), https://www.epic.org/foia/odni/russian-hacking/ (EPIC FOIA lawsuit to obtain full Intelligence Community Assessment on which declassified version was based).
[4] *Intelligence Community Assessment*, *supra* note 3, at 1.

US political parties."[5] These operations included the "exfiltrat[ion of] large volumes of data" from the Democratic National Committee ("DNC") and "the compromise of the personal e-mail accounts of Democratic Party officials and political figures."[6]

Second, Russian intelligence services "used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in cyber operations publicly and in exclusives to media outlets."[7] These disclosures included data extracted by Russian intelligence from DNC networks.[8] Subsequent investigation has also revealed that senior Trump campaign officials engaged in multiple meetings with Russian intermediaries offering to provide "dirt" on Hillary Clinton, including "thousands of emails" obtained by Russia.[9]

Third, "Russian intelligence accessed elements of multiple state or local electoral boards" in an ongoing effort to assess "US electoral processes and related technology and equipment."[10]

Fourth, "Russia's state-run propaganda machine—comprised of its domestic media apparatus, outlets targeting global audiences such as RT and Sputnik, and a network of quasi-government trolls—contributed to the influence campaign by serving as a platform for Kremlin messaging to Russian and international audiences."[11] As part of this propaganda push, the Russian government spent millions of dollars and employed hundreds of people to flood Facebook and Twitter with fraudulent users, posts, articles, groups, and targeted advertisements.[12]

---

[5] *Id.* at 2.

[6] *Id.*; *see also* EPIC, *EPIC v. FBI (Russian Hacking)* (May 22, 2018), https://epic.org/foia/fbi/russian-hacking/ (EPIC FOIA lawsuit revealing FBI's failure to follow its own victim notification procedures in response to Russian cyberattacks against U.S. officials).

[7] *Intelligence Community Assessment*, *supra* note 3, at 2–3.

[8] *Id.* at 3.

[9] Statement of the Offense at ¶ 14, *United States v. Papadopoulos*, No. 17-182 (D.D.C. Oct. 5, 2017) ("The Professor told defendant PAPADOPOULOS . . . that 'They [the Russians] have dirt on her'; 'the Russians had emails of Clinton'; 'they have thousands of emails.'"); *see also* House Permanent Select Committee on Intelligence, *Status of the Russia Investigation (Minority Report)* (Mar. 13, 2018), https://democrats-intelligence.house.gov/uploadedfiles/final_-_minority_status_of_the_russia_investigation_with_appendices.pdf (noting that the "stated purpose" of "the June 9, 2016 Trump Tower meeting with Russian emissaries" was to "provide damaging information on Hillary Clinton").

[10] *Intelligence Community Assessment*, *supra* note 3, at 3; *see also* EPIC, *EPIC v. DHS* (Aug. 17, 2018), https://epic.org/foia/dhs/cybersecurity/russian-interference/default.html (EPIC FOIA lawsuit revealing Department of Homeland Security response to Russian cyberattacks on election infrastructure).

[11] *Intelligence Community Assessment*, *supra* note 3, at 3–4.

[12] Indictment at ¶¶ 3–6, 10, *United States v. Internet Res. Agency*, No. 18-32 (D.D.C. Feb. 16, 2018); *see also* Statement from EPIC to U.S. Senate Select Comm. on Intelligence, Sep. 4, 2018, https://epic.org/testimony/congress/EPIC-SSCI-ForeignSocialMedia-Sept2018.pdf (calling for greater transparency concerning Russian manipulation of news and information on social networks during and after the 2016 election).

In the twenty-two months since the Intelligence Community Assessment was published, the ICA's findings have been repeatedly confirmed by federal inquiries[13] and investigative reporting.[14] The Senate Intelligence Committee, after an "an in-depth review" of the ICA and associated intelligence, determined that "the conclusions of the ICA are sound" and noted "that collection and analysis subsequent to the ICA's publication continue to reinforce its assessments."[15]

*Criminal Investigations into Russian Election Interference*

On January 20, 2018—two weeks after the public release of the Intelligence Community Assessment—Donald J. Trump was inaugurated as the 45th President of the United States. On March 2, 2017, Attorney General Jeff Sessions, who had been a prominent supporter of Mr. Trump during the campaign, recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."[16] As a result, the responsibilities of the Attorney General for any such investigation passed to the Deputy Attorney General.[17]

On March 20, 2017, James B. Comey, then-Director of the Federal Bureau of Investigation ("FBI"), confirmed to the House Permanent Select Committee on Intelligence that the FBI was conducting an investigation into "the Russian government's efforts to interfere in the 2016 presidential election," including "the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts."[18] Mr. Comey noted that the investigation would include "an assessment of whether any crimes were committed."[19]

---

[13] Senate Select Comm. on Intelligence, *The Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent U.S. Elections* (July 3, 2018), https://www.burr.senate.gov/imo/media/doc/SSCI%20ICA%20ASSESSMENT_FINALJULY3.pdf [hereinafter Senate Intelligence Report].

[14] *E.g.*, Scott Shane & Mark Mazzetti, *The Plot to Subvert an Election: Unraveling the Russia Story So Far*, N.Y. Times (Sep. 20, 2018), https://www.nytimes.com/interactive/2018/09/20/us/politics/russia-interference-election-trump-clinton.html; Philip Bump, *A Broad Debunking of Trump's Claims About Russian Interference and the Mueller Investigation*, Wash. Post (June 28, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/28/a-broad-debunking-of-trumps-claims-about-russian-interference-and-the-mueller-investigation/.

[15] Senate Intelligence Report, *supra* note 13, at 7.

[16] Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement on Recusal (Mar. 2, 2017), https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal; *see also* 28 C.F.R. § 45.2(a).

[17] *Id.*; *see also* 28 U.S.C. § 508 ("In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office[.]").

[18] *Russian Active Measures Investigation: Hearing Before the H. Permanent Select Comm. on Intelligence*, 115th Cong. (2017) (Statement of James B. Comey, Dir., Fed. Bureau of Investigation), https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation.

[19] *Id.*

On May 9, 2017, President Trump removed Director Comey from office and terminated his employment. [20] Two days later, in a nationally-televised NBC News interview, President Trump stated:

> I was going to fire Comey knowing, there was no good time to do it. And in fact when I decided to just do it, I said to myself, I said you know, this Russia thing with Trump and Russia is a made up story, it's an excuse by the Democrats for having lost an election that they should have won. [21]

On May 17, 2017, Deputy Attorney General Rod J. Rosenstein—in his capacity as Acting Attorney General—appointed Robert S. Mueller III "to serve as Special Counsel for the United States Department of Justice." [22] Mr. Rosenstein authorized Mr. Mueller to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017," including "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump"; "any matters that arose or may arise directly from the investigation"; and "any other matters within the scope of 28 C.F.R. § 600.4(a)." [23] Mr. Rosenstein also authorized Mr. Mueller "to prosecute federal crimes arising from the investigation of these matters" where "it is necessary and appropriate[.]" [24]

Since Mr. Mueller was appointed, the Special Counsel has brought criminal charges against 33 individuals and three organizations, [25] including:

- Former National Security Adviser Michael Flynn, who pleaded guilty to making false statements to the FBI; [26]
- Former Trump campaign manager Paul Manafort, who was convicted of multiple counts of tax fraud and bank fraud [27] and pleaded guilty to conspiracy against the United States and other charges; [28]

---

[20] Letter from Donald J. Trump, President of the United States, to James B. Comey, Dir., Fed. Bureau of Investigation (May 9, 2017), https://www.gpo.gov/fdsys/pkg/DCPD-201700325/pdf/DCPD-201700325.pdf.

[21] Adam Edelman, *Trump says He Didn't Fire Comey 'Because of Russia,' Contradicting Past Statements*, NBC News (May 31, 2018), https://www.nbcnews.com/politics/donald-trump/trump-says-he-didn-t-fire-comey-because-russia-contradicting-n878836.

[22] Appointment Order, *supra* note 1, ¶ (a).

[23] *Id.* ¶ (b).

[24] *Id.* ¶ (c).

[25] U.S. Dep't of Justice, *Special Counsel's Office* (Sep. 14, 2018), https://www.justice.gov/sco.

[26] Plea Agreement, *United States v. Flynn*, No. 17-232 (Dec. 1, 2017), https://www.justice.gov/file/1015121/download.

[27] U.S. Dep't of Justice, *Special Counsel's Office*, *supra* note 25 ("On Aug. 21, 2018, a federal jury found Manafort guilty on eight counts: counts 1-5, subscribing to a false individual income tax return for tax years 2010-2014; count 12, failure to file reports of foreign bank and financial accounts for year 2012; count 25, bank fraud; and count 27, bank fraud.").

[28] Plea Agreement, *United States v. Manafort*, No. 17-201 (Sep. 14, 2018), https://www.justice.gov/file/1094151/download.

- Former Trump deputy campaign manager Rick Gates, who pleaded guilty to conspiracy against the United States and making a false statement to the FBI;[29]
- Former Trump campaign foreign policy adviser George Papadopolous, who pleaded guilty to making false statements to the FBI;[30]
- The Internet Research Agency, Concord Management and Consulting LLC, and thirteen Russian nationals, who are charged with conspiracy against the United States and related offenses for flooding social media platforms with fraudulent content to interfere with U.S. political processes;[31] and
- Twelve other Russian nationals, who are charged with conspiracy to commit computer crimes and other offenses for hacking Democratic Party computer networks and email accounts linked to the Clinton campaign.[32]

*The Special Counsel Report(s)*

In addition to the criminal offenses charged by the Special Counsel, major news organizations[33] and President Trump's own attorneys[34] have stated that Mr. Mueller intends to

---

[29] Plea Agreement, *United States v. Gates*, No. 17-201 (Feb. 23, 2018), https://www.justice.gov/file/1038801/download.

[30] Plea Agreement, *United States v. Papadopolous*, No. 17-182 (Oct. 5, 2017), https://www.justice.gov/file/1007341/download.

[31] Indictment, *United States v. Internet Research Agency LLC,* No. 18-32 (Feb. 16, 2018), https://www.justice.gov/file/1035477/download.

[32] Indictment, *United States v. Netyksho*, No. 18-215 (July 13, 2018), https://www.justice.gov/file/1080281/download.

[33] *E.g.*, Charlie Savage, *Legal Experts Urge Release of Watergate Report to Offer Mueller a Road Map*, N.Y. Times (Sep. 14, 2018), https://www.nytimes.com/2018/09/14/us/politics/mueller-report-grand-jury-watergate.html ("The leading theory is that Mr. Mueller will write a report for his supervisor at the Justice Department. . . . But there is historical precedent for another model. Echoing a move by the Watergate prosecutor in March 1974, the grand jury with which Mr. Mueller has been working could try to send a report about the evidence it has gathered directly to the House Judiciary Committee."); Jeffrey Toobin, *How Rudy Giuliani Turned Into Trump's Clown,* New Yorker (Sep. 10, 2018), https://www.newyorker.com/magazine/2018/09/10/how-rudy-giuliani-turned-into-trumps-clown ("Mueller will file a concluding report with Rod Rosenstein, the Deputy Attorney General, at the end of the investigation[.]"); Michael S. Schmidt & Maggie Haberman, *Mueller Examining Trump's Tweets in Wide-Ranging Obstruction Inquiry*, N.Y. Times (July 26, 2018), https://www.nytimes.com/2018/07/26/us/politics/trump-tweets-mueller-obstruction.html ("If Mr. Mueller does not plan to make a case in court, a report of his findings could be sent to Congress, leaving it to lawmakers to decide whether to begin impeachment proceedings.").

[34] *E.g.*, Memorandum from John M. Dowd, Att'y for President Trump, to Robert S. Mueller, Special Counsel (Jan. 29, 2018), *reprinted in The Trump Lawyers' Confidential Memo to Mueller, Explained*, N.Y. Times (June 2, 2018), https://www.nytimes.com/interactive/2018/06/02/us/politics/trump-legal-documents.html ("It is our understanding that the reason behind the request for the interview is to allow the Special Counsel's office to complete its report."); @RudyGiuliani, Twitter (Aug. 15, 2018, 9:58 AM), https://twitter.com/RudyGiuliani/status/1029728984446193664 ("DOJ should require Mueller to submit his report before September 7."); Peter Nicholas, *Rudy Giuliani Says Trump Lawyers Are Prepared to Counter Mueller*, Wall Street J. (Aug. 12, 2018), https://www.wsj.com/articles/rudy-giuliani-says-trump-lawyers-are-prepared-to-counter-mueller-1534110560 ("President Trump's lawyers believe they can

transmit one or more report(s) detailing the Special Counsel's findings (the "Mueller Report(s)"). The precise number, character, and subject matter of the Mueller Report(s) are not publicly known, though at least one such report is said to address allegations that President Trump obstructed justice by attempting to block a criminal probe into Russian election interference.[35]

There are several legal authorities under which the Special Counsel, Attorney General, or Acting Attorney General might issue a report or otherwise release information concerning the Special Counsel's investigation. First, under 28 C.F.R. § 600.8(c), the Special Counsel is required to provide the Attorney General or Acting Attorney General with a report at the conclusion of the investigation:

> **(c) Closing documentation.** At the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel.[36]

Second, under 28 C.F.R. § 600.8(a)(2), the Special Counsel is required to provide annual status reports to the Attorney General or Acting Attorney General:

> **(2)** Thereafter, 90 days before the beginning of each fiscal year, the Special Counsel shall report to the Attorney General the status of the investigation, and provide a budget request for the following year. The Attorney General shall determine whether the investigation should continue and, if so, establish the budget for the next year.[37]

Third, under 28 C.F.R. § 600.7(b), the Attorney General or Acting Attorney General may request an explanation for any investigative or prosecutorial step taken by the Special Counsel:

> **(b)** The Special Counsel shall not be subject to the day-to-day supervision of any official of the Department. However, the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued. In conducting that review, the Attorney General will give great weight to the views of the Special Counsel. If the Attorney General concludes that a proposed action by a

---

weather a 'negative' report from special counsel Robert Mueller and are prepared to rebut the conclusions, Rudy Giuliani, one of Mr. Trump's attorneys, said in an interview.").

[35] Carol D. Leonnig & Robert Costa, *Mueller Told Trump's Attorneys the President Remains Under Investigation But is Not Currently a Criminal Target*, Wash. Post (Apr. 3, 2018), https://www.washingtonpost.com/politics/mueller-told-trumps-attorneys-the-president-remains-under-investigation-but-is-not-currently-a-criminal-target/2018/04/03/d7832cf0-36c1-11e8-acd5-35eac230e514_story.html ("The special counsel also told Trump's lawyers that he is preparing a report about the president's actions while in office and potential obstruction of justice, according to two people with knowledge of the conversations.").

[36] 28 C.F.R. § 600.8(c); *see also* Appointment Order, *supra* note 1, ¶ (d) ("Sections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations are applicable to the Special Counsel.").

[37] 28 C.F.R. § 600.8(a)(2).

Special Counsel should not be pursued, the Attorney General shall notify Congress as specified in § 600.9(a)(3).[38]

Fourth, under 28 C.F.R. § 600.9(a), the Attorney General or Acting Attorney General is required to notify certain members of Congress of key developments in the Special Counsel's investigation:

> **(a)** The Attorney General will notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress, with an explanation for each action —
>
> > **(1)** Upon appointing a Special Counsel;
> >
> > **(2)** Upon removing any Special Counsel; and
> >
> > **(3)** Upon conclusion of the Special Counsels investigation, including, to the extent consistent with applicable law, a description and explanation of instances (if any) in which the Attorney General concluded that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued.[39]

Fifth, under 28 C.F.R. § 600.4(c), the Special Counsel may take "necessary action" to pursue penalties "outside the criminal justice system" in consultation with the Attorney General or Acting Attorney General:

> **(c) Civil and administrative jurisdiction.** If in the course of his or her investigation the Special Counsel determines that administrative remedies, civil sanctions or other governmental action outside the criminal justice system might be appropriate, he or she shall consult with the Attorney General with respect to the appropriate component to take any necessary action. A Special Counsel shall not have civil or administrative authority unless specifically granted such jurisdiction by the Attorney General.[40]

Sixth, the Special Counsel may use its "full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney"[41] to transmit "report[s]," "recommendation[s]," or other "compilation[s] of information" to Congress via the grand jury process.[42] This procedure was used by Special Counsel Leon Jaworski in 1974 to convey "material in the Grand Jury's possession having a material bearing on matters within the

---

[38] 28 C.F.R. § 600.7(b).
[39] 28 C.F.R. § 600.9(a).
[40] 28 C.F.R. § 600.4(c).
[41] 28 C.F.R. § 600.6.
[42] *In re Report & Recommendation*, 370 F. Supp. at 1221, 1226.

primary jurisdiction of the United States House of Representatives Committee on the Judiciary relating to questions of impeachment."[43]

Finally, the Special Counsel, Attorney General, and/or Acting Attorney General may rely on their general powers under 28 C.F.R. § 600.1 *et seq.* (and on other legal authorities) to disclose developments, evidence, findings, decisions, actions, or planned actions from the Special Counsel's investigation.

EPIC, through this FOIA request, seeks all of the above categories of records and supporting materials generated by or related to Special Counsel Mueller's investigation.

**EPIC's Interest in the Special Counsel Investigation**

EPIC has a particular interest in the release of records related to Special Counsel Mueller's investigation because those records will inform EPIC's project on Democracy and Cybersecurity, which was launched in response the interference in the 2016 Presidential Election.[44] As part of EPIC's Democracy and Cybersecurity project, EPIC has filed suits seeking public release of President Trump's tax returns and to correct numerous misstatements of fact concerning the President's financial ties to Russia.

*EPIC v. IRS I (Donald Trump's Tax Records)*

In *EPIC v. IRS I,* EPIC argues that the Internal Revenue Service ("IRS") has the authority, under § 6103(k)(3) of the Internal Revenue Code,[45] to disclose the President's returns to correct numerous misstatement of fact concerning his financial ties to Russia.[46] For example, President Trump falsely tweeted that "Russia has never tried to use leverage over me. I HAVE NOTHING TO DO WITH RUSSIA – NO DEALS, NO LOANS, NO NOTHING."[47] Yet, numerous news organizations have covered President Trump's ties to Russian businesses and government.[48] The case is currently pending in the D.C. Circuit.

---

[43] Report & Recommendation at 1, *In re Report & Recommendation*, 370 F. Supp. at 1221 (Mar. 1, 1974) (capitalization altered), https://www.archives.gov/files/research/investigations/watergate/roadmap/docid-70105890.pdf; *see also* 105 Cong. Rec. H9,670 (daily ed. Oct. 6, 1998) (statement of Rep. Jackson-Lee) ("[I]t will be recalled the Watergate special prosecution force did not send to Congress an argumentative or inflammatory document, but rather a simple road map which merely summarized and identified the location of relevant evidence.").

[44] *See* EPIC, *Democracy and Cybersecurity: Preserving Democratic Institutions*, https://www.epic.org/democracy/.

[45] 26 U.S.C. § 6103(k)(3).

[46] *See* EPIC, *EPIC v. IRS (Donald Trump's Tax Records)*, https://www.epic.org/foia/irs/trump-taxes/.

[47] Donald J. Trump (@realDonaldTrump), Twitter (July 26, 2016), https://twitter.com/realdonaldtrump/status/758071952498159616?lang=en.

[48] See e.g., Tom Hamburger, Rosalind S. Helderman, & Michael Birnbaum, *Inside Trump's Financial Ties to Russian and His Unusual Flatters of Vladimir Putin*, Wash. Post (June 17, 2016), https://www.washingtonpost.com/politics/inside-trumps-financial-ties-to-russia-and-his-unusual-flattery-of-vladimir-putin/2016/06/17/dbdcaac8-31a6-11e6-8ff7-7b6c1998b7a0_story.html; *Despite Denial, Trump's Connections to Russia Go Back Years*, CBS News (July 29, 2016),

*EPIC v. IRS II (Trump Offers-in-Compromise)*

In *EPIC v. IRS II*, EPIC filed suit to compel the IRS to release certain tax records pertaining to President Trump's more than 300 associated business entities.[49] EPIC requested all "offers-in-compromise" used to satisfy a tax debt owed by President Trump or one of his businesses. Under § 6103(k)(1) of the Internal Revenue Code, taxpayer "return information shall be disclosed to all members of the general public to the extent necessary to permit inspection of any accepted offer-in-compromise[.]"[50] These records are public as a matter of law. The case is currently pending in the U.S. Federal Court for the District of Columbia.

<u>Request for Expedition</u>

EPIC is entitled to expedited processing of this request.[51] Under the DOJ's FOIA regulations, a request "shall be processed on an expedited basis" when (1) there is an "urgency to inform the public about an actual or alleged federal government activity," and (2) where the request is "made by a person who is primarily engaged in disseminating information."[52] This request satisfies both conditions.

First, there is an "urgency to inform the public about an actual or alleged federal government activity."[53] The actual federal government activities are (1) the Special Counsel's investigation of Russian interference in the 2016 U.S. presidential election, and (2) the U.S. government's response to Russian election interference, as reflected in the requested records of the Special Counsel.[54] The requested records also pertain to President Trump's alleged obstruction of justice while in office.[55]

The urgency to inform the public about these government activities is clear from the voluminous press coverage of,[56] and immense public interest in,[57] Mr. Mueller's investigation

---

https://www.cbsnews.com/news/election-2016-donald-trump-ties-to-russia-go-back-years-dnc-email-hack/; John Hardwood, *Trump Calls the Special Counsel's Probe a 'Witch Hunt,' but His Links to Russia Go Back a Long Time*, CNBC (May 23, 2018), https://www.cnbc.com/2018/05/23/trump-links-to-russia-an-explanation.html.

[49] See EPIC, *EPIC v. IRS II (Trump Offers-in-Compromise)*, https://epic.org/foia/irs/trump-taxes-ii/.

[50] 26 U.S.C. § 6103(k)(1).

[51] 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(1).

[52] 28 C.F.R. § 16.5(e)(1), (e)(1)(ii).

[53] *Id.*

[54] *See* Appointment Order, *supra* note 1.

[55] *See* Leonnig & Costa, *supra* note 35 ("The special counsel also told Trump's lawyers that he is preparing a report about the president's actions while in office and potential obstruction of justice, according to two people with knowledge of the conversations.").

[56] *See, e.g.*, *Robert Mueller — F.B.I. Director*, N.Y. Times (Nov. 1, 2018), https://www.nytimes.com/topic/person/robert-mueller-mdash-fbi-director (listing over 570 articles concerning Robert Mueller since his appointment as Special Counsel on May 17, 2017).

[57] *See, e.g.*, Morning Consult & Politico, *National Tracking Poll* (Oct. 30, 2018), https://www.politico.com/f/?id=00000166-cb61-d184-ad67-ff67dddd0000 (finding that over 66% of respondents were aware of, and had developed an opinion on, Special Counsel Mueller); Robert Mueller, Google Trends (Nov. 2, 2018), https://trends.google.com/trends/explore?date=today%205-

---

and findings. Americans are deeply concerned about the scope of Russian interference in the 2016 presidential election; the U.S. government's response to that interference; the involvement of particular individuals in that interference, including possibly President Trump; the susceptibility of U.S. election systems and democratic institutions to future foreign interference; and the integrity of the Special Counsel investigation itself.[58] The Mueller Report(s) and supporting materials are critical to the public's understanding of these issues.

Second, EPIC is an organization "primarily engaged in disseminating information."[59] As the Court explained in *EPIC v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003), "EPIC satisfies the definition of 'representative of the news media'" entitling it to preferred fee status under FOIA.[60]

EPIC is also entitled to expedited processing because EPIC's request involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence."[61] In addition to the extraordinary media attention given to the work of the Special Counsel,[62] the requested records concern the potential involvement of the President in a foreign campaign to influence an election that he won; the possible obstruction of justice by the President while in office; the federal government's capacity to defend U.S. election systems and democratic institutions against foreign attacks; and the discharge of a high-profile Special Counsel investigation.[63] These matters unquestionably bear on the integrity of the government and affect public confidence.

In submitting this request for expedited processing, I certify that this explanation is true and correct to the best of my knowledge and belief.[64]

---

y&geo=US&q=Robert%20Mueller (showing a more than 100-fold increase in U.S. Google searches for Robert Mueller following his appointment as Special Counsel).

[58] *See, e.g.*, NPR/PBS NewsHour/Marist, *The United States' Relationship with Russia* 10, 12–13, 17 (July 25, 2018), http://maristpoll.marist.edu/wp-content/uploads/2018/07/NPR_PBS-Nature-of-the-Sample-and-Tables_The-US-Relationship-with-Russia_July-2018_181807241048.pdf (finding that 69% of respondents believed Russian interference occurred in the 2016 election, 63% believed Russian interference impacted the 2016 election, 53% believed President Trump had done something illegal or unethical "in his dealings with Russia and Russian President Vladimir Putin," and 57% expected Russia to interfere in the 2018 election); Suffolk University, *Suffolk University/USA Today National Poll Shows Faith in Mueller's Russia Investigation but Not in Trump Denials* (Aug. 29, 2018), https://www.suffolk.edu/news/77724.php ("A majority of Americans (55 percent) trust special counsel Robert Mueller and his investigation into alleged Russian meddling in the 2016 election, but 59 percent don't trust President Donald Trump's denial that his campaign was involved, according to a new Suffolk University/USA TODAY national poll.").

[59] 28 C.F.R. § 16.5(e)(1)(ii).

[60] 241 F. Supp. at 15.

[61] 28 C.F.R. § 16.5(e)(1)(iv).

[62] *Search Results: "Robert Mueller" and "Russia"*, Google News (Nov. 2, 2018), https://www.google.com/search?tbm=nws&q=%22Robert+Mueller%22+and+%22Russia%22 (identifying 941,000 news results containing both "Robert Mueller" and "Russia").

[63] *See* Shane & Mazzetti, *supra* note 14.

[64] *See* 5 U.S.C. § 552(a)(6)(E)(vi); 28 C.F.R. § 16.5(e)(3).

## Request for News Media Fee Status and Fee Waiver

EPIC is a "representative of the news media" for fee classification purposes, as the Court held in *EPIC v. Department of Defense*.[65] Based on EPIC's status as a "news media" requester, EPIC is entitled to receive the requested record with only duplication fees assessed.[66]

Further, any duplication fees should also be waived because disclosure of the requested information "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest" of EPIC, the requester.[67] The DOJ evaluates the three factors to determine whether this requirement is met: (i) the "subject of the request must concern identifiable operations or activities of the Federal Government"; (ii) disclosure must be "likely to contribute significantly to public understanding of those operations or activities"; and (iii) "disclosure must not be primarily in the commercial interest of the requester."[68] EPIC's request satisfies all three factors.

First, the requested Mueller Report(s) and supporting materials clearly "concern[] identifiable operations or activities of the Federal Government,"[69] namely: (1) the Special Counsel's investigation of Russian interference in the 2016 U.S. Presidential Election; (2) the U.S. government's response to Russian election interference; and (3) possible obstruction of justice by President Trump while in office.[70]

Second, disclosure would be "likely to contribute significantly to public understanding of those operations or activities."[71] Disclosure would be "meaningfully informative about government operations or activities" because—apart from the charging documents already filed by Mr. Mueller—little is known about the Special Counsel's substantive findings concerning Russian election interference; the Trump campaign's involvement in that interference; the U.S. government's response to that interference; and possible obstruction of justice by President Trump.

Disclosure will also "contribute to the understanding of a reasonably broad audience of persons interested in the subject," because DOJ components must "presume that a representative of the news media," such as EPIC, "will satisfy this consideration."[72] The requested Mueller Report(s) and supporting materials will reach a large audience through EPIC's widely read website, https://epic.org, where EPIC routinely posts government documents obtained under the FOIA.

---

[65] 241 F. Supp. 2d 5.
[66] 5 U.S.C. § 552(a)(4)(A)(ii)(II).
[67] 28 C.F.R. § 16.10(k)(1); *see also* § 552(a)(4)(A)(iii).
[68] 28 C.F.R. §§ 16.10(k)(2)(i)–(iii).
[69] *Id.* § 16.10(k)(2)(i).
[70] *See* Appointment Order, *supra* note 1; Leonnig & Costa, *supra* note 35.
[71] 28 C.F.R. §§ 16.10(k)(2)(ii)(A)–(B).
[72] *Id.* § 16.10(k)(2)(ii)(B)

Third, disclosure of the requested information is not "primarily in the commercial interest" of EPIC.[73] EPIC has no "commercial interest . . . that would be furthered by the requested disclosure."[74] EPIC is a registered non-profit organization committed to open government, privacy, and civil liberties.[75] Moreover, DOJ components "ordinarily will presume that where a news media requester has satisfied [the public interest standard], the request is not primarily in the commercial interest of the requester."[76] As described above, EPIC is a news media requester and satisfies the public interest standard.

For these reasons, a fee waiver should be granted to EPIC's request.

<u>Conclusion</u>

Thank you for your consideration of this request. I anticipate your determination on our request within ten calendar days.[77] For questions regarding this request, I can be contacted at 202-483-1140 x120 or FOIA@epic.org.

Respectfully submitted,

*/s John Davisson*
John Davisson
EPIC Counsel

*/s Enid Zhou*
Enid Zhou
EPIC Open Government Counsel

---

[73] *Id.* §§ 16.10(k)(2)(iii)(A)–(B).
[74] *Id.* §§ 16.10(k)(2)(iii)(A).
[75] EPIC, *About EPIC* (2018), https://epic.org/epic/about.html.
[76] 28 C.F.R. § 16.10(k)(2)(iii)(B).
[77] 5 U.S.C. § 552 (a)(6)(E)(ii)(I).

# Exhibit 3



**U.S. Department of Justice**
Office of Information Policy
*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

November 15, 2018

Ms. Enid Zhou
Electronic Privacy Information Center
1718 Connecticut Ave., NW
Suite 200
Washington, DC  20009                         Re:     DOJ-2018-000676 (OIP)
FOIA@epic.org                                          VRB:VAV:SBT

Dear Ms. Zhou:

     This is to acknowledge receipt of your Freedom of Information Act (FOIA) request dated and received in this Office on November 5, 2018, in which you requested various records pertaining to the Special Counsel investigation into Russian interference with the presidential election and other related matters.  This response is made on behalf of the Special Counsel's Office.

     You have requested expedited processing of your request pursuant to the Department's standard permitting expedition for requests involving "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information." See C.F.R. § 16.5(d)(ii) (2017).  Based on the information you have provided, I have determined that your request for expedited processing under this standard should be denied.  This Office cannot identify a particular urgency to inform the public about an actual or alleged federal government activity beyond the public's right to know about government activities generally.

     Additionally, you also have requested expedited processing of your request pursuant to the Department's standard involving "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." See 28 C.F.R. § 16.5(e)(1)(iv) (2017).  Pursuant to Department policy, we directed your request to the Director of Public Affairs, who makes the decision whether to grant or deny expedited processing under this standard. See id. § 16.5(e)(2).  Please be advised the Director has determined that your request for expedited processing should be denied.  Although your request for expedited processing has been denied; it has been assigned to an analyst in this Office and our processing of it has been initiated.

     The records you seek require a search in and/or consultation with another Office, and so your request falls within "unusual circumstances."  See 5 U.S.C. 552 § (a)(6)(B)(i)-(iii) (2012 & Supp. V. 2017).  Because of these unusual circumstances, we need to extend the time limit to respond to your request beyond the ten additional days provided by the statute.  We have not yet completed a search to determine whether there are records within the scope of your request.  The time needed to process your request will necessarily depend on the complexity of

our records search and on the volume and complexity of any material located.  For your information, this Office assigns incoming requests to one of three tracks:  simple, complex, or expedited.  Each request is then handled on a first-in, first-out basis in relation to other requests in the same track.  Simple requests usually receive a response in about a month, whereas complex requests necessarily take longer.  At this time, your request has been assigned to the complex track.  In an effort to speed up our records search, you may wish to narrow the scope of your request to limit the number of potentially responsive records or agree to an alternative time frame for processing, should records be located; or you may wish to await the completion of our records search to discuss either of these options.

We have not yet made a decision on your request for a fee waiver.  We will do so after we determine whether fees will be assessed for this request.

If you have any questions or wish to discuss reformulation or an alternative time frame for the processing of your request, you may contact the analyst handing your request, Sara Tennant, by telephone at the above number or you may write to her at the above address.  You may also contact our FOIA Public Liaison, Douglas Hibbard, for any further assistance and to discuss any aspect of your request at: Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001; telephone at 202-514-3642; or facsimile at 202-514-1009.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with my response to your request for expedited processing, you may administratively appeal by writing to the Director, Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIAonline portal at https://www.foiaonline.gov/foiaonline/action/public/home.  Your appeal must be postmarked or electronically transmitted within ninety days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Vanessa R. Brinkmann
Senior Counsel

# Exhibit 4

# epic.org

**Electronic Privacy Information Center**
1718 Connecticut Avenue NW, Suite 200
Washington, DC 20009, USA

📞 +1 202 483 1140
🖨 +1 202 483 1248
🐦 @EPICPrivacy
🌐 https://epic.org

VIA MAIL

December 21, 2018

Director, Office of Information Policy
United States Department of Justice, Suite 11050
1425 New York Avenue, NW
Washington, DC 20530-0001

**Freedom of Information Act Appeal, DOJ-2018-000676 (OIP)**

This letter constitutes an appeal of the U.S. Department of Justice's ("DOJ") Office of Information Policy's ("OIP") denial of expedited processing under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(6)(E)(i), and the DOJ's FOIA regulation, 28 C.F.R. § 16.5(e)(4). The FOIA request was submitted on behalf of the Electronic Privacy Information Center ("EPIC") to the DOJ on November 5, 2018 ("EPIC's FOIA Request").

EPIC's FOIA Request sought records in possession of the DOJ concerning the investigation by Special Counsel Robert S. Mueller into Russian interference in the 2016 United States presidential election and related matters. EPIC's FOIA Request established that there is an "urgency to inform the public" about a matter "concerning actual or alleged Federal government activity" and that EPIC is "primarily engaged in disseminating information." *See* Appendix A.

The DOJ now contends that there is no need to grant expedited processing for the release of records about the ongoing investigation by Special Counsel Mueller into Russian interference in the 2016 presidential election. In an acknowledgement letter from the DOJ, dated November 15, 2018, the DOJ denied EPIC's request for expedited processing of EPIC's FOIA Request under two different standards, both of which EPIC satisfied with specific facts.

First, EPIC established that there is "[a]n urgency to inform the public about an actual or alleged federal government activity" that is "made by a person primarily engaged in disseminating information. 28 C.F.R. § 16.5(d)(ii). But the DOJ concluded that, "based on the information [EPIC] provided," "[t]he Office cannot identify a particular urgency to inform the public about an actual or alleged federal government activity beyond the public's right to know about government activities generally." *See* Appendix B.

Second, EPIC established that there is "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(a)(1)(iv). Yet the DOJ letter stated that the Director of Public Affairs denied EPIC's request for expedited processing without further justification for this conclusion. *See* Appendix B.

The DOJ's determination should be reversed. According to the relevant DOJ FOIA regulation, a request will be processed on an expedited basis whenever the request involves (1)

**P r i v a c y   i s   a   F u n d a m e n t a l   R i g h t.**

"[a]n urgency to inform the public about an actual or alleged Federal government activity, if made by a person who is primarily engaged in disseminating information" or (2) "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e)(1).

EPIC's FOIA Request made clear that EPIC is "primarily engaged in disseminating information" and that there is an "urgency to inform the public" about a government activity. EPIC's FOIA Request also made clear that the Special Counsel's reports and related material are a "matter of widespread and exceptional media interest" and that "there exists possible questions about the government's integrity that affect public confidence." EPIC's FOIA Request presented specific facts demonstrating that—according to major news organizations and President Trump's own attorneys—the Special Counsel intends to transmit one or more reports detailing his findings.

Based on the voluminous press coverage of, and intense public interest in, the Special Counsel's investigation, it is clear that the public urgently needs to know the details of the Special Counsel's findings. The American public is deeply concerned about the scope of Russian interference in the 2016 presidential election. The potential involvement of President Trump in a foreign campaign to influence an election unquestionably bears on the integrity of the government and inevitably affects public confidence. So, too, does the government's capacity to protect U.S. election systems and democratic institutions against foreign attacks. The Special Counsel's reports would shed significant light on both of these matters.

EPIC hereby appeals the DOJ's denial of expediting processing of EPIC's FOIA Request. EPIC should be granted expedited processing.

Procedural Background

On November 5, 2018, EPIC submitted EPIC's FOIA Request to the DOJ via facsimile. EPIC specifically requested:

(1)(a)   All "report[s]" and "closing documentation" prepared under 28 C.F.R. § 600.8(c), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

   (b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" or "closing documentation" under 28 C.F.R. § 600.8(c);

(2)(a)   All "report[s]" concerning "the status of the investigation" prepared under 28 C.F.R. § 600.8(a)(2), whether or not such records were actually provided to the Attorney General or Acting Attorney General

   (b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" concerning "the status of the investigation" under 28 C.F.R. § 600.8(a)(2);

(3)(a)  All records "expla[ining] . . . any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

(b)  All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "explanation for any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b);

(4)(a)  All records prepared under 28 C.F.R. § 600.9(a) to "notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress" of a development in the Special Counsel investigation, whether or not such records were actually transmitted to any member of Congress;

(b)  All drafts, outlines, exhibits, and supporting materials associated with any actual or planned notification under 28 C.F.R. § 600.9(a);

(5)(a)  All referrals by the Special Counsel, Attorney General, or Acting Attorney General for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c), whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

(b)  All drafts, outlines, exhibits, and supporting materials associated with any actual or planned referral for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c);

(6)(a)  All "report[s]," "recommendation[s]," and other "compilation[s] of information" prepared for the eventual consideration of one or more members of Congress, whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

(b)  All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report, recommendation, or compilation of the type described in Category (6)(a) of this request;

(7)(a)  All other reports summarizing or describing, for one or more persons outside of the Special Counsel's Office, (i) any of the Special Counsel's evidence, findings, decisions, actions, or planned actions, or (ii) any developments in the Special Counsel investigation; and

(b)  All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report of the type described in Category (7)(a) of this request.

EPIC also requested expedited processing and a fee waiver. *See* Appendix A.

On November 15, 2018, the DOJ sent an acknowledgement letter denying EPIC's request for expedited processing. The letter stated that the processing of EPIC's FOIA Request has been

initiated and assigned to the complex track because EPIC's request falls within "unusual circumstances." EPIC's request was assigned reference number DOJ-2018-000676 (OIP). *See* Appendix B.

### EPIC's FOIA Request Satisfies The "Compelling Need" Test For Expedited Processing Because It Involves An Urgency To Inform The Public About A Government Activity And Is Made By A Person Primarily Engaged In Disseminating Information

EPIC is entitled to expedited processing of this request because this request involves a "compelling need." 5 U.S.C. § 552(a)(6)(E)(v)(II). The DOJ FOIA regulations list four, independent considerations for demonstrating a "compelling need" for expedited processing, and the requester must satisfy at least one consideration to meet this "compelling need" requirement. EPIC established that its FOIA Request (1) involves "an urgency to inform the public about an actual or alleged federal government activity" and (2) is made by "a person primarily engaged in disseminating information." 16 C.F.R. § 16.5(e)(1)(ii). EPIC presented specific facts to demonstrate a "compelling need." EPIC explained that the activities of the Special Counsel concern matters of current exigency and that a delayed response would compromise the public's ability to understand the investigation into Russian interference in the 2016 presidential election. This determination is incorrect.

#### *(I) There is a Clear "Urgency to Inform the Public" About an Actual Government Activity*

First, this request self-evidently involves "an urgency to inform the public about an actual or alleged Federal government activity." 28 C.F.R. § 16.5(e)(1)(ii). The "actual or alleged Federal government activity" is the Special Counsel's investigation of Russian interference in the 2016 presidential election and the U.S. government's response to Russian election interference. There is also a clear "urgency to inform the public" about the details of the Special Counsel's findings, as is apparent from the voluminous press coverage of the Special Counsel's investigation. Courts evaluate three factors when determining whether the requester demonstrates an "urgency to inform," showing a "compelling need": "(1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity." *Protect Democracy Project, Inc. v. DOD*, 263 F. Supp. 3d 293, 298–99 (D.D.C. 2017) (quoting *Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001)).

##### (1) EPIC's FOIA Request concerns a matter of current exigency to the American public

For matters of current exigency, district courts require there be a "'substantial interest' in the 'particular aspect' of [the] FOIA request." *EPIC v. DOD*, 355 F. Supp. 2d 98, 102 (D.D.C. 2004). When determining whether an interest is substantial, courts will consider the number of publications, the variety of sources, and the content of the articles present in the request. *See Amer. Civil Liberties Union v. DOJ*, 321 F. Supp. 2d 24, 31–32 (D.D.C. 2004). According to the district court, "case law makes it clear that only public interest in the specific subject of a FOIA request is sufficient to weigh in favor of expedited treatment." *EPIC v. DOD*, 355 F. Supp. 2d at 102.

The subject of EPIC's FOIA Request, the Special Counsel's investigation into Russian interference in the 2016 presidential election, is clearly of "substantial interest" to the public because it involves a national election and an attack on U.S. democratic institutions by a foreign adversary. At the time of EPIC's request, EPIC identified 941,000 news articles related to Special Counsel Mueller and "Russia." EPIC described with significant factual detail the criminal and intelligence community investigations showing that the Russian government carried a multi-pronged attack on the U.S. presidential election. EPIC also cited to major news organizations and President Trump's own attorneys stating that Special Counsel Mueller intends to create one or more reports detailing the Special Counsel's findings.

Moreover, the D.C. Circuit has held that facts within an agency's knowledge are part of the record before the agency at the time it reviews a FOIA request, whether or not the requester specifically referenced such facts. *Nat'l Treasury Employees Union v. Griffin*, 811 F.2d 644, 648 (D.C.Cir. 1987). For example, in *EPIC v. DOD*, the district court recognized that a Government Accountability Report ("GAO") that was subsequently released after the FOIA request was made but before the denial of expedited processing was available to the agency during the time it would have considered the requester's expedition request. 355 F. Supp. 2d at 104 n.7. According to the court, "there can be little doubt that the agency was aware of the GAO report and the information it contained when considering Plaintiff's request for expedition." *Id.*

Like in *EPIC v. DOD*, the agency should have been aware of additional news coverage following the submission of EPIC's FOIA Request that underscored the urgency of the request. For example, former Attorney General Jeff Sessions submitted his resignation at the request of President Trump, and Matthew G. Whitaker was appointed acting Attorney General in his place.[1] Acting Attorney General Whitaker has been a public critic of the Mueller investigation.[2]

(2) The consequences of delaying a response would compromise a significant recognized interest

Delaying a response to EPIC's request would compromise a significant recognized interest in understanding the specific details of the Special Counsel's investigation into Russian interference in the 2016 presidential election. Courts require that for a public interest to become an interest recognized by the FOIA, the requester must show that the requested information is "vital to [a] current and ongoing debate." *Sai v. Transportation Sec. Admin.*, 54 F. Supp. 3d 5, 11 (D.D.C. 2014). The D.C. Circuit has acknowledged that "stale information is of little value . . ." *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988). For instance, in *EPIC v. DOJ*, the court found that EPIC had demonstrated a risk of irreparable injury when seeking expedited processing for information vital to an ongoing debate surrounding the legality of the government's warrantless surveillance program. 416 F. Supp. 2d 30, 41 (D.D.C. 2006).

---

[1] Devlin Barrett, Matt Zapotosky, & Josh Dawsey, *Jeff Sessions Forced Out As Attorney General*, Wash. Post (Nov. 7, 2018), https://www.washingtonpost.com/world/national-security/attorney-general-jeff-sessions-resigns-at-trumps-request/2018/11/07/d1b7a214-e144-11e8-ab2c-b31dcd53ca6b_story.html.
[2] *See e.g.*, Max de Haldevang & Adam Pasick, *All the Times Robert Mueller's New Boss Railed Against the Russia Probe*, Quartz (Nov. 7, 2018), https://qz.com/1454952/all-matthew-whitakers-criticisms-of-robert-muellers-russia-investigation/.

The release of the requested information is vital to an ongoing debate surrounding the scope of Russian interference in the 2016 presidential election and the involvement of particular individuals in that interference, such as the potential involvement of President Trump. In *Protect Democracy Project v. DOD*, the requesters sought information related to the President's legal authority to launch missile strikes against a Syrian-government airbase the day after the President launched missile strikes against Syria. The district court stated, "[b]eing closed off from such a debate is itself a harm in an open democracy" if there is an undue delay in processing. *Protect Democracy*, 263 F. Supp. 3d at 300.

Like the public debates surrounding the legality of military strikes against the Syrian government, there is great public debate surrounding the government's capacity to defend U.S. election systems and democratic institutions against foreign attacks. The loss in the value of the timely release of information results in cognizable harm because the public cannot participate in meaningful public debate about the Special Counsel's substantive findings, the Trump campaign's involvement in Russian interference, the government's response to that interference, and possible obstruction of justice by President Trump.

(3) The request concerns a federal government activity

As previously stated, the actual government activity at issue in EPIC's FOIA Request is the Special Counsel's investigation of Russian interference of the 2016 presidential election and the U.S. government's response to Russian election interference. EPIC's FOIA Request included facts—supported by both official government documents and federal regulations—to demonstrate that the activities of the Special Counsel, including the creation of investigatory reports, constitute a federal government activity. Moreover, the U.S. government's response to Russian election interference is self-evidently an actual government activity.

*(II) EPIC is an Organization "Primarily Engaged in Disseminating Information"*

EPIC is an organization "primarily engaged in disseminating information" under 28 C.F.R. § 16.5(e)(1)(ii) because, as the D.C. District Court explained in *EPIC v. DOD*, "EPIC satisfies the definition of 'representative of the news media.'" 241 F. Supp. 2d 5, 15 (D.D.C. 2003). Like the District Court's determination in 2003, EPIC still actively gathers information that is of interest to a segment of the public, turns the raw materials into distinct work, and publishes that work to the public through its website, bi-weekly newsletter, and various news outlets. In EPIC's FOIA Request, EPIC stated that it is a registered non-profit organization committed to open government, privacy, and civil liberties. EPIC's request emphasized that the requested information would reach a large audience because EPIC routinely publishes information obtained through the FOIA on its widely read website, https://epic.org.

EPIC's FOIA Request Also Satisfies The "Compelling Need" For Expedited Processing Because It Involves A Matter Of Widespread Interest In Which There Exists Possible Questions About The Government's Integrity The Affect Public Confidence

EPIC's FOIA Request also established that EPIC is entitled to expedited processing because the activities of the Special Counsel involves "[a] matter of widespread and exceptional

media interest in which there exists possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e)(1)(iv). The "primary" method for determining whether there are questions about the government's integrity that affect public confidence "is [to] examin[e] the state of public coverage of the matter at issue, and whether that coverage surfaces possible ethics issues so potentially significant as to reduce public confidence in governmental institutions." *Oversight v. DOJ*, 292 F. Supp. 3d 501, 508 (D.D.C. 2018).

EPIC's FOIA Request cited the extraordinary media attention given to the work of the Special Counsel, including 941,000 news articles containing the terms "Robert Mueller" and "Russia." Many of the top news articles discuss the potential involvement of President Trump in Russia's campaign to influence an election that he won. Other articles examine President Trump's possible obstruction of justice and the discharge of a high-profile Special Counsel investigation. This coverage pertains to ethics and conflict-of-interest issues that are "so significant" as to affect the public's confidence in democratic institutions and the government's ability to conduct a fair investigation. For example, a June 2018 Pew Research poll found that most Americans lacked confidence in President Trump in his ability to handle matters related to the Special Counsel investigation.[3]

I certify that this explanation is true and correct to the best of my knowledge and belief. 5 U.S.C. § 552(a)(6)(E)(vi). For the foregoing reasons, EPIC is entitled to expedited processing of EPIC's FOIA Request. § 552(a)(6)(E)(iii).

<u>Conclusion</u>

Thank you for your consideration of this appeal. We anticipate your determination on our appeal within twenty working days. 5 U.S.C. § 552(a)(6)(A)(ii). For question regarding this appeal, please contact John Davisson at 202-483-1140 x120 or davisson@epic.org, cc: FOIA@epic.org.

Respectfully submitted,

*/s John Davisson*
John Davisson
EPIC Counsel

*/s Enid Zhou*
Enid Zhou
EPIC Open Government Counsel

---

[3] Alec Tyson, *Most Americans Lack Confidence in Trump to Deal Appropriately with Mueller Probe*, Pew Research Center (June 20, 2018), http://www.pewresearch.org/fact-tank/2018/06/20/trump-mueller-probe/.

# Exhibit 5



# The Attorney General
## Washington, D.C.

March 22, 2019

The Honorable Lindsey Graham
Chairman, Committee on the Judiciary
United States Senate
290 Russell Senate Office Building
Washington, D.C. 20510

The Honorable Jerrold Nadler
Chairman, Committee on the Judiciary
United States House of Representatives
2132 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Dianne Feinstein
Ranking Member, Committee on the Judiciary
United States Senate
331 Hart Senate Office Building
Washington, D.C. 20510

The Honorable Doug Collins
Ranking Member, Committee on the Judiciary
United States House of Representatives
1504 Longworth House Office Building
Washington, D.C. 20515

Dear Chairman Graham, Chairman Nadler, Ranking Member Feinstein, and Ranking Member Collins:

I write to notify you pursuant to 28 C.F.R. § 600.9(a)(3) that Special Counsel Robert S. Mueller III has concluded his investigation of Russian interference in the 2016 election and related matters. In addition to this notification, the Special Counsel regulations require that I provide you with "a description and explanation of instances (if any) in which the Attorney General" or acting Attorney General "concluded that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued." 28 C.F.R. § 600.9(a)(3). There were no such instances during the Special Counsel's investigation.

The Special Counsel has submitted to me today a "confidential report explaining the prosecution or declination decisions" he has reached, as required by 28 C.F.R. § 600.8(c). I am reviewing the report and anticipate that I may be in a position to advise you of the Special Counsel's principal conclusions as soon as this weekend.

Separately, I intend to consult with Deputy Attorney General Rosenstein and Special Counsel Mueller to determine what other information from the report can be released to Congress and the public consistent with the law, including the Special Counsel regulations, and the Department's long-standing practices and policies. I remain committed to as much transparency as possible, and I will keep you informed as to the status of my review.

Finally, the Special Counsel regulations provide that "the Attorney General may determine that public release of" this notification "would be in the public interest." 28 C.F.R. § 600.9(c). I have so determined, and I will disclose this letter to the public after delivering it to you.

Sincerely,

William P. Barr
Attorney General

# Exhibit 6



# The Attorney General
### Washington, D.C.

March 24, 2019

The Honorable Lindsey Graham
Chairman, Committee on the Judiciary
United States Senate
290 Russell Senate Office Building
Washington, D.C. 20510

The Honorable Jerrold Nadler
Chairman, Committee on the Judiciary
United States House of Representatives
2132 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Dianne Feinstein
Ranking Member, Committee on the Judiciary
United States Senate
331 Hart Senate Office Building
Washington, D.C. 20510

The Honorable Doug Collins
Ranking Member, Committee on the Judiciary
United States House of Representatives
1504 Longworth House Office Building
Washington, D.C. 20515

Dear Chairman Graham, Chairman Nadler, Ranking Member Feinstein, and Ranking Member Collins:

As a supplement to the notification provided on Friday, March 22, 2019, I am writing today to advise you of the principal conclusions reached by Special Counsel Robert S. Mueller III and to inform you about the status of my initial review of the report he has prepared.

### *The Special Counsel's Report*

On Friday, the Special Counsel submitted to me a "confidential report explaining the prosecution or declination decisions" he has reached, as required by 28 C.F.R. § 600.8(c). This report is entitled "Report on the Investigation into Russian Interference in the 2016 Presidential Election." Although my review is ongoing, I believe that it is in the public interest to describe the report and to summarize the principal conclusions reached by the Special Counsel and the results of his investigation.

The report explains that the Special Counsel and his staff thoroughly investigated allegations that members of the presidential campaign of Donald J. Trump, and others associated with it, conspired with the Russian government in its efforts to interfere in the 2016 U.S. presidential election, or sought to obstruct the related federal investigations. In the report, the Special Counsel noted that, in completing his investigation, he employed 19 lawyers who were assisted by a team of approximately 40 FBI agents, intelligence analysts, forensic accountants, and other professional staff. The Special Counsel issued more than 2,800 subpoenas, executed nearly 500 search warrants, obtained more than 230 orders for communication records, issued almost 50 orders authorizing use of pen registers, made 13 requests to foreign governments for evidence, and interviewed approximately 500 witnesses.

1

The Special Counsel obtained a number of indictments and convictions of individuals and entities in connection with his investigation, all of which have been publicly disclosed. During the course of his investigation, the Special Counsel also referred several matters to other offices for further action. The report does not recommend any further indictments, nor did the Special Counsel obtain any sealed indictments that have yet to be made public. Below, I summarize the principal conclusions set out in the Special Counsel's report.

**Russian Interference in the 2016 U.S. Presidential Election.** The Special Counsel's report is divided into two parts. The first describes the results of the Special Counsel's investigation into Russia's interference in the 2016 U.S. presidential election. The report outlines the Russian effort to influence the election and documents crimes committed by persons associated with the Russian government in connection with those efforts. The report further explains that a primary consideration for the Special Counsel's investigation was whether any Americans – including individuals associated with the Trump campaign – joined the Russian conspiracies to influence the election, which would be a federal crime. The Special Counsel's investigation did not find that the Trump campaign or anyone associated with it conspired or coordinated with Russia in its efforts to influence the 2016 U.S. presidential election. As the report states: "[T]he investigation did not establish that members of the Trump Campaign conspired or coordinated with the Russian government in its election interference activities."[1]

The Special Counsel's investigation determined that there were two main Russian efforts to influence the 2016 election. The first involved attempts by a Russian organization, the Internet Research Agency (IRA), to conduct disinformation and social media operations in the United States designed to sow social discord, eventually with the aim of interfering with the election. As noted above, the Special Counsel did not find that any U.S. person or Trump campaign official or associate conspired or knowingly coordinated with the IRA in its efforts, although the Special Counsel brought criminal charges against a number of Russian nationals and entities in connection with these activities.

The second element involved the Russian government's efforts to conduct computer hacking operations designed to gather and disseminate information to influence the election. The Special Counsel found that Russian government actors successfully hacked into computers and obtained emails from persons affiliated with the Clinton campaign and Democratic Party organizations, and publicly disseminated those materials through various intermediaries, including WikiLeaks. Based on these activities, the Special Counsel brought criminal charges against a number of Russian military officers for conspiring to hack into computers in the United States for purposes of influencing the election. But as noted above, the Special Counsel did not find that the Trump campaign, or anyone associated with it, conspired or coordinated with the Russian government in these efforts, despite multiple offers from Russian-affiliated individuals to assist the Trump campaign.

---

[1]   In assessing potential conspiracy charges, the Special Counsel also considered whether members of the Trump campaign "coordinated" with Russian election interference activities. The Special Counsel defined "coordination" as an "agreement—tacit or express—between the Trump Campaign and the Russian government on election interference."

**Obstruction of Justice.** The report's second part addresses a number of actions by the President – most of which have been the subject of public reporting – that the Special Counsel investigated as potentially raising obstruction-of-justice concerns. After making a "thorough factual investigation" into these matters, the Special Counsel considered whether to evaluate the conduct under Department standards governing prosecution and declination decisions but ultimately determined not to make a traditional prosecutorial judgment. The Special Counsel therefore did not draw a conclusion – one way or the other – as to whether the examined conduct constituted obstruction. Instead, for each of the relevant actions investigated, the report sets out evidence on both sides of the question and leaves unresolved what the Special Counsel views as "difficult issues" of law and fact concerning whether the President's actions and intent could be viewed as obstruction. The Special Counsel states that "while this report does not conclude that the President committed a crime, it also does not exonerate him."

The Special Counsel's decision to describe the facts of his obstruction investigation without reaching any legal conclusions leaves it to the Attorney General to determine whether the conduct described in the report constitutes a crime. Over the course of the investigation, the Special Counsel's office engaged in discussions with certain Department officials regarding many of the legal and factual matters at issue in the Special Counsel's obstruction investigation. After reviewing the Special Counsel's final report on these issues; consulting with Department officials, including the Office of Legal Counsel; and applying the principles of federal prosecution that guide our charging decisions, Deputy Attorney General Rod Rosenstein and I have concluded that the evidence developed during the Special Counsel's investigation is not sufficient to establish that the President committed an obstruction-of-justice offense. Our determination was made without regard to, and is not based on, the constitutional considerations that surround the indictment and criminal prosecution of a sitting president.[2]

In making this determination, we noted that the Special Counsel recognized that "the evidence does not establish that the President was involved in an underlying crime related to Russian election interference," and that, while not determinative, the absence of such evidence bears upon the President's intent with respect to obstruction. Generally speaking, to obtain and sustain an obstruction conviction, the government would need to prove beyond a reasonable doubt that a person, acting with corrupt intent, engaged in obstructive conduct with a sufficient nexus to a pending or contemplated proceeding. In cataloguing the President's actions, many of which took place in public view, the report identifies no actions that, in our judgment, constitute obstructive conduct, had a nexus to a pending or contemplated proceeding, and were done with corrupt intent, each of which, under the Department's principles of federal prosecution guiding charging decisions, would need to be proven beyond a reasonable doubt to establish an obstruction-of-justice offense.

### *Status of the Department's Review*

The relevant regulations contemplate that the Special Counsel's report will be a "confidential report" to the Attorney General. *See* Office of Special Counsel, 64 Fed. Reg. 37,038,

---

[2]   *See A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (2000).

37,040-41 (July 9, 1999). As I have previously stated, however, I am mindful of the public interest in this matter. For that reason, my goal and intent is to release as much of the Special Counsel's report as I can consistent with applicable law, regulations, and Departmental policies.

Based on my discussions with the Special Counsel and my initial review, it is apparent that the report contains material that is or could be subject to Federal Rule of Criminal Procedure 6(e), which imposes restrictions on the use and disclosure of information relating to "matter[s] occurring before [a] grand jury." Fed. R. Crim. P. 6(e)(2)(B). Rule 6(e) generally limits disclosure of certain grand jury information in a criminal investigation and prosecution. *Id.* Disclosure of 6(e) material beyond the strict limits set forth in the rule is a crime in certain circumstances. *See, e.g.*, 18 U.S.C. § 401(3). This restriction protects the integrity of grand jury proceedings and ensures that the unique and invaluable investigative powers of a grand jury are used strictly for their intended criminal justice function.

Given these restrictions, the schedule for processing the report depends in part on how quickly the Department can identify the 6(e) material that by law cannot be made public. I have requested the assistance of the Special Counsel in identifying all 6(e) information contained in the report as quickly as possible. Separately, I also must identify any information that could impact other ongoing matters, including those that the Special Counsel has referred to other offices. As soon as that process is complete, I will be in a position to move forward expeditiously in determining what can be released in light of applicable law, regulations, and Departmental policies.

\*     \*     \*

As I observed in my initial notification, the Special Counsel regulations provide that "the Attorney General may determine that public release of" notifications to your respective Committees "would be in the public interest." 28 C.F.R. § 600.9(c). I have so determined, and I will disclose this letter to the public after delivering it to you.

Sincerely,

William P. Barr
Attorney General

4

# Exhibit 7



# The Attorney General
## Washington, D.C.

March 29, 2019

The Honorable Lindsey Graham
Chairman, Committee on the Judiciary
United States Senate
290 Russell Senate Office Building
Washington, D.C. 20510

The Honorable Jerrold Nadler
Chairman, Committee on the Judiciary
United States House of Representatives
2132 Rayburn House Office Building
Washington, D.C. 20515

Dear Chairman Graham and Chairman Nadler,

I write in response to Chairman Nadler's March 25, 2019 letter and Chairman Graham's March 27, 2019 letter, which addressed the investigation of Special Counsel Robert S. Mueller, III and the "confidential report" he has submitted to me pursuant to 28 C.F.R. § 600.8(c).

As we have discussed, I share your desire to ensure that Congress and the public have the opportunity to read the Special Counsel's report. We are preparing the report for release, making the redactions that are required. The Special Counsel is assisting us in this process. Specifically, we are well along in the process of identifying and redacting the following: (1) material subject to Federal Rule of Criminal Procedure 6(e) that by law cannot be made public; (2) material the intelligence community identifies as potentially compromising sensitive sources and methods; (3) material that could affect other ongoing matters, including those that the Special Counsel has referred to other Department offices; and (4) information that would unduly infringe on the personal privacy and reputational interests of peripheral third parties. Our progress is such that I anticipate we will be in a position to release the report by mid-April, if not sooner. Although the President would have the right to assert privilege over certain parts of the report, he has stated publicly that he intends to defer to me and, accordingly, there are no plans to submit the report to the White House for a privilege review.

Also, I am aware of some media reports and other public statements mischaracterizing my March 24, 2019 supplemental notification as a "summary" of the Special Counsel's investigation and report. For example, Chairman Nadler's March 25 letter refers to my supplemental notification as a "four-page summary of the Special Counsel's review." My March 24 letter was not, and did not purport to be, an exhaustive recounting of the Special Counsel's investigation or

1

report.  As my letter made clear, my notification to Congress and the public provided, pending release of the report, a summary of its "principal conclusions"—that is, its bottom line.  The Special Counsel's report is nearly 400 pages long (exclusive of tables and appendices) and sets forth the Special Counsel's findings, his analysis, and the reasons for his conclusions.  Everyone will soon be able to read it on their own.  I do not believe it would be in the public's interest for me to attempt to summarize the full report or to release it in serial or piecemeal fashion.

As I have discussed with both of you, I believe it would be appropriate for me to testify publicly on behalf of the Department shortly after the Special Counsel's report is made public.  I am currently available to testify before the Senate Judiciary Committee on May 1, 2019 and before the House Judiciary Committee on May 2, 2019.

* * *

Finally, in the interests of keeping the public informed as to these matters, I intend to make this letter public after delivering it to you.

Sincerely,

William P. Barr
Attorney General

cc:     Ranking Member Dianne Feinstein; Ranking Member Doug Collins