**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ELECTRONIC PRIVACY INFORMATION CENTER,

    Plaintiff,

    v.

UNITED STATES DEPARTMENT OF JUSTICE,

    Defendant.

Civ. Action No. 19-810 (RBW)

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

SUMMARY ..................................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.    Russian Interference in the 2016 U.S. Presidential Election ................................. 2

II.   Criminal and Counterintelligence Investigations into Russian Election Interference ........ 5

III.  The Mueller Report and Other Special Counsel Records.................................... 10

IV.   EPIC's FOIA Request......................................................................................... 12

V.    The DOJ's Failure to Expeditiously Search for and Release the Requested Records ....... 15

VI.   The Freedom of Information Act and Its Progeny ............................................. 16

ARGUMENT.................................................................................................................. 17

I.    The Court Has Jurisdiction to Grant the Requested Relief................................. 18

II.   EPIC Is Entitled to a Preliminary Injunction .................................................... 19

      A.    EPIC is likely to succeed on the merits of its claims. ........................... 20

      B.    EPIC will suffer irreparable harm if relief is not granted. .................... 25

      C.    The balance of the equities and the public interest favor relief............. 30

CONCLUSION.............................................................................................................. 33

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. DOJ*,
321 F. Supp. 2d 24 (D.D.C. 2004) ..................................................................... 24

*Ahuruonye v. U.S. Dep't of Interior*, 3
12 F. Supp. 3d 1 (D.D.C. 2018) ........................................................................ 19

*Al-Fayed v. CIA*,
254 F.3d 300 (D.C. Cir. 2001) ..................................................................... 18, 21

*Byrd v. EPA*,
174 F.3d 239 (D.C. Cir. 1999) ........................................................................... 25

*DOJ v. Tax Analysts*,
492 U.S. 136 (1989) .......................................................................................... 25

*Edmonds v. FBI*,
No. CIV.A. 02-1294 (ESH), 2002 WL 32539613 (D.D.C. Dec. 3, 2002) .............................. 24

*Elec. Frontier Found. v. DOJ*,
563 F. Supp. 2d 188 (D.D.C. 2008) ................................................................... 24

*Elec. Frontier Found. v. Office of Dir. of Nat'l Intelligence*,
2007 WL 4208311 (N.D. Cal. Nov. 27, 2007) ...................................................... 27

*EPIC v. DHS*,
No. 17-2047 (D.D.C. filed Oct. 4, 2017) ............................................................. 29

*EPIC v. DOD*,
241 F. Supp. 2d 5 (D.D.C. 2003) ............................................................. 14, 15, 22

*EPIC v. DOJ*,
416 F. Supp. 2d 30 (D.D.C. 2006) ........................................... 17, 18, 27, 30, 31

*EPIC v. FBI*,
No. 1:17-CV-00121 (TNM), 2018 WL 2324084 (D.D.C. May 22, 2018) .............................. 29

*EPIC v. Presidential Advisory Comm'n on Election Integrity*,
266 F. Supp. 3d 297 (D.D.C. 2017), *aff'd on other grounds*,
878 F.3d 371 (D.C. Cir. 2017) ........................................................................... 26

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ........................................................................... 31

*In re Report & Recommendation of June 5, 1972 Grand Jury Concerning*
  *Transmission of Evidence to House of Representatives,*
  370 F. Supp. 1219 (D.D.C. 1974), *aff'd sub nom. Haldeman v. Sirica,*
  501 F.2d 714 (D.C. Cir. 1974)............................................................................ 12

*Judicial Watch, Inc. v. DHS,*
  895 F.3d 770 (D.C. Cir. 2018)............................................................................ 25

*League of Women Voters of United States v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016)................................................................................ 31

*Nken v. Holder,*
  556 U.S. 418 (2009)........................................................................................... 19

*NLRB v. Robbins Tire & Rubber Co.,*
  437 U.S. 352 (1976)...................................................................................... 16, 32

*Oglesby v. Dep't of the Army,*
  920 F.2d 57 (D.C. Cir. 1990).............................................................................. 18

*Payne Enters., Inc. v. United States,*
  837 F.2d 486 (D.C. Cir. 1988)..............................................................18, 23, 25, 33

*Protect Democracy Project v. DOD,*
  263 F. Supp. 3d 293 (D.D.C. 2017)............................................................... 27, 31

*Pursuing America's Greatness v. FEC,*
  831 F.3d 500 (D.C. Cir. 2016)............................................................................ 31

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011)............................................................................ 19

*United States v. Internet Res. Agency,*
  No. 18-32 (D.D.C. Feb. 16, 2018)...................................................................... 27

*United States v. Netyksho,*
  No. 18-215 (D.D.C. July 13, 2018)..................................................................... 27

*United States v. Stone,*
  No. 19-18 (D.D.C. Jan. 24, 2019)....................................................................... 27

*Washington Post v. DHS,*
  459 F. Supp. 2d 61 (D.D.C. 2006)...................................................................... 26

*Winter v. NRDC,*
  555 U.S. 7 (2008)............................................................................................... 17

**Statutes**

5 U.S.C. § 552(a)(3)(A) .................................................................................... 25

5 U.S.C. § 552(a)(4)(A)(ii)(II) ......................................................................... 15

5 U.S.C. § 552(a)(4)(B) ............................................................................. 17, 18

5 U.S.C. § 552(a)(6) ............................................................................. 16, 19, 20

5 U.S.C. § 552(a)(6)(A)(i) ..................................................................... 17, 18, 20

5 U.S.C. § 552(a)(6)(A)(ii) ......................................................................... 18, 21

5 U.S.C. § 552(a)(6)(B)(i) ................................................................................ 20

5 U.S.C. § 552(a)(6)(C) ................................................................................... 18

5 U.S.C. § 552(a)(6)(E) ............................................................................. 16, 17

5 U.S.C. § 552(a)(6)(E)(i) ................................................................................ 21

5 U.S.C. § 552(a)(6)(E)(ii)(II) ................................................................... 18, 21

5 U.S.C. § 552(a)(6)(E)(iii) ....................................................................... 17, 21

5 U.S.C. § 552(a)(6)(E)(v) ............................................................................... 17

5 U.S.C. § 552(a)(6)(E)(v)(II) .......................................................... 21, 22, 23, 31

Electronic Freedom of Information Act Amendments of 1996,
    Pub. L. 104-231, 110 Stat. 3048 (1996) .................................................... 17

**Regulations**

28 C.F.R. § 16.5(e)(1) ..................................................................................... 21

28 C.F.R. § 16.5(e)(1)(ii) ........................................................ 14, 16, 21, 22, 23, 31

28 C.F.R. § 16.5(e)(1)(iv) ........................................................ 15, 16, 21, 23, 24

28 C.F.R. § 16.10(k)(1) .................................................................................... 15

28 C.F.R. § 45.2(a) ............................................................................................ 5

28 C.F.R. § 600.1 ...................................................................................... 12, 24

28 C.F.R. § 600.4(a) .......................................................................................... 7

28 C.F.R. § 600.4(c)...................................................................................................... 11

28 C.F.R. § 600.6 .......................................................................................................... 11

28 C.F.R. § 600.7(b)...................................................................................................... 11

28 C.F.R. § 600.8(a)(2) ................................................................................................. 10

28 C.F.R. § 600.8(c)................................................................................................. 10, 25

28 C.F.R. § 600.9(a)................................................................................................. 11, 25

**Other**

Adam Edelman, *Trump says He Didn't Fire Comey 'Because of Russia,'*
   *Contradicting Past Statements*, NBC News (May 31, 2018)......................................6

Adam Goldman & Edward Wong, *Trump Installs a Critic of the Mueller*
   *Investigation to Oversee It*, N.Y. Times (Nov. 7, 2018) ...........................................9

Allan Smith, *NBC News: First Democratic debate set for Miami,*
   *June 26-27*, NBC News (Mar. 28, 2019)...................................................................29

Andrew P. Napolitano, *Beyond the Barr Revelation*, Wash. Times
   (Mar. 27, 2019) ........................................................................................................27

EPIC, *Democracy and Cybersecurity: Preserving Democratic Institutions*
   (Feb. 4, 2019)............................................................................................................29

EPIC, *EPIC v. DHS* (Jan. 31, 2019)...............................................................................30

EPIC, *EPIC v. FBI* (Russian Hacking) (Feb. 28, 2019)..................................................29

Griffin Connolly, *Most Republicans Want to See the Full Mueller Report,*
   *New Poll Finds*, Roll Call (Mar. 27, 2019) .............................................................32

House Permanent Select Committee on Intelligence, *Status of the Russia*
   *Investigation (Minority Report)* (Mar. 13, 2018)......................................................4

Indictment, *United States v. Internet Res. Agency*,
   No. 18-32 (D.D.C. Feb. 16, 2018) .............................................................................4

Indictment, *United States v. Internet Research Agency LLC*,
   No. 18-32 (D.D.C. Feb. 16, 2018) .............................................................................8

Indictment, *United States v. Netyksho*,
   No. 18-215 (D.D.C. July 13, 2018)............................................................................8

Indictment, *United States v. Stone*,
No. 19-18 (D.D.C. Jan. 24, 2019) .............................................................. 8

Jennifer Agiesta, *CNN Poll: Almost Everyone Wants a Public Report on
Mueller's Findings*, CNN (Feb. 7, 2019) ...................................................... 32

Letter from Donald J. Trump, President of the United States, to James B.
Comey, Dir., Fed. Bureau of Investigation (May 9, 2017) ......................... 6

Letter from Jefferson B. Sessions III, Att'y Gen., to Donald J. Trump,
President (Nov. 7, 2018) ............................................................................... 9

Letter from Stephen E. Boyd, Asst. Att'y Gen., to Sen. Mitch McConnell
& Sen. Charles E. Schumer (Dec. 20, 2018) ............................................... 9

Marc Rotenberg, *Americans Have a Right to Know What Intel Community
Knows on Russia*, The Hill (March 27, 2017) ............................................. 29

Memorandum from Steven A. Engel, Asst. Att'y Gen., to Emmet T. Flood,
Counsel to the President (Nov. 14, 2018) .................................................... 9

Memorandum from William P. Barr to Rod Rosenstein, Deputy Attorney
General (June 8, 2018) ................................................................................. 9

Office of the Dir. of Nat'l Intelligence, ICA 2017-01D, *Intelligence
Community Assessment: Assessing Russian Activities and Intentions
in Recent US Elections* (Jan. 6, 2017) ...................................................... 3, 4

Plea Agreement, *United States v. Cohen*,
No. 18-850 (S.D.N.Y. Nov. 29, 2018) ........................................................ 8

Plea Agreement, *United States v. Flynn*,
No. 17-232 (D.D.C. Dec. 1, 2017) .............................................................. 7

Plea Agreement, *United States v. Gates*,
No. 17-201 (D.D.C. Feb. 23, 2018) ............................................................ 7

Plea Agreement, *United States v. Manafort*,
No. 17-201 (D.D.C. Sep. 14, 2018) ............................................................ 7

Plea Agreement, *United States v. Papadopolous*,
No. 17-182 (D.D.C. Oct. 5, 2017) .............................................................. 8

Press Release, Rep. Jerrold Nadler et al., House Committee Chairs
Demand DOJ Release Full Mueller Report & Underlying Evidence
to Congress ................................................................................................ 28

Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement
on Recusal (Mar. 2, 2017) .................................................................................. 5

Randall D. Eliason, *William Barr Has Some Explaining to Do*, Wash. Post
(Mar. 27, 2019) .................................................................................................. 26

*Remarks by President Trump Before Air Force One Departure*, The White
House (Mar. 24, 2019) ...................................................................................... 28

*Roll Call Vote 116th Congress - 1st Session*, U.S. Senate (Feb. 14, 2019) ................... 9

Rosalind S. Helderman, Leslie Shapiro, & Chris Alcantara, *What We
Learned About Trumpworld Outreach to Russia Since Mueller's
Investigation Began*, Wash. Post (Feb. 19, 2019)................................................ 5

*Russian Active Measures Investigation: Hearing Before the H. Permanent
Select Comm. on Intelligence*, 115th Cong. (2017) (Statement of James
B. Comey, Dir., Fed. Bureau of Investigation).................................................. 6

Scott Shane & Mark Mazzetti, *The Plot to Subvert an Election:
Unraveling the Russia Story So Far*, N.Y. Times (Sep. 20, 2018)........................ 5

Senate Select Comm. on Intelligence, *The Intelligence Community
Assessment: Assessing Russian Activities and Intentions in Recent
U.S. Elections* (July 3, 2018) ......................................................................... 4, 5

Statement of the Offense, *United States v. Papadopoulos*,
No. 17-182 (D.D.C. Oct. 5, 2017)....................................................................... 3

Steven Shepard, *Poll: Majority Wants Mueller Report Released to the
Public*, Politico (Mar. 27, 2019) ...................................................................... 32

*The Debate About the Mueller Report*, N.Y. Times (Mar. 26, 2019).......................... 26

*The Mueller Report's Fallout*, Wash. Post (Mar. 26, 2019)....................................... 26

Todd Ruger, *Lindsey Graham Wants Attorney General to Testify on
Mueller Report*, Roll Call (Mar. 25, 2019)....................................................... 27

U.S. Dep't of Justice, *Special Counsel's Office* (Jan. 25, 2019) ................................ 7

Vivian Salama & Kristina Peterson, *Trump Signals Support for Report's
Release as Democrats Dispute 'Exoneration,'* Wall Street J. (Mar. 25, 2019)......................... 33

Zack Budryk, *Poll: 84 Percent Want Mueller Report Made Public*,
The Hill (Mar. 26, 2019) .................................................................................. 32

## SUMMARY

Few, if any, government documents in the recent history of the United States have commanded more attention than the "Mueller Report"—the Special Counsel's final report on Russian interference in the 2016 presidential election. Since the launch of the Special Counsel investigation, news organizations have published thousands of articles concerning the timing, contents, and possible implications of the Mueller Report. The "Mueller Report" became a common phrase before it even existed. And public interest dramatically intensified one week ago, when Attorney General William P. Barr formally acknowledged that the Department of Justice, after a two-year investigation, was in possession of the report. Yet the agency has made available only a four-page summary of a nearly 400-page report detailing the possible ties between the President of the United States and a foreign adversary. Though clear majorities of Americans in both political parties favor the release of the Mueller Report, the agency has withheld the document. The public, which funds the activities of our government and has the right to know about its activities, remains in the dark as to the most consequential government investigation in recent history.

The Electronic Privacy Information Center ("EPIC") aims to change that. In November 2018, EPIC filed a detailed Freedom of Information Act ("FOIA") Request for the Mueller Report and related records generated by the Special Counsel. Astonishingly, the Department of Justice ("DOJ") refused to process EPIC's FOIA Request or to grant expedited processing, a determination that EPIC was surely entitled to. The agency concluded, inexplicably, that disclosure of the requested records was of no special urgency or interest to the public. Nearly five months later, the agency has still not undertaken a search for responsive records, issued a final determination, or disclosed a single document in response to EPIC's FOIA Request. The failure

of the DOJ to expeditiously process EPIC's request violates the FOIA in numerous respects and entitles EPIC to relief from this Court.

Accordingly, EPIC now seeks a preliminary injunction ordering the agency to grant EPIC's request for expedited processing and to immediately process and issue a determination on EPIC's FOIA Request. The requirements for an injunction are easily satisfied: (1) EPIC is likely to succeed on the merits of its claim because the DOJ improperly denied expedited processing, failed to issue a determination within the statutory processing deadlines, and is unlawfully withholding responsive records; (2) EPIC will be irreparably harmed absent an injunction because the requested records are central to an unfolding national controversy that cannot be replayed; and (3) the balance of the equities and public interest heavily favor the requested injunction, which would merely require the DOJ to fulfill its statutory obligation to expeditiously process EPIC's FOIA Request for documents that are of extraordinary value to the public. The Court should order the DOJ to complete an immediate search for responsive records and to issue a determination without delay, as the FOIA commands.

## BACKGROUND

### I.  Russian Interference in the 2016 U.S. Presidential Election

In 2016, the Russian government carried out a multi-pronged attack on the U.S. presidential election to destabilize U.S. democratic institutions and to aid the candidacy of Donald J. Trump. As explained in the declassified 2017 Intelligence Community Assessment ("ICA") on Russian election interference:

> We assess with high confidence that Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election, the consistent goals of which were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency. We further assess Putin and the Russian Government developed a clear preference for President-elect Trump. When it appeared to Moscow that Secretary Clinton was

2

likely to win the election, the Russian influence campaign then focused on undermining her expected presidency.

We also assess Putin and the Russian Government aspired to help President-elect Trump's election chances when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to him.

Office of the Dir. of Nat'l Intelligence, ICA 2017-01D, *Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent US Elections* 1 (Jan. 6, 2017) ("ICA").[1] The ICA—along with the reports, investigations, and prosecutions that have ensued—establishes that Russia interfered with the 2016 election on at least four fronts.

First, "Russia's intelligence services conducted cyber operations against targets associated with the 2016 US presidential election, including targets associated with both major US political parties." ICA at 2; *see also* Ex. 6, Letter from William P. Barr, Attorney Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, et al. at 2 (Mar. 24, 2019). These operations included the "exfiltrat[ion of] large volumes of data" from the Democratic National Committee ("DNC") and "the compromise of the personal e-mail accounts of Democratic Party officials and political figures." ICA at 2.

Second, Russian intelligence services "used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in cyber operations publicly and in exclusives to media outlets." *Id.* at 2–3; Ex. 6 at 2. These disclosures included data extracted by Russian intelligence from DNC networks. ICA at 3. Subsequent investigation has also revealed that senior Trump campaign officials engaged in multiple meetings with Russian intermediaries offering to provide "dirt" on Hillary Clinton, including "thousands of emails" obtained by Russia. Statement of the Offense ¶ 14, *United States v. Papadopoulos*, No. 17-182 (D.D.C. Oct. 5, 2017) ("The

---

[1] https://www.dni.gov/files/documents/ICA_2017_01.pdf.

Professor told defendant PAPADOPOULOS . . . that 'They [the Russians] have dirt on her'; 'the Russians had emails of Clinton'; 'they have thousands of emails.'");[2] *see also* House Permanent Select Committee on Intelligence, *Status of the Russia Investigation (Minority Report)* (Mar. 13, 2018), (noting that the "stated purpose" of "the June 9, 2016 Trump Tower meeting with Russian emissaries" was to "provide damaging information on Hillary Clinton").[3]

   Third, "Russian intelligence accessed elements of multiple state or local electoral boards" in an ongoing effort to assess "US electoral processes and related technology and equipment." ICA at 3.

   Fourth, "Russia's state-run propaganda machine—comprised of its domestic media apparatus, outlets targeting global audiences such as RT and Sputnik, and a network of quasi-government trolls—contributed to the influence campaign by serving as a platform for Kremlin messaging to Russian and international audiences." ICA at 3–4. As part of this propaganda push, the Russian government spent millions of dollars and employed hundreds of people to flood Facebook and Twitter with fraudulent users, posts, articles, groups, and targeted advertisements. Indictment ¶¶ 3–6, 10, *United States v. Internet Res. Agency*, No. 18-32 (D.D.C. Feb. 16, 2018).[4]

   In the two years since the Intelligence Community Assessment was published, the ICA's findings have been repeatedly confirmed by federal inquiries and investigative reporting. *See, e.g.*, Senate Select Comm. on Intelligence, *The Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent U.S. Elections* (July 3, 2018);[5] Scott Shane & Mark Mazzetti,

---

[2] https://www.justice.gov/file/1007346/download.

[3] https://democrats-intelligence.house.gov/uploadedfiles/final_-_minority_status_of_the_russia_investigation_with_appendices.pdf.

[4] https://www.justice.gov/file/1035477/download.

[5] https://www.burr.senate.gov/imo/media/doc/SSCI%20ICA%20ASSESSMENT_FINALJULY3.pdf

*The Plot to Subvert an Election: Unraveling the Russia Story So Far*, N.Y. Times (Sep. 20, 2018);[6] Rosalind S. Helderman, Leslie Shapiro, & Chris Alcantara, *What We Learned About Trumpworld Outreach to Russia Since Mueller's Investigation Began*, Wash. Post (Feb. 19, 2019).[7] The Senate Intelligence Committee, after an "an in-depth review" of the ICA and associated intelligence, determined that "the conclusions of the ICA are sound" and noted "that collection and analysis subsequent to the ICA's publication continue to reinforce its assessments." Senate Select Comm. on Intelligence, *supra*, at 7.

## II.    Criminal and Counterintelligence Investigations into Russian Election Interference

On January 20, 2017—two weeks after the public release of the Intelligence Community Assessment—Donald J. Trump was inaugurated as the 45th President of the United States.

On March 2, 2017, then-Attorney General Jeff Sessions, who had been a prominent supporter of Mr. Trump during the campaign, recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States." Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement on Recusal (Mar. 2, 2017);[8] *see also* 28 C.F.R. § 45.2(a). As a result, the responsibilities of the Attorney General for any such investigation passed to the Deputy Attorney General.

On March 20, 2017, James B. Comey, then-Director of the Federal Bureau of Investigation ("FBI"), confirmed to the House Permanent Select Committee on Intelligence that the FBI was conducting an investigation into "the Russian government's efforts to interfere in the 2016 presidential election," including "the nature of any links between individuals associated with

---

[6] https://www.nytimes.com/interactive/2018/09/20/us/politics/russia-interference-election-trump-clinton.html.

[7] https://www.washingtonpost.com/graphics/2019/politics/mueller-report-primer/.

[8] https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal.

the Trump campaign and the Russian government and whether there was any coordination

between the campaign and Russia's efforts." *Russian Active Measures Investigation: Hearing*

*Before the H. Permanent Select Comm. on Intelligence*, 115th Cong. (2017) (Statement of James

B. Comey, Dir., Fed. Bureau of Investigation).[9] Mr. Comey noted that the investigation would

include "an assessment of whether any crimes were committed." *Id.*

On May 9, 2017, President Trump removed Director Comey from office and terminated

his employment. Letter from Donald J. Trump, President of the United States, to James B.

Comey, Dir., Fed. Bureau of Investigation (May 9, 2017).[10] Two days later, in a nationally

televised NBC News interview, President Trump stated:

> I was going to fire Comey knowing, there was no good time to do it. And in fact
> when I decided to just do it, I said to myself, I said you know, this Russia thing with
> Trump and Russia is a made up story, it's an excuse by the Democrats for having
> lost an election that they should have won.

Adam Edelman, *Trump says He Didn't Fire Comey 'Because of Russia,' Contradicting Past*

*Statements*, NBC News (May 31, 2018).[11]

On May 17, 2017, Deputy Attorney General Rod J. Rosenstein—in his capacity as Acting

Attorney General—appointed Robert S. Mueller III "to serve as Special Counsel for the United

States Department of Justice." Ex. 1, U.S. Dep't of Justice, Office of the Deputy Att'y Gen., Order

No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the

2016 Presidential Election and Related Matters ¶ (a) (May 17, 2017). Mr. Rosenstein authorized

Mr. Mueller to "conduct the investigation confirmed by then-FBI Director James B. Comey in

---

[9] https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation.

[10] https://www.gpo.gov/fdsys/pkg/DCPD-201700325/pdf/DCPD-201700325.pdf.

[11] https://www.nbcnews.com/politics/donald-trump/trump-says-he-didn-t-fire-comey-because-russia-contradicting-n878836.

testimony before the House Permanent Select Committee on Intelligence on March 20, 2017,"

including "any links and/or coordination between the Russian government and individuals

associated with the campaign of President Donald Trump"; "any matters that arose or may arise

directly from the investigation"; and "any other matters within the scope of 28 C.F.R. § 600.4(a)."

Ex. 1 ¶ (b). Mr. Rosenstein also authorized Mr. Mueller "to prosecute federal crimes arising from

the investigation of these matters" where "it is necessary and appropriate[.]" *Id.* ¶ (c).

Over the course of Mr. Mueller's investigation, the Special Counsel brought criminal

charges against 34 individuals and three organizations. U.S. Dep't of Justice, *Special Counsel's

Office* (Jan. 25, 2019).[12] These include:

- Former National Security Adviser Michael Flynn, who pleaded guilty to making false

  statements to the FBI, Plea Agreement, *United States v. Flynn*, No. 17-232 (D.D.C.

  Dec. 1, 2017);[13]

- Former Trump campaign manager Paul Manafort, who was convicted of multiple

  counts of tax fraud and bank fraud, U.S. Dep't of Justice, *Special Counsel's Office*,

  *supra*, and pleaded guilty to conspiracy against the United States and other charges,

  Plea Agreement, *United States v. Manafort*, No. 17-201 (D.D.C. Sep. 14, 2018);[14]

- Former Trump deputy campaign manager Rick Gates, who pleaded guilty to

  conspiracy against the United States and making a false statement to the FBI, Plea

  Agreement, *United States v. Gates*, No. 17-201 (D.D.C. Feb. 23, 2018);[15]

---

[12] https://www.justice.gov/sco.

[13] https://www.justice.gov/file/1015121/download.

[14] https://www.justice.gov/file/1094151/download.

[15] https://www.justice.gov/file/1038801/download.

- Former Trump campaign foreign policy adviser George Papadopolous, who pleaded guilty to making false statements to the FBI, Plea Agreement, *United States v. Papadopolous*, No. 17-182 (D.D.C. Oct. 5, 2017);[16]

- Former Trump personal attorney Michael Cohen, who pleaded guilty to making false statements to Congress, Plea Agreement, *United States v. Cohen*, No. 18-850 (S.D.N.Y. Nov. 29, 2018);[17]

- Former Trump campaign advisor Roger Stone, who was indicted on charges of obstruction of justice, making false statements to Congress, and witness tampering, Indictment, *United States v. Stone*, No. 19-18 (D.D.C. Jan. 24, 2019);[18]

- The Internet Research Agency, Concord Management and Consulting LLC, Concord Catering, and thirteen Russian nationals, who are charged with conspiracy against the United States and related offenses for flooding social media platforms with fraudulent content to interfere with U.S. political processes, Indictment, *United States v. Internet Research Agency LLC,* No. 18-32 (D.D.C. Feb. 16, 2018);[19] and

- Twelve other Russian nationals, who are charged with conspiracy to commit computer crimes and other offenses for hacking Democratic Party computer networks and email accounts linked to the Clinton campaign, Indictment, *United States v. Netyksho*, No. 18-215 (D.D.C. July 13, 2018).[20]

---

[16] https://www.justice.gov/file/1007341/download.

[17] https://www.justice.gov/file/1115566/download.

[18] https://www.justice.gov/file/1124706/download.

[19] https://www.justice.gov/file/1035477/download.

[20] https://www.justice.gov/file/1080281/download.

On November 7, 2018, Attorney General Sessions resigned from office. Letter from Jefferson B. Sessions III, Att'y Gen., to Donald J. Trump, President (Nov. 7, 2018).[21] President Trump designated Matthew G. Whitaker, Chief of Staff to the Attorney General, to serve as Acting Attorney General. Memorandum from Steven A. Engel, Asst. Att'y Gen., to Emmet T. Flood, Counsel to the President, at 1 (Nov. 14, 2018).[22] Although Mr. Whitaker had been a prominent critic of Mr. Mueller's probe prior to assuming office, Adam Goldman & Edward Wong, *Trump Installs a Critic of the Mueller Investigation to Oversee It*, N.Y. Times (Nov. 7, 2018),[23] Whitaker "decided not to recuse himself from the Special Counsel investigation." Letter from Stephen E. Boyd, Asst. Att'y Gen., to Sen. Mitch McConnell & Sen. Charles E. Schumer at 2 (Dec. 20, 2018).[24]

In December 2018, President Trump nominated former Attorney General William P. Barr to serve again as Attorney General. Six months earlier, Mr. Barr had sent a memo to senior DOJ officials in which Barr strongly criticized the direction of the Special Counsel investigation and stated that Mr. Mueller's "obstruction theory" concerning President Trump's firing of Director Comey "should be rejected[.]" Memorandum from William P. Barr to Rod Rosenstein, Deputy Attorney General (June 8, 2018).[25] Mr. Barr was confirmed by the Senate as Attorney General on February 14, 2019. *Roll Call Vote 116th Congress - 1st Session*, U.S. Senate (Feb. 14, 2019).[26]

---

[21] https://int.nyt.com/data/documenthelper/475-jeff-sessions-letter-offering/optimized/full.pdf.

[22] https://www.justice.gov/olc/page/file/1110881/download.

[23] https://www.nytimes.com/2018/11/07/us/politics/whitaker-mueller-trump.html.

[24] https://int.nyt.com/data/documenthelper/551-senate-letter-re-acting-ag-eth/2ae5d0739b6be8f2ec12/optimized/full.pdf.

[25] https://int.nyt.com/data/documenthelper/549-june-2018-barr-memo-to-doj-mue/b4c05e39318dd2d136b3/optimized/full.pdf.

[26] https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=116&session=1&vote=00024.

### III.     The Mueller Report and Other Special Counsel Records

On March 22, 2019, Attorney General Barr officially confirmed that the DOJ was in

possession of "a 'confidential report explaining the prosecution or declination decisions' [Special

Counsel Mueller] has reached, as required by 28 C.F.R. § 600.8(c)." Ex. 5, Letter from William P.

Barr, Attorney Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, et al. at 1

(Mar. 22, 2019). This document, formally titled "Report on the Investigation into Russian

Interference in the 2016 Presidential Election," Ex. 6 at 1, is widely referred to as the "Mueller

Report." On March 24, 2019, Attorney General Barr sent a four-page letter to Congress broadly

summarizing certain aspects of the Mueller Report. *Id.* However, the full report remains

undisclosed. *See* Ex. 7, Letter from William P. Barr, Attorney Gen., to Lindsey Graham,

Chairman, Senate Comm. on the Judiciary, & Jerrold Nadler, Chairman, House Comm. on the

Judiciary (Mar. 29, 2019).

There are several legal authorities under which the Special Counsel or Attorney General

may issue a report or otherwise disclose information concerning the Special Counsel's

investigation. First, as noted, the Special Counsel is required to provide the Attorney General with

a report at the conclusion of the investigation under 28 C.F.R. § 600.8(c):

> **(c) Closing documentation.** At the conclusion of the Special Counsel's work, he or
> she shall provide the Attorney General with a confidential report explaining the
> prosecution or declination decisions reached by the Special Counsel.

Second, under 28 C.F.R. § 600.8(a)(2), the Special Counsel is required to provide annual

status reports to the Attorney General:

> **(2)** Thereafter, 90 days before the beginning of each fiscal year, the Special Counsel
> shall report to the Attorney General the status of the investigation, and provide a
> budget request for the following year. The Attorney General shall determine whether
> the investigation should continue and, if so, establish the budget for the next year.

Third, under 28 C.F.R. § 600.7(b), the Attorney General may request an explanation for any investigative or prosecutorial step taken by the Special Counsel:

> **(b)** The Special Counsel shall not be subject to the day-to-day supervision of any official of the Department. However, the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued. In conducting that review, the Attorney General will give great weight to the views of the Special Counsel. If the Attorney General concludes that a proposed action by a Special Counsel should not be pursued, the Attorney General shall notify Congress as specified in § 600.9(a)(3).

Fourth, under 28 C.F.R. § 600.9(a), the Attorney General is required to notify certain members of Congress of key developments in the Special Counsel's investigation:

> **(a)** The Attorney General will notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress, with an explanation for each action —
>
> > **(1)** Upon appointing a Special Counsel;
> >
> > **(2)** Upon removing any Special Counsel; and
> >
> > **(3)** Upon conclusion of the Special Counsels investigation, including, to the extent consistent with applicable law, a description and explanation of instances (if any) in which the Attorney General concluded that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued.

Fifth, under 28 C.F.R. § 600.4(c), the Special Counsel may take "necessary action" to pursue penalties "outside the criminal justice system" in consultation with the Attorney General:

> **(c) Civil and administrative jurisdiction.** If in the course of his or her investigation the Special Counsel determines that administrative remedies, civil sanctions or other governmental action outside the criminal justice system might be appropriate, he or she shall consult with the Attorney General with respect to the appropriate component to take any necessary action. A Special Counsel shall not have civil or administrative authority unless specifically granted such jurisdiction by the Attorney General.

Sixth, the Special Counsel may use its "full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney," 28 C.F.R. § 600.6, to

transmit "report[s]," "recommendation[s]," or other "compilation[s] of information" to Congress via the grand jury process. *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219, 1221, 1226 (D.D.C. 1974), *aff'd sub nom. Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974). This procedure was used by Special Counsel Leon Jaworski in 1974 to convey "material in the Grand Jury's possession having a material bearing on matters within the primary jurisdiction of the United States House of Representatives Committee on the Judiciary relating to questions of impeachment." Report & Recommendation at 1, *In re Report & Recommendation*, 370 F. Supp. at 1221, 1226 (D.D.C. 1974) (capitalization altered).[27]

Finally, the Special Counsel and/or Attorney General may rely on their powers under 28 C.F.R. §§ 600.1 *et seq.* (and on other legal authorities) to disclose developments, evidence, findings, decisions, actions, or planned actions from the Special Counsel's investigation.

## IV.   EPIC's FOIA Request

On November 5, 2018, EPIC submitted a FOIA Request via fax to the DOJ's Office of Information Policy. Ex. 2, FOIA Request from EPIC to Douglas Hibbard, Chief, Initial Request Staff, Office of Info. Policy, Dep't of Justice (Nov. 5, 2018). EPIC, in its FOIA Request, sought fourteen categories of records related to the Special Counsel's investigation into Russian interference in the 2016 U.S. presidential election:

(1)(a)   All "report[s]" and "closing documentation" prepared under 28 C.F.R. § 600.8(c), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" or "closing documentation" under 28 C.F.R. § 600.8(c);

---

[27] https://www.archives.gov/files/research/investigations/watergate/roadmap/docid-70105890.pdf.

(2)(a)    All "report[s]" concerning "the status of the investigation" prepared under 28 C.F.R. § 600.8(a)(2), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

  (b)    All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" concerning "the status of the investigation" under 28 C.F.R. § 600.8(a)(2);

(3)(a)    All records "expla[ining] . . . any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

  (b)    All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "explanation for any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b);

(4)(a)    All records prepared under 28 C.F.R. § 600.9(a) to "notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress" of a development in the Special Counsel investigation, whether or not such records were actually transmitted to any member of Congress;

  (b)    All drafts, outlines, exhibits, and supporting materials associated with any actual or planned notification under 28 C.F.R. § 600.9(a);

(5)(a)    All referrals by the Special Counsel, Attorney General, or Acting Attorney General for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c), whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

  (b)    All drafts, outlines, exhibits, and supporting materials associated with any actual or planned referral for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c);

(6)(a)    All "report[s]," "recommendation[s]," and other "compilation[s] of information" prepared for the eventual consideration of one or more members of Congress, whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

  (b)    All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report, recommendation, or compilation of the type described in Category (6)(a) of this request;

13

> (7)(a)   All other reports summarizing or describing, for one or more persons outside of the Special Counsel's Office, (i) any of the Special Counsel's evidence, findings, decisions, actions, or planned actions, or (ii) any developments in the Special Counsel investigation; and
>
> (b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report of the type described in Category (7)(a) of this request.

Ex. 2 at 1–3 (some internal citations omitted). EPIC excluded from its FOIA Request records "which have already been disclosed to the public in their complete and unredacted form (i) in the course of an open judicial proceeding; (ii) available at https://www.justice.gov/sco; or (iii) available at https://www.justice.gov/news." Ex. 2 at 3.

EPIC sought expedited processing of its FOIA Request and explained how the request qualifies for expedition under two separate provisions of the DOJ's FOIA regulations. *Id.* at 11–12. First, EPIC explained that it is entitled to expedition of its FOIA Request under 28 C.F.R. § 16.5(e)(1)(ii) because "there is an 'urgency to inform the public about an actual or alleged federal government activity" and because EPIC "is primarily engaged in disseminating information." Ex. 2 at 11 (quoting 28 C.F.R. § 16.5(e)(1)(ii)). EPIC cited to the "voluminous press coverage of, and immense public interest in" these government activities, noting that "Americans are deeply concerned about the scope of Russian interference in the 2016 presidential election; the U.S. government's response to that interference; the involvement of particular individuals in that interference, including possibly President Trump; the susceptibility of U.S. election systems and democratic institutions to future foreign interference; and the integrity of the Special Counsel investigation itself." Ex. 2 at 11–12 (citations omitted). EPIC also stated that it is "an organization 'primarily engaged in disseminating information'"—and is thereby entitled to expedited processing of its FOIA Request—because EPIC qualifies as "'a representative of the news media.'" *Id.* (quoting *EPIC v. DOD*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003)).

Second, EPIC explained that it is entitled to expedition of its FOIA Request under 28 C.F.R. § 16.5(e)(1)(iv) because "EPIC's request involves '[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence.'" Ex. 1 at 12 (quoting 28 C.F.R. § 16.5(e)(1)(iv)). EPIC stated that "[i]n addition to the extraordinary media attention given to the work of the Special Counsel, the requested records concern the potential involvement of the President in a foreign campaign to influence an election that he won; the possible obstruction of justice by the President while in office; the federal government's capacity to defend U.S. election systems and democratic institutions against foreign attacks; and the discharge of a high-profile Special Counsel investigation." Ex. 2 at 12 (citations omitted).

Finally, EPIC explained that it is "entitled to receive the requested record[s] with only duplication fees assessed," Ex. 2 at 13 (citing 5 U.S.C. § 552(a)(4)(A)(ii)(II)), because EPIC is "a representative of the news media." *EPIC v. DOD*, 241 F. Supp. 2d at 11. EPIC stated that "'any duplication fees should also be waived because disclosure of the requested information . . . 'is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.'" Ex. 2 at 13 (quoting 28 C.F.R. § 16.10(k)(1)). EPIC described in detail how its FOIA Request satisfies the DOJ's three-factor test for a waiver of duplication fees. Ex. 2 at 13–14.

## V.    The DOJ's Failure to Expeditiously Search for and Release the Requested Records

By letter dated November 15, 2018, the DOJ's Office of Information Policy acknowledged receipt of EPIC's FOIA Request "on behalf of the Special Counsel's Office." Ex. 3, Letter from Vanessa R. Brinkmann, Senior Counsel, Office of Info. Policy, Dep't of Justice, to Enid Zhou, EPIC Open Government Counsel, at 1 (Nov. 15, 2018). In the letter, the DOJ

15

admitted that it had "not yet completed a search to determine whether there are records within the scope of [EPIC's] request." *Id.* at 1.

The DOJ also stated that it was denying EPIC's request for expedited processing under both 28 C.F.R. § 16.5(e)(1)(ii) and 28 C.F.R. § 16.5(e)(1)(iv). Ex. 3 at 1. The DOJ claimed that it could not "identify a particular urgency to inform the public about an actual or alleged federal government activity [under 28 C.F.R. § 16.5(e)(1)(ii)] beyond the public's right to know about government activities generally." Ex. 3 at 1. To date, the DOJ has failed to conduct a search for records responsive to EPIC's FOIA Request or make a determination on EPIC's FOIA Request.

On December 21, 2018, EPIC submitted a FOIA Appeal to the Director of the Office of Information Policy concerning the DOJ's denial of expedited processing. Ex. 4, FOIA Appeal from EPIC to Director, Office of Info. Policy, Dep't of Justice (Dec. 21, 2018). EPIC reiterated the grounds for expedition set forth in EPIC's original FOIA Request. *Id.* at 4–7. To date, the DOJ has failed to make a determination on EPIC's FOIA Appeal.

On March 22, 2019, EPIC filed the instant FOIA lawsuit against the DOJ. Complaint, ECF No. 1. EPIC stated three claims for relief. First, EPIC charged that the DOJ had unlawfully failed to make a determination on EPIC's FOIA Request and FOIA Appeal within the timeframes set forth in 5 U.S.C. § 552(a)(6). Compl. ¶¶ 66–70. Second, EPIC charged that the DOJ had unlawfully denied expedited processing of EPIC's FOIA Request in violation of 5 U.S.C. § 552(a)(6)(E). Compl. ¶¶ 71–75. Third, EPIC charged that the DOJ had unlawfully withheld records responsive to EPIC's FOIA Request. Compl. ¶¶ 76–79.

## VI.   The Freedom of Information Act and Its Progeny

The FOIA's purpose is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 352, 261 (1976). Congress later passed

the Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, 110 Stat.

3048 (1996), that, *inter alia*, required that agencies process certain categories of documents on an

expedited basis. *Id.* § 8, 110 Stat. 3052 (codified at 5 U.S.C. § 552(a)(6)(E)). Typically, a FOIA

Request must be processed within twenty business days. 5 U.S.C. § 552(a)(6)(A)(i). However,

expedited processing is to be granted in cases where either the "failure to obtain requested records

. . . could reasonably be expected to pose an imminent threat to the life or physical safety of an

individual," or "with respect to a request made by a person primarily engaged in disseminating

information" there is an "urgency to inform the public concerning actual or alleged Federal

Government activity." 5 U.S.C. § 552(a)(6)(E)(v). In these cases, an agency must process the

FOIA request "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii). "Where an agency fails to

comply with the twenty-day deadline applicable to a standard FOIA request, the agency

'presumptively also fails to process an expedited request 'as soon as practicable." *EPIC v. DOJ*,

416 F. Supp. 2d 30, 39 (D.D.C. 2006).

## ARGUMENT

EPIC hereby moves the Court to issue preliminary injunction and order the Justice

Department to (1) grant EPIC's request for expedited processing, (2) immediately process and

make a determination on EPIC's FOIA Request, and (3) produce responsive records "as soon as

practicable." 5 U.S.C. § 552(a)(6)(E)(iii). This Court has jurisdiction under the FOIA to award

such relief. 5 U.S.C. § 552(a)(4)(B). And EPIC is entitled to a preliminary injunction because

EPIC is likely to succeed on the merits of its claims; because EPIC will suffer irreparable harm if

the DOJ is permitted to further defer action on EPIC's FOIA Request; and because the balance of

the equities and public interest favor the DOJ's expeditious processing of EPIC's request. *See*

*Winter v. NRDC*, 555 U.S. 7, 20 (2008). If there ever was a FOIA case that presented the

extraordinary circumstances to justify preliminary injunctive relief, the public release of the

Mueller Report is that case.

## I.      THE COURT HAS JURISDICTION TO GRANT THE REQUESTED RELIEF

The FOIA grants this Court jurisdiction to consider this matter and to grant appropriate

relief:

> On complaint, the district court of the United States . . . in the District of Columbia,
> has jurisdiction to enjoin the agency from withholding agency records and to order
> the production of any agency records improperly withheld from the complainant. In
> such a case the court shall determine the matter de novo.

5 U.S.C. § 552(a)(4)(B); *see also Al-Fayed v. CIA*, 254 F.3d 300, 304 (D.D.C. 2001). The statute

further provides:

> Any person making a request to any agency for records . . . shall be deemed to have
> exhausted his administrative remedies with respect to such request if the agency fails
> to comply with the applicable time limit provisions of this paragraph.

5 U.S.C. § 552(a)(6)(C); *see also Oglesby v. Dep't of the Army*, 920 F.2d 57, 62 (D.C. Cir. 1990)

("If the agency has not responded within the statutory time limits, then . . .  the requester may

bring suit."). "[T]he FOIA imposes no limits on courts' equitable powers in enforcing its terms

and unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the

FOIA, and the courts have a duty to prevent such abuses." *EPIC v. DOJ,* 416 F. Supp. 2d at 35

(citing *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)) (internal citations

omitted).

Here, the agency has failed to issue a determination on EPIC's FOIA Request within the

time limit of twenty working days established by 5 U.S.C. § 552(a)(6)(A)(i). The agency has also

failed to issue a determination on EPIC's appeal of the agency's denial of expedited processing

within the twenty-day limit of 5 U.S.C. § 552(a)(6)(A)(ii) and § 552(a)(6)(E)(ii)(II). All

applicable administrative remedies have therefore been exhausted, and EPIC's claim is ripe for adjudication.

## II.     EPIC IS ENTITLED TO A PRELIMINARY INJUNCTION

EPIC is entitled to a preliminary injunction because the DOJ's unlawful refusal to expeditiously process EPIC's FOIA Request causes EPIC irreparable harm and conflicts with the public interest. A plaintiff is entitled to a preliminary injunction upon demonstrating that "[1] that [the plaintiff] is likely to succeed on the merits, [2] that [the plaintiff] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [the plaintiff's] favor, and [4] that an injunction is in the public interest." *Ahuruonye v. U.S. Dep't of Interior*, 312 F. Supp. 3d 1, 9 (D.D.C. 2018) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). The final two elements of the preliminary injunction test "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). EPIC readily satisfies each of these factors.

First, EPIC is likely to succeed on its claims under the FOIA. The DOJ has violated the statutory deadlines set forth in 5 U.S.C. § 552(a)(6) by failing to make a determination on EPIC's FOIA Request and FOIA Appeal within twenty working days; the DOJ has unlawfully refused to conduct expedited processing of EPIC's FOIA Request notwithstanding the extraordinary public interest and urgency in disclosure of the requested records; and the DOJ has unlawfully withheld agency records.

Second, absent an injunction, EPIC will suffer irreparable harm from the DOJ's refusal to expeditiously process and make a determination on EPIC's FOIA Request. EPIC has a right to timely disclosure of information relevant to the ongoing debate over Russian election interference and the Special Counsel's investigation—a right that cannot be vindicated after the fact.

Third, the balance of the equities favors relief because EPIC has a strong interest in the expeditious processing of its FOIA Request, whereas other parties will bear no undue burden. The DOJ can hardly claim that compliance with its statutory obligation to expeditiously process a qualifying FOIA Request constitutes a hardship. Moreover, granting an injunction would be in the public interest. The FOIA was enacted to promote government transparency and to ensure that persons are able to participate in public debates in an informed manner. Absent expedited processing of EPIC's FOIA Request, a fully informed public debate will be impossible.

For these reasons, this Court should grant EPIC's motion and order the DOJ to make an immediate determination on EPIC's FOIA request.

### A.     EPIC is likely to succeed on the merits of its claims.

EPIC will almost certainly succeed on the merits of the three claims alleged in EPIC's Complaint. Thus, EPIC satisfies the first prong of the preliminary injunction test.

*First*, it is beyond dispute that the DOJ has violated the statutory processing deadlines set forth in 5 U.S.C. § 552(a)(6). Compl. ¶¶ 66–70. EPIC submitted its FOIA Request by fax on November 5, 2018. Ex. 2 at 1. Ten days later, the DOJ acknowledged that it had received EPIC's FOIA Request on November 5 and confirmed that the agency had "initiated" processing. Ex. 3 at 1–2. Today—March 29, 2019—is the 98th working day since the DOJ received EPIC's FOIA Request, yet the agency has failed to make a determination. The DOJ has therefore violated the deadlines set forth in 5 U.S.C. § 552(a)(6)(A)(i) (requiring an agency to make a determination within 20 working days) and 5 U.S.C. § 552(a)(6)(B)(i) (permitting an agency 10 additional working days to make a determination in "unusual circumstances").

The DOJ has also violated the statutory deadline for issuing a determination on EPIC's FOIA Appeal concerning expedited processing. EPIC submitted its FOIA Appeal by mail on December 21, 2018. Today—March 29, 2019—is approximately the 64th working day since the

DOJ received EPIC's FOIA Appeal, yet the DOJ has failed to make a determination. The DOJ

has therefore violated the deadline set forth in 5 U.S.C. § 552(a)(6)(A)(ii) (requiring an agency to

make a determination on "any appeal" within 20 working days) and 5 U.S.C. §

552(a)(6)(E)(ii)(II) (requiring "expeditious consideration of administrative appeals" concerning

expedited processing). Accordingly, EPIC is certain to prevail on its claim that the DOJ has failed

to comply with the FOIA's statutory deadlines.

*Second*, EPIC is likely to succeed on its claim that the DOJ unlawfully refused to process

EPIC's FOIA Request on an expedited basis. Compl. ¶¶ 71–75. Under 5 U.S.C. § 552(a)(6)(E)(i),

an agency must "provid[e] for expedited processing of requests for records— (I) in cases in which

the person requesting the records demonstrates a compelling need; and (II) in other cases

determined by the agency." A "compelling need" includes an "urgency to inform the public

concerning actual or alleged Federal Government activity" when the request is "made by a person

primarily engaged in disseminating information." 5 U.S.C. § 552(a)(6)(E)(v)(II); *accord* 28

C.F.R. § 16.5(e)(1)(ii). The DOJ also requires that FOIA requests "be processed on an expedited

basis whenever it is determined that they involve . . . [a] matter of widespread and exceptional

media interest in which there exist possible questions about the government's integrity that affect

public confidence." 28 C.F.R. §§ 16.5(e)(1), (e)(1)(iv). Although judicial review of an expedited

processing determination "shall be based on the record before the agency at the time of the

determination," 5 U.S.C. § 552(a)(6)(E)(iii), the Court must conduct its review de novo. *Al-Fayed

v. CIA*, 254 F.3d 300, 305 (D.C. Cir. 2001).

The administrative record that was before the DOJ—i.e., EPIC's FOIA Request—readily

demonstrates EPIC's entitlement to expedited processing. Specifically, EPIC is entitled to

expedited processing because it is an organization primarily engaged in disseminating information

seeking records that are urgently needed to inform the public about federal government activities. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(1)(ii). As EPIC explained in its FOIA Request, EPIC has previously been held to "satisf[y] the definition of 'representative of the news media.'" Ex. 2 at 12 (quoting *EPIC v. DOD*, 241 F. Supp. 2d at 5). Accordingly, EPIC—the *Electronic Privacy Information Center*—is primarily engaged in disseminating information.

The DOJ did not dispute that EPIC is a qualifying entity under 28 C.F.R. § 16.5(e)(1)(ii). Instead, the agency rested its denial of expedited processing on the view that there was no "particular urgency to inform the public about an actual or alleged federal government activity beyond the public's right to know about government activities generally." Ex. 3 at 1. Yet EPIC's FOIA Request provided abundant evidence to the contrary. Citing to the DOJ's Special Counsel appointment order, public polling data, and exhaustive coverage by major news organizations, EPIC explained:

> The actual federal government activities are (1) the Special Counsel's investigation of Russian interference in the 2016 U.S. presidential election, and (2) the U.S. government's response to Russian election interference, as reflected in the requested records of the Special Counsel. The requested records also pertain to President Trump's alleged obstruction of justice while in office.

> The urgency to inform the public about these government activities is clear from the voluminous press coverage of, and immense public interest in, Mr. Mueller's investigation and findings. Americans are deeply concerned about the scope of Russian interference in the 2016 presidential election; the U.S. government's response to that interference; the involvement of particular individuals in that interference, including possibly President Trump; the susceptibility of U.S. election systems and democratic institutions to future foreign interference; and the integrity of the Special Counsel investigation itself. The Mueller Report(s) and supporting materials are critical to the public's understanding of these issues.

Ex. 2 at 11–12 (internal citations omitted).

These facts unquestionably establish an urgency to inform the public about actual and alleged government activities. Absent the records sought in EPIC's FOIA Request, the public will be left with only a limited understanding of Russian interference in the 2016 presidential election

and the federal government's ability to counteract it—even as the 2020 election cycle gets

underway. Moreover, "if production is unduly delayed, both [the plaintiff] and the public at large

will be 'precluded . . . from obtaining in a timely fashion information vital to the current and

ongoing debate surrounding the legality of' a high-profile government action"—namely,

President Trump's firing of Director Comey and other acts by the President that may constitute

obstruction of justice. *Protect Democracy Project, Inc. v. DOD*, 263 F. Supp. 3d 293, 299

(D.D.C. 2017). "Being closed off from such a debate is itself a harm in an open democracy." *Id.*

at 300. The requested records are also vital to the public's understanding of the Special Counsel

investigation itself, an "actual . . . government activity" that has routinely occupied the front

pages of newspapers for nearly two years. 5 U.S.C. § 552(a)(6)(E)(v)(II). The public has a

powerful interest in obtaining a full account of Mr. Mueller's investigation *now*, while the matter

is still fresh—not months or years from now, when such "stale information [will be] of little

value." *Payne Enters.*, 837 F.2d at 494. Thus, EPIC is entitled to expedited processing under 28

C.F.R. § 16.5(e)(1)(ii).

EPIC is also entitled to expedited processing under 28 C.F.R. § 16.5(e)(1)(iv) because the

requested records concern a "matter of widespread and exceptional media interest in which there

exist possible questions about the government's integrity that affect public confidence." As EPIC

explained in its FOIA Request:

> In addition to the extraordinary media attention given to the work of the Special
> Counsel, the requested records concern the potential involvement of the President in
> a foreign campaign to influence an election that he won; the possible obstruction of
> justice by the President while in office; the federal government's capacity to defend
> U.S. election systems and democratic institutions against foreign attacks; and the
> discharge of a high-profile Special Counsel investigation. These matters
> unquestionably bear on the integrity of the government and affect public confidence.

Ex. 2 at 12 (internal citations omitted). Among other sources, EPIC cited to a search results page

from Google News identifying **941,000 news articles** containing the terms "Robert Mueller" and

"Russia." *Id.* Indeed, EPIC struggles to name an agency record that has been the subject of more "widespread and exceptional media interest" than the documents sought in this case. 28 C.F.R. § 16.5(e)(1)(iv). And the relationship of these records to "questions about the government's integrity that affect public confidence" is both indisputable and clearly articulated in EPIC's FOIA Request. *Id.*

For the DOJ to deny processing under 28 C.F.R. § 16.5(e)(1)(iv)—particularly without any substantive explanation—is therefore unlawful. *E.g.*, *Edmonds v. FBI*, No. CIV.A. 02-1294 (ESH), 2002 WL 32539613, at *3 (D.D.C. Dec. 3, 2002) (ordering expedited processing where the subject matter of plaintiff's request had "received extensive media coverage, including numerous newspaper articles in the printed press—*Associated Press*, *The Washington Post*, *Chicago Tribune*—and on TV"); *Elec. Frontier Found. v. DOJ*, 563 F. Supp. 2d 188, 189, 191 (D.D.C. 2008) (noting the DOJ's conclusion that a FOIA request "concerning the FBI's Investigative Data Warehouse" satisfied 28 C.F.R. § 16.5(e)(1)(iv)). "As DOJ's 'media specialists,' [the Office of Public Affairs] cannot simply turn a blind eye to the flurry of media attention" surrounding the records EPIC seeks. *ACLU v. DOJ*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004) (quoting 63 Fed. Reg. at 29,592). Thus, EPIC is likely to succeed on its claim that the DOJ unlawfully denied expedited processing of EPIC's FOIA Request.

*Third*, EPIC is likely to succeed on its claim that the DOJ has unlawfully withheld records responsive to EPIC's FOIA Request. Compl. ¶¶ 76–79. EPIC's FOIA Request reasonably described the records EPIC sought. Specifically, EPIC identified fourteen categories of records related to the Special Counsel's investigation into Russian election interference. Ex. 2 at 1–3. Each of those fourteen categories is defined by a type of disclosure the Special Counsel or Attorney General is authorized to make under 28 C.F.R. §§ 600.1 *et seq.* and related legal

authorities. The documents generated under these legal authorities are agency records subject to the FOIA. *See DOJ v. Tax Analysts*, 492 U.S. 136, 144–45 (1989) (defining "agency records" as materials "create[d] or obtain[ed]" by an agency and within an agency's control at the time the request is made). In at least two instances, the DOJ has unequivocally confirmed the existence of records responsive to EPIC's FOIA Request. *See* Ex. 5 at 1 ("I write to notify you pursuant to 28 C.F.R. § 600.9(a)(3) that Special Counsel Robert S. Mueller III has concluded his investigation of Russian interference in the 2016 election and related matters."); Ex. 6 at 1 ("On Friday [March 22, 2019], the Special counsel submitted to me a 'confidential report explaining the prosecution or declination decisions' he has reached, as required by 28 C.F.R. § 600.8(c)."). Nevertheless, the DOJ has unlawfully failed to "make the [requested] records"—or any portion thereof—"promptly available" in response to EPIC's FOIA Request. 5 U.S.C. § 552(a)(3)(A). EPIC is therefore likely to succeed on its unlawful withholding claim.

Because EPIC will succeed on each of its three FOIA claims, EPIC has demonstrated a likelihood of success on the merits sufficient for a preliminary injunction.

### B.    EPIC will suffer irreparable harm if relief is not granted.

EPIC will suffer irreparable harm absent an order directing the DOJ to immediately process and issue a determination on EPIC's FOIA Request. As the D.C. Circuit has emphasized, "stale information is of little value[.]" *Judicial Watch, Inc. v. DHS*, 895 F.3d 770, 778 (D.C. Cir. 2018) (quoting *Payne Enters.*, 837 F.2d at 494); *see also Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999) ("Byrd's injury, however, resulted from EPA's failure to furnish him with the documents until long after they would have been of any use to him."). Thus, "the non-disclosure of information to which a plaintiff is entitled, under certain circumstances itself constitutes an irreparable harm; specifically, where the information is highly relevant to an ongoing and highly public matter." *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d

297, 319 (D.D.C. 2017), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017); *see also*

*Washington Post v. DHS*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Because the urgency with

which the plaintiff makes its FOIA request is predicated on a matter of current national debate,

due to the impending election, a likelihood for irreparable harm exists if the plaintiff's FOIA

request does not receive expedited treatment.").

It is beyond question that the records EPIC seeks are "highly relevant to an ongoing and

highly public matter." *EPIC v. Presidential Advisory Comm'n*, 266 F. Supp. 3d at 319. As noted,

the public and the news media have focused extraordinary attention on Russian election

interference; the Special Counsel investigation into such interference; the potential involvement

of the President in a foreign campaign to influence the 2016 election; and possible obstruction of

justice by the President while in office. The national debate over these subjects is playing out

*right now*, in the immediate aftermath of the Special Counsel's investigation. *See, e.g.*, *The

Debate About the Mueller Report*, N.Y. Times (Mar. 26, 2019);[28] *The Mueller Report's Fallout*,

Wash. Post (Mar. 26, 2019).[29] Yet EPIC, like every other member of the public, has been denied

access to the records most critical to that debate: the Mueller Report and related Special Counsel

documents. Until those records are disclosed, EPIC and the public are left to rely on the Attorney

General's four-page summary of the Mueller Report—a letter that has come under widespread

criticism for its selective presentation of information. *See, e.g.*, Randall D. Eliason, *William Barr

Has Some Explaining to Do*, Wash. Post (Mar. 27, 2019);[30] Andrew P. Napolitano, *Beyond the*

---

[28] https://www.nytimes.com/2019/03/26/opinion/letters/trump-mueller-barr.html.

[29] https://www.washingtonpost.com/opinions/the-mueller-reports-fallout/2019/03/26/af87b926-4f31-11e9-bdb7-
44f948cc0605_story.html.

[30] https://www.washingtonpost.com/opinions/2019/03/27/william-barr-has-some-explaining-do/.

*Barr Revelation*, Wash. Times (Mar. 27, 2019).[31] Thus, absent the requested preliminary

injunction, EPIC will "be precluded . . . from obtaining in a timely fashion information vital to the

current and ongoing debate" concerning Russian election interference and the Special Counsel

investigation. *EPIC v. DOJ*, 416 F. Supp. 2d at 41. This harm to EPIC will be irreparable, as

"[o]ngoing public and congressional debates about issues of vital national importance cannot be

restarted or wound back.'" *Protect Democracy Project*, 263 F. Supp. 3d at 300 (quoting *Elec.*

*Frontier Found. v. Office of Dir. of Nat'l Intelligence*, 2007 WL 4208311, at *7 (N.D. Cal. Nov.

27, 2007)).

The records EPIC seeks are also highly relevant to specific events and proceedings that

are ongoing or imminent. First, the Mueller Report and related Special Counsel records would

provide EPIC with essential context concerning the still-active criminal cases brought by the

Special Counsel's office. *See, e.g.*, *United States v. Stone*, No. 19-18 (D.D.C. Jan. 24, 2019);

*United States v. Netyksho*, No. 18-215 (D.D.C. July 13, 2018); *United States v. Internet Res.*

*Agency*, No. 18-32 (D.D.C. Feb. 16, 2018).

Second, Congress is moving forward with its own investigations and oversight activities

concerning Russian election interference and the Special Counsel probe. *See, e.g.*, Todd Ruger,

*Lindsey Graham Wants Attorney General to Testify on Mueller Report*, Roll Call (Mar. 25, 2019)

("Senate Judiciary Chairman Lindsey Graham plans to call Attorney General William Barr to

testify in a public hearing about the Russia investigation and his conclusions that President

Donald Trump did not obstruct justice.");[32] Press Release, Rep. Jerrold Nadler et al., House

Committee Chairs Demand DOJ Release Full Mueller Report & Underlying Evidence to

---

[31] https://www.washingtontimes.com/news/2019/mar/27/beyond-the-barr-revelation/.

[32] https://www.rollcall.com/news/graham-wants-attorney-general-to-testify-on-mueller-report.

Congress (Mar. 25, 2019) ("Each of our committees is currently engaged in oversight activities that go directly to the President's conduct, his attempts to interfere with federal and congressional investigations, his relationships and communications with the Russian government and other foreign powers, and/or other alleged instances of misconduct.").[33] In particular, the chairpersons of six U.S. House committees have demanded to see the Mueller Report in full by April 2, 2019. Press Release, Rep. Jerrold Nadler et al., *supra*. Public access to the Mueller Report and related records is necessary to ensure that EPIC can follow, evaluate, and provide expert input concerning these congressional proceedings.

Third, President Trump has called for an investigation of the persons responsible for the "illegal" Special Counsel probe. As President Trump told reporters on March 24, 2019: "To be honest, it's a shame that your President has had to go through this for—before I even got elected, it began. And it began illegally. And hopefully, somebody is going to look at the other side. This was an illegal takedown that failed. And hopefully, somebody is going to be looking at the other side." *Remarks by President Trump Before Air Force One Departure*, The White House (Mar. 24, 2019).[34] Access to the Mueller Report is vital to assessing the validity of the President's demand for an investigation—*before* any such investigation begins.

And fourth, the Mueller Report and related records are critical to the public's understanding of the election interference techniques used by Russia, techniques that may be deployed again in the 2020 presidential election. The first scheduled presidential primary debate is less than three months away, yet EPIC and the public still do not know the full scope of Russian election interference uncovered by the Special Counsel investigation. Allan Smith, *NBC*

---

[33] https://oversight.house.gov/news/press-releases/house-committee-chairs-demand-doj-release-full-mueller-report-underlying.

[34] https://www.whitehouse.gov/briefings-statements/remarks-president-trump-air-force-one-departure-7/.

*News: First Democratic debate set for Miami, June 26-27*, NBC News (Mar. 28, 2019).[35] Prompt access to this information is needed to ensure that the democratic process is not undermined in the current election cycle.

Finally, absent an injunction, EPIC's mission of educating the public about threats to the U.S. political system will be irreparably harmed. Two years ago, EPIC launched the Democracy and Cybersecurity Project as a response to Russian interference in the 2016 election. *See* EPIC, *Democracy and Cybersecurity: Preserving Democratic Institutions* (Feb. 4, 2019).[36] Since then, EPIC has regularly used the FOIA to educate the public about the susceptibility of U.S. democratic institutions to foreign cyberattacks and has made clear the public interest in disclosure of information about Russian election interference. Marc Rotenberg, *Americans Have a Right to Know What Intel Community Knows on Russia*, The Hill (March 27, 2017).[37] In *EPIC v. FBI*, EPIC obtained records revealing the FBI's failure to follow its own victim notification procedures in response to Russian cyberattacks against U.S. officials and political organizations. *EPIC v. FBI*, No. 1:17-CV-00121 (TNM), 2018 WL 2324084 (D.D.C. May 22, 2018). EPIC published these records on its website, garnering extensive media coverage in the process. *See* EPIC, *EPIC v. FBI* (Russian Hacking) (Feb. 28, 2019).[38] In *EPIC v. DHS*, EPIC has obtained records detailing the Department of Homeland Security's response to Russian cyberattacks on election infrastructure. *EPIC v. DHS*, No. 17-2047 (D.D.C. filed Oct. 4, 2017). EPIC continues to publish new records from the case on its website for the public's benefit. EPIC, *EPIC v. DHS* (Jan. 31,

---

[35] https://www.nbcnews.com/politics/2020-election/nbc-news-first-democratic-debate-set-miami-june-26-27-n988481.

[36] https://epic.org/democracy/.

[37] http://thehill.com/blogs/pundits-blog/the-administration/325862-americans-have-a-right-to-know-what-intel-community.

[38] https://epic.org/foia/fbi/russianhacking/.

2019).[39] EPIC is uniquely situated to perform the same public education function with respect to the Mueller Report and related Special Counsel records. However, the DOJ's unlawful refusal to expeditiously process EPIC's FOIA Request prevents EPIC from sharing information with the public at a critical moment in the national discourse, thereby causing EPIC irreparable harm.

Thus, the failure to enforce EPIC's statutory right to expedited processing would result in irreparable harm to EPIC. *See EPIC v. DOJ*, 416 F. Supp. 2d at 40–41 ("[T]he statutory right to expedition in certain cases underlined Congress' recognition of the value in hastening release of certain information . . . . [T]he loss of that value constitutes a cognizable harm. As time is necessarily of the essence in cases like this such harm will likely be irreparable.") (internal citations and quotation marks omitted).

## C.     The balance of the equities and the public interest favor relief.

The balance of the equities and the public interest favor entry of the preliminary injunction that EPIC seeks. EPIC and the public both have a compelling interest in ensuring the immediate processing of EPIC's FOIA Request, whereas no parties will be harmed by EPIC's proposed order.

For the reasons identified above, EPIC has powerful equities in the disclosure of the requested records. EPIC has a clear interest in obtaining information relevant to the ongoing national debate over Russian election interference and the Special Counsel investigation. EPIC also has an equitable interest in obtaining the requested records prior to key imminent events, such the conclusion of the criminal cases brought by the Special Counsel and Congress's investigatory response to the Mueller Report. Finally, EPIC has a compelling interest in ensuring the timely dissemination of the requested records to the public at large.

---

[39] https://epic.org/foia/dhs/cybersecurity/russian-interference/.

The DOJ, meanwhile, cannot claim to be burdened by a requirement to comply with its statutory obligations. "[T]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citing *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511–12 (D.C. Cir. 2016); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). To the contrary: "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.*

Nor will other FOIA requesters will be unduly affected if this Court orders the DOJ to make an immediate determination on EPIC's FOIA Request. The expedited processing system envisions that some requests will be prioritized over others. In amending the FOIA to include an expedited processing provision, Congress recognized that there was "value in hastening release of certain information." *EPIC v. DOJ*, 416 F. Supp. 2d at 39. And indeed, EPIC's FOIA Request demonstrates a "compelling need" for the information by showing an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(1)(ii). EPIC's FOIA Request also involves a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(1)(ii); 28 C.F.R. § 16.5(e)(1)(iv). Thus, prioritizing EPIC's request would simply be in keeping with the intent of the expedited processing provision and the DOJ's FOIA obligation to make a determination within the statutory deadlines.

Granting EPIC's preliminary injunction would also serve the public interest. An agency's compliance with a mandatory statutory regime such as FOIA is "presumptively always in the public interest." *Protect Democracy Project*, 263 F. Supp. 3d at 301. Moreover, in enacting the

FOIA, Congress recognized that the public must be able to participate in debates over issues of national importance in an informed and meaningful way. *Robbins*, 437 U.S. at 242 ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."). The information EPIC seeks is absolutely essential to permit vigorous, informed public debate over the scope of Russian interference in the 2016 presidential election; the U.S. government's response to that interference; the involvement of particular individuals in that interference, including possibly President Trump; the susceptibility of U.S. election systems and democratic institutions to future foreign interference; and the integrity of the Special Counsel investigation itself.

Indeed, poll after poll has shown overwhelming support for public disclosure of the records EPIC seeks. *See, e.g.*, Griffin Connolly, *Most Republicans Want to See the Full Mueller Report, New Poll Finds*, Roll Call (Mar. 27, 2019) (finding 56% support for full release of the Mueller Report among Republicans and 84% among Democrats);[40] Zack Budryk, *Poll: 84 Percent Want Mueller Report Made Public*, The Hill (Mar. 26, 2019) (finding 84% support for release of the Mueller Report);[41] Steven Shepard, *Poll: Majority Wants Mueller Report Released to the Public*, Politico (Mar. 27, 2019) (finding 68% support for release of the Mueller Report);[42] Jennifer Agiesta, *CNN Poll: Almost Everyone Wants a Public Report on Mueller's Findings*, CNN (Feb. 7, 2019) (finding 87% support for release of the Mueller Report).[43] Even President

---

[40] https://www.rollcall.com/news/most-republicans-want-to-see-full-mueller-report-poll-finds.

[41] https://thehill.com/homenews/news/435881-poll-84-percent-want-to-see-mueller-report.

[42] https://www.politico.com/story/2019/02/27/mueller-report-release-public-support-poll-1188068.

[43] https://www.cnn.com/2019/02/07/politics/cnn-poll-russia-mueller-reportrelease/index.html.

Trump has stated that he supports such a release. Vivian Salama & Kristina Peterson, *Trump Signals Support for Report's Release as Democrats Dispute 'Exoneration,'* Wall Street J. (Mar. 25, 2019).[44]

This Court has repeatedly recognized that information must be provided in a timely fashion, or else it becomes useless to a public debate over an urgent issue of national importance. The D.C. Circuit has rightly said that "[s]tale information is of little value." *Payne Enters., Inc.*, 837 F.2d at 494. So too here. Both EPIC and the public have a right to full accounting of Russian election interference and the Special Counsel's investigation—not simply a four-page cover letter. The equities thus weigh heavily in EPIC's favor, entitling EPIC to a preliminary injunction.

## CONCLUSION

For the above reasons, this Court should grant EPIC's Motion for a Preliminary Injunction and order the DOJ to immediately process and make a determination on EPIC's FOIA Request.

Respectfully Submitted,

MARC ROTENBERG, D.C. Bar #422825
EPIC President and Executive Director

ALAN BUTLER, D.C. Bar #1012128
EPIC Senior Counsel

/s/ John Davisson
JOHN DAVISSON, D.C. Bar #1531914
EPIC Counsel
davisson@epic.org

ELECTRONIC PRIVACY INFORMATION
CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)

---

[44] https://www.wsj.com/articles/trump-more-than-happy-for-release-of-full-mueller-report-white-house-says-11553520972.

(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*

Dated: March 29, 2019