**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

—————————————————————————— )
ELECTRONIC PRIVACY                              )
INFORMATION CENTER,                          )
                                                                )
                         Plaintiff,                        )
                                                                )
            v.                                                )            Civil Action No. 19-cv-810 (RBW)
                                                                )
UNITED STATES DEPARTMENT OF           )
JUSTICE,                                                 )
                                                                )
                         Defendant.                     )
—————————————————————————— )

**<u>DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ......................................................................................................................... 2

    I.      Statutory and Regulatory Background .................................................................. 2

    II.     Plaintiff's FOIA Request and Request for Expedited Processing ......................... 4

    III.    The Attorney General's Letters to Congress Concerning Release of the
             Mueller Report ..................................................................................................... 6

    IV.    The Instant Litigation ........................................................................................... 9

    V.     The Department of Justice Granted Plaintiff's Request for Expedited
             Processing and Will Provide a Response to Plaintiff's FOIA Request
             "As Soon As Practicable" ..................................................................................... 9

ARGUMENT .............................................................................................................................. 12

    I.      Standard of Review ............................................................................................. 12

    II.     Preliminary Injunctive Relief Is Generally Not Appropriate in FOIA Cases ....... 13

    III.    Even if Preliminary Injunctive Relief Were Appropriate in FOIA Cases,
             Plaintiff Has Failed to Meet its Heavy Burden to Show Entitlement to a
             Preliminary Injunction in this Case .................................................................... 16

          A.     Plaintiff Has Failed to Establish a Likelihood of Success on the
                 Merits ...................................................................................................... 16

          B.     Plaintiff Has Failed To Establish that it Will Suffer Irreparable
                 Harm or that a Mandatory Injunction Would Cure Any Alleged
                 Harm ....................................................................................................... 20

          C.     The Balance of Equities and the Public Interest Weigh Against a
                 Preliminary Injunction ........................................................................... 25

CONCLUSION........................................................................................................................... 29

# TABLE OF AUTHORITIES

## CASES

*Aguilera v. Federal Bureau of Investigation*,
  941 F. Supp. 144 (D.D.C. 1996) ................................................................................... 21

*Al-Fayed v. CIA*,
  254 F.3d 300 (D.C. Cir. 2001) .......................................................................... 3, 16, 26

*Al-Fayed v. CIA*,
  No. 00-20292, 2000 WL 34342564 (D.D.C. Sept. 20, 2000) ..................................... 16

*Allied Progress v. Consumer Fin. Prot. Bureau*,
  No. CV 17-686 (CKK), 2017 WL 1750263 (D.D.C. May 4, 2017) ..................................... 13, 15

*Aronson v. U.S. Dep't of Hous. & Urban Dev.*,
  869 F.2d 646 (1st Cir. 1989) ...................................................................................... 16

*Baker v. Consumer Fin. Prot. Bureau*,
  No. CV 18-2403(CKK), 2018 WL 5723146 (D.D.C. Nov. 1, 2018) ................................ 26, 28

*Beta Steel Corp. v. NLRB*,
  No. 2:97 CV 358, 1997 WL 836525 (N.D. Ind. Oct. 22, 1997) ................................... 16

*Carlson v. USPS*,
  No. 02-5471, 2005 WL 756573 (N.D. Cal. Mar. 31, 2005) ....................................... 16

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .................................................................................... 13

*Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*,
  711 F.3d 180 (D.C. Cir. 2013) ................................................................................ 4, 17

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995) .................................................................................. 13, 20

*Cleaver v. Kelley*,
  427 F. Supp. 80 (D.D.C. 1976) ............................................................................... 21, 22

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006) .................................................................................... 14

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) .................................................................................... 12

*Daily Caller v. U.S. Dep't of State*,
  152 F. Supp. 3d 1 (D.D.C. 2015)............................................................... 2, 15, 17, 28

*Dorfmann v. Boozer*,
  414 F.2d 1168 (D.C. Cir. 1969)............................................................... 14

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*,
  No. 03-2078 (D.D.C. Oct. 20, 2003),
  *vacated as moot* 2004 WL 2713119 (D.C. Cir. 2004)............................... 15, 16

*Elec. Info. Privacy Ctr. v. U.S. Dep't of Justice*,
  15 F. Supp. 3d 32 (D.D.C. 2014)............................................................. 14, 17, 23, 27

*Friends of Animals v. U.S. Bureau of Land Mgmt.*,
  No. 17-0136, 2017 WL 499882 (D.D.C. Feb. 7, 2017).............................. 12

*Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*,
  639 F.3d 1078 (D.C. Cir. 2011).............................................................. 22

*Heggestad v. U.S. Dep't of Justice*,
  182 F. Supp. 2d 1 (D.D.C. 2000)............................................................. 20

*Hubbard v. United States*,
  496 F. Supp. 2d 194 (D.D.C. 2007).......................................................... 16

*Hunter Group, Inc. v. Smith*,
  164 F.3d 624 (4th Cir. 1998) ................................................................ 20

*In re Navy Chaplaincy*,
  534 F.3d 756 (D.C. Cir. 2008)................................................................ 21

*Judicial Watch v. U.S. Dep't of Justice*,
  No. 00-1396 (D.D.C. June 27, 2000)........................................................ 16

*Landmark Legal Found. v. EPA*,
  910 F. Supp. 2d 270 (D.D.C. 2012)......................................................... 16, 17, 23

*Larson v. U.S. Dep't of State*,
  565 F.3d 857 (D.C. Cir. 2009)................................................................ 19

*Long v. U.S. Dep't of Homeland Sec.*,
  436 F. Supp. 2d 38 (D.D.C. 2006)........................................................... 15

*Manning v. U.S. Dep't of Justice*,
  234 F. Supp. 3d 26 (D.D.C. 2017)........................................................... 19, 24

*Munaf v. Green,*
    553 U.S. 674 (2008) ........................................................................... 12, 15

*Nation Magazine v. Dep't of State,*
    805 F. Supp. 68 (D.D.C. 1992).......................................................... 23, 27

*Nat'l Conf. on Ministry to the Armed Forces v. James,*
    278 F. Supp. 2d 37 (D.D.C. 2003) ........................................................ 14

*Nat'l Immigration Law Ctr. v. U.S. Dep't of Homeland Sec.,*
    No. 19-cv-866 (D.D.C. Apr. 1, 2019).................................................... 21

*Nat'l Sec. Archive v. CIA,*
    859 F. Supp. 2d 65 (D.D.C. 2012), *aff'd* 752 F.3d 460 (D.C. Cir. 2014)................................. 20

*Navistar, Inc. v. EPA,*
    No. 11-cv-449(RLW), 2011 WL 3743732 (D.D.C. 2011) ...................... 22

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................. 13

*Open Am. v. Watergate Special Prosecution Force,*
    547 F.2d 605 (D.C. Cir. 1976).................................................................2

*Pinnacle Armor, Inc. v. United States,*
    No. 07-1655, 2008 WL 108969 (E.D. Cal. Jan. 7, 2008) ...................... 16

*Protect Democracy Project, Inc. v. U.S. Dep't of Def.,*
    263 F. Supp. 3d 293 (D.D.C. 2017)........................................... 18, 27, 28

*Russell v. Dep't of the Air Force,*
    682 F.2d 1045 (D.C. Cir. 1982)........................................................... 20

*Sampson v. Murray,*
    415 U.S. 61 (1974) ............................................................................... 20

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011).............................................................. 13

*Toensing v. U.S. Dep't of Justice,*
    999 F. Supp. 2d 50 (D.D.C. 2013)........................................................ 19

*Univ. of Texas v. Camenisch,*
    451 U.S. 390 (1981) ............................................................................. 14

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
   259 F.2d 921 (D.C. Cir. 1958)....................................................................... 13, 21

*Wadelton v. Dep't of State*,
   941 F. Supp. 2d 120 (D.D.C. 2013).................................................................. 16, 26

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
   559 F.2d 841 (D.C. Cir. 1977)............................................................................... 13

*Wash. Post v. Dep't of Homeland Sec.*,
   459 F. Supp. 2d 61 (D.D.C. 2006).......................................................................... 21

*Wiedenhoeft v. United States*,
   189 F. Supp. 2d 295............................................................................................... 16

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ............................................................................................ 12, 13

*Wisc. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985)...................................................................... 20, 21, 24

*Worldnetdaily.com, Inc. v. U.S. Dep't of Justice*,
   215 F. Supp. 3d 81 (D.D.C. 2016).......................................................................... 20

## STATUTES

5 U.S.C. § 552......................................................................................... *passim*

18 U.S.C. § 401(3) ...................................................................................................... 7

Electronic Freedom of Information Amendments of 1996,
   Pub. L. No. 104-231 .............................................................................................. 3

## OTHER LEGISLATIVE AUTHORITIES

H.R. Rep. No. 104-795 (1996), reprinted in 1996 U.S.C.C.A.N 3448,
   1996 WL 532690 (Sept. 17, 1996) ..................................................................... 3, 27

Electronic Freedom of Information Improvement Act of 1995, S. Rep. No. 104-272 (1996),
   1996 WL 262861 (May 15, 1996) ........................................................................ 18

## RULES

Fed. R. Civ. P. 12 ....................................................................................................... 4

Fed. R. Crim. P. 6(e) ......................................................................................... 7, 8, 19

Local Civ. Rule 16.5 ................................................................................................................ 4

## **REGULATIONS**

28 C.F.R. § 16.5 .......................................................................................................... 3, 4, 5, 6

28 C.F.R. § 600.8 ........................................................................................................ 1, 6, 7, 10

63 Fed. Reg. 29,591 (June 1, 1998) ......................................................................................... 3

## **OTHER AUTHORITIES**

Remarks by President Trump Before Air Force One Departure, The White House (Mar. 24, 2019), *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-air-force-one-departure-7/ ............................................................................................ 24

**INTRODUCTION**

On March 29, 2019, the Attorney General informed Congress and the public that he anticipates that the report issued by Special Counsel Robert S. Mueller, III to the Attorney General pursuant to 28 C.F.R. § 600.8 (the "Mueller Report") will be released "by mid-April, if not sooner." Pl.'s Mot., Ex. 7 at 1, Dkt. 7-4 (letter from the Attorney General to Senator Graham and Representative Nadler (Mar. 29, 2019)). The Attorney General explained that the Department of Justice, with the assistance of the Special Counsel, is "preparing the report for release" by "making the redactions that are required." *Id.* The Attorney General further explained that the Department and the Special Counsel "are well along in the process" of redacting the nearly 400-page report. *Id.* Thus, in less than a few weeks, "[e]veryone will . . . be able to read it on their own." *Id.* at 2.

Only a few hours after the Attorney General's letter was released and widely reported in the media, Plaintiff, the Electronic Privacy Information Center ("EPIC"), filed a motion for a preliminary injunction, seeking an order compelling Defendant, the Department of Justice (the "Department" or "DOJ"), to grant expedited processing of Plaintiff's request for the Mueller Report and related records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to immediately process Plaintiff's FOIA request, and to issue a determination on Plaintiff's FOIA request on a date certain. *See* Pl.'s Mot., Dkt. 7; Pl.'s Proposed Order, Dkt. 7-2.

Plaintiff's motion should be denied. Although Plaintiff acknowledges the Attorney General's letter, *see* Pl.'s Mem. at 10, Dkt. 7-1, and even attaches it to its motion, *see* Pl.'s Mot. at Ex. 7, Dkt. 7-4, Plaintiff inexplicably ignores the Attorney General's statements that the Department and the Special Counsel "are well along in the process" of preparing the Mueller Report for release, and that he anticipates that the report will be released "by mid-April, if not sooner." Pl.'s Mot. at Ex. 7, at 1. There is simply no reason for this Court to allow Plaintiff to circumvent this orderly process.

Even aside from the Attorney General's representation that he anticipates the Mueller Report will be released by mid-April, a preliminary injunction is not warranted because the Department of Justice has agreed to expedite processing of Plaintiff's FOIA request. *See* Ex. 1 (Declaration of Vanessa R. Brinkmann ¶ 13 (Apr. 5, 2019)). Therefore, Plaintiff's request that the Court order the Department to expedite processing of its FOIA request is moot.

And the remainder of Plaintiff's requested relief—that the Court order the Department to immediately process Plaintiff's exceptionally broad FOIA request and issue a determination on Plaintiff's FOIA request by a date certain—is merely an attempt to leap-frog ahead of other FOIA requesters and should be rejected outright. The Department of Justice has already agreed to expedite processing Plaintiff's FOIA request and will thus process its request "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii). That is all Plaintiff is entitled to under the law. *See id.* Plaintiff should not, by seeking emergency, injunctive relief, be permitted to bypass procedures designed to ensure fair treatment to those requesters who have also been granted expedited processing. Because Plaintiff has already received all the relief to which it is entitled at this stage in the litigation, Plaintiff's motion for a preliminary injunction should be denied.

## BACKGROUND

### I.     Statutory and Regulatory Background

Agencies ordinarily process FOIA requests for agency records on a first-in, first-out basis. *Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1, 8 (D.D.C. 2015) (citing *Open Am. v. Watergate Special Prosecution Force*, 547 F.2d 605, 616 (D.C. Cir. 1976)). In 1996, Congress amended the FOIA to provide for "expedited processing" of certain categories of requests. *See* Electronic Freedom of Information Amendments of 1996 ("EFOIA"), Pub. L. No. 104-231, § 8 (codified at 5 U.S.C. § 552(a)(6)(E)). Expedition, when granted, entitles requesters to move immediately to the front of the applicable processing queue, ahead of requests filed previously by

2

other persons, but at the end of the queue of other outstanding requests that have previously been granted expedited processing.

As part of EFOIA, Congress directed agencies to promulgate regulations providing for expedited processing of requests for records in the following circumstances: (i) "in cases in which the person requesting the records demonstrates a compelling need," 5 U.S.C. § 552(a)(6)(E)(i)(I); and (ii) "in other cases determined by the agency," *id.* § 552(a)(6)(E)(i)(II).   FOIA defines "compelling need" to mean, as relevant here, "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity."   *Id.* § 552(a)(6)(E)(v)(II).   The "other cases determined by the agency" provision (subsection (E)(i)(II)) gives agencies "'latitude to expand the criteria for expedited access' beyond cases of 'compelling need.'"   *Al-Fayed v. CIA*, 254 F.3d 300, 307 n.7 (D.C. Cir. 2001) (quoting EFOIA, H.R. Rep. No. 104-795, at 26 (1996), reprinted in 1996 U.S.C.C.A.N 3448, 3469, 1996 WL 532690 (Sept. 17, 1996)).

The Department of Justice's regulations provide that "[r]equests and appeals" will be taken out of order and "processed on an expedited basis whenever it is determined that they involve," as relevant here:

> (ii) An urgency to inform the public about an actual or alleged Federal Government activity, if made by a person primarily engaged in disseminating information; . . .

> (iv) A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence.

28 C.F.R. § 16.5(e)(1). Standard (ii) implements the statutory "compelling need" standard; standard (iv) defines additional categories for expedition.   *See* Revision of FOIA and Privacy Act Regulations and Implementation of EFOIA, 63 Fed. Reg. 29,591, 29,592 (June 1, 1998).   If the

request is granted, "the request shall be given priority and shall be processed as soon as practicable." 28 C.F.R. § 16.5(e)(4); *see also* 5 U.S.C. § 552(a)(6)(E)(iii).[1]

## II.   Plaintiff's FOIA Request and Request for Expedited Processing

On November 5, 2018, Plaintiff submitted a FOIA request to the Department of Justice seeking fourteen broad categories of records "concerning the investigation by Special Counsel Robert S. Mueller into Russian interference in the 2016 United States presidential election and related matters." Compl., Ex. 2 at 1, Dkt. 1-1 (EPIC FOIA request (Nov. 5, 2018)). In that request, Plaintiff sought what is now referred to as the Mueller Report—which did not exist at the time— and numerous other types of records related to the Special Counsel's Office, including "[a]ll reports concerning the status of the investigation," "[a]ll records explaining any investigative or prosecutorial step," "[a]ll referrals by the Special Counsel, Attorney General, or Acting Attorney General for administrative remedies, civil sanctions or other governmental action outside the criminal justice system," and "[a]ll drafts" of such records. *Id.* at 1–3 (quotations, ellipses, and brackets omitted).

Plaintiff also requested expedited processing of its request. *Id.* at 11–12. Plaintiff claimed that expedition was warranted because "there is an 'urgency to inform the public about an actual or alleged federal government activity,'" *id.* at 11 (quoting 28 C.F.R. § 16.5(e)(1)), and "EPIC is an organization 'primarily engaged in disseminating information,'" *id.* at 12 (quoting 28 C.F.R. § 16.5(e)(1)). Plaintiff asserted that "EPIC is also entitled to expedited processing because EPIC's

---

[1] In addition to expedited processing, Congress also accelerated litigation involving all FOIA claims. *See* 5 U.S.C. § 552(a)(4)(C) (providing that government defendants have 30 days in which to answer a FOIA complaint as opposed to the ordinary 60 days provided by Rule 12 of the Federal Rules of Civil Procedure). FOIA litigation is further accelerated in this District because FOIA cases are exempt from Rule 16 requirements. *See* Local Civ. Rule 16.5(c)(1). Despite these provisions allowing for expedited processing of litigation of FOIA claims, "[a] district court may of course consider FOIA cases in the ordinary course" as "[t]here is no statutory mandate for district courts to prioritize FOIA cases ahead of other civil cases on their dockets." *Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 711 F.3d 180, 189 n.7 (D.C. Cir. 2013).

request involves '[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that would affect public confidence.'" *Id.* at 12 (quoting 28 C.F.R. § 16.5(e)(1)(iv)).

On November 15, 2018, the Department of Justice's Office of Information Policy ("OIP") acknowledged receipt of Plaintiff's FOIA request and responded on behalf of the Special Counsel's Office. Compl., Ex. 3 at 1 (letter from the Department of Justice to EPIC (Nov. 15, 2018)). In that letter, OIP stated that it had not yet completed its search to determine whether there were records within the scope of Plaintiff's request. *Id.* The letter further stated that the request fell within "unusual circumstances" because the records that Plaintiff sought required searches in and/or in consultation with other offices. *Id.* (quoting 5 U.S.C. § 552(a)(6)(B)(i)–(iii); *see also* Ex. 1 (Brinkmann Decl. ¶ 8). Accordingly, OIP informed Plaintiff that the request had been placed in the complex processing track and that OIP would not be able to respond within the twenty-working-day time limit, or within the ten additional days provided by the statute. Compl., Ex. 3 at 1–2. Finally, OIP suggested that Plaintiff "may wish to narrow the scope of [its] request to limit the number of potentially responsive records" "in an effort to speed up [OIP's] records search." *Id.* at 2.

In that same letter, OIP also denied Plaintiff's request for expedited processing, stating that "based on the information that [Plaintiff] provided," "[t]his Office cannot identify a particular urgency to inform the public about actual or alleged federal government activity beyond the public's right to know about government activities generally." *Id.* at 1. As Vanessa Brinkmann, Senior Counsel in the Office of Information Policy, explains, "Plaintiff's request for expedited processing focused on the public interest in the Special Counsel's Office's investigation and concern about foreign interference in elections generally, but did not articulate the urgency as

related to the specific records sought in Plaintiff's FOIA request." Ex. 1 (Brinkmann Decl. ¶ 10).

Accordingly, although OIP "recogniz[ed] that there was, and continues to be, sustained public

interest in the investigation as a whole"—"which is not a factor to be considered in evaluating the

merits of a request for expedited processing"—OIP denied Plaintiff's request for expedited

processing. *Id.* With regard to Plaintiff's request for expedition on the basis of "widespread and

exceptional media interest in which there exist possible questions about the government's integrity

that would affect public confidence," that request was directed, pursuant to Department policy, *see*

28 C.F.R. § 16.5(e)(2), to the Director of Public Affairs, who "determined that [Plaintiff's] request

for expedited processing should be denied," Compl., Ex. 3 at 1.

In addition, as set forth in Ms. Brinkmann's declaration, OIP "determined that there was

no 'urgency to inform the public' in part because, at the time Plaintiff's FOIA request and appeal

were submitted, the investigation was still underway and many of the requested records—

including the final report—did not yet exist." Ex. 1 (Brinkmann Decl. ¶ 10) (citing 28 C.F.R.

§ 16.5(e)(1)(ii) (2017)).

On December 21, 2018, Plaintiff administratively appealed the Department's denial of

expedited processing. *See* Compl., Ex. 4 (letter from EPIC to the Department of Justice (Dec. 21,

2018)). The Department has since granted Plaintiff's request for expedited processing. *See infra*

Part V.

## III.    The Attorney General's Letters to Congress Concerning Release of the Mueller Report

At the time Plaintiff requested records related to the Special Counsel's investigation and

filed its appeal of the Department's denial of its expedition request, the Mueller Report (i.e., the

"'confidential report explaining the prosecution or declination decisions'" by the Special Counsel

submitted to the Attorney General, pursuant to 28 C.F.R. § 600.8(c), on March 22, 2019) did not

exist.  Ex. 1 (Brinkmann Decl. ¶ 10; *see also* Pl.'s Mot., Ex. 5 (letter from the Attorney General (Mar. 22, 2019)).  Indeed, it was not until March 22, 2019, that the Attorney General informed Congress that the Special Counsel "has concluded his investigation of Russian interference in the 2016 election and related matters" and had "submitted to me today a 'confidential report explaining the prosecution or declination decisions' he has reached, as required by 28 C.F.R. § 600.8(c)." Pl.'s Mot., Ex. 5 (letter from the Attorney General (Mar. 22, 2019)).  In that letter, the Attorney General stated that he "remain[ed] committed to as much transparency as possible" and that he "intend[ed] to determine what other information from the report [(aside from its principal conclusions)] can be released to Congress and to the public consistent with the law, including the Special Counsel regulations, and the Department's long-standing practices and policies."  *Id.*

Two days later, on March 24, 2019, the Attorney General submitted another letter to Congress, in which he "advise[d] [Congress] of the principal conclusions reached by Special Counsel Robert S. Mueller III and . . . inform[ed] [Congress] about the status of his initial review of the report [the Special Counsel] has prepared."  *See* Pl.'s Mot., Ex. 6 at 1 (letter from the Attorney General (Mar. 24, 2019)).  In that letter, the Attorney General reiterated that he is "mindful of the public interest in this matter," and, "[f]or that reason, [his] goal and intent is to release as much of the Special Counsel's report as [he] can consistent with applicable law, regulations, and Departmental policies."  *Id.* at 4.  The Attorney General determined that certain grand jury information must be redacted before the report could be released:

> Based on my discussions with the Special Counsel and my initial review, it is apparent that the report contains material that is or could be subject to Federal Rule of Criminal Procedure 6(e), which imposes restrictions on the use and disclosure of information relating to "matter[s] occurring before [a] grand jury."  Fed. R. Crim. P. 6(e)(2)(B). Rule 6(e) generally limits disclosure of certain grand jury information in a criminal investigation and prosecution.  *Id.*  Disclosure of 6(e) material beyond the strict limits set forth in the rule is a crime in certain circumstances.  *See, e.g.*, 18 U.S.C. § 401(3).  This restriction protects the integrity of grand jury proceedings

and ensures that the unique and invaluable investigative powers of a grand jury are used strictly for their intended criminal justice function.

*Id.*   Finally, the Attorney General explained the process by which the Department would redact the grand jury information and "any information that could impact other ongoing matters" and release the report:

Given these restrictions, the schedule for processing the report depends in part on how quickly the Department can identify the 6(e) material that by law cannot be made public.  I have requested the assistance of the Special Counsel in identifying all 6(e) information contained in the report as quickly as possible.  Separately, I also must identify any information that could impact other ongoing matters, including those that the Special Counsel has referred to other offices.  As soon as that process is complete, I will be in a position to move forward expeditiously in determining what can be released in light of applicable law, regulations, and Departmental policies.

*Id.*

On March 29, 2019, the Attorney General submitted a third letter to Congress, in which he again reiterated his "desire to ensure that Congress and the public have the opportunity to read the Special Counsel's report."  Pl.'s Mot., Ex. 7, at 1.  The Attorney General updated Congress on the progress the Department had made in processing the Mueller Report for release:

We are preparing the report for release, making the redactions that are required. The Special Counsel is assisting us in this process.  Specifically, we are well along in the process of identifying and redacting the following:  (1) material subject to Federal Rule of Criminal Procedure 6(e) that by law cannot be made public; (2) material that the intelligence community identifies as potentially compromising sensitive sources and methods; (3) material that could affect other ongoing matters, including those that the Special Counsel has referred to other Department offices; and (4) information that would unduly infringe on the personal privacy and reputational interests of peripheral third parties.

*Id.*   The Department's "progress is such that [the Attorney General] anticipate[s] that the [Department] will be in a position to release the report by mid-April, if not sooner."  *Id.*   As the Attorney General emphasized, "[e]veryone will soon be able to read it on their own."  *Id.* at 2.

**IV.     The Instant Litigation**

On March 22, 2019—the same day the Attorney General first publicly acknowledged the existence of the Mueller Report—Plaintiff filed the instant lawsuit.  *See* Pl.'s Compl.; Pl.'s Mot., Ex. 5 (letter from the Attorney General dated March 22, 2019).  Defendants have not yet filed a response to Plaintiff's Complaint, which is not due until April 25, 2019.

On March 29, 2019—only a few hours after the Attorney General stated that he anticipates that the Mueller Report will be released "by mid-April, if not sooner"—Plaintiff filed a motion for a preliminary injunction.  *See* Pl.'s Mot.; *see also id.*, Ex. 7, at 1.  Plaintiff seeks an order compelling the Department of Justice to grant expedited processing of Plaintiff's FOIA request for the Mueller Report and related records, to immediately process Plaintiff's FOIA request, and to issue a determination on Plaintiff's FOIA request on a date certain.  *See* Pl.'s Mot.; Pl.'s Proposed Order.

**V.      The Department of Justice Granted Plaintiff's Request for Expedited Processing and Will Provide a Response to Plaintiff's FOIA Request "As Soon As Practicable"**

In April 2019, given the now-acknowledged existence of the Mueller Report, the Department of Justice reversed its earlier determination and granted Plaintiff's request for expedited processing.  Ex. 1 (Brinkmann Decl. ¶ 13).

"Now that Plaintiff's request for expedited processing has been granted, OIP is processing Plaintiff's FOIA request and will provide a response 'as soon as practicable.'"  *Id.* ¶ 29 (quoting 5 U.S.C. § 522(a)(6)(E)(iii)); *see also id.* ¶ 34.  As the Department's declarant, Ms. Brinkmann, explained, "[t]here are multiple considerations that factor into when a response on an expedited request may be issued."  *Id.* ¶ 29.  One of the considerations is the number of other expedited FOIA requests that were granted expedition prior to Plaintiff's FOIA request.  *Id.* ¶ 30.  As of April 5, 2019, OIP is processing 243 requests on an expedited basis.  *Id.* ¶ 18.  "Plaintiff's FOIA request is

9

number 206 in the expedited track, which means OIP is currently processing 205 requests which were granted expedited processing ahead of Plaintiff's." *Id.* Ten of the requests pending in the expedited track are FOIA litigation matters, nine of which were granted expedited processing prior to the grant of expedited processing for Plaintiff's FOIA request.[2] *Id.*

Of the 243 FOIA requests that were granted expedition, 106 were filed by public advocacy groups similar to Plaintiff's, and many of the records sought include similarly high-profile topics as Plaintiff's request that are of great interest to the public. *Id.* ¶ 26. Indeed, "[a]s of March 29, 2019, OIP is processing 415 requests related to the Special Counsel's investigation." *Id.* ¶ 17. Of those 415 requests, 198 were received on or after March 22, 2019, *id.*, when the Attorney General informed Congress that the Special Counsel "has concluded his investigation of Russian interference in the 2016 election and related matters" and had "submitted to me today a 'confidential report explaining the prosecution or declination decisions' he has reached, as required by 28 C.F.R. § 600.8(c)," Pl.'s Mot., Ex. 5.

As a practical matter, OIP does not process each request to completion one at a time, but rather, "at each step of the search and review process the requests in a given track are prioritized on a first-in, first-out basis." Ex. 1 (Brinkmann Decl. ¶ 25). "Accordingly, OIP is processing Plaintiff's FOIA request, within each phase of the review process, behind the 205 requests already being processed ahead of Plaintiff's within the expedited track." *Id.* "Plaintiff is not entitled to jump ahead of other expedited requests simply because litigation has been filed, due to the disproportionate and inefficient effect such prioritization has on OIP's ability to process all other non-litigation and expedited requests." *Id.* ¶ 30; *see also id.* ¶ 32.

---

[2] Additionally, as of March 29, 2019, OIP is currently engaged in 96 ongoing FOIA litigation matters, approximately 53 of which still require records searches or document production schedules to be completed. Ex. 1 (Brinkmann Decl. ¶ 16).

Another consideration concerning processing speed is the breadth of the request.  Because "Plaintiff submitted a wide-ranging request for records and it is not entirely clear what, exactly, they are seeking," "OIP will need time to discuss, both internally and with Plaintiff, how to better frame their request to locate [responsive] records."  *Id.* ¶ 32.  "Depending on what Plaintiff is seeking, OIP may be required to refer portions of Plaintiff's FOIA request to other components within the Department," and, like OIP, those components would "need to balance similar considerations and process Plaintiff's expedited FOIA request while balancing the expedited requests received prior to Plaintiff's."  *Id.*  Moreover, "[b]ased on the nature of the topic of Plaintiff's FOIA request, any responsive material may contain sensitive information that is properly exempt from release under the FOIA," so "OIP will require sufficient time to conduct a careful review of the materials to ensure that it adequately safeguards any such information from disclosure and consult with other Department components" prior to disclosure.  *Id.* ¶ 33.

For these same reasons, "[i]t would be inappropriate at this time for OIP to commit to a fixed processing schedule."  *Id.* ¶ 29, *see id.* ¶ 34.  Plaintiff recently requested that OIP process and produce the Mueller Report by April 9, and that OIP identify, process, and release records responsive to its request for "[a]ll referrals by the Special Counsel, Attorney General, or Acting Attorney General for administrative remedies, civil sanctions or other governmental action outside the criminal justice system," and "[a]ll drafts" of such records, by April 29.  *See id.* at Ex. D; *see also* Compl., Ex. 2 at 2 (quotations, ellipses, and brackets omitted).  But, as stated above, the Attorney General "anticipates that we will be in a position to release the [Mueller] report by mid-April, if not sooner."  Pl.'s Mot., Ex. 7 at 1.  OIP has determined that "it is not practicable for the Department to process the report for release to Plaintiff in response to Plaintiff's FOIA request any earlier than the timeframe the Attorney General has already provided."  Ex. 1 (Brinkmann Decl.

¶ 31).  As reflected in the Attorney General's March 29, 2019 letter, the Department is identifying and redacting the report as appropriate using the same type of considerations for which FOIA provides exemptions.  Pl.'s Mot., Ex. 7 at 1.  Once released, there likely will be a need for more processing for FOIA purposes, if at least to align redactions with the proper exemptions.  Ex. 1 (Brinkmann Decl. ¶ 31).  OIP has further determined that "it would be unduly burdensome and infeasible to complete the processing" of records responsive to Plaintiff's request for "[a]ll referrals by the Special Counsel, Attorney General, or Acting Attorney General for administrative remedies, civil sanctions or other governmental action outside the criminal justice system," and "[a]ll drafts" of such records, by April 29.  *Id.* ¶ 34; Compl., Ex. 2 at 2 (quotations, ellipses, and brackets omitted).  These records likely contain sensitive information subject to a number of FOIA exemptions, and OIP may have to refer the request other offices within the Department for processing.  *Id.* ¶ 33.  In sum, "[g]iven OIP's available resources, the estimated time necessary to locate and complete the review of records at issue in Plaintiff's FOIA request, and OIP's other FOIA obligations, it would be inappropriate at this time for OIP to commit to Plaintiff's requested schedule, or a fixed processing schedule."  *Id.* ¶ 34.

## ARGUMENT

### I.   Standard of Review

Preliminary injunctive relief "is 'an extraordinary remedy never awarded as of right.'" *Friends of Animals v. U.S. Bureau of Land Mgmt.*, No. 17-0136, 2017 WL 499882, *3 (D.D.C. Feb. 7, 2017) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24, (2008)); *see Munaf v. Green*, 553 U.S. 674, 689 (2008) ("A preliminary injunction is an extraordinary and drastic remedy") (citation omitted)).  It "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."  *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

A party moving for a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction is not granted; (3) that an injunction would not substantially injure other interested (nonmoving) parties; and (4) that the public interest would be furthered by the injunction.  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995); *see also, e.g.*, *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842–43 (D.C. Cir. 1977); *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).  The final two "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Although the D.C. Circuit has not yet definitively decided whether *Winter* abrogates the "sliding scale" approach for assessing these four factors previously applied in this Circuit, "[s]everal judges" on the Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"  *See Allied Progress v. Consumer Fin. Prot. Bureau*, No. CV 17-686 (CKK), 2017 WL 1750263, at *2 (D.D.C. May 4, 2017) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011)).  This Circuit has also emphasized that a showing of irreparable harm is an "independent prerequisite" for a preliminary injunction.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## II.   Preliminary Injunctive Relief Is Generally Not Appropriate in FOIA Cases

As an initial matter, preliminary injunctive relief is generally not appropriate in FOIA cases, for a number of reasons.

First, FOIA establishes its own specialized procedural framework controlling the processing of FOIA requests and procedures for FOIA litigation.  *See, e.g.*, 5 U.S.C. § 552(a)(3)(A) (providing that a FOIA request must reasonably describe the records sought and must be filed in accordance with published rules and procedures); *id.* § 552(a)(4)(C) (requiring responsive filing

within thirty days of service of a complaint).  Courts should not casually sidestep this statutory framework through issuance of preliminary relief.

In addition, the traditional purpose of a preliminary injunction is to "preserve the status quo" so that the court can issue a meaningful decision on the merits.  *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) (citation omitted).  Therefore, when, as here, a movant seeks mandatory injunctive relief, *i.e.*, an injunction that "would alter, rather than preserve, the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction."  *Elec. Info. Privacy Ctr. v. U.S. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (citations omitted); *see also Nat'l Conf. on Ministry to the Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) ("A district court should not issue a mandatory preliminary injunction unless the facts and law clearly favor the moving party." (quotation omitted)).  An order compelling accelerated processing of a FOIA request would not merely preserve the status quo but would force specific action by Defendant.

Finally, because preliminary injunctive relief is not intended to provide plaintiffs with a means to bypass the litigation process and achieve rapid victory, "a preliminary injunction should not work to give a party essentially the full relief he seeks on the merits."  *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969) (per curiam); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits.").  As Plaintiff has indicated, however, that is essentially what it seeks here: an injunction that the Department "immediately process and make a determination on EPIC's FOIA request and produce responsive records as soon as practicable." Pl.'s Mem. 17.  That is further indication that Plaintiff's motion is merely a tactic to circumvent

the standard litigation process.  *See Daily Caller*, 152 F. Supp. 3d at 6–7 (noting that "in seeking

a preliminary order requiring the State Department to process fully the plaintiff's outstanding

FOIA requests, and produce all responsive non-exempt documents within twenty business days,

the plaintiff essentially requests the full relief it seeks in filing its underlying Complaint").

Indeed, rather than treating a preliminary injunction as an "extraordinary and drastic

remedy," *Munaf*, 553 U.S. at 689, Plaintiff seeks an emergency, mandatory injunctions as a means

of jumping ahead of other requests (including those already in the expedited processing track) and

requests that have been in litigation longer than these newly-filed cases.  Not only is this procedure

unfair to other FOIA requesters, but it also results in burdensome and unnecessary motion practice

for the parties and the Court.  That is especially true where, as here, Defendant has agreed to

process Plaintiff's request on an already expedited basis. Ex. 1 (Brinkmann Decl. ¶ 13).

For these reasons, Courts in this district routinely deny requests for preliminary injunctions

in FOIA cases.  *See, e.g.*, *Long v. U.S. Dep't of Homeland Sec.*, 436 F. Supp. 2d 38, 44 (D.D.C.

2006) (given the "broad scope of plaintiff's requests," denying motion for preliminary injunction

to compel processing within twenty days, and explaining that "[t]he government has not yet had a

chance to review its files, prepare and file a dispositive motion, and provide the Court the

information necessary to make a decision on any material that might be subject to an exemption");

*Allied Progress*, 2017 WL 1750263, at *1 (denying request for a preliminary injunction mandating

expedited processing and production where requester failed to show a likelihood of success on the

merits and irreparable harm); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*, No. 03-2078, slip

op. at 1 (D.D.C. Oct. 20, 2003), Dkt. 4 (denying, *sua sponte*, a request "'enjoining defendant DOJ

from continuing to deny plaintiff expedited processing of plaintiff's Freedom of Information Act

request'" because such relief "would effectively grant all the relief plaintiff seeks"), *vacated as*

*moot* 2004 WL 2713119 (D.C. Cir. 2004).[3]   The Court should similarly deny Plaintiff's motion

for preliminary injunctive relief here.

## III.    Even if Preliminary Injunctive Relief Were Appropriate in FOIA Cases, Plaintiff Has Failed to Meet its Heavy Burden to Show Entitlement to a Preliminary Injunction in this Case

### A.    Plaintiff Has Failed to Establish a Likelihood of Success on the Merits

Before a court may enter a preliminary injunction, "[i]t is particularly important for the

movant to demonstrate a substantial likelihood of success on the merits," because "absent a

substantial indication of likely success on the merits, there would be no justification for the

[C]ourt's intrusion into the ordinary processes of administration and judicial review."  *Hubbard v.*

*United States*, 496 F. Supp. 2d 194, 198 (D.D.C. 2007) (internal quotation marks and citation

omitted).  Here, Plaintiff cannot do so.

Plaintiff argues that it "is likely to succeed on its claim that the DOJ unlawfully refused to

process EPIC's FOIA request on an expedited basis."  Pl.'s Mem. 21; *see also id.* at 21–24.  But

the Department has since granted expedited processing of Plaintiff's FOIA request.   Ex. 1

---

[3] *See also, e.g.*, *Wadelton v. Dep't of State*, 941 F. Supp. 2d 120, 124 (D.D.C. 2013) (denying request for a preliminary injunction to expedite processing where requester failed to meet all four elements); *Landmark Legal Found. v. EPA*, 910 F. Supp. 2d 270, 279 (D.D.C. 2012) (denying request for a preliminary injunction to expedite processing where agency stated request is already at the top of the queue and requester failed to meet other elements); *Al-Fayed v. CIA*, No. 00-20292, 2000 WL 34342564, *6 (D.D.C. Sept. 20, 2000) (finding that "upon consideration of the parties' arguments, the statutory and regulatory context, and the applicable case law," emergency relief was not warranted despite the agency's delay in responding to FOIA requests), *aff'd*, 254 F.3d 300 (D.C. Cir. 2001); *Judicial Watch v. U.S. Dep't of Justice*, No. 00-1396, slip op. at 1 (D.D.C., June 27, 2000), Dkt. 4 (denying plaintiff's "emergency motion for expedited treatment" to "compel defendant to respond to plaintiff's Freedom of Information Act request" and noting that the FOIA "was not designed and does not operate as a vehicle to provide immediate and continuing access to government records through litigation").  Courts in other districts do so as well.  *See, e.g.*, *Aronson v. U.S. Dep't of Hous. & Urban Dev.*, 869 F.2d 646, 648 (1st Cir. 1989) (Breyer, J.) (denying preliminary injunction); *Pinnacle Armor, Inc. v. United States*, No. 07-1655, 2008 WL 108969, at *9 (E.D. Cal. Jan. 7, 2008) (denying injunctive relief and noting that "[p]laintiff has not provided any authority for the proposition that the claim for the Freedom of Information Act supports a claim for an injunction"); *Carlson v. USPS*, No. 02-5471, 2005 WL 756573, at *8 (N.D. Cal. Mar. 31, 2005) (denying request for injunction sought to compel "timely" response to FOIA request); *Beta Steel Corp. v. NLRB*, No. 2:97 CV 358, 1997 WL 836525, at *2 (N.D. Ind. Oct. 22, 1997) (denying preliminary injunction); *cf. Wiedenhoeft v. United States*, 189 F. Supp. 2d 295, 29697 (D. Md. 2002) (refusing to issue temporary restraining order to force "immediate compliance" with plaintiff's FOIA requests by moving them "to the head of the queue forthwith").

(Brinkmann Decl. ¶ 13).  Accordingly, Plaintiff's request for injunctive relief to secure expedited

processing of is FOIA request is moot.  *See Daily Caller*, 152 F. Supp. 3d at 5 n.2 (declining to

enter a preliminary injunction upon finding that the plaintiff's request for expedited processing

had been granted by the agency, rendering the requested relief moot).  Because Plaintiff's request

for expedited processing is moot, Plaintiff cannot show a likelihood of success on the merits of

this claim.  *See Landmark Legal Found. v. EPA*, 910 F. Supp. 2d 270, 275 (D.D.C. 2012) (stating

that "the Court believes that Landmark's request for expedited processing may be moot" and "[i]f

it is, this alone would prevent Landmark from showing a likelihood of success").

Plaintiff also argues that it is likely to succeed on its claim that "the DOJ violated the

statutory processing deadlines set forth in 5 U.S.C. § 552(a)(6)" by failing to make a determine

within 20 working days and by failing to issue a determination on its FOIA appeal concerning

expedited processing within 20 working days.  Pl.'s Mem. 20–21.  But the consequence for a

violation of the processing timeline is that Plaintiff is entitled to file suit in district court, and its

suit is not barred by a defense that the Plaintiff has not exhausted administrative remedies.  *Citizens*

*for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 711 F.3d 180, 189 (D.C. Cir. 2013)

("If the agency does not adhere to FOIA's explicit timelines, the 'penalty' is that the agency cannot

rely on the administrative exhaustion requirement to keep cases from getting into court."); *see also*

*Elec. Info. Privacy Ctr.*, 15 F. Supp. 3d at 40 ("[N]othing in the FOIA statute establishes that an

agency's failure to comply with this 20–day deadline automatically results in the agency's having

to produce the requested documents without continued processing, as EPIC suggests.").

Moreover, the fact that the Department has now granted expedited processing of Plaintiff's

request does not entitle Plaintiff to any relief by the Court.  The expedited processing provisions

of FOIA do not dictate a specific, compressed schedule for the processing of expedited requests;

rather, the statute directs an agency to "process *as soon as practicable* any request for records to which the agency has granted expedited processing." 5 U.S.C. § 552(a)(6)(E)(iii) (emphasis added).  Requests granted expedited treatment are placed ahead of other requests that have not been granted expedited treatment, but a grant of expedited treatment is not an assurance of immediate processing.  Multiple requests may be granted expedited treatment at any given time, and there is no direct limit or check on the number of requests or the proportion of total requests granted expedited processing.

A Senate Judiciary Committee report explained the expedited processing provisions as follows:

> Once . . . the request for expedited access is granted, the agency must then proceed to process that request "as soon as practicable."  No specific number of days for compliance is imposed by the bill since, depending upon the complexity of the request, the time needed for compliance may vary.  The goal is not to get the request for expedited access processed within a specific time frame, but to give the request priority for processing more quickly than otherwise would occur.

Electronic Freedom of Information Improvement Act of 1995, S. Rep. No. 104-272 at 18 (1996), *available at* 1996 WL 262861.  Accordingly, this Court has recognized that when expedited treatment is warranted, the statute requires that "requests must be 'process[ed] as soon as practicable.'"  *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 296 (D.D.C. 2017) (quoting 5 U.S.C. § 552(a)(6)(E)(iii)).

Finally, Plaintiff argues that it is "likely to succeed on its claim that the DOJ has unlawfully withheld records responsive to EPIC's FOIA Request."  Pl.'s Mem. 24.  But at the time Plaintiff submitted its FOIA request in November 2018, the Mueller Report did not exist.  *See* Ex. 1 (Brinkmann Decl. ¶ 10); *see also* Pl.'s Mot. Ex. 5.  And many of the records Plaintiff seeks are exempt from disclosure.  As the Attorney General explained in his letters to Congress, the Mueller Report itself contains several categories of information that are plainly exempt from disclosure

under FOIA.  *See* Pl.'s Mot., Ex. 7, at 1.  Those include (1) "material subject to Federal Rule of Criminal Procedure 6(e) that by law cannot be made public" (i.e., certain grand jury information); (2) "material the intelligence community identifies as potentially compromising sensitive sources and methods;" (3) "information that could affect other ongoing matters, including those that the Special Counsel has referred to other Department offices;" and (4) "information that would unduly infringe on the personal privacy and reputational interests of peripheral third parties."  *See id.*; *see also id.*, Ex. 6 at 4.  Each of these categories coincides with well-established FOIA exemptions. *See* 5 U.S.C. § 552(b)(1), (b)(3), (b)(6), (b)(7); *see also, e.g.*, *Toensing v. U.S. Dep't of Justice*, 999 F. Supp. 2d 50, 60 (D.D.C. 2013) (finding that grand jury material subject to Federal Rule of Criminal Procedure 6(e) is "exempt from disclosure under FOIA Exemption 3"); *Larson v. U.S. Dep't of State*, 565 F.3d 857, 863, 865, 868–69 (D.C. Cir. 2009) (finding that agencies properly protected "information relating to 'intelligence sources and methods'" under Exemption 1 and Exemption 3); *Manning v. U.S. Dep't of Justice*, 234 F. Supp. 3d 26, 35 (D.D.C. 2017) (finding that the agency properly withheld information concerning an ongoing investigation under Exemption 7).

Aside from Plaintiff's request for the Mueller Report itself, many, if not all, of Plaintiff's other requests are, on their face, overbroad and/or subject to exemptions.  Plaintiff requested fourteen categories of records touching on numerous aspects of the Special Counsel's "investigation into Russian interference with the presidential election" and "related matters." Compl., Ex. 2 at 1.  For example, Plaintiff seeks "[a]ll reports concerning the status of the investigation," "[a]ll records explaining any investigative or prosecutorial step," and "[a]ll referrals by the Special Counsel, Attorney General, or Acting Attorney General for administrative remedies, civil sanctions or other governmental action outside the criminal justice system."  *Id.* at 1–3

(quotations, ellipses, and brackets omitted).   Such records likely would be subject to several

exemptions.  *See, e.g.*, *Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1, 8–12 (D.D.C. 2000)

(finding that prosecution memoranda were exempt from disclosure under Exemption 5 because

they constituted attorney work product and were covered by the deliberative process privilege);

*Worldnetdaily.com, Inc. v. U.S. Dep't of Justice*, 215 F. Supp. 3d 81, 85 (D.D.C. 2016) (finding

that a memorandum from memo from DOJ prosecutors to superiors recommending against

prosecution was protected from disclosure under the deliberative process privilege).  As another

example, Plaintiff seeks "drafts" of each category of records.  Compl., Ex. 2 at 1–3.  Courts have

routinely found that drafts are exempt from disclosure under Exemption 5.  *See, e.g.*, *Russell v.

Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (withholding draft manuscript

because release could lead to "confusion of the public"); *Nat'l Sec. Archive v. CIA*, 859 F. Supp.

2d 65, 70–72 (D.D.C. 2012), *aff'd* 752 F.3d 460 (D.C. Cir. 2014) (allowing agency to withhold

entire volume of multivolume agency history because volume in question was a draft and was not

included in final published version).

     Accordingly, because Plaintiff cannot show a likelihood of success on the merits—indeed,

to the contrary—its motion for a preliminary injunction should be denied.

    **B.**    **Plaintiff Has Failed To Establish that it Will Suffer Irreparable Harm
or that a Mandatory Injunction Would Cure Any Alleged Harm**

    "[T]he basis of injunctive relief in the federal courts has always been irreparable harm."

*CityFed Fin. Corp.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974), internal

quotation marks omitted).  The D.C. Circuit "has set a high standard for irreparable injury."  *In re

Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) (internal quotation marks and citation

omitted).  The party seeking injunctive relief must show that its injury is "both certain and great,"

and that it is "actual and not theoretical."  *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir.

1985) (per curiam).  It is a "well known and indisputable principle[]" that a "unsubstantiated and speculative" harm cannot constitute "irreparable harm" sufficient to justify injunctive relief.  *Id.* In short, "[t]he key word in this consideration is *irreparable*. . . .  The possibility that adequate . . . corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."  *Id.* (quoting *Va. Petroleum Jobbers Ass'n*, 259 F.2d at 925).  Thus, in the rare instances where courts have granted preliminary injunctions in FOIA cases, the courts have done so upon finding that the plaintiff would be irreparably harmed by an actual, impending deadline.  *See, e.g.*, Minute Order, *Nat'l Immigration Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. 19-cv-866 (D.D.C. Apr. 1, 2019) (finding that the plaintiff established "irreparable harm" because "if Plaintiff is unable to obtain the information sought in its FOIA request, the individuals Plaintiff represents in Tennessee may lose their ability to pursue *Bivens* claims due to the imminent lapsing of the relevant statute of limitations"); *Wash. Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Because the urgency with which the plaintiff makes its FOIA request is predicated on a matter of current national debate, due to the impending election [(which was only three weeks away)], a likelihood for irreparable harm exists if the plaintiff's FOIA request does not receive expedited treatment."); *Aguilera v. Federal Bureau of Investigation*, 941 F. Supp. 144, 151–52 (D.D.C. 1996) (finding, in a case where the agency refused expedition, because the documents at issue were key evidence in an evidentiary hearing that a trial court had scheduled for the near future regarding the requester's conviction for murder, a preliminary injunction requiring the FBI to expedite the processing of plaintiff's FOIA request was warranted); *Cleaver v. Kelley*, 427 F. Supp. 80, 81–82 (D.D.C. 1976) (granting a preliminary

injunction and ordering expedited processing of plaintiff's FOIA request where plaintiff had been indicted for attempted murder and assault, and trial was scheduled to begin in a month).

Moreover, the movant "'must demonstrate a causal connection between the alleged harm and the actions to be enjoined; a preliminary injunction will not issue unless it will remedy the alleged injuries.'" *Navistar, Inc. v. EPA*, No. 11-cv-449(RLW), 2011 WL 3743732, at *2 (D.D.C. 2011) (quoting *Hunter Group, Inc. v. Smith*, 164 F.3d 624 (4th Cir. 1998) (per curiam)). Because Plaintiff has not made the requisite showing of an actual, nonspeculative injury that could be remedied by preliminary injunctive relief, its motion should be denied on this basis alone. *Cf. Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011) (noting that if one requirement is not met then "there is no need to consider the remaining factors").

Plaintiff argues that it will suffer harm because, "absent the requested preliminary injunction, EPIC will be precluded from obtaining in a timely fashion information vital to the current and ongoing debate concerning Russian election interference and the Special Counsel investigation." Pl.'s Mem. at 27 (quotation and ellipsis omitted). Plaintiff further argues that a delay in the production of the Mueller Report will result in it becoming "stale information . . . of little value." *Id.* at 25. But the Department has granted Plaintiff's request for expedition and will process its request "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii); Ex. 1 (Brinkmann Decl. ¶¶ 29, 34). Plaintiff plainly suffers no harm by receiving all it is entitled to under the law.

Moreover, as Plaintiff acknowledges, "the public and the news media have focused extraordinary attention on Russian election interference; the Special Counsel investigation into such interference; the potential involvement of the President in a foreign campaign to influence the 2016 election; and possible obstruction of justice by the President while in office," Pl.'s Mem.

at 26—to the tune of "941,000 news articles containing the terms 'Robert Mueller' and 'Russia,'" *id.* at 23–24.  The argument that the public and the media will lose interest in the Mueller Report or that the information contained therein will be of little value to them if Plaintiffs' requests are processed according to the normal expedited procedures—strains credulity.

Plaintiff next argues that the records it seeks "are also highly relevant to specific events and proceedings that are ongoing or imminent."  Pl.'s Mem. 27.  As one example, Plaintiff asserts that "the Mueller Report and related Special Counsel records would provide EPIC with essential context concerning the still-active criminal cases brought by the Special Counsel's Office."  *Id.* But, as set forth above, the very fact that there are ongoing investigative matters and cases makes it likely that many of the requested records would be exempt from disclosure.  *See supra* Part III.A. In the absence of a showing that EPIC would likely be entitled to a significant release of documents, Plaintiff cannot meet its burden to establish that it will be irreparably harmed if it fails to receive a determination on an expedited timeframe.  *See Elec. Privacy Info. Ctr.*, 15 F. Supp. 3d at 46 (finding that a requestor "cannot claim to be injured—much less 'irreparably' so—if the [defendant] withholds documents that that [plaintiff] is not entitled to access in the first instance"); *Landmark*, 910 F. Supp. 2d at 278 (finding no irreparable injury where, among other things, "there is no guarantee, even if the Court were to issue a preliminary injunction that the records Landmark seeks would be disclosed"); *Nation Magazine v. Dep't of State*, 805 F. Supp. 68, 74 (D.D.C. 1992) (denying preliminary injunction on ground that plaintiff had failed to demonstrate irreparable harm because "[e]ven if this Court were to direct the speed up of processing of their requests, [plaintiffs] have not shown at this time that they are entitled to the release of the documents that they seek" as "it is undisputed that at least some of the documents are probably exempt from production under FOIA").

Plaintiff also asserts that because "Congress is moving forward with its own investigation and oversight activities concerning Russian interference and the Special Counsel probe," Pl.'s Mem. 27, "[p]ublic access to the Mueller Report and related records is necessary to ensure that EPIC can follow, evaluate, and provide expert input concerning these congressional proceedings," *id.* at 28. But as the Attorney General has stated in his March 29 letter to Chairmen Graham and Nadler, "I share your desire to ensure that Congress and the public have the opportunity to read the Special Counsel's report. We are preparing the report for release, making the redactions that are required." *Id.* at Ex. 7, at 1. And the Attorney General has stated his willingness to testify before Congress in early May. *Id.* at Ex. 7, at 2. If Plaintiff wishes to "follow, evaluate, and provide expert input concerning these congressional proceedings," Pl.'s Mem. 28, Plaintiff likely will have ample opportunity to review the Mueller Report and provide input prior to the Attorney General's testimony. Plaintiff does not explain how it will be harmed, much less irreparably so, by receiving the redacted report in approximately mid-April.

In addition, Plaintiff cites to a statement by the President and argues that, "[a]ccess to the Mueller Report is vital to accessing the validity of the President's demand for an investigation" of "the persons responsible for the 'illegal' Special Counsel probe" "before any such investigation begins." Pl.'s Mem. 28. But the President did not state that an investigation had begun or was imminent; instead, the President merely expressed that "hopefully, somebody is going to look at the other side." Remarks by President Trump Before Air Force One Departure, The White House (Mar. 24, 2019), *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-air-force-one-departure-7/. Thus, any injury Plaintiff faces is merely speculative and insufficient to establish irreparable harm. *See Wisc. Gas Co.*, 758 F.2d at 674. In any event,

Plaintiff again does not explain how it will be harmed if Plaintiffs' requests are processed according to the normal expedited procedures.

Plaintiff cites to "the first scheduled presidential primary debate" in June and argues that "the Mueller Report and related records are critical to the public's understanding of the election interference techniques used by Russia, techniques that may be deployed again in the 2020 presidential election." Pl.'s Mem. 28.  Again, however, the Attorney General anticipates releasing the redacted Mueller Report by approximately mid-April, before the June presidential primary debate, and well before the 2020 primaries or general election.  Plaintiff does not explain how it is prejudiced by the report's release at that time or how it will be harmed if Plaintiffs' requests are processed according to the normal expedited procedures.[4]

Finally, Plaintiff argues that "the DOJ's unlawful refusal to expeditiously process EPIC's FOIA Request prevents EPIC from sharing information with the public at a critical moment in the national discourse, thereby causing EPIC irreparable harm." Pl.'s Mem. 30.  But the Department has granted Plaintiff's request for expedition. Ex. 1 (Brinkmann Decl. ¶ 13).  Thus, Plaintiff suffers no harm.

For all of these reasons, Plaintiff has failed to meet is heavy burden of showing of irreparable harm and has accordingly demonstrated no reason for the Court to invoke its emergency powers at this early stage in the litigation.

### C.    The Balance of Equities and the Public Interest Weigh Against a Preliminary Injunction

Along with alleged harm to Plaintiff, the Court must consider whether a preliminary injunction of the sort demanded by Plaintiff would be in the public interest or harm nonlitigants.

---

[4] Plaintiff appears to be describing a harm that is suffered primarily by the public, not by Plaintiff itself.  That harm is more properly considered when weighing the public interest factor in the injunction analysis—and, as explained below, in this case the public interest counsels against the award of the preliminary injunction Plaintiff seeks.

*See Al-Fayed*, 254 F.3d at 303.  The relief Plaintiff seeks is not in the public interest and would harm nonlitigants, and for this reason as well, Plaintiff's motion should be denied.  *See Wadelton v. Dep't of State*, 941 F. Supp. 2d 120, 124 (D.D.C. 2013) ("Plaintiffs argue that a preliminary injunction will be in the public interest, based on little more than the core purpose of FOIA being to 'allow the public to be informed about "what their government is up to'. . . .  This explanation does nothing to distinguish plaintiffs' FOIA request from any other FOIA request.  Therefore, the Court finds that plaintiffs fail to satisfy the public interest prong." (citations omitted)).

Plaintiff's request for the proposed preliminary injunction threatens to compromise the delicate balancing of interests that Congress undertook in enacting FOIA.  Importantly, granting accelerated processing of Plaintiff's request would disadvantage other, similarly situated members of the press (or the public) who themselves have FOIA requests pending before the Department of Justice (some of which also may be viewed as urgent by the requestors) that have been granted expedited processing.  *See* Ex. 1 (Brinkmann Decl. ¶¶ 26, 30, 32); *see also Baker v. Consumer Fin. Prot. Bureau*, No. CV 18-2403(CKK), 2018 WL 5723146, at *5 (D.D.C. Nov. 1, 2018) (finding that a "preliminary injunction ordering the immediate processing and release of the requested records" "would harm the approximately 100 other requesters . . . in line ahead of Plaintiff and would erode the proper functioning of the FOIA system").  Because the Department has granted expedited processing of Plaintiff's FOIA request, Ex. 1 (Brinkmann Decl. ¶ 13), the Department will process the request before FOIA requests filed previously by other persons, but after other outstanding requests that have previously been granted expedited processing, *see id.* ¶ 25.  Although Plaintiff argues that an injunction would not affect other FOIA requesters, Pl.'s Mem. 31, ordering the Department to complete Plaintiff's request on an artificial timeline would require that resources be diverted from those other requests that have already been granted

expedited processing and thus, would undermine their interests as well as the overall public interest in proper operation of the FOIA, including its provision for expedition. *See Nation Magazine*, 805 F. Supp. at 74 (entry of a preliminary injunction expediting a FOIA request over other pending requests "would severely jeopardize the public's interest in an orderly, fair, and efficient administration of [ ] FOIA"); *Elec. Privacy Info. Ctr.*, 15 F. Supp. 3d at 47 (D.D.C. 2014) ("[A]llowing [a plaintiff] to jump to the head of the line would upset the agency's processes and be detrimental to the other expedited requesters, some of whom may have even more pressing needs."); *Protect Democracy Project*, 263 F. Supp. 3d at 303 ("[R]equiring production by a date certain, without any factual basis for doing so, might actually disrupt FOIA's expedited processing regime rather than implement it."); *see also* Ex. 1 (Brinkmann Decl. ¶¶ 26, 30).

In addition, granting Plaintiff's request for an infeasible and extraordinary processing schedule would compromise the public interest in ensuring that certain types of documents, the disclosure of which would cause harm, are carefully redacted consistent with the FOIA exemptions. *See* Ex. 1 (Brinkmann Decl. ¶ 33). The exemptions listed in § 552(b) embody a judgment by Congress that the public interest would best be served by allowing agencies to withhold certain records—for example, classified information and those records whose disclosure would interfere with effective law enforcement, 5 U.S.C. § 552(b)(7). Indeed, Congress specifically recognized that, in certain cases, depending on the subject matter of the request, additional time would be required to ensure that the public's interest in preventing the public disclosure of these exempted documents was not compromised. *See* H.R. Rep. No. 104-795, 1996 U.S.C.C.A.N. at 3466 ("In underscoring the requirement that agencies respond to requests in a timely manner, the Committee does not intend to weaken the interests protected by the FOIA exemptions. Agencies processing some requests may need additional time to adequately review

requested material to protect these exemption interests."). Ordering the Department to disclose documents, not "as soon as practicable" as dictated by FOIA, 5 U.S.C. § 552(a)(6)(E)(iii), but rather on any artificial, accelerated timetable, threatens to risk disclosure of statutorily exempt material. *See Daily Caller*, 152 F. Supp. 3d at 14 ("Requiring the agency to process and produce [requested] materials under an abbreviated deadline raises a significant risk of inadvertent disclosure of records properly subject to exemption under FOIA."); *Protect Democracy Project*, 263 F. Supp. 3d at 302 ("Imposing on Defendants an arbitrary deadline for processing would run the risk of overburdening them, and could even lead to the mistaken release of protected information."); *Baker*, 2018 WL 5723146, at *5 ("Ordering Defendant to process and release documents according to Plaintiff's timeline risks that, in its haste, Defendant will inadvertently release records which fall under a FOIA exception and Congress has decided should not be released."); *see also* Ex. 1 (Brinkmann Decl. ¶ 33). For this reason as well, the public interest weighs in favor of applying the normal, statutorily provided processing schedule to Plaintiff's request.

Moreover, the Executive Branch is currently in discussions with Congress over the anticipated release of the Mueller Report, and a court order setting a premature deadline could disrupt that ongoing process. The confidential report is a sensitive Executive Branch document, and the Executive has stated its willingness to accommodate Congress's desire to see much of the report. Given these negotiations and the ongoing accommodation process, a court order in this case could preempt or disrupt those ongoing negotiations between the two branches. Such a disruption is contrary to the public interest.

Finally, the Attorney General has already stated that he anticipates public release of the Mueller Report with the appropriate redactions within a short time frame. *See* Pl.'s Mot., Ex. 7 at

1.  The public interest is best served by permitting the expeditious processing and release of that report, without diverting resources with unnecessary and unjustified litigation.

### CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for a Preliminary Injunction.


Dated: April 5, 2019                              Respectfully submitted,

                                                  JOSEPH H. HUNT
                                                  Assistant Attorney General
                                                  Civil Division

                                                  ELIZABETH J. SHAPIRO
                                                  Deputy Director
                                                  Federal Programs Branch

                                                  */s/ Courtney D. Enlow*
                                                  COURTNEY D. ENLOW
                                                  Trial Attorney
                                                  United States Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  1100 L Street, N.W.
                                                  Room 12102
                                                  Washington, D.C. 20005
                                                  Tel: (202) 616-8467
                                                  Email: courtney.d.enlow@usdoj.gov

                                                  *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2019, I electronically transmitted the foregoing to the parties and the clerk of court for the United States District Court for the District of Columbia using the CM/ECF filing system.

*/s/ Courtney D. Enlow*
COURTNEY D. ENLOW
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Room 12102
Washington, D.C. 20005
Tel: (202) 616-8467
Email: courtney.d.enlow@usdoj.gov

# Exhibit 1

Declaration of Vanessa Brinkmann,

dated April 5, 2019

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER  Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) )  Civ. No. 1:19-CV-00810-RBW |

**DECLARATION OF VANESSA R. BRINKMANN**

I, Vanessa R. Brinkmann, declare the following to be true and correct:

1. I am Senior Counsel in the Office of Information Policy (OIP), United States Department of Justice (the "Department" or "DOJ"). In this capacity, I am responsible for supervising the handling of the Freedom of Information Act (FOIA) requests subject to litigation processed by the Initial Request Staff (IR Staff) of OIP. The IR Staff of OIP is responsible for processing FOIA requests seeking records from within OIP and from within six senior leadership offices of the Department of Justice, specifically the Offices of the Attorney General (OAG), Deputy Attorney General (ODAG), Associate Attorney General (OASG), Legal Policy (OLP), Legislative Affairs (OLA), and Public Affairs (PAO). In addition, and as especially relevant in this case, OIP also processes FOIA requests seeking records from within DOJ's Special Counsel's Office (SCO). The IR Staff determines whether records responsive to requests exist and, if so, whether they can be released in accordance with the FOIA. In processing such requests, the IR Staff consults with personnel in the senior leadership offices and, when appropriate, with other personnel in the Executive Branch.

1

2.   I make the statements herein on the basis of personal knowledge, as well as on information acquired by me in the course of performing my official duties.

3.   The purpose of this declaration is to respond to Plaintiff's Motion for a Preliminary Injunction dated March 29, 2019, requesting that the Court order Defendant to complete the expedited processing of Plaintiff's FOIA request.  See ECF No. 7.

**OIP's Receipt of Plaintiff's FOIA Request**

4.   By letter dated November 5, 2018, Plaintiff submitted a FOIA request to OIP seeking fourteen broad categories of records "concerning the investigation by Special Counsel Robert S. Mueller into Russian interference in the 2016 United States presidential election and related matters."

5.   Plaintiff requested expedited processing of its request, stating that "there is an 'urgency to inform the public about an actual or alleged federal government activity'" and that Plaintiff "is an organization 'primarily engaged in disseminating information.'"  See 28 C.F.R. § 16.5(e)(1)(ii) (2017).   The FOIA request also asserted that Plaintiff is "entitled to expedited processing" because its "request involves '[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence.'"  See id. § 16.5(d)(iv).

6.   Additionally, Plaintiff requested a waiver of all fees associated with its request.  A copy of Plaintiff's FOIA request is attached hereto as Exhibit A.

7.   By letter dated November 15, 2018, OIP acknowledged Plaintiff's FOIA request, and assigned tracking number DOJ-2018-000676 (OIP).  In this acknowledgment letter, OIP denied Plaintiff's request for expedited processing under "standard ii" because OIP could not "identify a particular urgency to inform the public about an actual or alleged federal government activity

beyond the public's right to know about government activities generally."  OIP further confirmed

that it had directed Plaintiff's FOIA request to the Director of DOJ's Office of Public Affairs

(PAO) pursuant to Department policy, to determine whether expedited processing was

appropriate and that the Director of Public Affairs denied Plaintiff's request for expedited

processing under "standard iv."  See id. § 16.5(e)(2).

8.   In this acknowledgement letter, OIP informed Plaintiff that unusual circumstances

apply because the records sought required a search in and/or consultation with another office and

that its request had been placed in the complex processing track and that OIP would need to

extend the response time limit beyond twenty-working-days, as well as the ten additional days

provided by the statute.  Finally, OIP deferred making a determination on Plaintiff's request for a

fee waiver until it is determined whether fees would be assessed for the request.  A copy of OIP's

acknowledgment letter, dated November 15, 2018, is attached hereto as Exhibit B.

**OIP's Expedition Determinations**

9.   As stated above and in OIP's November 15, 2018 acknowledgment letter, both OIP

and the Director of Public Affairs denied Plaintiff's requests for expedited processing.

10. When OIP originally denied expedited processing, the report issued by Special

Counsel Robert S. Mueller, III to the Attorney General pursuant to 28 C.F.R. § 600.8 (the

"Mueller Report" or "report") did not exist.  Plaintiff's request for expedited processing focused

on the public interest in the Special Counsel's Office's investigation and concern about foreign

interference in elections generally, but did not articulate the urgency as related to the specific

records sought in Plaintiff's FOIA request.  It was determined that there was no "urgency to

inform the public" in part because, at the time Plaintiff's FOIA request and appeal were

submitted, the investigation was still underway and many of the requested records – including

3

the final report – did not yet exist.  See 28 C.F.R. § 16.5(e)(1)(ii).  This expedition denial was

made given OIP's recognition that there was, and continues to be, sustained public interest in the

investigation as a whole, which is not a factor to be considered in evaluating the merits of a

request for expedited processing.

11. At the time Plaintiff submitted its FOIA request, PAO also denied Plaintiff's request

for expedited processing because, although the topic of the request was a matter of "widespread

and exceptional media interest," PAO found that it was not a matter "in which there exist[ed]

possible questions about the government's integrity which affect public confidence." See id.

§ 16.5(e)(1)(iv).

12. On December 21, 2018, Plaintiff administratively appealed OIP's denial of its request

for expedited processing.  A copy of Plaintiff's appeal letter to OIP is attached hereto as Exhibit

C.  Plaintiff then filed suit, on March 22, 2019.

13. Since OIP and PAO's original denials of Plaintiff's request for expedited processing,

the Department has publicly acknowledged that the Special Counsel's final report has been

submitted to the Attorney General.  Given this change in circumstances, OIP has now determined

that expedited processing should be granted and Plaintiff has been made aware of this

determination.  A copy of the email informing Plaintiff of the decision regarding expedited

processing is attached hereto as Exhibit D.

**OIP's Surging FOIA Obligations**

14. OIP has been inundated by an ongoing and unprecedented surge of FOIA requests,

which began in the middle of Fiscal Year (FY) 2016,[1] and which has not abated.  Although the

---

[1] The Fiscal Year is the accounting period for the federal government which begins on October 1
and ends on September 30.  The Fiscal Year is defined by the calendar year in which it ends (i.e.
Fiscal Year 2017 began on October 1, 2016 and ended on September 30, 2017).

volume of FOIA requests received by OIP steadily and significantly increased from FY 2009 to

FY 2016, OIP encountered an especially steep and unanticipated spike midway through FY

2016.[2]  This spike was not a onetime event, but instead was the beginning of a massive surge of

requests that continues to this day.[3]  Each year since, OIP's incoming volume of requests has

vastly outpaced OIP's historical averages.[4]

15. In addition to the sheer volume of incoming requests, OIP has also experienced an

influx of increasingly complicated requests – and an increase in requests seeking, and granted,

expedited handling – requiring broad searches of a variety of complex records, often implicating

a multitude of equities requiring consultations with other DOJ components and agencies, and

sensitivities including classified and law enforcement information.  At the same time, the number

of lawsuits filed in connection with requests being processed by OIP has exponentially increased

– tripling in the past three years.  This combination of increased volume of requests and

custodians, request scope and complexity, and litigation has substantially increased the amount

---

[2] In the first half of FY 2016, OIP received 751 requests (an annual pace of 1,502). In the second
half of FY 2016, OIP received 1,061 requests (an annual pace of 2,122), a 41.3% increase over
the first half of the year.

[3] In FY 2017, OIP received 2,818 requests. In FY 2018, OIP received an even larger 3,523
requests. And, as of March 29, 2019, OIP has received 1,541* requests (an annual pace of
3,082). *Note that in the first half of FY 2019, OIP modified the way it administratively tracks
new FOIA requests, assigning only one tracking number to each FOIA request instead of one
number per Office that requires a search. Therefore, for purposes of comparison with previous
fiscal years, OIP has adjusted its FY 2019 numbers throughout this declaration. The unadjusted
number of requests received by OIP is 1,375 (an annual pace of 2,750).

[4] During the Bush administration (FY01 through FY08), OIP received an average of 1,046
requests per fiscal year, and never more than 1,342 in any one fiscal year. During the Obama
administration (FY09 through FY16), OIP received an average of 1,515 requests per fiscal year,
and never more than 1,803 in any one fiscal year. During the first two years of the Trump
administration (FY17 through FY18), OIP has received an average of 3,170 requests per fiscal
year, and never less than 2,818 in either fiscal year.

of time and resources required for OIP to complete its searches and processing, and has exhausted OIP's resources.

16. Additionally, as of March 29, 2019, OIP is currently engaged in ninety-six ongoing FOIA litigation matters, approximate fifty-three of which still require records searches or document production schedules to be completed.  This represents a significant 28.0% increase from the seventy-five litigation matters in which OIP was involved as of March 19, 2018, a substantial 95.9% increase from the forty-nine litigation matters in which OIP was involved as of March 20, 2017, and an even more staggering 231.0% increase from the twenty-nine litigation matters in which OIP was involved as of March 21, 2016.

17. As of March 29, 2019, OIP is processing 415 FOIA requests related to the Special Counsel's Office Investigation.  This includes both requests for records of the Special Counsel's Office as well as related records located in the Department's senior leadership offices.  Of those 415 requests, 198 were received after the Attorney General notified Congress of the conclusion of the investigation.  This number continues to grow each day.

18. Finally, as of April 5, 2019, OIP is currently processing 243 pending FOIA requests in the expedited track.  Plaintiff's FOIA request is number 206 in the expedited track, which means OIP is currently processing 205 requests which were granted expedited processing ahead of Plaintiff's.  Ten of these requests pending in the expedited track are FOIA litigation matters, nine of which were notably granted expedited processing prior to the grant of expedited processing for Plaintiff's FOIA request.

**OIP's Processing of FOIA Requests**

19. As noted in paragraph 1 above, OIP processes FOIA requests on behalf of itself and six senior leadership offices of the Department of Justice. OIP is also responsible for processing FOIA requests for records of the Office of the Special Counsel.

20. Incoming FOIA requests are assigned to a Government Information Specialist (GIS) or Attorney-Advisor who gathers potentially responsive documents and coordinates their review. OIP makes determinations upon receipt of a FOIA request, both as to the appropriate senior leadership office or offices in which to conduct initial records searches and the records repositories and search methods to use in conducting records searches on behalf of the designated senior leadership offices. OIP processes FOIA requests on a first-in, first-out basis within each of its three request tracks (expedited, simple, and complex). Assessments of where responsive records are likely maintained are based on a review of the content of the request itself and the nature of the records sought therein, as well as our familiarity with the types and location of records that each senior leadership office maintains, discussions with knowledgeable personnel in the senior leadership offices, and any research that OIP staff may conduct on the topic of the request. When searching the records of leadership office custodians identified as having potentially responsive material, OIP staff employ any one of a variety of search methods or a combination of methods, depending on a number of factors, including the type of records systems implicated in the search. Potentially responsive records may be located in e-mail systems, computer hard drives, or hard copy (paper) files.

21. When a FOIA request enters litigation, it is assigned to a new Attorney-Advisor, who handles both any remaining processing of records, as well as the responses to time-sensitive litigation deadlines. Once all potentially responsive documents have been collected, the

Attorney-Advisor assigned to the litigation matter will coordinate the review process with the appropriate senior reviewing attorney.

22. OIP employs a three-level review in processing most FOIA requests to ensure that all information that must be protected is properly withheld and that all information that can be, or must be, released is provided accordingly.  This three-level review is especially important, where, as here, the FOIA request at issue may implicate sensitive topics relating to internal DOJ advice and deliberations.  In reviewing FOIA requests in litigation, the Attorney-Advisor assigned to the matter conducts an initial review of each document, a senior reviewing attorney then conducts an intermediate review, and OIP's Senior Counsel conducts a final review.  Both reviewing attorneys have significant experience with both the FOIA and internal policies and procedures for processing such requests in litigation, and, on behalf of DOJ senior leadership offices, perform an additional quality assurance review.

23. Following review by the senior reviewing attorney and OIP's Senior Counsel, all relevant consultations with other equity-holders are conducted in order to comply with Department regulations regarding the need to consult with other offices on information appearing within the documents at issue.  See 28 C.F.R. § 16.4(d)(1).  All consultation responses will be analyzed, de-conflicted, and reconciled, which is a process that often involves further engagement with consulting entities and high-level internal review.  OIP must necessarily complete all consultations prior to providing any final response to a requester/plaintiff.

24. Prior to releasing any records to a requester/plaintiff, OIP fully reviews all final disclosure determinations, ensuring that information that must be protected is properly withheld pursuant to the FOIA and that all information that can be released is provided accordingly.

**Expedited Processing**

25. As mentioned above in paragraph 20, OIP processes FOIA requests on a first-in, first-out basis within each of its three request tracks (expedited, simple, and complex).  As of April 5, 2019 OIP was processing 243 requests on an expedited basis.  As a practical matter, this does not mean that OIP processes each request to completion one at a time, but rather, at each step of the search and review process the requests in a given track are prioritized on a first-in, first-out basis. Accordingly, OIP is processing Plaintiff's FOIA request, within each phase of the review process, behind the 205 requests already being processed ahead of Plaintiff's within the expedited track.

26. Of these 243 requests, records sought include similarly high-profile topics as Plaintiff's request that are of great interest to the public.  For example, a FOIA request seeking records related to alleged unauthorized disclosures of national security information was submitted to OIP on July 7, 2017 and expedited processing was granted on August 22, 2017. This request, which is subject to litigation, is number 96 in the expedited track. Another high profile FOIA request seeking records related to the decision to terminate the Deferred Action for Childhood Arrivals (DACA) Program, was submitted to OIP on September 22, 2017.  This request, which is also the subject of litigation, was granted expedited processing on October 2, 2017 and is currently request number 114 in the expedited processing track.  Another notable example is a FOIA request received by OIP on November 29, 2018, seeking records related to the Department's "zero tolerance" immigration policy.  This request was granted expedited processing on December 13, 2018 and is currently request number 190 in the expedited track. Notably, of these 243 requests, at least 106 were filed by public advocacy groups similar to Plaintiff's, who are also seeking records to satisfy strong public interest in the matters at hand.

27. In FY 2018, for the top three DOJ senior leadership offices, OAG expedited requests were processed in an average of 228.57 working days, ODAG expedited requests were processed in an average of 231.42 working days, and OASG expedited requests were processed in an average of 172.5 working days.  This amounts to an average time of approximately seven and a half months to complete processing of an OAG or ODAG expedited request and five and a half months to complete processing of an OASG expedited request.  See DOJ Annual FOIA Report-FY 2018, *available at* https://www.justice.gov/oip/page/file/1135781/download.[5]

28. For FY 2019, OIP has assigned significantly more requests to the expedited processing track and is currently on pace to have at least 20% more requests in this expedited processing track than it did in FY 2018.  Notably, in fourteen calendar days dating between March 22, 2019 and April 4, 2019, thirty-five FOIA requested were assigned to the expedited track, which is more than the number of requests assigned to this track in the first quarter of FY 2019, which was twenty-seven requests.

**OIP's Processing of Plaintiff's FOIA Request**

29. Now that Plaintiff's request for expedited processing has been granted, OIP is processing Plaintiff's FOIA request and will provide a response "as soon as practicable."  See 5 U.S.C. § 522(a)(6)(E)(iii).  There are multiple considerations that factor into when a response on an expedited request may be issued.  It would be inappropriate at this time for OIP to commit to a fixed processing schedule for these same reasons.

30. As has been discussed above, OIP is currently processing other FOIA requests in its expedited processing track, many of which were granted expedition before Plaintiff's FOIA

---

[5] The DOJ Annual Report for FY 2018 is the most recent reporting available regarding average expedited processing times for OAG FOIA requests on a yearly basis.

request.  Plaintiff is not entitled to jump ahead of other expedited requests simply because litigation has been filed, due to the disproportionate and inefficient effect such prioritization has on OIP's ability to process all other non-litigation and expedited requests.  Such prioritization is unfair and harms other FOIA requesters with equally meritorious expedited and non-expedited requests who have been in the queue for a longer period of time.

31. Because the requested Mueller Report will be released by the Attorney General in mid-April, it is not practicable for the Department to process the report for release to Plaintiff in response to Plaintiff's FOIA request any earlier than the timeframe the Attorney General has already provided.  See Pl.'s Mot., Ex. 7 at 1, Dkt. 7-4.  Additionally, once the Mueller Report is released by the Attorney General, OIP will need to undergo a review of the material for disclosure under the FOIA, which is likely to take some time due to the reported length of the Mueller Report and also require consultation with other Department components.

32. Of further note, Plaintiff submitted a wide-ranging request for records and it is not entirely clear what, exactly, they are seeking in some of the fourteen categories of records outlined in Plaintiff's FOIA request.  OIP will need time to discuss, both internally and with Plaintiff, how to better frame its request to locate records responsive to the fourteen categories of records as described in the request.  Depending on what Plaintiff is seeking, OIP may be required to refer portions of Plaintiff's FOIA request to other components within the Department if certain records cannot be located in one of the six senior leadership offices on behalf of which OIP processes FOIA requests.  Each DOJ component will need to balance similar considerations and process Plaintiff's expedited FOIA request while balancing the expedited requests received prior to Plaintiff's.  As with OIP's processing of Plaintiff's FOIA request, Plaintiff is not entitled to prioritization in any other Department component simply because litigation has been filed.

33. Based on the nature of the topic of Plaintiff's FOIA request, any responsive material may contain sensitive information that is properly exempt from release under the FOIA. OIP will require sufficient time to conduct a careful review of the materials to ensure that it adequately safeguards any such information from disclosure and consult with other Department components, as discussed above, that may have equity in the materials. Also as discussed above, OIP will necessarily be required to undergo a consultation process for the material contained in the Mueller Report once it is released by the Department in its redacted form. Finally, if OIP records containing "referrals" and the underlying material as outlined in categories 5(a) and (b) of Plaintiff's FOIA request exist, the information contained in such records are likely to impact other criminal investigations for years to come. Referrals inherently involve ongoing criminal investigations, which may or may not eventually become criminal prosecutions. Plaintiff's request for OIP to produce such records by April 29, 2019 is impractical because records implicating these referrals will require consultation and/or referral to other Department components.

34. Having now granted Plaintiff's request for expedited processing, OIP is fully committed to processing Plaintiff's FOIA request as soon as practicable. For the reasons discussed above, it would be unduly burdensome and infeasible to complete the processing of portions of Plaintiff's FOIA request by April 9 and 29, 2019, as requested by Plaintiff. Given OIP's available resources, the estimated time necessary to locate and complete the review of records at issue in Plaintiff's FOIA request, and OIP's other FOIA obligations, it would be inappropriate at this time for OIP to commit to Plaintiff's requested schedule, or a fixed processing schedule.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Vanessa R. Brinkmann

Executive this 5th day of April, 2019.

# Exhibit A

# FAX COVER SHEET

| | |
|---|---|
| TO | Douglas Hibbard |
| COMPANY | Chief, Initial Request Staff, Office of Information Policy, U.S. Dep't of Justice |
| FAX NUMBER | 12025141009 |
| FROM | EPIC FOIA |
| DATE | 2018-11-05 21:11:59 GMT |
| RE | Freedom of Information Act Request Submission: 18-11-05-DOJ (Special Counsel Report) |

## COVER MESSAGE

Dear FOIA Officer:

This is a Freedom of Information Act request submission made on behalf of the Electronic Privacy Information Center (EPIC) to the U.S. Department of Justice seeking information about Special Counsel Mueller's investigation into Russian interference in the 2016 presidential election. A total of 15 pages, including this cover page, is attached. Please direct any questions and communications about this request to FOIA@epic.org, cc: davisson@epic.org or 202-483-1140x120. Thank you.

Best,

Enid Zhou
EPIC Open Government Counsel
1718 Connecticut Ave, N.W.
Suite 200
Washington, DC 20009

*RECEIVED*

*NOV - 5 2018*

*Office of Information Policy*

# epic.org

**Electronic Privacy Information Center**
1718 Connecticut Avenue NW, Suite 200
Washington, DC 20009, USA

  📞 +1 202 483 1140
  📠 +1 202 483 1248
  🐦 @EPICPrivacy
  🌐 https://epic.org

VIA FACSIMILE

November 5, 2018

Douglas Hibbard
Chief, Initial Request Staff
Office of Information Policy
Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, D.C., 20530-0001
Fax: (202) 514-1009

Dear Mr. Hibbard,

     This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a), and is submitted on behalf of the Electronic Privacy Information Center ("EPIC") to the Department of Justice's ("DOJ") Office of Information Policy ("OIP").

     EPIC seeks documents, in the possession of the agency, concerning the investigation by Special Counsel Robert S. Mueller into Russian interference in the 2016 United States presidential election and related matters.

## Documents Requested

     EPIC requests the following records concerning the Special Counsel investigation into Russian interference with the presidential election:[1]

   (1)(a) All "report[s]" and "closing documentation" prepared under 28 C.F.R. § 600.8(c), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

    (b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" or "closing documentation" under 28 C.F.R. § 600.8(c);

   (2)(a) All "report[s]" concerning "the status of the investigation" prepared under 28 C.F.R. § 600.8(a)(2), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

---

[1] U.S. Dep't of Justice, Office of the Deputy Attorney General, Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017), https://www.justice.gov/opa/press-release/file/967231/download [hereinafter Appointment Order].

EPIC FOIA Request               1              Special Counsel Report(s)
November 5, 2018                          Department of Justice

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" concerning "the status of the investigation" under 28 C.F.R. § 600.8(a)(2);

(3)(a) All records "expla[ining] . . . any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "explanation for any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b);

(4)(a) All records prepared under 28 C.F.R. § 600.9(a) to "notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress" of a development in the Special Counsel investigation, whether or not such records were actually transmitted to any member of Congress;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned notification under 28 C.F.R. § 600.9(a);

(5)(a) All referrals by the Special Counsel, Attorney General, or Acting Attorney General for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c), whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned referral for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c);

(6)(a) All "report[s]," "recommendation[s]," and other "compilation[s] of information" prepared for the eventual consideration of one or more members of Congress,[2] whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report, recommendation, or compilation of the type described in Category (6)(a) of this request;

(7)(a) All other reports summarizing or describing, for one or more persons outside of the Special Counsel's Office, (i) any of the Special Counsel's evidence, findings, decisions, actions, or planned actions, or (ii) any developments in the Special Counsel investigation; and

---

[2] *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219, 1221, 1226 (D.D.C. 1974), *aff'd sub nom. Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974).

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report of the type described in Category (7)(a) of this request.

EPIC does not seek records which have already been disclosed to the public in their complete and unredacted form (i) in the course of an open judicial proceeding; (ii) available at https://www.justice.gov/sco; or (iii) available at https://www.justice.gov/news.

## Background

EPIC's FOIA request, and the Special Counsel investigation to which it pertains, arise out of the Russian government's coordinated campaign to interfere with the 2016 U.S. presidential election.

### *Russian Interference in the 2016 U.S. Presidential Election*

In 2016, the Russian government carried out a multi-pronged attack on the U.S. Presidential Election to destabilize U.S. democratic institutions and aid the candidacy of Donald J. Trump. As explained in the declassified 2017 Intelligence Community Assessment ("ICA") on Russian election interference:[3]

> We assess with high confidence that Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election, the consistent goals of which were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency. We further assess Putin and the Russian Government developed a clear preference for President-elect Trump. When it appeared to Moscow that Secretary Clinton was likely to win the election, the Russian influence campaign then focused on undermining her expected presidency.
>
> We also assess Putin and the Russian Government aspired to help President-elect Trump's election chances when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to him.[4]

The ICA—along with the reports, investigations, and prosecutions that have ensued—establishes that Russia interfered with the 2016 election on at least four fronts.

First, "Russia's intelligence services conducted cyber operations against targets associated with the 2016 US presidential election, including targets associated with both major

---

[3] Office of the Dir. of Nat'l Intelligence, ICA 2017-01D, *Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent US Elections* (Jan. 6, 2017),
https://www.dni.gov/files/documents/ICA_2017_01.pdf [hereinafter *Intelligence Community Assessment*]; *see also* EPIC, *EPIC v. ODNI (Russian Hacking)* (Dec. 18, 2017),
https://www.epic.org/foia/odni/russian-hacking/ (EPIC FOIA lawsuit to obtain full Intelligence Community Assessment on which declassified version was based).
[4] *Intelligence Community Assessment*, *supra* note 3, at 1.

US political parties."[5] These operations included the "exfiltrat[ion of] large volumes of data" from the Democratic National Committee ("DNC") and "the compromise of the personal e-mail accounts of Democratic Party officials and political figures."[6]

Second, Russian intelligence services "used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in cyber operations publicly and in exclusives to media outlets."[7] These disclosures included data extracted by Russian intelligence from DNC networks.[8] Subsequent investigation has also revealed that senior Trump campaign officials engaged in multiple meetings with Russian intermediaries offering to provide "dirt" on Hillary Clinton, including "thousands of emails" obtained by Russia.[9]

Third, "Russian intelligence accessed elements of multiple state or local electoral boards" in an ongoing effort to assess "US electoral processes and related technology and equipment."[10]

Fourth, "Russia's state-run propaganda machine—comprised of its domestic media apparatus, outlets targeting global audiences such as RT and Sputnik, and a network of quasi-government trolls—contributed to the influence campaign by serving as a platform for Kremlin messaging to Russian and international audiences."[11] As part of this propaganda push, the Russian government spent millions of dollars and employed hundreds of people to flood Facebook and Twitter with fraudulent users, posts, articles, groups, and targeted advertisements.[12]

---

[5] *Id.* at 2.

[6] *Id.; see also* EPIC, *EPIC v. FBI (Russian Hacking)* (May 22, 2018), https://epic.org/foia/fbi/russian-hacking/ (EPIC FOIA lawsuit revealing FBI's failure to follow its own victim notification procedures in response to Russian cyberattacks against U.S. officials).

[7] *Intelligence Community Assessment, supra* note 3, at 2–3.

[8] *Id.* at 3.

[9] Statement of the Offense at ¶ 14, *United States v. Papadopoulos*, No. 17-182 (D.D.C. Oct. 5, 2017) ("The Professor told defendant PAPADOPOULOS . . . that 'They [the Russians] have dirt on her'; 'the Russians had emails of Clinton'; 'they have thousands of emails.'"); *see also* House Permanent Select Committee on Intelligence, *Status of the Russia Investigation (Minority Report)* (Mar. 13, 2018), https://democrats-intelligence.house.gov/uploadedfiles/final_-

minority_status_of_the_russia_investigation_with_appendices.pdf (noting that the "stated purpose" of "the June 9, 2016 Trump Tower meeting with Russian emissaries" was to "provide damaging information on Hillary Clinton").

[10] *Intelligence Community Assessment, supra* note 3, at 3; *see also* EPIC, *EPIC v. DHS* (Aug. 17, 2018), https://epic.org/foia/dhs/cybersecurity/russian-interference/default.html (EPIC FOIA lawsuit revealing Department of Homeland Security response to Russian cyberattacks on election infrastructure).

[11] *Intelligence Community Assessment, supra* note 3, at 3–4.

[12] Indictment at ¶¶ 3–6, 10, *United States v. Internet Res. Agency*, No. 18-32 (D.D.C. Feb. 16, 2018); *see also* Statement from EPIC to U.S. Senate Select Comm. on Intelligence, Sep. 4, 2018, https://epic.org/testimony/congress/EPIC-SSCI-ForeignSocialMedia-Sept2018.pdf (calling for greater transparency concerning Russian manipulation of news and information on social networks during and after the 2016 election).

In the twenty-two months since the Intelligence Community Assessment was published, the ICA's findings have been repeatedly confirmed by federal inquiries[13] and investigative reporting.[14] The Senate Intelligence Committee, after an "an in-depth review" of the ICA and associated intelligence, determined that "the conclusions of the ICA are sound" and noted "that collection and analysis subsequent to the ICA's publication continue to reinforce its assessments."[15]

*Criminal Investigations into Russian Election Interference*

On January 20, 2018—two weeks after the public release of the Intelligence Community Assessment—Donald J. Trump was inaugurated as the 45th President of the United States. On March 2, 2017, Attorney General Jeff Sessions, who had been a prominent supporter of Mr. Trump during the campaign, recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."[16] As a result, the responsibilities of the Attorney General for any such investigation passed to the Deputy Attorney General.[17]

On March 20, 2017, James B. Comey, then-Director of the Federal Bureau of Investigation ("FBI"), confirmed to the House Permanent Select Committee on Intelligence that the FBI was conducting an investigation into "the Russian government's efforts to interfere in the 2016 presidential election," including "the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts."[18] Mr. Comey noted that the investigation would include "an assessment of whether any crimes were committed."[19]

---

[13] Senate Select Comm. on Intelligence, *The Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent U.S. Elections* (July 3, 2018), https://www.burr.senate.gov/imo/media/doc/SSCI%20ICA%20ASSESSMENT_FINALJULY3.pdf [hereinafter Senate Intelligence Report].
[14] *E.g.*, Scott Shane & Mark Mazzetti, *The Plot to Subvert an Election: Unraveling the Russia Story So Far*, N.Y. Times (Sep. 20, 2018), https://www.nytimes.com/interactive/2018/09/20/us/politics/russia-interference-election-trump-clinton.html; Philip Bump, *A Broad Debunking of Trump's Claims About Russian Interference and the Mueller Investigation*, Wash. Post (June 28, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/28/a-broad-debunking-of-trumps-claims-about-russian-interference-and-the-mueller-investigation/.
[15] Senate Intelligence Report, *supra* note 13, at 7.
[16] Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement on Recusal (Mar. 2, 2017), https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal; *see also* 28 C.F.R. § 45.2(a).
[17] *Id.*; *see also* 28 U.S.C. § 508 ("In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office[.]").
[18] *Russian Active Measures Investigation: Hearing Before the H. Permanent Select Comm. on Intelligence*, 115th Cong. (2017) (Statement of James B. Comey, Dir., Fed. Bureau of Investigation), https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation.
[19] *Id.*

On May 9, 2017, President Trump removed Director Comey from office and terminated his employment. [20] Two days later, in a nationally-televised NBC News interview, President Trump stated:

> I was going to fire Comey knowing, there was no good time to do it. And in fact when I decided to just do it, I said to myself, I said you know, this Russia thing with Trump and Russia is a made up story, it's an excuse by the Democrats for having lost an election that they should have won. [21]

On May 17, 2017, Deputy Attorney General Rod J. Rosenstein—in his capacity as Acting Attorney General—appointed Robert S. Mueller III "to serve as Special Counsel for the United States Department of Justice." [22] Mr. Rosenstein authorized Mr. Mueller to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017," including "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump"; "any matters that arose or may arise directly from the investigation"; and "any other matters within the scope of 28 C.F.R. § 600.4(a)." [23] Mr. Rosenstein also authorized Mr. Mueller "to prosecute federal crimes arising from the investigation of these matters" where "it is necessary and appropriate[.]" [24]

Since Mr. Mueller was appointed, the Special Counsel has brought criminal charges against 33 individuals and three organizations, [25] including:

- Former National Security Adviser Michael Flynn, who pleaded guilty to making false statements to the FBI; [26]
- Former Trump campaign manager Paul Manafort, who was convicted of multiple counts of tax fraud and bank fraud [27] and pleaded guilty to conspiracy against the United States and other charges; [28]

---

[20] Letter from Donald J. Trump, President of the United States, to James B. Comey, Dir., Fed. Bureau of Investigation (May 9, 2017), https://www.gpo.gov/fdsys/pkg/DCPD-201700325/pdf/DCPD-201700325.pdf.

[21] Adam Edelman, *Trump says He Didn't Fire Comey 'Because of Russia,' Contradicting Past Statements*, NBC News (May 31, 2018), https://www.nbcnews.com/politics/donald-trump/trump-says-he-didn-t-fire-comey-because-russia-contradicting-n878836.

[22] Appointment Order, *supra* note 1, ¶ (a).

[23] *Id.* ¶ (b).

[24] *Id.* ¶ (c).

[25] U.S. Dep't of Justice, *Special Counsel's Office* (Sep. 14, 2018), https://www.justice.gov/sco.

[26] Plea Agreement, *United States v. Flynn*, No. 17-232 (Dec. 1, 2017), https://www.justice.gov/file/1015121/download.

[27] U.S. Dep't of Justice, *Special Counsel's Office*, *supra* note 25 ("On Aug. 21, 2018, a federal jury found Manafort guilty on eight counts: counts 1-5, subscribing to a false individual income tax return for tax years 2010-2014; count 12, failure to file reports of foreign bank and financial accounts for year 2012; count 25, bank fraud; and count 27, bank fraud.").

[28] Plea Agreement, *United States v. Manafort*, No. 17-201 (Sep. 14, 2018), https://www.justice.gov/file/1094151/download.

- Former Trump deputy campaign manager Rick Gates, who pleaded guilty to conspiracy against the United States and making a false statement to the FBI;[29]
- Former Trump campaign foreign policy adviser George Papadopolous, who pleaded guilty to making false statements to the FBI;[30]
- The Internet Research Agency, Concord Management and Consulting LLC, and thirteen Russian nationals, who are charged with conspiracy against the United States and related offenses for flooding social media platforms with fraudulent content to interfere with U.S. political processes;[31] and
- Twelve other Russian nationals, who are charged with conspiracy to commit computer crimes and other offenses for hacking Democratic Party computer networks and email accounts linked to the Clinton campaign.[32]

*The Special Counsel Report(s)*

In addition to the criminal offenses charged by the Special Counsel, major news organizations[33] and President Trump's own attorneys[34] have stated that Mr. Mueller intends to

---

[29] Plea Agreement, *United States v. Gates*, No. 17-201 (Feb. 23, 2018),
https://www.justice.gov/file/1038801/download.

[30] Plea Agreement, *United States v. Papadopolous*, No. 17-182 (Oct. 5, 2017),
https://www.justice.gov/file/1007341/download.

[31] Indictment, *United States v. Internet Research Agency LLC*, No. 18-32 (Feb. 16, 2018),
https://www.justice.gov/file/1035477/download.

[32] Indictment, *United States v. Netyksho*, No. 18-215 (July 13, 2018),
https://www.justice.gov/file/1080281/download.

[33] *E.g.*, Charlie Savage, *Legal Experts Urge Release of Watergate Report to Offer Mueller a Road Map*,
N.Y. Times (Sep. 14, 2018), https://www.nytimes.com/2018/09/14/us/politics/mueller-report-grand-jury-watergate.html ("The leading theory is that Mr. Mueller will write a report for his supervisor at the Justice
Department. . . . But there is historical precedent for another model. Echoing a move by the Watergate
prosecutor in March 1974, the grand jury with which Mr. Mueller has been working could try to send a
report about the evidence it has gathered directly to the House Judiciary Committee."); Jeffrey Toobin,
*How Rudy Giuliani Turned Into Trump's Clown*, New Yorker (Sep. 10, 2018),
https://www.newyorker.com/magazine/2018/09/10/how-rudy-giuliani-turned-into-trumps-clown
("Mueller will file a concluding report with Rod Rosenstein, the Deputy Attorney General, at the end of
the investigation[.]"); Michael S. Schmidt & Maggie Haberman, *Mueller Examining Trump's Tweets in
Wide-Ranging Obstruction Inquiry*, N.Y. Times (July 26, 2018),
https://www.nytimes.com/2018/07/26/us/politics/trump-tweets-mueller-obstruction.html ("If Mr. Mueller
does not plan to make a case in court, a report of his findings could be sent to Congress, leaving it to
lawmakers to decide whether to begin impeachment proceedings.").

[34] *E.g.*, Memorandum from John M. Dowd, Att'y for President Trump, to Robert S. Mueller, Special
Counsel (Jan. 29, 2018), *reprinted in The Trump Lawyers' Confidential Memo to Mueller, Explained*,
N.Y. Times (June 2, 2018), https://www.nytimes.com/interactive/2018/06/02/us/politics/trump-legal-documents.html ("It is our understanding that the reason behind the request for the interview is to allow
the Special Counsel's office to complete its report."); @RudyGiuliani, Twitter (Aug. 15, 2018, 9:58 AM),
https://twitter.com/RudyGiuliani/status/1029728984446193664 ("DOJ should require Mueller to submit
his report before September 7."); Peter Nicholas, *Rudy Giuliani Says Trump Lawyers Are Prepared to
Counter Mueller*, Wall Street J. (Aug. 12, 2018), https://www.wsj.com/articles/rudy-giuliani-says-trump-lawyers-are-prepared-to-counter-mueller-1534110560 ("President Trump's lawyers believe they can

transmit one or more report(s) detailing the Special Counsel's findings (the "Mueller Report(s)"). The precise number, character, and subject matter of the Mueller Report(s) are not publicly known, though at least one such report is said to address allegations that President Trump obstructed justice by attempting to block a criminal probe into Russian election interference.[35]

There are several legal authorities under which the Special Counsel, Attorney General, or Acting Attorney General might issue a report or otherwise release information concerning the Special Counsel's investigation. First, under 28 C.F.R. § 600.8(c), the Special Counsel is required to provide the Attorney General or Acting Attorney General with a report at the conclusion of the investigation:

> **(c) Closing documentation.** At the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel.[36]

Second, under 28 C.F.R. § 600.8(a)(2), the Special Counsel is required to provide annual status reports to the Attorney General or Acting Attorney General:

> **(2)** Thereafter, 90 days before the beginning of each fiscal year, the Special Counsel shall report to the Attorney General the status of the investigation, and provide a budget request for the following year. The Attorney General shall determine whether the investigation should continue and, if so, establish the budget for the next year.[37]

Third, under 28 C.F.R. § 600.7(b), the Attorney General or Acting Attorney General may request an explanation for any investigative or prosecutorial step taken by the Special Counsel:

> **(b)** The Special Counsel shall not be subject to the day-to-day supervision of any official of the Department. However, the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued. In conducting that review, the Attorney General will give great weight to the views of the Special Counsel. If the Attorney General concludes that a proposed action by a

---

weather a 'negative' report from special counsel Robert Mueller and are prepared to rebut the conclusions, Rudy Giuliani, one of Mr. Trump's attorneys, said in an interview.").

[35] Carol D. Leonnig & Robert Costa, *Mueller Told Trump's Attorneys the President Remains Under Investigation But is Not Currently a Criminal Target*, Wash. Post (Apr. 3, 2018),

https://www.washingtonpost.com/politics/mueller-told-trumps-attorneys-the-president-remains-under-investigation-but-is-not-currently-a-criminal-target/2018/04/03/d7832cf0-36c1-11e8-acd5-35eac230e514_story.html ("The special counsel also told Trump's lawyers that he is preparing a report about the president's actions while in office and potential obstruction of justice, according to two people with knowledge of the conversations.").

[36] 28 C.F.R. § 600.8(c); *see also* Appointment Order, *supra* note 1, ¶ (d) ("Sections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations are applicable to the Special Counsel.").
[37] 28 C.F.R. § 600.8(a)(2).

Special Counsel should not be pursued, the Attorney General shall notify Congress as specified in § 600.9(a)(3).[38]

Fourth, under 28 C.F.R. § 600.9(a), the Attorney General or Acting Attorney General is required to notify certain members of Congress of key developments in the Special Counsel's investigation:

(a) The Attorney General will notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress, with an explanation for each action —

(1) Upon appointing a Special Counsel;

(2) Upon removing any Special Counsel; and

(3) Upon conclusion of the Special Counsels investigation, including, to the extent consistent with applicable law, a description and explanation of instances (if any) in which the Attorney General concluded that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued.[39]

Fifth, under 28 C.F.R. § 600.4(c), the Special Counsel may take "necessary action" to pursue penalties "outside the criminal justice system" in consultation with the Attorney General or Acting Attorney General:

(c) Civil and administrative jurisdiction. If in the course of his or her investigation the Special Counsel determines that administrative remedies, civil sanctions or other governmental action outside the criminal justice system might be appropriate, he or she shall consult with the Attorney General with respect to the appropriate component to take any necessary action. A Special Counsel shall not have civil or administrative authority unless specifically granted such jurisdiction by the Attorney General.[40]

Sixth, the Special Counsel may use its "full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney"[41] to transmit "report[s]," "recommendation[s]," or other "compilation[s] of information" to Congress via the grand jury process.[42] This procedure was used by Special Counsel Leon Jaworski in 1974 to convey "material in the Grand Jury's possession having a material bearing on matters within the

---

[38] 28 C.F.R. § 600.7(b).

[39] 28 C.F.R. § 600.9(a).

[40] 28 C.F.R. § 600.4(c).

[41] 28 C.F.R. § 600.6.

[42] *In re Report & Recommendation*, 370 F. Supp. at 1221, 1226.

primary jurisdiction of the United States House of Representatives Committee on the Judiciary relating to questions of impeachment."[43]

Finally, the Special Counsel, Attorney General, and/or Acting Attorney General may rely on their general powers under 28 C.F.R. § 600.1 *et seq.* (and on other legal authorities) to disclose developments, evidence, findings, decisions, actions, or planned actions from the Special Counsel's investigation.

EPIC, through this FOIA request, seeks all of the above categories of records and supporting materials generated by or related to Special Counsel Mueller's investigation.

## EPIC's Interest in the Special Counsel Investigation

EPIC has a particular interest in the release of records related to Special Counsel Mueller's investigation because those records will inform EPIC's project on Democracy and Cybersecurity, which was launched in response the interference in the 2016 Presidential Election.[44] As part of EPIC's Democracy and Cybersecurity project, EPIC has filed suits seeking public release of President Trump's tax returns and to correct numerous misstatements of fact concerning the President's financial ties to Russia.

### *EPIC v. IRS I (Donald Trump's Tax Records)*

In *EPIC v. IRS I*, EPIC argues that the Internal Revenue Service ("IRS") has the authority, under § 6103(k)(3) of the Internal Revenue Code,[45] to disclose the President's returns to correct numerous misstatement of fact concerning his financial ties to Russia.[46] For example, President Trump falsely tweeted that "Russia has never tried to use leverage over me. I HAVE NOTHING TO DO WITH RUSSIA – NO DEALS, NO LOANS, NO NOTHING."[47] Yet, numerous news organizations have covered President Trump's ties to Russian businesses and government.[48] The case is currently pending in the D.C. Circuit.

---

[43] Report & Recommendation at 1, *In re Report & Recommendation*, 370 F. Supp. at 1221 (Mar. 1, 1974) (capitalization altered), https://www.archives.gov/files/research/investigations/watergate/roadmap/docid-70105890.pdf; *see also* 105 Cong. Rec. H9,670 (daily ed. Oct. 6, 1998) (statement of Rep. Jackson-Lee) ("[I]t will be recalled the Watergate special prosecution force did not send to Congress an argumentative or inflammatory document, but rather a simple road map which merely summarized and identified the location of relevant evidence.").

[44] *See* EPIC, *Democracy and Cybersecurity: Preserving Democratic Institutions*, https://www.epic.org/democracy/.

[45] 26 U.S.C. § 6103(k)(3).

[46] *See* EPIC, *EPIC v. IRS (Donald Trump's Tax Records)*, https://www.epic.org/foia/irs/trump-taxes/.

[47] Donald J. Trump (@realDonaldTrump), Twitter (July 26, 2016), https://twitter.com/realdonaldtrump/status/758071952498159616?lang=en.

[48] See e.g., Tom Hamburger, Rosalind S. Helderman, & Michael Birnbaum, *Inside Trump's Financial Ties to Russian and His Unusual Flatters of Vladimir Putin*, Wash. Post (June 17, 2016), https://www.washingtonpost.com/politics/inside-trumps-financial-ties-to-russia-and-his-unusual-flattery-of-vladimir-putin/2016/06/17/dbdcaac8-31a6-11e6-8ff7-7b6c1998b7a0_story.html; *Despite Denial, Trump's Connections to Russia Go Back Years*, CBS News (July 29, 2016),

*EPIC v. IRS II (Trump Offers-in-Compromise)*

In *EPIC v. IRS II*, EPIC filed suit to compel the IRS to release certain tax records pertaining to President Trump's more than 300 associated business entities.[49] EPIC requested all "offers-in-compromise" used to satisfy a tax debt owed by President Trump or one of his businesses. Under § 6103(k)(1) of the Internal Revenue Code, taxpayer "return information shall be disclosed to all members of the general public to the extent necessary to permit inspection of any accepted offer-in-compromise[.]"[50] These records are public as a matter of law. The case is currently pending in the U.S. Federal Court for the District of Columbia.

## Request for Expedition

EPIC is entitled to expedited processing of this request.[51] Under the DOJ's FOIA regulations, a request "shall be processed on an expedited basis" when (1) there is an "urgency to inform the public about an actual or alleged federal government activity," and (2) where the request is "made by a person who is primarily engaged in disseminating information."[52] This request satisfies both conditions.

First, there is an "urgency to inform the public about an actual or alleged federal government activity."[53] The actual federal government activities are (1) the Special Counsel's investigation of Russian interference in the 2016 U.S. presidential election, and (2) the U.S. government's response to Russian election interference, as reflected in the requested records of the Special Counsel.[54] The requested records also pertain to President Trump's alleged obstruction of justice while in office.[55]

The urgency to inform the public about these government activities is clear from the voluminous press coverage of,[56] and immense public interest in,[57] Mr. Mueller's investigation

---

https://www.cbsnews.com/news/election-2016-donald-trump-ties-to-russia-go-back-years-dnc-email-hack/; John Hardwood, *Trump Calls the Special Counsel's Probe a 'Witch Hunt,' but His Links to Russia Go Back a Long Time*, CNBC (May 23, 2018), https://www.cnbc.com/2018/05/23/trump-links-to-russia-an-explanation.html.

[49] See EPIC, *EPIC v. IRS II (Trump Offers-in-Compromise)*, https://epic.org/foia/irs/trump-taxes-ii/.
[50] 26 U.S.C. § 6103(k)(1).
[51] 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(1).
[52] 28 C.F.R. § 16.5(e)(1), (e)(1)(ii).
[53] *Id.*
[54] *See* Appointment Order, *supra* note 1.
[55] *See* Leonnig & Costa, *supra* note 35 ("The special counsel also told Trump's lawyers that he is preparing a report about the president's actions while in office and potential obstruction of justice, according to two people with knowledge of the conversations.").
[56] *See, e.g., Robert Mueller — F.B.I. Director*, N.Y. Times (Nov. 1, 2018), https://www.nytimes.com/topic/person/robert-mueller-mdash-fbi-director (listing over 570 articles concerning Robert Mueller since his appointment as Special Counsel on May 17, 2017).
[57] *See, e.g.*, Morning Consult & Politico, *National Tracking Poll* (Oct. 30, 2018), https://www.politico.com/f/?id=00000166-cb61-d184-ad67-ff67dddd0000 (finding that over 66% of respondents were aware of, and had developed an opinion on, Special Counsel Mueller); Robert Mueller, Google Trends (Nov. 2, 2018), https://trends.google.com/trends/explore?date=today%205-

and findings. Americans are deeply concerned about the scope of Russian interference in the 2016 presidential election; the U.S. government's response to that interference; the involvement of particular individuals in that interference, including possibly President Trump; the susceptibility of U.S. election systems and democratic institutions to future foreign interference; and the integrity of the Special Counsel investigation itself.[58] The Mueller Report(s) and supporting materials are critical to the public's understanding of these issues.

Second, EPIC is an organization "primarily engaged in disseminating information."[59] As the Court explained in *EPIC v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003), "EPIC satisfies the definition of 'representative of the news media'" entitling it to preferred fee status under FOIA.[60]

EPIC is also entitled to expedited processing because EPIC's request involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence."[61] In addition to the extraordinary media attention given to the work of the Special Counsel,[62] the requested records concern the potential involvement of the President in a foreign campaign to influence an election that he won; the possible obstruction of justice by the President while in office; the federal government's capacity to defend U.S. election systems and democratic institutions against foreign attacks; and the discharge of a high-profile Special Counsel investigation.[63] These matters unquestionably bear on the integrity of the government and affect public confidence.

In submitting this request for expedited processing, I certify that this explanation is true and correct to the best of my knowledge and belief.[64]

---

y&geo=US&q=Robert%20Mueller (showing a more than 100-fold increase in U.S. Google searches for Robert Mueller following his appointment as Special Counsel).

[58] *See, e.g.*, NPR/PBS NewsHour/Marist, *The United States' Relationship with Russia* 10, 12–13, 17 (July 25, 2018), http://maristpoll.marist.edu/wp-content/uploads/2018/07/NPR_PBS-Nature-of-the-Sample-and-Tables_The-US-Relationship-with-Russia_July-2018_181807241048.pdf (finding that 69% of respondents believed Russian interference occurred in the 2016 election, 63% believed Russian interference impacted the 2016 election, 53% believed President Trump had done something illegal or unethical "in his dealings with Russia and Russian President Vladimir Putin," and 57% expected Russia to interfere in the 2018 election); Suffolk University, *Suffolk University USA Today National Poll Shows Faith in Mueller's Russia Investigation but Not in Trump Denials* (Aug. 29, 2018),
https://www.suffolk.edu/news/77724.php ("A majority of Americans (55 percent) trust special counsel Robert Mueller and his investigation into alleged Russian meddling in the 2016 election, but 59 percent don't trust President Donald Trump's denial that his campaign was involved, according to a new Suffolk University/USA TODAY national poll.").

[59] 28 C.F.R. § 16.5(e)(1)(ii).

[60] 241 F. Supp. at 15.

[61] 28 C.F.R. § 16.5(e)(1)(iv).

[62] *Search Results: "Robert Mueller" and "Russia"*, Google News (Nov. 2, 2018),
https://www.google.com/search?tbm=nws&q=%22Robert+Mueller%22+and+%22Russia%22 (identifying 941,000 news results containing both "Robert Mueller" and "Russia").

[63] *See* Shane & Mazzetti, *supra* note 14.

[64] *See* 5 U.S.C. § 552(a)(6)(E)(vi); 28 C.F.R. § 16.5(e)(3).

## Request for News Media Fee Status and Fee Waiver

EPIC is a "representative of the news media" for fee classification purposes, as the Court held in *EPIC v. Department of Defense*.[65] Based on EPIC's status as a "news media" requester, EPIC is entitled to receive the requested record with only duplication fees assessed.[66]

Further, any duplication fees should also be waived because disclosure of the requested information "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest" of EPIC, the requester.[67] The DOJ evaluates the three factors to determine whether this requirement is met: (i) the "subject of the request must concern identifiable operations or activities of the Federal Government"; (ii) disclosure must be "likely to contribute significantly to public understanding of those operations or activities"; and (iii) "disclosure must not be primarily in the commercial interest of the requester."[68] EPIC's request satisfies all three factors.

First, the requested Mueller Report(s) and supporting materials clearly "concern[] identifiable operations or activities of the Federal Government,"[69] namely: (1) the Special Counsel's investigation of Russian interference in the 2016 U.S. Presidential Election; (2) the U.S. government's response to Russian election interference; and (3) possible obstruction of justice by President Trump while in office.[70]

Second, disclosure would be "likely to contribute significantly to public understanding of those operations or activities."[71] Disclosure would be "meaningfully informative about government operations or activities" because—apart from the charging documents already filed by Mr. Mueller—little is known about the Special Counsel's substantive findings concerning Russian election interference; the Trump campaign's involvement in that interference; the U.S. government's response to that interference; and possible obstruction of justice by President Trump.

Disclosure will also "contribute to the understanding of a reasonably broad audience of persons interested in the subject," because DOJ components must "presume that a representative of the news media," such as EPIC, "will satisfy this consideration."[72] The requested Mueller Report(s) and supporting materials will reach a large audience through EPIC's widely read website, https://epic.org, where EPIC routinely posts government documents obtained under the FOIA.

---

[65] 241 F. Supp. 2d 5.

[66] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[67] 28 C.F.R. § 16.10(k)(1); *see also* § 552(a)(4)(A)(iii).

[68] 28 C.F.R. §§ 16.10(k)(2)(i)–(iii).

[69] *Id.* § 16.10(k)(2)(i).

[70] *See* Appointment Order, *supra* note 1; Leonnig & Costa, *supra* note 35.

[71] 28 C.F.R. §§ 16.10(k)(2)(ii)(A)–(B).

[72] *Id.* § 16.10(k)(2)(ii)(B)

Third, disclosure of the requested information is not "primarily in the commercial interest" of EPIC.[73] EPIC has no "commercial interest . . . that would be furthered by the requested disclosure."[74] EPIC is a registered non-profit organization committed to open government, privacy, and civil liberties.[75] Moreover, DOJ components "ordinarily will presume that where a news media requester has satisfied [the public interest standard], the request is not primarily in the commercial interest of the requester."[76] As described above, EPIC is a news media requester and satisfies the public interest standard.

For these reasons, a fee waiver should be granted to EPIC's request.

<div align="center">Conclusion</div>

Thank you for your consideration of this request. I anticipate your determination on our request within ten calendar days.[77] For questions regarding this request, I can be contacted at 202-483-1140 x120 or FOIA@epic.org.

Respectfully submitted,

*/s John Davisson*
John Davisson
EPIC Counsel

*/s Enid Zhou*
Enid Zhou
EPIC Open Government Counsel

---

[73] *Id.* §§ 16.10(k)(2)(iii)(A)–(B).

[74] *Id.* §§ 16.10(k)(2)(iii)(A).

[75] EPIC, *About EPIC* (2018), https://epic.org/epic/about.html.

[76] 28 C.F.R. § 16.10(k)(2)(iii)(B).

[77] 5 U.S.C. § 552 (a)(6)(E)(ii)(I).

# Exhibit B



**U.S. Department of Justice**
Office of Information Policy
*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

November 15, 2018

Ms. Enid Zhou
Electronic Privacy Information Center
1718 Connecticut Ave., NW
Suite 200
Washington, DC  20009                        Re:     DOJ-2018-000676 (OIP)
FOIA@epic.org                                        VRB:VAV:SBT

Dear Ms. Zhou:

     This is to acknowledge receipt of your Freedom of Information Act (FOIA) request dated and received in this Office on November 5, 2018, in which you requested various records pertaining to the Special Counsel investigation into Russian interference with the presidential election and other related matters.  This response is made on behalf of the Special Counsel's Office.

     You have requested expedited processing of your request pursuant to the Department's standard permitting expedition for requests involving "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information." See C.F.R. § 16.5(d)(ii) (2017).  Based on the information you have provided, I have determined that your request for expedited processing under this standard should be denied.  This Office cannot identify a particular urgency to inform the public about an actual or alleged federal government activity beyond the public's right to know about government activities generally.

     Additionally, you also have requested expedited processing of your request pursuant to the Department's standard involving "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." See 28 C.F.R. § 16.5(e)(1)(iv) (2017).  Pursuant to Department policy, we directed your request to the Director of Public Affairs, who makes the decision whether to grant or deny expedited processing under this standard. See id. § 16.5(e)(2).  Please be advised the Director has determined that your request for expedited processing should be denied.  Although your request for expedited processing has been denied; it has been assigned to an analyst in this Office and our processing of it has been initiated.

     The records you seek require a search in and/or consultation with another Office, and so your request falls within "unusual circumstances."  See 5 U.S.C. 552 § (a)(6)(B)(i)-(iii) (2012 & Supp. V. 2017).  Because of these unusual circumstances, we need to extend the time limit to respond to your request beyond the ten additional days provided by the statute.  We have not yet completed a search to determine whether there are records within the scope of your request.  The time needed to process your request will necessarily depend on the complexity of

our records search and on the volume and complexity of any material located.  For your information, this Office assigns incoming requests to one of three tracks:  simple, complex, or expedited.  Each request is then handled on a first-in, first-out basis in relation to other requests in the same track.  Simple requests usually receive a response in about a month, whereas complex requests necessarily take longer.  At this time, your request has been assigned to the complex track.  In an effort to speed up our records search, you may wish to narrow the scope of your request to limit the number of potentially responsive records or agree to an alternative time frame for processing, should records be located; or you may wish to await the completion of our records search to discuss either of these options.

We have not yet made a decision on your request for a fee waiver.  We will do so after we determine whether fees will be assessed for this request.

If you have any questions or wish to discuss reformulation or an alternative time frame for the processing of your request, you may contact the analyst handing your request, Sara Tennant, by telephone at the above number or you may write to her at the above address.  You may also contact our FOIA Public Liaison, Douglas Hibbard, for any further assistance and to discuss any aspect of your request at: Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001; telephone at 202-514-3642; or facsimile at 202-514-1009.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with my response to your request for expedited processing, you may administratively appeal by writing to the Director, Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIAonline portal at https://www.foiaonline.gov/foiaonline/action/public/home.  Your appeal must be postmarked or electronically transmitted within ninety days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Vanessa R. Brinkmann
Senior Counsel

# Exhibit C



**epic.org**

**Electronic Privacy Information Center**
1718 Connecticut Avenue NW, Suite 200
Washington, DC 20009, USA

📞 +1 202 483 1140
🖨 +1 202 483 1248
🐦 @EPICPrivacy
🌐 https://epic.org

*Ep Type 1   JW*

VIA MAIL

December 21, 2018

*FOIA*
*Ⓡ*
*OIP Fee Issue*

RECEIVED

JAN 28 2019

Office of Information Policy

Director, Office of Information Policy
United States Department of Justice, Suite 11050
1425 New York Avenue, NW
Washington, DC 20530-0001

### Freedom of Information Act Appeal, DOJ-2018-000676 (OIP)

This letter constitutes an appeal of the U.S. Department of Justice's ("DOJ") Office of Information Policy's ("OIP") denial of expedited processing under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(6)(E)(i), and the DOJ's FOIA regulation, 28 C.F.R. § 16.5(e)(4). The FOIA request was submitted on behalf of the Electronic Privacy Information Center ("EPIC") to the DOJ on November 5, 2018 ("EPIC's FOIA Request").

EPIC's FOIA Request sought records in possession of the DOJ concerning the investigation by Special Counsel Robert S. Mueller into Russian interference in the 2016 United States presidential election and related matters. EPIC's FOIA Request established that there is an "urgency to inform the public" about a matter "concerning actual or alleged Federal government activity" and that EPIC is "primarily engaged in disseminating information." *See* Appendix A.

The DOJ now contends that there is no need to grant expedited processing for the release of records about the ongoing investigation by Special Counsel Mueller into Russian interference in the 2016 presidential election. In an acknowledgement letter from the DOJ, dated November 15, 2018, the DOJ denied EPIC's request for expedited processing of EPIC's FOIA Request under two different standards, both of which EPIC satisfied with specific facts.

First, EPIC established that there is "[a]n urgency to inform the public about an actual or alleged federal government activity" that is "made by a person primarily engaged in disseminating information. 28 C.F.R. § 16.5(d)(ii). But the DOJ concluded that, "based on the information [EPIC] provided," "[t]he Office cannot identify a particular urgency to inform the public about an actual or alleged federal government activity beyond the public's right to know about government activities generally." *See* Appendix B.

Second, EPIC established that there is "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 28 C.F.R. § 16.5(a)(1)(iv). Yet the DOJ letter stated that the Director of Public Affairs denied EPIC's request for expedited processing without further justification for this conclusion. *See* Appendix B.

The DOJ's determination should be reversed. According to the relevant DOJ FOIA regulation, a request will be processed on an expedited basis whenever the request involves (1)

Privacy is a Fundamental Right.

"[a]n urgency to inform the public about an actual or alleged Federal government activity, if made by a person who is primarily engaged in disseminating information" or (2) "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e)(1).

EPIC's FOIA Request made clear that EPIC is "primarily engaged in disseminating information" and that there is an "urgency to inform the public" about a government activity. EPIC's FOIA Request also made clear that the Special Counsel's reports and related material are a "matter of widespread and exceptional media interest" and that "there exists possible questions about the government's integrity that affect public confidence." EPIC's FOIA Request presented specific facts demonstrating that—according to major news organizations and President Trump's own attorneys—the Special Counsel intends to transmit one or more reports detailing his findings.

Based on the voluminous press coverage of, and intense public interest in, the Special Counsel's investigation, it is clear that the public urgently needs to know the details of the Special Counsel's findings. The American public is deeply concerned about the scope of Russian interference in the 2016 presidential election. The potential involvement of President Trump in a foreign campaign to influence an election unquestionably bears on the integrity of the government and inevitably affects public confidence. So, too, does the government's capacity to protect U.S. election systems and democratic institutions against foreign attacks. The Special Counsel's reports would shed significant light on both of these matters.

EPIC hereby appeals the DOJ's denial of expediting processing of EPIC's FOIA Request. EPIC should be granted expedited processing.

Procedural Background

On November 5, 2018, EPIC submitted EPIC's FOIA Request to the DOJ via facsimile. EPIC specifically requested:

(1)(a) All "report[s]" and "closing documentation" prepared under 28 C.F.R. § 600.8(c), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" or "closing documentation" under 28 C.F.R. § 600.8(c);

(2)(a) All "report[s]" concerning "the status of the investigation" prepared under 28 C.F.R. § 600.8(a)(2), whether or not such records were actually provided to the Attorney General or Acting Attorney General

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" concerning "the status of the investigation" under 28 C.F.R. § 600.8(a)(2);

(3)(a)   All records "expla[ining] . . . any investigative or prosecutorial step" under 28 C.F.R.
§ 600.7(b), whether or not such records were actually provided to the Attorney
General or Acting Attorney General;

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or
planned "explanation for any investigative or prosecutorial step" under 28 C.F.R. §
600.7(b);

(4)(a)   All records prepared under 28 C.F.R. § 600.9(a) to "notify the Chairman and Ranking
Minority Member of the Judiciary Committees of each House of Congress" of a
development in the Special Counsel investigation, whether or not such records were
actually transmitted to any member of Congress;

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or
planned notification under 28 C.F.R. § 600.9(a);

(5)(a)   All referrals by the Special Counsel, Attorney General, or Acting Attorney General
for "administrative remedies, civil sanctions or other governmental action outside the
criminal justice system" under 28 C.F.R. § 600.4(c), whether or not such records were
actually transmitted to any party outside of the Special Counsel's Office;

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or
planned referral for "administrative remedies, civil sanctions or other governmental
action outside the criminal justice system" under 28 C.F.R. § 600.4(c);

(6)(a)   All "report[s]," "recommendation[s]," and other "compilation[s] of information"
prepared for the eventual consideration of one or more members of Congress,
whether or not such records were actually transmitted to any party outside of the
Special Counsel's Office;

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or
planned report, recommendation, or compilation of the type described in Category
(6)(a) of this request;

(7)(a)   All other reports summarizing or describing, for one or more persons outside of the
Special Counsel's Office, (i) any of the Special Counsel's evidence, findings,
decisions, actions, or planned actions, or (ii) any developments in the Special Counsel
investigation; and

(b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or
planned report of the type described in Category (7)(a) of this request.

EPIC also requested expedited processing and a fee waiver. *See* Appendix A.

On November 15, 2018, the DOJ sent an acknowledgement letter denying EPIC's request
for expedited processing. The letter stated that the processing of EPIC's FOIA Request has been

initiated and assigned to the complex track because EPIC's request falls within "unusual circumstances." EPIC's request was assigned reference number DOJ-2018-000676 (OIP). *See* Appendix B.

**EPIC's FOIA Request Satisfies The "Compelling Need" Test For Expedited Processing Because It Involves An Urgency To Inform The Public About A Government Activity And Is Made By A Person Primarily Engaged In Disseminating Information**

EPIC is entitled to expedited processing of this request because this request involves a "compelling need." 5 U.S.C. § 552(a)(6)(E)(v)(II). The DOJ FOIA regulations list four, independent considerations for demonstrating a "compelling need" for expedited processing, and the requester must satisfy at least one consideration to meet this "compelling need" requirement. EPIC established that its FOIA Request (1) involves "an urgency to inform the public about an actual or alleged federal government activity" and (2) is made by "a person primarily engaged in disseminating information." 16 C.F.R. § 16.5(e)(1)(ii). EPIC presented specific facts to demonstrate a "compelling need." EPIC explained that the activities of the Special Counsel concern matters of current exigency and that a delayed response would compromise the public's ability to understand the investigation into Russian interference in the 2016 presidential election. This determination is incorrect.

*(I) There is a Clear "Urgency to Inform the Public" About an Actual Government Activity*

First, this request self-evidently involves "an urgency to inform the public about an actual or alleged Federal government activity." 28 C.F.R. § 16.5(e)(1)(ii). The "actual or alleged Federal government activity" is the Special Counsel's investigation of Russian interference in the 2016 presidential election and the U.S. government's response to Russian election interference. There is also a clear "urgency to inform the public" about the details of the Special Counsel's findings, as is apparent from the voluminous press coverage of the Special Counsel's investigation. Courts evaluate three factors when determining whether the requester demonstrates an "urgency to inform," showing a "compelling need": "(1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity." *Protect Democracy Project, Inc. v. DOD*, 263 F. Supp. 3d 293, 298–99 (D.D.C. 2017) (quoting *Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001)).

(1) EPIC's FOIA Request concerns a matter of current exigency to the American public

For matters of current exigency, district courts require there be a "'substantial interest' in the 'particular aspect' of [the] FOIA request." *EPIC v. DOD*, 355 F. Supp. 2d 98, 102 (D.D.C. 2004). When determining whether an interest is substantial, courts will consider the number of publications, the variety of sources, and the content of the articles present in the request. *See Amer. Civil Liberties Union v. DOJ*, 321 F. Supp. 2d 24, 31–32 (D.D.C. 2004). According to the district court, "case law makes it clear that only public interest in the specific subject of a FOIA request is sufficient to weigh in favor of expedited treatment." *EPIC v. DOD*, 355 F. Supp. 2d at 102.

The subject of EPIC's FOIA Request, the Special Counsel's investigation into Russian interference in the 2016 presidential election, is clearly of "substantial interest" to the public because it involves a national election and an attack on U.S. democratic institutions by a foreign adversary. At the time of EPIC's request, EPIC identified 941,000 news articles related to Special Counsel Mueller and "Russia." EPIC described with significant factual detail the criminal and intelligence community investigations showing that the Russian government carried a multi-pronged attack on the U.S. presidential election. EPIC also cited to major news organizations and President Trump's own attorneys stating that Special Counsel Mueller intends to create one or more reports detailing the Special Counsel's findings.

Moreover, the D.C. Circuit has held that facts within an agency's knowledge are part of the record before the agency at the time it reviews a FOIA request, whether or not the requester specifically referenced such facts. *Nat'l Treasury Employees Union v. Griffin*, 811 F.2d 644, 648 (D.C.Cir. 1987). For example, in *EPIC v. DOD*, the district court recognized that a Government Accountability Report ("GAO") that was subsequently released after the FOIA request was made but before the denial of expedited processing was available to the agency during the time it would have considered the requester's expedition request. 355 F. Supp. 2d at 104 n.7. According to the court, "there can be little doubt that the agency was aware of the GAO report and the information it contained when considering Plaintiff's request for expedition." *Id.*

Like in *EPIC v. DOD*, the agency should have been aware of additional news coverage following the submission of EPIC's FOIA Request that underscored the urgency of the request. For example, former Attorney General Jeff Sessions submitted his resignation at the request of President Trump, and Matthew G. Whitaker was appointed acting Attorney General in his place.[1] Acting Attorney General Whitaker has been a public critic of the Mueller investigation.[2]

> (2) The consequences of delaying a response would compromise a significant recognized interest

Delaying a response to EPIC's request would compromise a significant recognized interest in understanding the specific details of the Special Counsel's investigation into Russian interference in the 2016 presidential election. Courts require that for a public interest to become an interest recognized by the FOIA, the requester must show that the requested information is "vital to [a] current and ongoing debate." *Sai v. Transportation Sec. Admin.*, 54 F. Supp. 3d 5, 11 (D.D.C. 2014). The D.C. Circuit has acknowledged that "stale information is of little value . . ." *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988). For instance, in *EPIC v. DOJ*, the court found that EPIC had demonstrated a risk of irreparable injury when seeking expedited processing for information vital to an ongoing debate surrounding the legality of the government's warrantless surveillance program. 416 F. Supp. 2d 30, 41 (D.D.C. 2006).

---

[1] Devlin Barrett, Matt Zapotosky, & Josh Dawsey, *Jeff Sessions Forced Out As Attorney General*, Wash. Post (Nov. 7, 2018), https://www.washingtonpost.com/world/national-security/attorney-general-jeff-sessions-resigns-at-trumps-request/2018/11/07/d1b7a214-e144-11e8-ab2c-b31dcd53ca6b_story.html.
[2] *See e.g.*, Max de Haldevang & Adam Pasick, *All the Times Robert Mueller's New Boss Railed Against the Russia Probe*, Quartz (Nov. 7, 2018), https://qz.com/1454952/all-matthew-whitakers-criticisms-of-robert-muellers-russia-investigation/.

The release of the requested information is vital to an ongoing debate surrounding the scope of Russian interference in the 2016 presidential election and the involvement of particular individuals in that interference, such as the potential involvement of President Trump. In *Protect Democracy Project v. DOD*, the requesters sought information related to the President's legal authority to launch missile strikes against a Syrian-government airbase the day after the President launched missile strikes against Syria. The district court stated, "[b]eing closed off from such a debate is itself a harm in an open democracy" if there is an undue delay in processing. *Protect Democracy*, 263 F. Supp. 3d at 300.

Like the public debates surrounding the legality of military strikes against the Syrian government, there is great public debate surrounding the government's capacity to defend U.S. election systems and democratic institutions against foreign attacks. The loss in the value of the timely release of information results in cognizable harm because the public cannot participate in meaningful public debate about the Special Counsel's substantive findings, the Trump campaign's involvement in Russian interference, the government's response to that interference, and possible obstruction of justice by President Trump.

(3) The request concerns a federal government activity

As previously stated, the actual government activity at issue in EPIC's FOIA Request is the Special Counsel's investigation of Russian interference of the 2016 presidential election and the U.S. government's response to Russian election interference. EPIC's FOIA Request included facts—supported by both official government documents and federal regulations—to demonstrate that the activities of the Special Counsel, including the creation of investigatory reports, constitute a federal government activity. Moreover, the U.S. government's response to Russian election interference is self-evidently an actual government activity.

*(II) EPIC is an Organization "Primarily Engaged in Disseminating Information"*

EPIC is an organization "primarily engaged in disseminating information" under 28 C.F.R. § 16.5(e)(1)(ii) because, as the D.C. District Court explained in *EPIC v. DOD*, "EPIC satisfies the definition of 'representative of the news media.'" 241 F. Supp. 2d 5, 15 (D.D.C. 2003). Like the District Court's determination in 2003, EPIC still actively gathers information that is of interest to a segment of the public, turns the raw materials into distinct work, and publishes that work to the public through its website, bi-weekly newsletter, and various news outlets. In EPIC's FOIA Request, EPIC stated that it is a registered non-profit organization committed to open government, privacy, and civil liberties. EPIC's request emphasized that the requested information would reach a large audience because EPIC routinely publishes information obtained through the FOIA on its widely read website, https://epic.org.

EPIC's FOIA Request Also Satisfies The "Compelling Need" For Expedited Processing Because It Involves A Matter Of Widespread Interest In Which There Exists Possible Questions About The Government's Integrity The Affect Public Confidence

EPIC's FOIA Request also established that EPIC is entitled to expedited processing because the activities of the Special Counsel involves "[a] matter of widespread and exceptional

media interest in which there exists possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e)(1)(iv). The "primary" method for determining whether there are questions about the government's integrity that affect public confidence "is [to] examin[e] the state of public coverage of the matter at issue, and whether that coverage surfaces possible ethics issues so potentially significant as to reduce public confidence in governmental institutions." *Oversight v. DOJ*, 292 F. Supp. 3d 501, 508 (D.D.C. 2018).

EPIC's FOIA Request cited the extraordinary media attention given to the work of the Special Counsel, including 941,000 news articles containing the terms "Robert Mueller" and "Russia." Many of the top news articles discuss the potential involvement of President Trump in Russia's campaign to influence an election that he won. Other articles examine President Trump's possible obstruction of justice and the discharge of a high-profile Special Counsel investigation. This coverage pertains to ethics and conflict-of-interest issues that are "so significant" as to affect the public's confidence in democratic institutions and the government's ability to conduct a fair investigation. For example, a June 2018 Pew Research poll found that most Americans lacked confidence in President Trump in his ability to handle matters related to the Special Counsel investigation.[3]

I certify that this explanation is true and correct to the best of my knowledge and belief. 5 U.S.C. § 552(a)(6)(E)(vi). For the foregoing reasons, EPIC is entitled to expedited processing of EPIC's FOIA Request. § 552(a)(6)(E)(iii).

<u>Conclusion</u>

Thank you for your consideration of this appeal. We anticipate your determination on our appeal within twenty working days. 5 U.S.C. § 552(a)(6)(A)(ii). For question regarding this appeal, please contact John Davisson at 202-483-1140 x120 or davisson@epic.org, cc: FOIA@epic.org.

Respectfully submitted,

*/s John Davisson*
John Davisson
EPIC Counsel

*/s Enid Zhou*
Enid Zhou
EPIC Open Government Counsel

---

[3] Alec Tyson, *Most Americans Lack Confidence in Trump to Deal Appropriately with Mueller Probe*, Pew Research Center (June 20, 2018), http://www.pewresearch.org/fact-tank/2018/06/20/trump-mueller-probe/.

# APPENDIX A

# epic.org

**Electronic Privacy Information Center**
1718 Connecticut Avenue NW, Suite 200
Washington, DC 20009, USA

📞 +1 202 483 1140
🖨 +1 202 483 1248
🐦 @EPICPrivacy
🌐 https://epic.org

VIA FACSIMILE

November 5, 2018

Douglas Hibbard
Chief, Initial Request Staff
Office of Information Policy
Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, D.C., 20530-0001
Fax: (202) 514-1009

Dear Mr. Hibbard,

This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a), and is submitted on behalf of the Electronic Privacy Information Center ("EPIC") to the Department of Justice's ("DOJ") Office of Information Policy ("OIP").

EPIC seeks documents, in the possession of the agency, concerning the investigation by Special Counsel Robert S. Mueller into Russian interference in the 2016 United States presidential election and related matters.

<u>Documents Requested</u>

EPIC requests the following records concerning the Special Counsel investigation into Russian interference with the presidential election:[1]

(1)(a) All "report[s]" and "closing documentation" prepared under 28 C.F.R. § 600.8(c), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" or "closing documentation" under 28 C.F.R. § 600.8(c);

(2)(a) All "report[s]" concerning "the status of the investigation" prepared under 28 C.F.R. § 600.8(a)(2), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

---

[1] U.S. Dep't of Justice, Office of the Deputy Attorney General, Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017), https://www.justice.gov/opa/press-release/file/967231/download [hereinafter Appointment Order].

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" concerning "the status of the investigation" under 28 C.F.R. § 600.8(a)(2);

(3)(a) All records "expla[ining] . . . any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "explanation for any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b);

(4)(a) All records prepared under 28 C.F.R. § 600.9(a) to "notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress" of a development in the Special Counsel investigation, whether or not such records were actually transmitted to any member of Congress;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned notification under 28 C.F.R. § 600.9(a);

(5)(a) All referrals by the Special Counsel, Attorney General, or Acting Attorney General for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c), whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned referral for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c);

(6)(a) All "report[s]," "recommendation[s]," and other "compilation[s] of information" prepared for the eventual consideration of one or more members of Congress,[2] whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

(b) All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report, recommendation, or compilation of the type described in Category (6)(a) of this request;

(7)(a) All other reports summarizing or describing, for one or more persons outside of the Special Counsel's Office, (i) any of the Special Counsel's evidence, findings, decisions, actions, or planned actions, or (ii) any developments in the Special Counsel investigation; and

---

[2] *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives,* 370 F. Supp. 1219, 1221, 1226 (D.D.C. 1974), *aff'd sub nom. Haldeman v. Sirica,* 501 F.2d 714 (D.C. Cir. 1974).

    (b) All drafts, outlines, exhibits, and supporting materials associated with any actual or
planned report of the type described in Category (7)(a) of this request.

EPIC does not seek records which have already been disclosed to the public in their complete
and unredacted form (i) in the course of an open judicial proceeding; (ii) available at
https://www.justice.gov/sco; or (iii) available at https://www.justice.gov/news.

<div align="center">Background</div>

    EPIC's FOIA request, and the Special Counsel investigation to which it pertains, arise
out of the Russian government's coordinated campaign to interfere with the 2016 U.S.
presidential election.

*Russian Interference in the 2016 U.S. Presidential Election*

    In 2016, the Russian government carried out a multi-pronged attack on the U.S.
Presidential Election to destabilize U.S. democratic institutions and aid the candidacy of Donald
J. Trump. As explained in the declassified 2017 Intelligence Community Assessment ("ICA") on
Russian election interference:[3]

> We assess with high confidence that Russian President Vladimir Putin ordered an
> influence campaign in 2016 aimed at the US presidential election, the consistent
> goals of which were to undermine public faith in the US democratic process,
> denigrate Secretary Clinton, and harm her electability and potential presidency. We
> further assess Putin and the Russian Government developed a clear preference for
> President-elect Trump. When it appeared to Moscow that Secretary Clinton was
> likely to win the election, the Russian influence campaign then focused on
> undermining her expected presidency.
>
> We also assess Putin and the Russian Government aspired to help President-elect
> Trump's election chances when possible by discrediting Secretary Clinton and
> publicly contrasting her unfavorably to him.[4]

    The ICA—along with the reports, investigations, and prosecutions that have ensued—
establishes that Russia interfered with the 2016 election on at least four fronts.

    First, "Russia's intelligence services conducted cyber operations against targets
associated with the 2016 US presidential election, including targets associated with both major

---

[3] Office of the Dir. of Nat'l Intelligence, ICA 2017-01D, *Intelligence Community Assessment: Assessing
Russian Activities and Intentions in Recent US Elections* (Jan. 6, 2017),
https://www.dni.gov/files/documents/ICA_2017_01.pdf [hereinafter *Intelligence Community
Assessment*]; *see also* EPIC, *EPIC v. ODNI (Russian Hacking)* (Dec. 18, 2017),
https://www.epic.org/foia/odni/russian-hacking/ (EPIC FOIA lawsuit to obtain full Intelligence
Community Assessment on which declassified version was based).
[4] *Intelligence Community Assessment*, *supra* note 3, at 1.

US political parties."[5] These operations included the "exfiltrat[ion of] large volumes of data" from the Democratic National Committee ("DNC") and "the compromise of the personal e-mail accounts of Democratic Party officials and political figures."[6]

Second, Russian intelligence services "used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in cyber operations publicly and in exclusives to media outlets."[7] These disclosures included data extracted by Russian intelligence from DNC networks.[8] Subsequent investigation has also revealed that senior Trump campaign officials engaged in multiple meetings with Russian intermediaries offering to provide "dirt" on Hillary Clinton, including "thousands of emails" obtained by Russia.[9]

Third, "Russian intelligence accessed elements of multiple state or local electoral boards" in an ongoing effort to assess "US electoral processes and related technology and equipment."[10]

Fourth, "Russia's state-run propaganda machine—comprised of its domestic media apparatus, outlets targeting global audiences such as RT and Sputnik, and a network of quasi-government trolls—contributed to the influence campaign by serving as a platform for Kremlin messaging to Russian and international audiences."[11] As part of this propaganda push, the Russian government spent millions of dollars and employed hundreds of people to flood Facebook and Twitter with fraudulent users, posts, articles, groups, and targeted advertisements.[12]

---

[5] *Id.* at 2.

[6] *Id.*; *see also* EPIC, *EPIC v. FBI (Russian Hacking)* (May 22, 2018), https://epic.org/foia/fbi/russian-hacking/ (EPIC FOIA lawsuit revealing FBI's failure to follow its own victim notification procedures in response to Russian cyberattacks against U.S. officials).

[7] *Intelligence Community Assessment, supra* note 3, at 2–3.

[8] *Id.* at 3.

[9] Statement of the Offense at ¶ 14, *United States v. Papadopoulos*, No. 17-182 (D.D.C. Oct. 5, 2017) ("The Professor told defendant PAPADOPOULOS . . . that 'They [the Russians] have dirt on her'; 'the Russians had emails of Clinton'; 'they have thousands of emails.'"); *see also* House Permanent Select Committee on Intelligence, *Status of the Russia Investigation (Minority Report)* (Mar. 13, 2018), https://democrats-intelligence.house.gov/uploadedfiles/final_-_minority_status_of_the_russia_investigation_with_appendices.pdf (noting that the "stated purpose" of "the June 9, 2016 Trump Tower meeting with Russian emissaries" was to "provide damaging information on Hillary Clinton").

[10] *Intelligence Community Assessment, supra* note 3, at 3; *see also* EPIC, *EPIC v. DHS* (Aug. 17, 2018), https://epic.org/foia/dhs/cybersecurity/russian-interference/default.html (EPIC FOIA lawsuit revealing Department of Homeland Security response to Russian cyberattacks on election infrastructure).

[11] *Intelligence Community Assessment, supra* note 3, at 3–4.

[12] Indictment at ¶¶ 3–6, 10, *United States v. Internet Res. Agency*, No. 18-32 (D.D.C. Feb. 16, 2018); *see also* Statement from EPIC to U.S. Senate Select Comm. on Intelligence, Sep. 4, 2018, https://epic.org/testimony/congress/EPIC-SSCI-ForeignSocialMedia-Sept2018.pdf (calling for greater transparency concerning Russian manipulation of news and information on social networks during and after the 2016 election).

In the twenty-two months since the Intelligence Community Assessment was published, the ICA's findings have been repeatedly confirmed by federal inquiries[13] and investigative reporting.[14] The Senate Intelligence Committee, after an "an in-depth review" of the ICA and associated intelligence, determined that "the conclusions of the ICA are sound" and noted "that collection and analysis subsequent to the ICA's publication continue to reinforce its assessments."[15]

*Criminal Investigations into Russian Election Interference*

On January 20, 2018—two weeks after the public release of the Intelligence Community Assessment—Donald J. Trump was inaugurated as the 45th President of the United States. On March 2, 2017, Attorney General Jeff Sessions, who had been a prominent supporter of Mr. Trump during the campaign, recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."[16] As a result, the responsibilities of the Attorney General for any such investigation passed to the Deputy Attorney General.[17]

On March 20, 2017, James B. Comey, then-Director of the Federal Bureau of Investigation ("FBI"), confirmed to the House Permanent Select Committee on Intelligence that the FBI was conducting an investigation into "the Russian government's efforts to interfere in the 2016 presidential election," including "the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts."[18] Mr. Comey noted that the investigation would include "an assessment of whether any crimes were committed."[19]

---

[13] Senate Select Comm. on Intelligence, *The Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent U.S. Elections* (July 3, 2018), https://www.burr.senate.gov/imo/media/doc/SSCI%20ICA%20ASSESSMENT_FINALJULY3.pdf [hereinafter Senate Intelligence Report].

[14] *E.g.*, Scott Shane & Mark Mazzetti, *The Plot to Subvert an Election: Unraveling the Russia Story So Far*, N.Y. Times (Sep. 20, 2018), https://www.nytimes.com/interactive/2018/09/20/us/politics/russia-interference-election-trump-clinton.html; Philip Bump, *A Broad Debunking of Trump's Claims About Russian Interference and the Mueller Investigation*, Wash. Post (June 28, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/28/a-broad-debunking-of-trumps-claims-about-russian-interference-and-the-mueller-investigation/.

[15] Senate Intelligence Report, *supra* note 13, at 7.

[16] Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement on Recusal (Mar. 2, 2017), https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal; *see also* 28 C.F.R. § 45.2(a).

[17] *Id.*; *see also* 28 U.S.C. § 508 ("In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office[.]").

[18] *Russian Active Measures Investigation: Hearing Before the H. Permanent Select Comm. on Intelligence*, 115th Cong. (2017) (Statement of James B. Comey, Dir., Fed. Bureau of Investigation), https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation.

[19] *Id.*

On May 9, 2017, President Trump removed Director Comey from office and terminated his employment.[20] Two days later, in a nationally-televised NBC News interview, President Trump stated:

> I was going to fire Comey knowing, there was no good time to do it. And in fact when I decided to just do it, I said to myself, I said you know, this Russia thing with Trump and Russia is a made up story, it's an excuse by the Democrats for having lost an election that they should have won.[21]

On May 17, 2017, Deputy Attorney General Rod J. Rosenstein—in his capacity as Acting Attorney General—appointed Robert S. Mueller III "to serve as Special Counsel for the United States Department of Justice."[22] Mr. Rosenstein authorized Mr. Mueller to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017," including "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump"; "any matters that arose or may arise directly from the investigation"; and "any other matters within the scope of 28 C.F.R. § 600.4(a)."[23] Mr. Rosenstein also authorized Mr. Mueller "to prosecute federal crimes arising from the investigation of these matters" where "it is necessary and appropriate[.]"[24]

Since Mr. Mueller was appointed, the Special Counsel has brought criminal charges against 33 individuals and three organizations,[25] including:

- Former National Security Adviser Michael Flynn, who pleaded guilty to making false statements to the FBI;[26]
- Former Trump campaign manager Paul Manafort, who was convicted of multiple counts of tax fraud and bank fraud[27] and pleaded guilty to conspiracy against the United States and other charges;[28]

---

[20] Letter from Donald J. Trump, President of the United States, to James B. Comey, Dir., Fed. Bureau of Investigation (May 9, 2017), https://www.gpo.gov/fdsys/pkg/DCPD-201700325/pdf/DCPD-201700325.pdf.

[21] Adam Edelman, *Trump says He Didn't Fire Comey 'Because of Russia,' Contradicting Past Statements*, NBC News (May 31, 2018), https://www.nbcnews.com/politics/donald-trump/trump-says-he-didn-t-fire-comey-because-russia-contradicting-n878836.

[22] *Appointment Order*, *supra* note 1, ¶ (a).

[23] *Id.* ¶ (b).

[24] *Id.* ¶ (c).

[25] U.S. Dep't of Justice, *Special Counsel's Office* (Sep. 14, 2018), https://www.justice.gov/sco.

[26] Plea Agreement, *United States v. Flynn*, No. 17-232 (Dec. 1, 2017), https://www.justice.gov/file/1015121/download.

[27] U.S. Dep't of Justice, *Special Counsel's Office*, *supra* note 25 ("On Aug. 21, 2018, a federal jury found Manafort guilty on eight counts: counts 1-5, subscribing to a false individual income tax return for tax years 2010-2014; count 12, failure to file reports of foreign bank and financial accounts for year 2012; count 25, bank fraud; and count 27, bank fraud.").

[28] Plea Agreement, *United States v. Manafort*, No. 17-201 (Sep. 14, 2018), https://www.justice.gov/file/1094151/download.

- Former Trump deputy campaign manager Rick Gates, who pleaded guilty to conspiracy against the United States and making a false statement to the FBI;[29]
- Former Trump campaign foreign policy adviser George Papadopolous, who pleaded guilty to making false statements to the FBI;[30]
- The Internet Research Agency, Concord Management and Consulting LLC, and thirteen Russian nationals, who are charged with conspiracy against the United States and related offenses for flooding social media platforms with fraudulent content to interfere with U.S. political processes;[31] and
- Twelve other Russian nationals, who are charged with conspiracy to commit computer crimes and other offenses for hacking Democratic Party computer networks and email accounts linked to the Clinton campaign.[32]

*The Special Counsel Report(s)*

In addition to the criminal offenses charged by the Special Counsel, major news organizations[33] and President Trump's own attorneys[34] have stated that Mr. Mueller intends to

---

[29] Plea Agreement, *United States v. Gates*, No. 17-201 (Feb. 23, 2018), https://www.justice.gov/file/1038801/download.

[30] Plea Agreement, *United States v. Papadopolous*, No. 17-182 (Oct. 5, 2017), https://www.justice.gov/file/1007341/download.

[31] Indictment, *United States v. Internet Research Agency LLC*, No. 18-32 (Feb. 16, 2018), https://www.justice.gov/file/1035477/download.

[32] Indictment, *United States v. Netyksho*, No. 18-215 (July 13, 2018), https://www.justice.gov/file/1080281/download.

[33] *E.g.*, Charlie Savage, *Legal Experts Urge Release of Watergate Report to Offer Mueller a Road Map*, N.Y. Times (Sep. 14, 2018), https://www.nytimes.com/2018/09/14/us/politics/mueller-report-grand-jury-watergate.html ("The leading theory is that Mr. Mueller will write a report for his supervisor at the Justice Department. . . . But there is historical precedent for another model. Echoing a move by the Watergate prosecutor in March 1974, the grand jury with which Mr. Mueller has been working could try to send a report about the evidence it has gathered directly to the House Judiciary Committee."); Jeffrey Toobin, *How Rudy Giuliani Turned Into Trump's Clown*, New Yorker (Sep. 10, 2018), https://www.newyorker.com/magazine/2018/09/10/how-rudy-giuliani-turned-into-trumps-clown ("Mueller will file a concluding report with Rod Rosenstein, the Deputy Attorney General, at the end of the investigation[.]"); Michael S. Schmidt & Maggie Haberman, *Mueller Examining Trump's Tweets in Wide-Ranging Obstruction Inquiry*, N.Y. Times (July 26, 2018), https://www.nytimes.com/2018/07/26/us/politics/trump-tweets-mueller-obstruction.html ("If Mr. Mueller does not plan to make a case in court, a report of his findings could be sent to Congress, leaving it to lawmakers to decide whether to begin impeachment proceedings.").

[34] *E.g.*, Memorandum from John M. Dowd, Att'y for President Trump, to Robert S. Mueller, Special Counsel (Jan. 29, 2018), *reprinted in The Trump Lawyers' Confidential Memo to Mueller, Explained*, N.Y. Times (June 2, 2018), https://www.nytimes.com/interactive/2018/06/02/us/politics/trump-legal-documents.html ("It is our understanding that the reason behind the request for the interview is to allow the Special Counsel's office to complete its report."); @RudyGiuliani, Twitter (Aug. 15, 2018, 9:58 AM), https://twitter.com/RudyGiuliani/status/1029728984446193664 ("DOJ should require Mueller to submit his report before September 7."); Peter Nicholas, *Rudy Giuliani Says Trump Lawyers Are Prepared to Counter Mueller*, Wall Street J. (Aug. 12, 2018), https://www.wsj.com/articles/rudy-giuliani-says-trump-lawyers-are-prepared-to-counter-mueller-1534110560 ("President Trump's lawyers believe they can

transmit one or more report(s) detailing the Special Counsel's findings (the "Mueller Report(s)"). The precise number, character, and subject matter of the Mueller Report(s) are not publicly known, though at least one such report is said to address allegations that President Trump obstructed justice by attempting to block a criminal probe into Russian election interference.[35]

There are several legal authorities under which the Special Counsel, Attorney General, or Acting Attorney General might issue a report or otherwise release information concerning the Special Counsel's investigation. First, under 28 C.F.R. § 600.8(c), the Special Counsel is required to provide the Attorney General or Acting Attorney General with a report at the conclusion of the investigation:

> **(c) Closing documentation.** At the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel.[36]

Second, under 28 C.F.R. § 600.8(a)(2), the Special Counsel is required to provide annual status reports to the Attorney General or Acting Attorney General:

> **(2)** Thereafter, 90 days before the beginning of each fiscal year, the Special Counsel shall report to the Attorney General the status of the investigation, and provide a budget request for the following year. The Attorney General shall determine whether the investigation should continue and, if so, establish the budget for the next year.[37]

Third, under 28 C.F.R. § 600.7(b), the Attorney General or Acting Attorney General may request an explanation for any investigative or prosecutorial step taken by the Special Counsel:

> **(b)** The Special Counsel shall not be subject to the day-to-day supervision of any official of the Department. However, the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued. In conducting that review, the Attorney General will give great weight to the views of the Special Counsel. If the Attorney General concludes that a proposed action by a

---

weather a 'negative' report from special counsel Robert Mueller and are prepared to rebut the conclusions, Rudy Giuliani, one of Mr. Trump's attorneys, said in an interview.").

[35] Carol D. Leonnig & Robert Costa, *Mueller Told Trump's Attorneys the President Remains Under Investigation But is Not Currently a Criminal Target*, Wash. Post (Apr. 3, 2018), https://www.washingtonpost.com/politics/mueller-told-trumps-attorneys-the-president-remains-under-investigation-but-is-not-currently-a-criminal-target/2018/04/03/d7832cf0-36c1-11e8-acd5-35eac230e514_story.html ("The special counsel also told Trump's lawyers that he is preparing a report about the president's actions while in office and potential obstruction of justice, according to two people with knowledge of the conversations.").

[36] 28 C.F.R. § 600.8(c); *see also* Appointment Order, *supra* note 1, ¶ (d) ("Sections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations are applicable to the Special Counsel.").

[37] 28 C.F.R. § 600.8(a)(2).

Special Counsel should not be pursued, the Attorney General shall notify Congress as specified in § 600.9(a)(3).[38]

Fourth, under 28 C.F.R. § 600.9(a), the Attorney General or Acting Attorney General is required to notify certain members of Congress of key developments in the Special Counsel's investigation:

> (a) The Attorney General will notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress, with an explanation for each action —
>
> (1) Upon appointing a Special Counsel;
>
> (2) Upon removing any Special Counsel; and
>
> (3) Upon conclusion of the Special Counsels investigation, including, to the extent consistent with applicable law, a description and explanation of instances (if any) in which the Attorney General concluded that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued.[39]

Fifth, under 28 C.F.R. § 600.4(c), the Special Counsel may take "necessary action" to pursue penalties "outside the criminal justice system" in consultation with the Attorney General or Acting Attorney General:

> (c) Civil and administrative jurisdiction. If in the course of his or her investigation the Special Counsel determines that administrative remedies, civil sanctions or other governmental action outside the criminal justice system might be appropriate, he or she shall consult with the Attorney General with respect to the appropriate component to take any necessary action. A Special Counsel shall not have civil or administrative authority unless specifically granted such jurisdiction by the Attorney General.[40]

Sixth, the Special Counsel may use its "full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney"[41] to transmit "report[s]," "recommendation[s]," or other "compilation[s] of information" to Congress via the grand jury process.[42] This procedure was used by Special Counsel Leon Jaworski in 1974 to convey "material in the Grand Jury's possession having a material bearing on matters within the

---

[38] 28 C.F.R. § 600.7(b).

[39] 28 C.F.R. § 600.9(a).

[40] 28 C.F.R. § 600.4(c).

[41] 28 C.F.R. § 600.6.

[42] *In re Report & Recommendation*, 370 F. Supp. at 1221, 1226.

primary jurisdiction of the United States House of Representatives Committee on the Judiciary relating to questions of impeachment."[43]

Finally, the Special Counsel, Attorney General, and/or Acting Attorney General may rely on their general powers under 28 C.F.R. § 600.1 *et seq.* (and on other legal authorities) to disclose developments, evidence, findings, decisions, actions, or planned actions from the Special Counsel's investigation.

EPIC, through this FOIA request, seeks all of the above categories of records and supporting materials generated by or related to Special Counsel Mueller's investigation.

<div align="center">

### EPIC's Interest in the Special Counsel Investigation
</div>

EPIC has a particular interest in the release of records related to Special Counsel Mueller's investigation because those records will inform EPIC's project on Democracy and Cybersecurity, which was launched in response the interference in the 2016 Presidential Election.[44] As part of EPIC's Democracy and Cybersecurity project, EPIC has filed suits seeking public release of President Trump's tax returns and to correct numerous misstatements of fact concerning the President's financial ties to Russia.

*EPIC v. IRS I (Donald Trump's Tax Records)*

In *EPIC v. IRS I*, EPIC argues that the Internal Revenue Service ("IRS") has the authority, under § 6103(k)(3) of the Internal Revenue Code,[45] to disclose the President's returns to correct numerous misstatement of fact concerning his financial ties to Russia.[46] For example, President Trump falsely tweeted that "Russia has never tried to use leverage over me. I HAVE NOTHING TO DO WITH RUSSIA – NO DEALS, NO LOANS, NO NOTHING."[47] Yet, numerous news organizations have covered President Trump's ties to Russian businesses and government.[48] The case is currently pending in the D.C. Circuit.

---

[43] Report & Recommendation at 1, *In re Report & Recommendation*, 370 F. Supp. at 1221 (Mar. 1, 1974) (capitalization altered), https://www.archives.gov/files/research/investigations/watergate/roadmap/docid-70105890.pdf; *see also* 105 Cong. Rec. H9,670 (daily ed. Oct. 6, 1998) (statement of Rep. Jackson-Lee) ("[I]t will be recalled the Watergate special prosecution force did not send to Congress an argumentative or inflammatory document, but rather a simple road map which merely summarized and identified the location of relevant evidence.").

[44] *See* EPIC, *Democracy and Cybersecurity: Preserving Democratic Institutions*, https://www.epic.org/democracy/.

[45] 26 U.S.C. § 6103(k)(3).

[46] *See* EPIC, *EPIC v. IRS (Donald Trump's Tax Records)*, https://www.epic.org/foia/irs/trump-taxes/.

[47] Donald J. Trump (@realDonaldTrump), Twitter (July 26, 2016), https://twitter.com/realdonaldtrump/status/758071952498159616?lang=en.

[48] See e.g., Tom Hamburger, Rosalind S. Helderman, & Michael Birnbaum, *Inside Trump's Financial Ties to Russian and His Unusual Flatters of Vladimir Putin*, Wash. Post (June 17, 2016), https://www.washingtonpost.com/politics/inside-trumps-financial-ties-to-russia-and-his-unusual-flattery-of-vladimir-putin/2016/06/17/dbdcaac8-31a6-11e6-8ff7-7b6c1998b7a0_story.html; *Despite Denial, Trump's Connections to Russia Go Back Years*, CBS News (July 29, 2016),

*EPIC v. IRS II (Trump Offers-in-Compromise)*

In *EPIC v. IRS II*, EPIC filed suit to compel the IRS to release certain tax records pertaining to President Trump's more than 300 associated business entities.[49] EPIC requested all "offers-in-compromise" used to satisfy a tax debt owed by President Trump or one of his businesses. Under § 6103(k)(1) of the Internal Revenue Code, taxpayer "return information shall be disclosed to all members of the general public to the extent necessary to permit inspection of any accepted offer-in-compromise[.]"[50] These records are public as a matter of law. The case is currently pending in the U.S. Federal Court for the District of Columbia.

<u>Request for Expedition</u>

EPIC is entitled to expedited processing of this request.[51] Under the DOJ's FOIA regulations, a request "shall be processed on an expedited basis" when (1) there is an "urgency to inform the public about an actual or alleged federal government activity," and (2) where the request is "made by a person who is primarily engaged in disseminating information."[52] This request satisfies both conditions.

First, there is an "urgency to inform the public about an actual or alleged federal government activity."[53] The actual federal government activities are (1) the Special Counsel's investigation of Russian interference in the 2016 U.S. presidential election, and (2) the U.S. government's response to Russian election interference, as reflected in the requested records of the Special Counsel.[54] The requested records also pertain to President Trump's alleged obstruction of justice while in office.[55]

The urgency to inform the public about these government activities is clear from the voluminous press coverage of,[56] and immense public interest in,[57] Mr. Mueller's investigation

---

https://www.cbsnews.com/news/election-2016-donald-trump-ties-to-russia-go-back-years-dnc-email-hack/; John Hardwood, *Trump Calls the Special Counsel's Probe a 'Witch Hunt,' but His Links to Russia Go Back a Long Time*, CNBC (May 23, 2018), https://www.cnbc.com/2018/05/23/trump-links-to-russia-an-explanation.html.

[49] See EPIC, *EPIC v. IRS II (Trump Offers-in-Compromise)*, https://epic.org/foia/irs/trump-taxes-ii/.

[50] 26 U.S.C. § 6103(k)(1).

[51] 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(1).

[52] 28 C.F.R. § 16.5(e)(1), (e)(1)(ii).

[53] *Id.*

[54] *See* Appointment Order, *supra* note 1.

[55] *See* Leonnig & Costa, *supra* note 35 ("The special counsel also told Trump's lawyers that he is preparing a report about the president's actions while in office and potential obstruction of justice, according to two people with knowledge of the conversations.").

[56] *See, e.g., Robert Mueller — F.B.I. Director*, N.Y. Times (Nov. 1, 2018), https://www.nytimes.com/topic/person/robert-mueller-mdash-fbi-director (listing over 570 articles concerning Robert Mueller since his appointment as Special Counsel on May 17, 2017).

[57] *See, e.g.,* Morning Consult & Politico, *National Tracking Poll* (Oct. 30, 2018), https://www.politico.com/f/?id=00000166-cb61-d184-ad67-ff67dddd0000 (finding that over 66% of respondents were aware of, and had developed an opinion on, Special Counsel Mueller); Robert Mueller, Google Trends (Nov. 2, 2018), https://trends.google.com/trends/explore?date=today%205-

and findings. Americans are deeply concerned about the scope of Russian interference in the 2016 presidential election; the U.S. government's response to that interference; the involvement of particular individuals in that interference, including possibly President Trump; the susceptibility of U.S. election systems and democratic institutions to future foreign interference; and the integrity of the Special Counsel investigation itself.[58] The Mueller Report(s) and supporting materials are critical to the public's understanding of these issues.

Second, EPIC is an organization "primarily engaged in disseminating information."[59] As the Court explained in *EPIC v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003), "EPIC satisfies the definition of 'representative of the news media'" entitling it to preferred fee status under FOIA.[60]

EPIC is also entitled to expedited processing because EPIC's request involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence."[61] In addition to the extraordinary media attention given to the work of the Special Counsel,[62] the requested records concern the potential involvement of the President in a foreign campaign to influence an election that he won; the possible obstruction of justice by the President while in office; the federal government's capacity to defend U.S. election systems and democratic institutions against foreign attacks; and the discharge of a high-profile Special Counsel investigation.[63] These matters unquestionably bear on the integrity of the government and affect public confidence.

In submitting this request for expedited processing, I certify that this explanation is true and correct to the best of my knowledge and belief.[64]

---

y&geo=US&q=Robert%20Mueller (showing a more than 100-fold increase in U.S. Google searches for Robert Mueller following his appointment as Special Counsel).

[58] *See, e.g.*, NPR/PBS NewsHour/Marist, *The United States' Relationship with Russia* 10, 12–13, 17 (July 25, 2018), http://maristpoll.marist.edu/wp-content/uploads/2018/07/NPR_PBS-Nature-of-the-Sample-and-Tables_The-US-Relationship-with-Russia_July-2018_181807241048.pdf (finding that 69% of respondents believed Russian interference occurred in the 2016 election, 63% believed Russian interference impacted the 2016 election, 53% believed President Trump had done something illegal or unethical "in his dealings with Russia and Russian President Vladimir Putin," and 57% expected Russia to interfere in the 2018 election); Suffolk University, *Suffolk University/USA Today National Poll Shows Faith in Mueller's Russia Investigation but Not in Trump Denials* (Aug. 29, 2018), https://www.suffolk.edu/news/77724.php ("A majority of Americans (55 percent) trust special counsel Robert Mueller and his investigation into alleged Russian meddling in the 2016 election, but 59 percent don't trust President Donald Trump's denial that his campaign was involved, according to a new Suffolk University/USA TODAY national poll.").

[59] 28 C.F.R. § 16.5(e)(1)(ii).

[60] 241 F. Supp. at 15.

[61] 28 C.F.R. § 16.5(e)(1)(iv).

[62] *Search Results: "Robert Mueller" and "Russia"*, Google News (Nov. 2, 2018), https://www.google.com/search?tbm=nws&q=%22Robert+Mueller%22+and+%22Russia%22 (identifying 941,000 news results containing both "Robert Mueller" and "Russia").

[63] *See* Shane & Mazzetti, *supra* note 14.

[64] *See* 5 U.S.C. § 552(a)(6)(E)(vi); 28 C.F.R. § 16.5(e)(3).

## Request for News Media Fee Status and Fee Waiver

EPIC is a "representative of the news media" for fee classification purposes, as the Court held in *EPIC v. Department of Defense*.[65] Based on EPIC's status as a "news media" requester, EPIC is entitled to receive the requested record with only duplication fees assessed.[66]

Further, any duplication fees should also be waived because disclosure of the requested information "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest" of EPIC, the requester.[67] The DOJ evaluates the three factors to determine whether this requirement is met: (i) the "subject of the request must concern identifiable operations or activities of the Federal Government"; (ii) disclosure must be "likely to contribute significantly to public understanding of those operations or activities"; and (iii) "disclosure must not be primarily in the commercial interest of the requester."[68] EPIC's request satisfies all three factors.

First, the requested Mueller Report(s) and supporting materials clearly "concern[] identifiable operations or activities of the Federal Government,"[69] namely: (1) the Special Counsel's investigation of Russian interference in the 2016 U.S. Presidential Election; (2) the U.S. government's response to Russian election interference; and (3) possible obstruction of justice by President Trump while in office.[70]

Second, disclosure would be "likely to contribute significantly to public understanding of those operations or activities."[71] Disclosure would be "meaningfully informative about government operations or activities" because—apart from the charging documents already filed by Mr. Mueller—little is known about the Special Counsel's substantive findings concerning Russian election interference; the Trump campaign's involvement in that interference; the U.S. government's response to that interference; and possible obstruction of justice by President Trump.

Disclosure will also "contribute to the understanding of a reasonably broad audience of persons interested in the subject," because DOJ components must "presume that a representative of the news media," such as EPIC, "will satisfy this consideration."[72] The requested Mueller Report(s) and supporting materials will reach a large audience through EPIC's widely read website, https://epic.org, where EPIC routinely posts government documents obtained under the FOIA.

---

[65] 241 F. Supp. 2d 5.
[66] 5 U.S.C. § 552(a)(4)(A)(ii)(II).
[67] 28 C.F.R. § 16.10(k)(1); *see also* § 552(a)(4)(A)(iii).
[68] 28 C.F.R. §§ 16.10(k)(2)(i)–(iii).
[69] *Id.* § 16.10(k)(2)(i).
[70] *See* Appointment Order, *supra* note 1; Leonnig & Costa, *supra* note 35.
[71] 28 C.F.R. §§ 16.10(k)(2)(ii)(A)–(B).
[72] *Id.* § 16.10(k)(2)(ii)(B)

Third, disclosure of the requested information is not "primarily in the commercial interest" of EPIC.[73] EPIC has no "commercial interest . . . that would be furthered by the requested disclosure."[74] EPIC is a registered non-profit organization committed to open government, privacy, and civil liberties.[75] Moreover, DOJ components "ordinarily will presume that where a news media requester has satisfied [the public interest standard], the request is not primarily in the commercial interest of the requester."[76] As described above, EPIC is a news media requester and satisfies the public interest standard.

For these reasons, a fee waiver should be granted to EPIC's request.

<u>Conclusion</u>

Thank you for your consideration of this request. I anticipate your determination on our request within ten calendar days.[77] For questions regarding this request, I can be contacted at 202-483-1140 x120 or FOIA@epic.org.

Respectfully submitted,

<u>/s John Davisson</u>
John Davisson
EPIC Counsel

<u>/s Enid Zhou</u>
Enid Zhou
EPIC Open Government Counsel

---

[73] *Id.* §§ 16.10(k)(2)(iii)(A)–(B).
[74] *Id.* §§ 16.10(k)(2)(iii)(A).
[75] EPIC, *About EPIC* (2018), https://epic.org/epic/about.html.
[76] 28 C.F.R. § 16.10(k)(2)(iii)(B).
[77] 5 U.S.C. § 552 (a)(6)(E)(ii)(I).

# APPENDIX B



**U.S. Department of Justice**

Office of Information Policy

*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

November 15, 2018

Ms. Enid Zhou
Electronic Privacy Information Center
1718 Connecticut Ave., NW
Suite 200
Washington, DC 20009
FOIA@epic.org

Re:     DOJ-2018-000676 (OIP)
        VRB:VAV:SBT

Dear Ms. Zhou:

       This is to acknowledge receipt of your Freedom of Information Act (FOIA) request dated and received in this Office on November 5, 2018, in which you requested various records pertaining to the Special Counsel investigation into Russian interference with the presidential election and other related matters. This response is made on behalf of the Special Counsel's Office.

       You have requested expedited processing of your request pursuant to the Department's standard permitting expedition for requests involving "[a]n urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information." See C.F.R. § 16.5(d)(ii) (2017). Based on the information you have provided, I have determined that your request for expedited processing under this standard should be denied. This Office cannot identify a particular urgency to inform the public about an actual or alleged federal government activity beyond the public's right to know about government activities generally.

       Additionally, you also have requested expedited processing of your request pursuant to the Department's standard involving "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." See 28 C.F.R. § 16.5(e)(1)(iv) (2017). Pursuant to Department policy, we directed your request to the Director of Public Affairs, who makes the decision whether to grant or deny expedited processing under this standard. See id. § 16.5(e)(2). Please be advised the Director has determined that your request for expedited processing should be denied. Although your request for expedited processing has been denied; it has been assigned to an analyst in this Office and our processing of it has been initiated.

       The records you seek require a search in and/or consultation with another Office, and so your request falls within "unusual circumstances." See 5 U.S.C. 552 § (a)(6)(B)(i)-(iii) (2012 & Supp. V. 2017). Because of these unusual circumstances, we need to extend the time limit to respond to your request beyond the ten additional days provided by the statute. We have not yet completed a search to determine whether there are records within the scope of your request. The time needed to process your request will necessarily depend on the complexity of

our records search and on the volume and complexity of any material located.  For your information, this Office assigns incoming requests to one of three tracks: simple, complex, or expedited.  Each request is then handled on a first-in, first-out basis in relation to other requests in the same track.  Simple requests usually receive a response in about a month, whereas complex requests necessarily take longer.  At this time, your request has been assigned to the complex track.  In an effort to speed up our records search, you may wish to narrow the scope of your request to limit the number of potentially responsive records or agree to an alternative time frame for processing, should records be located; or you may wish to await the completion of our records search to discuss either of these options.

We have not yet made a decision on your request for a fee waiver.  We will do so after we determine whether fees will be assessed for this request.

If you have any questions or wish to discuss reformulation or an alternative time frame for the processing of your request, you may contact the analyst handing your request, Sara Tennant, by telephone at the above number or you may write to her at the above address.  You may also contact our FOIA Public Liaison, Douglas Hibbard, for any further assistance and to discuss any aspect of your request at: Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001; telephone at 202-514-3642; or facsimile at 202-514-1009.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with my response to your request for expedited processing, you may administratively appeal by writing to the Director, Office of Information Policy, United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIAonline portal at https://www.foiaonline.gov/foiaonline/action/public/home.  Your appeal must be postmarked or electronically transmitted within ninety days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Vanessa R. Brinkmann
Senior Counsel

# Exhibit D

| From: | Enlow, Courtney D. (CIV) |
|---|---|
| To: | Alan Butler |
| Cc: | Marc Rotenberg; John Davisson |
| Subject: | RE: Activity in Case 1:19-cv-00810-RBW ELECTRONIC PRIVACY INFORMATION CENTER v. UNITED STATES DEPARTMENT OF JUSTICE Order |
| Date: | Tuesday, April 2, 2019 7:18:14 PM |

Dear Alan,

Thank you for your email. We would also like to avoid unnecessary briefing in this case.

The Department of Justice has agreed to expedite EPIC's FOIA request. EPIC's request for a preliminary injunction directing the Department to grant EPIC's request for expedited processing is now moot. On that basis alone, EPIC should withdraw its motion for a preliminary injunction. Please let me know if EPIC will agree to do so.

We are not able to commit to a processing schedule at this time. As you know, on March 29, 2019, the Attorney General sent a letter to Congress to address the "'confidential report' [the Special Counsel Robert S. Mueller, III] has submitted to [the Attorney General] pursuant to 28 C.F.R. § 600.8(c)." *See* Pl.'s Mot., Ex. 7 at 1, Dkt. 7-4. In that letter, the Attorney General stated, "We are preparing the report for release, making the redactions that are required. The Special Counsel is assisting us in this process. Specifically, we are well along in the process of identifying and redacting the following: (1) material subject to Federal Rule of Criminal Procedure 6(e) that by law cannot be made public; (2) material that the intelligence community identifies as potentially compromising sensitive sources and methods; (3) material that could affect other ongoing matters, including those that the Special Counsel has referred to other Department offices; and (4) information that would unduly infringe on the personal privacy and reputational interests of peripheral third parties." The Attorney General further stated, "Our progress is such that I anticipate we will be in a position to release the report by mid-April, if not sooner." *Id.* It is not practicable for the Department to release the report earlier than the timeframe the Attorney General already provided. Furthermore, a schedule should not be set until after the release of the report.

Best regards,

Courtney

Courtney Enlow

Trial Attorney

U.S. Department of Justice

Civil Division, Federal Programs Branch

1100 L Street, N.W., Room 12102

Washington, D.C. 20005

(202) 616-8467

courtney.d.enlow@usdoj.gov

**From:** Alan Butler <butler@epic.org>
**Sent:** Monday, April 01, 2019 7:12 PM
**To:** Enlow, Courtney D. (CIV) <cenlow@CIV.USDOJ.GOV>
**Cc:** Marc Rotenberg <rotenberg@epic.org>; John Davisson <davisson@epic.org>
**Subject:** Re: Activity in Case 1:19-cv-00810-RBW ELECTRONIC PRIVACY INFORMATION CENTER v.

UNITED STATES DEPARTMENT OF JUSTICE Order

Dear Courtney,

We have reviewed Judge Walton's briefing order and would like to schedule a call with you to discuss the possibility of setting a production schedule to avoid unnecessary briefing in this case.

As you know, EPIC is seeking expedited processing of its Freedom of Information Act request for the Mueller Report and related documents. Our goal is to ensure the prompt release of the unredacted report, and then the subsequent release of related documents.

We believe that the Court is likely to grant our motion and require the agency to process our request and produce responsive records on an expedited schedule. If the agency can commit now to the release of certain documents, it should be possible to avoid unnecessary briefing.

We are willing to agree to a reasonable, expedited processing schedule to prioritize the release of the most significant documents. Specifically, we would propose the following schedule:
• The agency will process and produce the final report (category (1)(a)) by April 9th. We are aware that the Attorney General has said to the Chairmen of the House and Senate Judiciary Committees that he is working with the Special Counsel to release the report to Congress by "mid-April, if not sooner." Therefore, we believe it should be practicable for the agency to produce the report by the date of the Court's scheduled hearing, which is April 9.
• The agency identify, process, and release records responsive to Category 5 by April 29, 2019.
• After that process is complete, we would schedule a call the week of April 29th to discus and set a schedule for processing the remaining categories

If the agency is willing to agree to this schedule, then EPIC would be willing to consider withdrawing its preliminary injunction motion in the interest of efficiency and in expediting these proceedings.

Please let us know if you are available for a call tomorrow.

Sincerely,

Alan Butler
Senior Counsel
Electronic Privacy Information Center
1718 Connecticut Ave., N.W. Suite 200
Washington, D.C. 20009
(202) 483-1140 x103
butler@epic.org

Begin forwarded message:
**From:** DCD_ECFNotice@dcd.uscourts.gov
**Subject: Activity in Case 1:19-cv-00810-RBW ELECTRONIC PRIVACY INFORMATION CENTER v. UNITED STATES DEPARTMENT OF JUSTICE Order**
**Date:** April 1, 2019 at 5:12:26 PM EDT
**To:** DCD_ECFNotice@dcd.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Columbia**

**Notice of Electronic Filing**

The following transaction was entered on 4/1/2019 at 5:12 PM and filed on 4/1/2019

**Case Name:** ELECTRONIC PRIVACY INFORMATION CENTER v. UNITED STATES DEPARTMENT OF JUSTICE

**Case Number:** 1:19-cv-00810-RBW

**Filer:**

**Document Number:** 11

**Docket Text:**

ORDER. In accordance with the reasons stated in the attached Order, it is hereby ORDERED that David Christenson's [5] Motion for Leave to File Motion to Join and Intervene is GRANTED. It is further ORDERED that David Christenson shall file his motion to join or intervene on or before 12:00 p.m. on April 4, 2019. It is further ORDERED that the Department shall file its opposition to David Christenson's motion to join or intervene on or before 12:00 p.m. on April 8, 2019. It is further ORDERED that the Department shall file its opposition to the plaintiff's motion for preliminary injunction on or before April 5, 2019. It is further ORDERED that the plaintiff shall file its reply in support of its motion on or before 12:00 p.m. on April 8, 2019. It is further ORDERED that the parties shall appear before the Court for a hearing on the Plaintiff's Motion for a Preliminary Injunction on April 9, 2019, at 9:00 a.m. Signed by Judge Reggie B. Walton on April 1, 2019. (lcrbw1)

**1:19-cv-00810-RBW Notice has been electronically mailed to:**

Courtney Danielle Enlow courtney.d.enlow@usdoj.gov, fedprog.ecf@usdoj.gov

John L. Davisson davisson@epic.org, efiling@epic.org

**1:19-cv-00810-RBW Notice will be delivered by other means to::**

DAVID ANDREW CHRISTENSON
P.O. Box 9063
Miramar Beach, FL 32550
The following document(s) are associated with this transaction:
**Document description:**Main Document
**Original filename:**suppressed
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=4/1/2019] [FileNumber=5944659-0]
[4498727f9c9bd13d0d0bcca008497fe472203b1c64dbfc484d1ef225a197bf7b8207f
94cd798e4bc31fc54ba4af4e973854741ad903e377ce2d790f4c59f0b26]]
<!--[if !supportLineBreakNewLine]-->
<!--[endif]-->