**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | |
| Plaintiff, | |
| v. | Civ. Action No. 19-810 (RBW) |
| UNITED STATES DEPARTMENT OF JUSTICE, | |
| Defendant. | |

**PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT,
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT,
AND MOTION FOR IN CAMERA REVIEW OF THE "MUELLER REPORT"**

Plaintiff Electronic Privacy Information Center ("EPIC") hereby opposes the Motion for

Partial Summary Judgment filed by the Defendant United States Department of Justice ("DOJ")

and cross-moves for partial summary judgment pursuant to Federal Rule of Civil Procedure 56.

The Court should conduct in camera review of the record in dispute. The Court should then grant

EPIC's motion and deny the DOJ's motion for the reasons set forth in the accompanying

Memorandum of Points and Authorities.

Respectfully Submitted,
MARC ROTENBERG, D.C. Bar #422825
EPIC President and Executive Director

/s/ Alan Butler
ALAN BUTLER, D.C. Bar #1012128
EPIC Senior Counsel

JOHN DAVISSON, D.C. Bar #1531914
EPIC Counsel

ELECTRONIC PRIVACY INFORMATION
CENTER

1718 Connecticut Avenue, N.W.
   Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*[1]

Dated: June 24, 2019

---

[1] EPIC Open Government Counsel Enid Zhou, a member of the California bar whose admission is pending in the District of Columbia, contributed to this motion.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

ELECTRONIC PRIVACY INFORMATION CENTER,

    Plaintiff,

    v.

UNITED STATES DEPARTMENT OF JUSTICE,

    Defendant.

Civ. Action No. 19-810 (RBW)

---

**PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT,
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT,
AND MOTION FOR IN CAMERA REVIEW OF THE "MUELLER REPORT"**

Plaintiff Electronic Privacy Information Center ("EPIC") hereby opposes the Motion for Partial Summary Judgment filed by the Defendant United States Department of Justice ("DOJ") and cross-moves for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court should conduct in camera review of the record in dispute. The Court should then grant EPIC's motion and deny the DOJ's motion for the reasons set forth in the accompanying Memorandum of Points and Authorities.

Respectfully Submitted,
MARC ROTENBERG, D.C. Bar #422825
EPIC President and Executive Director

/s/ Alan Butler
ALAN BUTLER, D.C. Bar #1012128
EPIC Senior Counsel

JOHN DAVISSON, D.C. Bar #1531914
EPIC Counsel

ELECTRONIC PRIVACY INFORMATION
CENTER

1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*[1]

Dated: June 24, 2019

---

[1] EPIC Open Government Counsel Enid Zhou, a member of the California bar whose admission is pending in the District of Columbia, contributed to this motion.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER, | |
| Plaintiff, | |
| v. | Civ. Action No. 19-810 (RBW) |
| UNITED STATES DEPARTMENT OF JUSTICE, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S COMBINED OPPOSITION AND CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT AND MOTION FOR
IN CAMERA REVIEW OF THE "MUELLER REPORT"**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.      Russian Interference in the 2016 U.S. Presidential Election ................................. 2

II.     Criminal and Counterintelligence Investigations into Russian Election Interference .......... 4

III.    Statements by the Attorney General, the Special Counsel, and Leaders of the
        Congressional Oversight Committees Regarding the Contents of the Mueller Report ........ 6

IV.     EPIC's FOIA Request and the Instant Litigation ................................................... 8

V.      Public Interest in Release of the Mueller Report ................................................ 10

ARGUMENT ................................................................................................................... 11

I.      STANDARD OF REVIEW ..................................................................................... 13

II.     THE DOJ HAS NOT MET ITS BURDEN OF DEMONSTRATING THAT THE
        REDACTED PORTIONS OF THE MUELLER REPORT ARE EXEMPT FROM
        DISCLOSURE ......................................................................................................... 13

III.    EPIC IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ............................ 14

        A.      The DOJ has not met its burden to withhold material pursuant to
                Exemption 7(A). ......................................................................................... 15

        B.      The DOJ has improperly withheld information about "investigative
                focus and scope" and the "fruits of investigatory operations" that is
                not properly subject to Exemption 7(E). .................................................. 20

        C.      The DOJ has improperly withheld information about Roger Stone
                and his associates. ....................................................................................... 22

        D.      The DOJ has improperly withheld information about the President's
                family members, close associates, and other public figures under
                Exemptions 6 and 7(C). .............................................................................. 25

        E.      The DOJ has improperly withheld information that is not
                predecisional or otherwise exempt from disclosure under
                Exemption 5. ................................................................................................ 32

        F.      The DOJ has failed to justify its withholdings of alleged grand jury
                information under Exemption 3 and Federal Rule of Criminal
                Procedure 6(e). ............................................................................................ 35

IV.     THE COURT SHOULD CONDUCT IN CAMERA REVIEW OF THE MUELLER
        REPORT TO ASSESS THE VALIDITY OF THE AGENCY'S WITHHOLDINGS. ...... 38

CONCLUSION ................................................................................................................. 42

# TABLE OF AUTHORITIES

**Cases**

*100Reporters LLC v. DOJ*,
   248 F. Supp. 3d 115 (D.D.C. 2017) .................................................................................27

*Abtew v. DHS*,
   808 F.3d 895 (D.C. Cir. 2015) ...............................................................................33, 34

*ACLU v. DOJ*,
   655 F.3d 1 (D.C. Cir. 2011) ....................................................................................12, 25

*Afshar v. U.S. Dep't of State*,
   702 F.2d 1125 (D.C. Cir. 1983) ...................................................................................34

*Alexander & Alexander Servs., Inc. v. SEC*,
   No. CIV. A. 92-1112-JHG, 1993 WL 439799
   (D.D.C. Oct. 19, 1993) ................................................................................................23

*Alyeska Pipeline Services Company v. EPA*,
   856 F.2d 309 (D.C. Cir. 1988) .....................................................................................18

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .....................................................................................................13

*Assassination Archives & Research Ctr. v. CIA*,
   334 F.3d 55 (D.C. Cir. 2003) .......................................................................................13

*Bevis v. Dep't of State*,
   801 F.2d 1386 (D.C. Cir. 1986) ...................................................................................15

*Boyd v. Exec. Office for U.S. Att'ys*,
   87 F. Supp. 3d 58 (D.D.C. 2015) ...........................................................................31, 41

*Campbell v. HHS*,
   682 F.2d 256 (D.C. Cir. 1982) ...............................................................................15, 16

*Carter v. Dep't of Commerce*,
   830 F.2d 388 (D.C. Cir. 1987) ...........................................................................39, 40, 41

*Chiquita Brands Int'l Inc. v. SEC*,
   805 F.3d 289 (D.C. Cir. 2015) ...............................................................................22, 23

*Chiquita Brands Int'l, Inc.*,
   10 F. Supp. 3d 1 (D.D.C. 2013) .............................................................................23, 24

*Church of Scientology of Cal., Inc. v. Turner*,
   662 F.2d 784 (D.C. Cir. 1980) (per curiam) ................................................................14

*Citizens for Responsibility & Ethics in Wash. v. DOJ*,
   746 F.3d 1082 (D.C. Cir. 2014) ...............................12, 13, 15, 17, 19, 21, 22, 25, 30

*Citizens for Responsibility & Ethics in Wash. v. DOJ*,
   854 F.3d 675 (D.C. Cir. 2017) ...........................................................................12, 25, 27

*Citizens for Responsibility & Ethics in Wash. v. NARA*,
   583 F. Supp. 2d 146 (D.D.C. 2008) ........................................................................39, 42

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) .....................................................................................33

*Common Cause v. NARA,*
  628 F.2d 179 (D.C. Cir. 1980) ...............................................................................29

*Crooker v. Bureau of Alcohol, Tobacco & Firearms,*
  789 F.2d 64 (D.C. Cir. 1986) .................................................................................16

*Davis v. DOJ,*
  968 F.2d 1276 (D.C. Cir. 1992) .............................................................................31

*Dep't of State v. Ray,*
  502 U.S. 164 (1991) ...............................................................................................12

*DiBacco v. Dep't of the Army,*
  No. 17-5048, 2019 WL 2479443 (D.C. Cir. June 14, 2019) ..................14, 35, 36, 39

*DiBacco v. U.S. Army,*
  795 F.3d 178 (D.C. Cir. 2015) .........................................................14, 35, 36, 38, 39

*DOJ v. Reporters Comm. for Freedom of the Press,*
  489 U.S. 749 (1989) .................................................................................13, 17, 25

*DOJ v. Tax Analysts,*
  492 U.S. 136 (1989) ...............................................................................................12

*Dow Jones Co. v. FERC,*
  219 F.R.D. 167 (C.D. Cal. 2003) ...........................................................................23

*Dugan v. DOJ,*
  82 F. Supp. 3d 485 (D.D.C. 2015) .........................................................................12

*EPIC v. CBP,*
  160 F. Supp. 3d 35 (D.D.C. 2016) .........................................................................21

*EPIC v. DHS,*
  384 F. Supp. 2d 100 (D.D.C. 2005) .......................................................................12

*EPIC v. DHS,*
  999 F. Supp. 2d 24 (D.D.C. 2013) ....................................................................12, 13

*EPIC v. DOJ,*
  511 F. Supp. 2d 56 (D.D.C. 2007) .........................................................................12

*Friends of Blackwater v. U.S. Dep't of Interior,*
  391 F. Supp. 2d 115 (D.D.C. 2005) .......................................................................13

*Fund for Constitutional Gov't v. NARA,*
  656 F.2d 856 (D.C. Cir. 1981) ...............................................................................29

*Gallant v. NLRB,*
  26 F.3d 168 (D.C. Cir. 1994) .................................................................................14

*Georgia-Pac. Corp. v. IRS,*
  517 F. Supp. 2d 65 (D.D.C. 2007) ...............................................................39, 41, 42

*In re Sealed Case,*
  121 F.3d 729 (D.C. Cir. 1997) ...............................................................................32

*James Madison Project v. DOJ,*
  302 F. Supp. 3d 290 (D.D.C. 2018) .......................................................................39

*John Doe Agency v. John Doe Corp.*,
   493 U.S. 146 (1989) ....................................................................................................12

*Judicial Watch, Inc. v. DOD*,
   245 F. Supp. 3d 19 (D.D.C. 2017), *aff'd*,
   913 F.3d 1106 (D.C. Cir. 2019) ..................................................................................33

*Judicial Watch, Inc. v. NARA*,
   214 F. Supp. 3d 43 (D.D.C. 2016), *aff'd*,
   876 F.3d 346 (D.C. Cir. 2017) .........................................................30, 31, 35, 36, 38, 40

*Kay v. FCC*, 976 F. Supp. 23 (D.D.C. 1997), *aff'd*,
   172 F.3d 919 (D.C. Cir. 1998) ...................................................................16, 18, 19

*Kidder v. FBI*,
   517 F. Supp. 2d 17 (D.D.C. 2007) ........................................................................15, 17

*Labow v. DOJ*,
   831 F.3d 523 (D.C. Cir. 2016) ...........................................................................36, 37, 38

*Leopold v. DOJ*,
   No. 19-957-RBW (D.D.C. filed Apr. 4, 2019) ...........................................................9

*Lopez v. DOJ*,
   393 F.3d 1345 (D.C. Cir. 2005) ..........................................................................35, 36, 40

*Maydak v. DOJ*,
   218 F.3d 760 (D.C. Cir. 2000) ....................................................................................15

*McKinley v. Bd. of Governors of the Fed. Reserve System*,
   647 F.3d 331 (D.C. Cir. 2011) ....................................................................................35

*Military Audit Project v. Casey*,
   656 F.2d 724 (D.C. Cir. 1981) ....................................................................................14

*Milner v. Dep't of the Navy*,
   562 U.S. 562 (2011) ....................................................................................................12

*Mobley v. CIA*,
   806 F.3d 568 (D.C. Cir. 2015) ...............................................................................39, 40

*Nat'l Sec. Archive v. CIA*,
   752 F.3d 460 (D.C. Cir. 2014) ....................................................................................35

*Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*,
   745 F.3d 1219 (D.C. Cir. 2014) ..................................................................................34

*Nat'l Ass'n of Home Builders v. Norton*,
   309 F.3d 26 (D.C. Cir. 2002) ......................................................................................12

*Nation Magazine, Washington Bureau v. U.S. Customs Serv.*,
   71 F.3d 885 (D.C. Cir. 1995) ................................................................................27, 31

*New Orleans Workers' Ctr. for Racial Justice v. ICE*,
   373 F. Supp. 3d 16 (D.D.C. 2019) ...................................................................13, 21, 25

*NLRB v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978) ...............................................................................................16, 18

*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975) .................................................................32, 34, 35

*North v. Walsh*,
  881 F.2d 1088 (D.C. Cir. 1989) ...........................................15, 19, 20

*PETA v. NIH*,
  745 F.3d 535 (D.C. Cir. 2014) ........................................................13

*Poitras v. DHS*,
  303 F. Supp. 3d 136 (D.D.C. 2018) ................................................22

*Pub. Citizen, Inc. v. OMB*,
  598 F.3d 865 (D.C. Cir. 2010) ........................................................32

*Putnam v. DOJ*,
  873 F. Supp. 714 (D.D.C. 1995) .....................................................16

*Quinon v. FBI*,
  86 F.3d 1222 (D.C. Cir. 1996) ...................................................39, 41

*Ray v. Turner*,
  587 F.2d 1187 (D.C. Cir. 1978) ......................................................39

*Reporters Comm. for Freedom of the Press v. FBI*,
  369 F. Supp. 3d 21 (D.D.C. 2019) ..................................................14

*Ripskis v. HUD*,
  746 F.2d 1 (D.C. Cir. 1984) ............................................................25

*Rogers v. Exec. Office for U.S. Att'ys*,
  No. 18-454-RBW, 2019 WL 1538252 (Apr 9., 2019) ...............12, 13

*Role Models Am., Inc. v. White*,
  317 F.3d 327 (D.C. Cir. 2003) ........................................................34

*SafeCard Servs., Inc. v. SEC*,
  926 F.2d 1197 (D.C. Cir. 1991) ......................................................33

*Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. DOJ*,
  823 F.2d 574 (D.C. Cir. 1987) .........................................33, 35, 36, 38

*Showing Animals Respect & Kindness v. U.S. Dep't of Interior*,
  730 F. Supp. 2d 180 (D.D.C. 2010) ................................................31

*Spirko v. U.S. Postal Serv.*,
  147 F.3d 992 (D.C. Cir. 1998) ...................................................39, 41

*Summers v. DOJ*,
  140 F.3d 1077 (D.C. Cir. 1998) ......................................................13

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) ......................................................16

*Tax Analysts v. IRS*,
  294 F.3d 71 (D.C. Cir. 2002) ..........................................................32

*Taxation With Representation Fund v. IRS*,
  646 F.2d 666 (D.C. Cir. 1981) ........................................................33

*Washington Post Co. v. DOJ,*
   863 F.2d 96 (D.C. Cir. 1988) ......................................................................23

*Wayland v. NLRB,*
   627 F. Supp. 1473 (M.D. Tenn. 1986) ........................................................23

## Statutes

5 U.S.C. § 552(a)(4)(B) ...................................................................... 12, 13

5 U.S.C. § 552(a)(6) ....................................................................................9

5 U.S.C. § 552(a)(6)(E) ...............................................................................9

5 U.S.C. § 552(a)(8)(A)(ii)(II) ..................................................................12

5 U.S.C. § 552(b)(3) ..................................................................................35

5 U.S.C. § 552(b)(5) ..................................................................................32

5 U.S.C. § 552(b)(6) ..................................................................................25

5 U.S.C. § 552(b)(7)(A) .............................................................................15

5 U.S.C. § 552(b)(7)(B) .............................................................................24

5 U.S.C. § 552(b)(7)(C) .............................................................................25

5 U.S.C. § 552(b)(7)(E) .............................................................................20

## Regulations

28 C.F.R. § 600.8(c) ...................................................................9, 32, 33, 34

## Rules

Fed. R. Civ. P. 56(a).................................................................................13

Fed. R. Crim. P. 16..................................................................................20

Fed. R. Crim. P. 6(e) .................................................................35, 37, 40, 41

## Other Authorities

Adam K. Raymond, N.Y. Mag., *Rick Hasen on Why Mueller Should Have
   Gone After Don Jr.* (Apr. 18, 2019) ..........................................................30

Alvin Chang & Javier Zarracina, *The Mueller Report Redactions,
   Explained in 4 Charts,* Vox (Apr. 19, 2019)................................................8

Anna Schecter, *Mueller Has Emails from Stone Pal Corsi About
   WikiLeaks Dem Email Dum*p, NBC News (Nov. 27, 2018) ......................29

Arena Stage, *A Reading of the Mueller Report, Volume II* (July 11, 2019) ..................10

Charlie Savage, *How Barr's Excerpts Compare to the Mueller Report's
   Findings,* N.Y. Times (Apr. 20, 2019).......................................................40

Donald Trump Jr. (@DonaldJTrumpJr), Twitter (July 11, 2017)....................28

Donald Trump Jr. (@DonaldJTrumpJr), Twitter (Nov. 13, 2017) ..................28

Elie Mystal, *Robert Mueller Obstructed His Own Investigation As Much
   as Donald Trump,* The Nation (Apr. 18, 2019) ..........................................30

H.R. Con. Res. 24, 116th Cong. (2019) .....................................................11

vi

House Permanent Select Committee on Intelligence, *Status of the Russia Investigation (Minority Report)* (Mar. 13, 2018) ............................................3

Hr'g Tr., *Leopold v. DOJ*, No. 19-957-RBW (D.D.C. Apr. 16, 2019) ....................................2, 39

Indictment, *United States v. Internet Res. Agency*, No. 18-32 (D.D.C. Feb. 16, 2018) ....................................................................................................4

K.K. Rebecca Lai et al., *See Which Sections of the Mueller Report Were Redacted*, N.Y. Times (Apr. 19, 2019) ..................................................41

Letter from Donald J. Trump, President of the United States, to James B. Comey, Dir., Fed. Bureau of Investigation (May 9, 2017) ..........................5

Makini Brice & Mark Hosenball, *Trump Jr. Says 'Nothing to Correct' After Closed Interview with Senate Committee*, Reuters (June 12, 2019) ...................28

Mueller Book Club, *Mueller Book Club* (2019) ..................................................10

Nathan Layne, *Corsi, 'Person 1' in Roger Stone Indictment, Says He's Done Nothing Wrong,* Reuters (Jan. 25, 2019) ..........................................29

Nicholas Fandos, *House Votes, 420-to-0, to Demand Public Release of Mueller Report*, N.Y. Times (Mar. 14, 2019) ..........................................11

Office of the Dir. of Nat'l Intelligence, ICA 2017-01D, *Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent US Elections* (Jan. 6, 2017) ..............................................................3

Order, *United States v. Stone*, 19-18 (D.D.C. Feb. 15, 2019) ..........................24

Press Release, Sen. Patrick Leahy, Statement of Senator Patrick Leahy on the Need to Release the Full Mueller Report (Mar. 28, 2019) ...................11

Press Release, Senate Select Comm. on Intelligence, Senate Intel Completes Review of Intelligence Community Assessment on Russian Activities in the 2016 U.S. Elections (May 16, 2018) ..................................4

Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement on Recusal (Mar. 2, 2017)............................................................................5

Quinnipiac Univ., *84% of U.S. Voters Want to See Mueller Report, Quinnipiac University National Poll Finds* (Mar. 26, 2019).......................10

*Russian Active Measures Investigation: Hearing Before the H. Permanent Select Comm. on Intelligence*, 115th Cong. (2017)..................5

Ryan Goodman, *A Side-by-Side Comparison of Barr's vs. Mueller's Statements about Special Counsel Report* (2019)........................................7

Ryan Goodman, Opinion, *Trump's Position on the Mueller Report is Legally Ridiculous—and Dangerous*, N.Y. Times (May 20, 2019) ...........11

Sara Murray & Eli Watkins, *Roger Stone Associate Says He Won't Agree to Plea Deal*, CNN (Nov. 26, 2018)..........................................................31

Scott Shane & Mark Mazzetti, *The Plot to Subvert an Election: Unraveling the Russia Story So Far*, N.Y. Times (Sep. 20, 2018)...............4

*See Which Sections of the Mueller Report Were Redacted*, N.Y. Times, Apr. 19, 2019 ..........................................................................................8

Spencer S. Hsu & Manuel Roig-Franzia, *Prosecutors Say New Roger
    Stone Instagram Posts Violate Gag Order, Ask Judge to Hold Hearing
    to Consider Jailing Him*, Wash. Post (June 20, 2019) ................................................29

Statement of the Offense, *United States v. Papadopoulos*, No. 17-182
    (D.D.C. Oct. 5, 2017) ...................................................................................................3

Steven Shepard, *Poll: Little support for Barr's handling of Mueller report*,
    Politico (May 8, 2019) ................................................................................................10

*Transcript: Attorney General Bill Barr Faces Questions on Capitol Hill*,
    CNN (Apr. 9, 2019) .....................................................................................................41

*Transcript: Attorney General William Barr's Press Conference Remarks
    Ahead of Mueller Report Release*, Politico (Apr. 18, 2019) .......................................40

## INTRODUCTION

This case concerns one of the most important documents in U.S. history—the final Report of the Special Counsel regarding Russian interference in the 2016 presidential election. According to the Special Counsel, the Report documents "multiple, systematic efforts to interfere in our election." Robert S. Mueller III, the Special Counsel, said "that allegation deserves the attention of every American." Yet the nation's ability to fully assess the Report is hindered by the decision of the Justice Department to withhold critical information from the American public.

The Mueller Report is not simply a matter of history. The Report describes ongoing efforts to undermine democratic institutions in the United States. The President, a central figure in the investigation, has described these allegations as "a hoax." And the Attorney General, the nation's chief law enforcement officer, has mischaracterized, misrepresented, and misled all with the aim of exonerating the President and concealing information from Congress and the public that would reveal the full extent of the threat upon our nation.

The Department of Justice has withheld material from 178 of the 448 pages on such matters described in the Report as "Russian 'Active Measures' Social Media Campaign" and the "Russian Hacking and Dumping Operation." There are pages covered entirely with black ink. The agency is concealing information about how foreign agents infiltrated U.S. political organizations and social networks, hacked e-mail accounts, and coordinated with persons in the United States to sow discord and sway the 2016 presidential election. All of these topics are of immediate concern to Congressional oversight committees and the American public.

With our growing dependence on social networks and computer voting systems, it is not overstatement to suggest that a full and complete examination of the materials uncovered by the Special Counsel may be the single most important step we take as a nation today to preserve the political institutions of the United States.

The challenge that this case presents to the Court is the ongoing effort of the Department of Justice to conceal the full scope of election interference, the individuals responsible, and the ongoing risks to American democratic institutions. As the Court reviews EPIC's efforts to obtain

the full and complete Mueller Report, it should consider: (1) the purpose of the Freedom of Information Act ("FOIA") is disclosure, (2) the burden falls on the agency to justify withholdings, (3) conclusory claims are insufficient to justify withholding, (4) in the absence of a claim for categorical withholding, the agency must tether exemption claims to specific text in the document, (5) segregable, non-exempt information must be released, (6) there is a presumption that investigations concerning the protection of democratic institutions have a heightened public interest, (7) final reports are not predecisional, (8) privacy exemptions should not be applied equally to public figures and private persons, and (9) the threat to the United States detailed in the redacted sections of the Report is ongoing.

Given the urgency of the matter, EPIC also respectfully asks the Court to conduct in camera review at this stage in the proceeding. The government has had more than ample time to conduct its review and set out its justifications for withholding. The Attorney General's various statements about the Report have only underscored the need for an independent determination of the exemption claims by. As this Court has already noted, "the Attorney General has created an environment that . . . is going to cause a significant portion of the American public to be concerned about whether there is transparency" with respect to the Mueller Report, such that "there's going to have to be some type of probing on [the Court's] behalf as to whether or not appropriate redactions have been made." Hr'g Tr. 14:22–24, *Leopold v. DOJ*, No. 19-957-RBW (D.D.C. Apr. 16, 2019).

## BACKGROUND

### I.    Russian Interference in the 2016 U.S. Presidential Election

In 2016, the Russian government carried out a "multi-pronged attack" on the U.S. presidential election to destabilize U.S. democratic institutions and to aid the candidacy of Donald J. Trump. Office of the Dir. of Nat'l Intelligence, ICA 2017-01D, *Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent US Elections* 1

(Jan. 6, 2017) [hereinafter ICA].[2] The ICA—along with the reports, investigations, and prosecutions that have ensued—establishes that Russia interfered with the 2016 presidential election on at least four fronts.

First, "Russia's intelligence services conducted cyber operations against targets associated with the 2016 US presidential election, including targets associated with both major US political parties." ICA at 2; *see also* Ex. 1, Letter from William P. Barr, Attorney Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, et al. at 2 (Mar. 24, 2019). These operations included the "exfiltrat[ion of] large volumes of data" from the Democratic National Committee ("DNC") and "the compromise of the personal e-mail accounts of Democratic Party officials and political figures." ICA at 2.

Second, Russian intelligence services "used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in cyber operations publicly and in exclusives to media outlets." *Id.* at 2–3; Ex. 1 at 2. These disclosures included data extracted by Russian intelligence from DNC networks. ICA at 3. Subsequent investigation has also revealed that senior Trump campaign officials engaged in multiple meetings with Russian intermediaries offering to provide "dirt" on Hillary Clinton, including "thousands of emails" obtained by Russia. Statement of the Offense ¶ 14, *United States v. Papadopoulos*, No. 17-182 (D.D.C. Oct. 5, 2017);[3] *see also* House Permanent Select Committee on Intelligence, *Status of the Russia Investigation (Minority Report)* (Mar. 13, 2018).[4]

Third, "Russian intelligence accessed elements of multiple state or local electoral boards" in an ongoing effort to assess "US electoral processes and related technology and equipment." ICA at 3; *accord* Senate Select Comm. on Intelligence, *The Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent U.S. Elections* (July 3, 2018).[5]

---

[2] https://www.dni.gov/files/documents/ICA_2017_01.pdf.

[3] https://www.justice.gov/file/1007346/download.

[4] https://democrats-intelligence.house.gov/uploadedfiles/final_-_minority_status_of_the_russia_ investigation_with_appendices.pdf.

[5] https://www.burr.senate.gov/imo/media/doc/SSCI%20ICA%20ASSESSMENT_FINALJULY3.pdf.

Fourth, the Russian government spent millions of dollars and employed hundreds of people to flood Facebook and Twitter with fraudulent users, posts, articles, groups, and targeted advertisements. Indictment at 3-4, ¶¶ 3–6, 10, *United States v. Internet Res. Agency*, No. 18-32 (D.D.C. Feb. 16, 2018).[6]

In the two years since the Intelligence Community Assessment was published, the ICA's findings have been repeatedly confirmed by federal inquiries and investigative reporting. *See* Senate Select Comm. on Intelligence, *supra*; *see also* Scott Shane & Mark Mazzetti, *The Plot to Subvert an Election: Unraveling the Russia Story So Far*, N.Y. Times (Sep. 20, 2018).[7] The Senate Intelligence Committee, after an "an in-depth review" of the ICA and associated intelligence, determined that "the conclusions of the ICA are sound" and noted "that collection and analysis subsequent to the ICA's publication continue to reinforce its assessments." Senate Select Comm. on Intelligence, *supra*, at 7. "There is no doubt that Russia undertook an unprecedented effort to interfere with our 2016 elections," said Senator Richard Burr (R-NC), the Chairman of the Committee. Press Release, Senate Select Comm. on Intelligence, Senate Intel Completes Review of Intelligence Community Assessment on Russian Activities in the 2016 U.S. Elections (May 16, 2018).[8]

## II.      Criminal and Counterintelligence Investigations into Russian Election Interference

On January 20, 2017—two weeks after the public release of the Intelligence Community Assessment—Donald J. Trump was inaugurated as the 45th President of the United States.

On March 2, 2017, then-Attorney General Jeff Sessions, who had been a prominent supporter of Mr. Trump during the campaign, recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States." Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement on Recusal

---

[6] https://www.justice.gov/file/1035477/download.

[7] https://www.nytimes.com/interactive/2018/09/20/us/politics/russia-interference-election-trump-clinton.html.

[8] https://www.warner.senate.gov/public/index.cfm/2018/5/senate-intel-completes-review-of-intelligence-community-assessment-on-russian-activities-in-the-2016-u-s-elections.

(Mar. 2, 2017);[9] *see also* 28 C.F.R. § 45.2(a). As a result, the responsibilities of the Attorney

General for any such investigation passed to the Deputy Attorney General.

On March 20, 2017, James B. Comey, then-Director of the Federal Bureau of

Investigation ("FBI"), confirmed to the House Permanent Select Committee on Intelligence that

the FBI was conducting an investigation into "the Russian government's efforts to interfere in

the 2016 presidential election," including "the nature of any links between individuals associated

with the Trump campaign and the Russian government and whether there was any coordination

between the campaign and Russia's efforts." *Russian Active Measures Investigation: Hearing

Before the H. Permanent Select Comm. on Intelligence*, 115th Cong. (2017) (statement of James

B. Comey, Director, Fed. Bureau of Investigation).[10] Mr. Comey noted that the investigation

would include "an assessment of whether any crimes were committed." *Id.*

On May 9, 2017, President Trump removed Director Comey from office and terminated

his employment. Letter from Donald J. Trump, President of the United States, to James B.

Comey, Dir., Fed. Bureau of Investigation (May 9, 2017).[11]

On May 17, 2017, Deputy Attorney General Rod J. Rosenstein—in his capacity as Acting

Attorney General—appointed Robert S. Mueller III "to serve as Special Counsel for the United

States Department of Justice." Ex. 2, U.S. Dep't of Justice, Office of the Deputy Att'y Gen.,

Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with

the 2016 Presidential Election and Related Matters ¶ (a) (May 17, 2017) [hereinafter

Appointment Order]. Mr. Rosenstein authorized Special Counsel Mueller to "conduct the

investigation confirmed by then-FBI Director James B. Comey in testimony before the House

Permanent Select Committee on Intelligence on March 20, 2017," including "any links and/or

coordination between the Russian government and individuals associated with the campaign of

President Donald Trump"; "any matters that arose or may arise directly from the investigation";

---

[9] https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal.

[10] https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation.

[11] https://www.gpo.gov/fdsys/pkg/DCPD-201700325/pdf/DCPD-201700325.pdf.

and "any other matters within the scope of 28 C.F.R. § 600.4(a)." Appointment Order ¶ (b). Mr. Rosenstein also authorized Mr. Mueller "to prosecute federal crimes arising from the investigation of these matters" where "it is necessary and appropriate[.]" *Id.* ¶ (c).

## III.    Statements by the Attorney General, the Special Counsel, and Leaders of the Congressional Oversight Committees Regarding the Contents of the Mueller Report

On March 22, 2019, Attorney General Barr confirmed that the DOJ was in possession of "a 'confidential report explaining the prosecution or declination decisions' [Special Counsel Mueller] has reached, as required by 28 C.F.R. § 600.8(c)." Ex. 3, Letter from William P. Barr, Attorney Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, et al. at 1 (Mar. 22, 2019). This document, officially titled "Report on the Investigation into Russian Interference in the 2016 Presidential Election," is widely referred to as the "Mueller Report."

On March 24, 2019, Attorney General Barr sent a second letter to Congress that included his own four-page description of the Mueller Report and a summary of "the principal conclusions reached by the Special Counsel and the results of his investigation." Ex. 1 at 1. The Attorney General stated in his second letter that his "goal and intent is to release as much of the Special Counsel's report as [he] can," but he indicated that the DOJ would need to limit disclosure, in particular, of certain materials "relating to 'matter[s] occurring before [a] grand jury.'" Ex. 1 at 4.

The Attorney General's summary of the Mueller Report acknowledged the "two main Russian efforts to influence the 2016 election," including a campaign of "disinformation and social media operations" led by the Russian Internet Research Agency ("IRA") and "designed to sow discord," as well as the "Russian government's efforts to conduct computer hacking operations designed to gather and disseminate information to influence the election." Ex. 1 at 2. The Attorney General also acknowledged that the Special Counsel brought criminal charges against "a number of Russian nationals and entities" in connection with the disinformation campaign and "a number of Russian military officers for conspiring to hack into computers in the United States for purposes of influencing the election." *Id.* The Attorney General went on to

discuss the Special Counsel's investigation into potential obstruction of justice but did not describe or summarize any of the factual findings contained in Volume II of the Report. *See id.* at 3–4. Instead, the Attorney General set out his own decision not to bring criminal charges against the President of the United States for obstruction of justice. *See* Ryan Goodman, *A Side-by-Side Comparison of Barr's vs. Mueller's Statements about Special Counsel Report* (2019).[12] Contrary to the declination decision of the Special Counsel who determined that it would have been a violation of established DOJ policy for to bring any criminal charges against the President while in office, the Attorney General set out an entirely different basis for his determination not to bring charges. *Compare* Decl. of Vanessa Brinkmann. Ex. D, 2 Mueller, *Report on the Investigation into Russian Interference in the 2016 Presidential Election* 128 n.888 (March 2019), ECF No. 54-5 [hereinafter *Redacted Report Vol. II*], *with* Ex. 1 at 3–4.

The Special Counsel disputed the Attorney's Generals characterization of the Report. On March 27, 2019, the Special Counsel sent a letter to the Attorney General stating that the introductions and executive summaries are "in a form that can be released to the public consistent with legal requirements and Department policies." Ex. 4, Letter from Robert S. Mueller III, Special Counsel, to William P. Barr, Attorney Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, et al. at 1 (Mar. 22, 2019). The Special Counsel requested that the Attorney General "provide these materials to Congress and authorize their public release at this time." *Id.* The Special Counsel expressed concern that the Attorney General's letters had caused public confusion about the Report and related investigations:

> As we stated in our meeting of March 5 and reiterated to the Department early in the afternoon of March 24th, the introductions and executive summaries of our two-volume report accurately summarize this Office's work and conclusions. The summary letter the Department sent to Congress and released to the public late in the afternoon of March 24 did not fully capture the context, nature, and substance of this Office's work and conclusions. We communicated that concern to the Department on the morning of March 25. There is now public confusion about critical aspects of the results of our investigation. This threatens to undermine a

---

[12] https://www.scribd.com/document/412477974/Chart-A-Side-by-Side-Comparison-of-Bill-Barr-s-vs-Bob-Mueller-s-Statements-About-Special-Counsel-Report-on-2016-Russian-Election-Interference#from_embed.

central purpose for which the Department appointed the Special Counsel: to assure full public confidence in the outcome of the investigations.

*Id.* The Special Counsel further emphasized that the DOJ's review of the full Report "need not delay release of the enclosed materials. Release at this time would alleviate the misunderstandings that have arisen and would answer congressional and public questions about the nature and outcome of our investigation. It would also accord with the standard for public release of notifications to Congress cited in your letter." *Id.* at 1–2.

On March 22, 2019, the Attorney General published a heavily redacted version of the Mueller Report. According to one analysis, more than 10% of the Report was withheld from the American public. K.K. Rebecca Lai et al., *See Which Sections of the Mueller Report Were Redacted*, N.Y. Times, Apr. 19, 2019.[13] Another analysis indicates that the most extensive redactions concerned "Russian 'Active Measures' Social Media Campaign," "Russian Hacking and Dumping Operations," and "Russian Government Links to and Contacts with the Trump Campaign." Alvin Chang & Javier Zarracina, *The Mueller Report Redactions*, *Explained in 4 Charts,* Vox (Apr. 19, 2019).[14]

## IV.   EPIC's FOIA Request and the Instant Litigation

On November 5, 2018, EPIC submitted a FOIA Request to the DOJ's Office of Information Policy. Ex. 5, FOIA Request from EPIC to Douglas Hibbard, Chief, Initial Request Staff, Office of Info. Policy, U.S. Dep't of Justice (Nov. 5, 2018) [hereinafter EPIC's FOIA Request]. EPIC sought fourteen categories of records related to the Special Counsel's investigation into Russian interference in the 2016 U.S. presidential election, including the final report of the Special Counsel. Ex. 5 at 1–3. The categories in EPIC's FOIA request were derived from the regulation establishing the Special Counsel.

This cross motion for partial summary judgment concerns a single record—the Mueller Report—that is responsive to category (1)(a) of EPIC's FOIA Request: "All "report[s]" and

---

[13] https://www.nytimes.com/interactive/2019/04/19/us/politics/redacted-mueller-report.html.

[14] https://www.vox.com/2019/4/19/18485535/mueller-report-redactions-data-chart.

"closing documentation" prepared under 28 C.F.R. § 600.8(c), whether or not such records were actually provided to the Attorney General or Acting Attorney General." Ex. 5 at 1.

After the agency denied EPIC's request for expedited processing and failed to respond to EPIC's timely administrative appeal, EPIC filed the instant lawsuit on March 22, 2019. Complaint, ECF No. 1. EPIC stated three claims for relief. First, EPIC charged that the DOJ had unlawfully failed to make a determination on EPIC's FOIA Request and FOIA Appeal within the timeframes set forth in 5 U.S.C. § 552(a)(6). Compl. ¶¶ 66–70. Second, EPIC charged that the DOJ had unlawfully denied expedited processing of EPIC's FOIA Request in violation of 5 U.S.C. § 552(a)(6)(E). Compl. ¶¶ 71–75. Third, EPIC charged that the DOJ had unlawfully withheld records responsive to EPIC's FOIA Request. Compl. ¶¶ 76–79.

EPIC subsequently filed a motion for a preliminary injunction on March 29, 2019. On April 9, 2019, the Court held a hearing on EPIC's motion. Hr'g Tr., ECF No. 25. The Court stated that the disclosure of the Mueller Report is "a very important matter and the public has a right to know what it can know about the investigation[.]" *Id.* at 15:25–16:2. The Court also stated that this case should proceed "as expeditiously as humanly possible." *Id.* at 26:12. However, the Court denied EPIC's motion for a preliminary injunction, without prejudice, finding that EPIC had not shown "that it face[d] irreparable harm in the absence of an injunction." Order, ECF No. 24. The Court ordered the parties to appear at a status conference on May 2, 2019 "to discuss how the parties wish to proceed in this case." *Id.*

On April 22, 2019, the Court ordered EPIC's case to be consolidated with a related case, *Leopold v. DOJ,* No. 19-957-RBW (D.D.C. filed Apr. 4, 2019), "to the extent that the plaintiffs in the [two] matters are seeking the release of the Special Counsel Mueller's report[.]" Order, ECF No. 33. On May 3, 2019, following the scheduled status conference, the Court set an expedited schedule for the briefing of the parties' cross-motions for partial summary judgment with respect to disclosure of the Mueller Report. Order, ECF No. 43. The Court also scheduled hearing on the parties' cross-motions for August 5, 2019. *Id.* at 2.

## V.      Public Interest in Release of the Mueller Report

In his final public statement as Special Counsel, Robert Mueller stated that "the matters investigated were of paramount importance. . . and deserve[] the attention of every American." *Full Transcript of Mueller's Statement on Russia Investigation*, N.Y. Times (May 29, 2019).[15] And there is immense public interest in the Special Counsel's Report. The Report not only concerns interference by a foreign adversary to disrupt a major U.S. election, but also whether the President of the United States obstructed the investigation that followed. After Attorney General Barr released a four-page summary of Special Counsel Mueller's Report briefly describing its contents, an overwhelming majority of Americans wanted the full Report to be made public. Quinnipiac Univ., *84% of U.S. Voters Want to See Mueller Report, Quinnipiac University National Poll Finds* (Mar. 26, 2019);[16] *see also* Steven Shepard, *Poll: Little support for Barr's handling of Mueller report*, Politico (May 8, 2019).[17] The public interest in the Report is ongoing. Thousands of people across the country have pledged to read the Mueller Report "cover to cover." Mueller Book Club*, Mueller Book Club* (2019).[18] Public readings are scheduled in many cities including Washington, D.C. Arena Stage, *A Reading of the Mueller Report, Volume II* (July 11, 2019),[19]

Congress has explicitly called for the "full release" of the Report, including the Special Counsel's findings. In a sweeping 420-0 vote, House Democrats and Republicans passed a unanimous resolution which

> (1) calls for the public release of any report, including findings, Special Counsel Mueller provides to the Attorney General, except to the extent the public disclosure of any portion thereof is expressly prohibited by law; and

> (2) calls for the full release to Congress of any report, including findings, Special Counsel Mueller provides to the Attorney General.

---

[15] https://www.nytimes.com/2019/05/29/us/politics/mueller-transcript.html

[16] https://poll.qu.edu/national/release-detail?ReleaseID=2609.

[17] https://www.politico.com/story/2019/05/08/poll-little-support-for-barrs-handling-of-mueller-report-1309713.

[18] https://www.muellerbookclub.com.

[19] https://www.arenastage.org/mueller-reading.

H.R. Con. Res. 24, 116th Cong. (2019).[20] Nicholas Fandos, *House Votes, 420-to-0, to Demand Public Release of Mueller Report*, N.Y. Times (Mar. 14, 2019).[21]

Senator Patrick Leahy (D-VT), former Chair of the Senate Judiciary Committee and ardent defender of open government, stated:

> There is simply no justification for hiding even a portion of the Mueller report. With respect to the collusion investigation, grand jury secrecy can be waived by the courts where there is a particularized need that outweighs the interest in secrecy. . . .
>
> Transparency is the touchstone of our democracy. Any attempt to hide swaths of the Mueller report from public scrutiny will only fuel suspicions that President Trump's Justice Department, which represents the United States, is playing the role of President Trump's defense team. . . .

Press Release, Senator Patrick Leahy, Statement of Senator Patrick Leahy on the Need to Release the Full Mueller Report (Mar. 28, 2019).[22] Experts have also noted that release of the full Mueller Report would have a tremendous public benefit, especially because it would inform important legislative actions and set priorities. As Professor Ryan Goodman has explained:

> The redacted Mueller report is rich in information, but legislators would very likely benefit enormously by knowing more about a number of things from the pages that have been kept from Congress: how Moscow devised its attempts to penetrate the Trump campaign and the tactical benefits it expected to gain from different parts of the operation, what actions Americans took wittingly and unwittingly to support Kremlin front organizations and WikiLeaks, and why members of the Russian delegation at Trump Tower were not charged with violations of the Foreign Agent Registration Act. Those are just a few of the many pieces missing from the puzzle.

Ryan Goodman, Opinion, *Trump's Position on the Mueller Report is Legally Ridiculous—and Dangerous*, N.Y. Times (May 20, 2019).[23]

## ARGUMENT

The FOIA was enacted "to facilitate public access to Government documents" and "was designed to pierce the veil of administrative secrecy and to open agency action to the light of

---

[20] https://www.congress.gov/bill/116th-congress/house-concurrent-resolution/24/text.

[21] https://www.nytimes.com/2019/03/14/us/politics/mueller-report-public.html.

[22] https://www.leahy.senate.gov/press/20190328muellerrelease.

[23] https://www.nytimes.com/2019/05/20/opinion/trump-mueller-report.html.

public scrutiny." *Citizens for Responsibility & Ethics in Wash. v. DOJ*, 746 F.3d 1082, 1088

(D.C. Cir. 2014) [hereinafter *CREW I*] (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).

The purpose of the FOIA is "to ensure an informed citizenry, vital to the functioning of a

democratic society, needed to check against corruption and to hold the governors accountable to

the governed." *EPIC v. DHS*, 999 F. Supp. 2d 24, 29 (D.D.C. 2013) (quoting *John Doe Agency

v. John Doe Corp.*, 493 U.S. 146, 152 (1989)). As the has Supreme Court explained in *Milner v.

Department of the Navy*, 562 U.S. 562 (2011), "We have often noted 'the Act's goal of broad

disclosure' and insisted that the exemptions be 'given a narrow compass.'" *Id*. at 571 (quoting

*DOJ v. Tax Analysts*, 492 U.S. 136, 151 (1989)). As a result, the FOIA "mandates a strong

presumption in favor of disclosure." *Citizens for Responsibility & Ethics in Wash. v. DOJ*, 854

F.3d 675, 681 (D.C. Cir. 2017) [hereinafter *CREW II*]; *EPIC v. DOJ*, 511 F. Supp. 2d 56, 64

(D.D.C. 2007) (internal citations omitted).

The FOIA specifies that certain categories of information may be exempt from

disclosure, "[b]ut these limited exemptions do not obscure the basic policy that disclosure, not

secrecy, is the dominant objective of the Act." *ACLU*, 655 F.3d at 5 (quoting *Nat'l Ass'n of

Home Builders v. Norton,* 309 F.3d 26, 32 (D.C. Cir. 2002)). Therefore, FOIA exemptions "must

be narrowly construed." *Id*. Even where an exemption claim may be properly asserted, the

agency must also segregate that information that can be released. 5 U.S.C. § 552(a)(8)(A)(ii)(II).

Furthermore, "the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B); *see

also Rogers v. Exec. Office for U.S. Att'ys*, No. 18-454-RBW, 2019 WL 1538252, at *4 (Apr. 9,

2019); *EPIC v. DHS*, 384 F. Supp. 2d 100, 106 (D.D.C. 2005). Where the government has not

carried this burden, summary judgment in favor of the Plaintiff is appropriate. *See, e.g.*, *CREW I*,

746 F.3d at 1082 (reversing district court award of summary judgment to the government due to

the DOJ failure to justify categorical withholding under Exemption 7(A), among other

exemptions); *Dugan v. DOJ*, 82 F. Supp. 3d 485 (D.D.C. 2015) (denying summary judgment to

the ATF for its 7(A) claim).

## I.     STANDARD OF REVIEW

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact is one that would change the outcome of the litigation." *EPIC v. DHS*, 999 F. Supp. 2d at 28 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). FOIA cases are typically decided on motions for summary judgment. *New Orleans Workers' Ctr. for Racial Justice v. ICE*, 373 F. Supp. 3d 16, 30 (D.D.C. 2019).

A district court reviewing a motion for summary judgment in a FOIA case conducts a de novo review of the record. 5 U.S.C. § 552(a)(4)(B); *CREW I*, 746 F.3d at 1088 (citing *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989)). "In the FOIA context, *de novo* review requires the court to 'ascertain whether the agency has sustained its burden of demonstrating that the documents requested are not "agency records" or are exempt from disclosure under the FOIA.'" *Assassination Archives & Research Ctr. v. CIA,* 334 F.3d 55, 57 (D.C. Cir. 2003) (quoting *Summers v. DOJ,* 140 F.3d 1077, 1080 (D.C. Cir. 1998)). The Court will grant summary judgment to the government in a FOIA case only if the agency can prove "that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *Rogers*, No. 18-454-RBW, 2019 WL 1538252, at *4 (Apr 9., 2019) (quoting *Friends of Blackwater v. U.S. Dep't of Interior,* 391 F. Supp. 2d 115, 119 (D.D.C. 2005)).

## II.    THE DOJ HAS NOT MET ITS BURDEN OF DEMONSTRATING THAT THE REDACTED PORTIONS OF THE MUELLER REPORT ARE EXEMPT FROM DISCLOSURE

Again, the "agency bears the burden of establishing that an exemption applies." *PETA v. NIH*, 745 F.3d 535, 540 (D.C. Cir. 2014). The agency may carry its burden by submitting affidavits or declarations if they describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor evidence of agency bad faith." *Reporters Comm. for Freedom of the Press v. FBI*, 369 F. Supp. 3d 212, 219

(D.D.C. 2019) (quoting *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C. Cir. 1981)).

Agencies may also submit a Vaughn index describing its justifications and "there is no set

formula for a *Vaughn* index; so long as the agency provides the Court with materials providing a

'reasonable basis to evaluate the claim of privilege[.]'" *Gallant v. NLRB,* 26 F.3d 168, 173 (D.C.

Cir. 1994). It is not sufficient for the agency to provide "vague, conclusory affidavits, or those

that merely paraphrase the words of a statute." *Church of Scientology of Cal., Inc. v. Turner*, 662

F.2d 784, 787 (D.C. Cir. 1980) (per curiam).

      The agency's argument relies upon the representations contained within the Brinkman

declaration; however, the declaration fails to tether the exemptions claimed to the specific text in

the document. Accordingly, the DOJ has violated the requirement under the FOIA to substantiate

its withholdings with "specific detail." *DiBacco v. Dep't of the Army*, No. 17-5048, 2019 WL

2479443, at *4 (D.C. Cir. June 14, 2019) (quoting *DiBacco v. U.S. Army*, 795 F.3d 178, 196

(D.C. Cir. 2015)).

## III.    EPIC IS ENTITLED TO PARTIAL SUMMARY JUDGMENT

      EPIC is entitled to summary judgment with respect to the Mueller Report because the

agency has unlawfully withheld material that does not fall within any of the FOIA's narrow

exemptions. First, the DOJ has failed to demonstrate that material withheld under Exemption

7(A) could be expected to interfere with law enforcement proceedings. Second, the agency has

improperly withheld information about the "investigative focus and scope" and the "fruits of

investigatory operations" that is not properly subject to Exemption 7(E). Third, the agency has

failed to meet its lofty burden under Exemption 7(B) to show that disclosure of information

concerning Roger Stone would deprive Mr. Stone of a fair trial. Fourth, the agency has

improperly withheld information concerning the President's family members, close associates,

and other public figures under Exemptions 6 and 7(C). Fifth, the agency has erroneously

withheld portions of the final, postdecisional Mueller Report under the deliberative process

privilege and Exemption 5. And finally, the agency has failed to show that any particular passage

redacted under Exemption 3 and Federal Rule of Criminal Procedure 6(e) would reveal a protected aspect of the grand jury process. EPIC is therefore entitled to summary judgment and disclosure of the withheld portions of the Mueller Report.

### A. The DOJ has not met its burden to withhold material pursuant to Exemption 7(A).

Exemption 7(A) allows for the withholding of records "compiled for law enforcement purposes," if disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Exemption 7(A) "does not authorize automatic or wholesale withholding of records or information simply because the material is related to an enforcement proceeding." *Kidder v. FBI*, 517 F. Supp. 2d 17, 28 (D.D.C. 2007) (quoting *North v. Walsh*, 881 F.2d 1088, 1097 (D.C. Cir. 1989)); *accord Dugan v. DOJ*, 82 F. Supp. 3d 485, 500 (D.D.C. 2016). In order to prevail on an Exemption 7(A) claim at summary judgment, an agency "must show, by more than [a] conclusory statement, how the particular kinds of investigatory records requested would interfere with a pending enforcement proceeding." *North*, 881 F.2d at 1097 (quoting *Campbell v. HHS*, 682 F.2d 256, 259 (D.C. Cir. 1982)).

Categorical withholding is permitted in some cases under Exemption 7(A), and an agency in such a case may satisfy its burden of proof "by grouping documents in categories and offering generic reasons for withholding the documents in each category." *CREW*, 746 F.3d at 1098 (quoting *Maydak v. DOJ*, 218 F.3d 760, 765 (D.C. Cir. 2000)). However, an agency that choses this approach

> has a three-fold task. First, it must define its categories functionally. Second, it must conduct a document-by-document review in order to assign documents to the proper category. Finally, it must explain to the court how the release of each category would interfere with enforcement proceedings.

*Id*. (quoting *Bevis v. Dep't of State*, 801 F.2d 1386, 1389–90 (D.C. Cir. 1986)). The burden is on the agency making a categorical Exemption 7(A) claim to define the "particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records" that it is withholding. *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 789 F.2d 64, 67 (D.C. Cir.

1986) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 235 (1978)). The agency's "definitions of the relevant categories of documents must be sufficiently distinct to allow a court to grasp 'how each . . . category of documents, if disclosed, would interfere with the investigation.'" *Id.* (quoting *Campbell*, 682 F.2d at 265). The "hallmark of an acceptable Robbins category is thus that it is functional; it allows the court to trace a rational link between the nature of the document and the alleged likely interference." *Id*.

The DOJ has failed to demonstrate that the redacted portions of the Mueller Report are exempt under 7(A). First, the agency has not described either the enforcement proceedings at issue or the functional categories of information withheld with any specificity. The DOJ merely asserts that "information withheld in the Report pursuant to 7(A) pertains to a number of pending law enforcement prosecutions and investigations." Brinkmann Decl. ¶ 43. While it is certainly necessary for an agency to identify the "pending or prospective enforcement proceeding" to which a record relates, that is not sufficient to establish a categorical withholding under Exemption 7(A). The agency has identified five different prosecutions that DOJ is currently pursuing as a result of the Special Counsel's investigation but has not provided a *Vaughn* index or otherwise specified which redactions relate to each prosecution. Brinkmann Decl. ¶ 44. The agency must "establish a direct relationship between the agency records and the pending investigation to evidence the possible interference." *Kay v. FCC*, 976 F. Supp. 23, 38 (D.D.C. 1997), *aff'd*, 172 F.3d 919 (D.C. Cir. 1998). The agency simply cannot meet that burden based on a conclusory assertion and the declaration it has produced. *See Putnam v. DOJ*, 873 F. Supp. 705, 714 (D.D.C. 1995) (denying the DOJ's motion for summary judgment on an Exemption 7(A) claim where the agency's descriptions were "patently inadequate to permit the court to determine whether Exemption 7(A) was properly invoked").

Second, the agency has failed to demonstrate *how* disclosure of the redacted portions of the Mueller Report would actually interfere with the five listed prosecutions or with any prospective enforcement proceedings. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1114 (D.C. Cir. 2007). The Mueller Report is not a traditional investigatory record. The Report was

drafted specifically in response to a special investigation triggered by foreign interference in a presidential election and attempts by the President and his associates to obstruct that investigation. Public release of the Report is therefore essential to ensuring the protection of our democratic system and upholding the rule of law. The agency's conclusory assertions regarding the status of the prosecutions and investigations arising from the Special Counsel investigation are woefully inadequate to justify withholding a substantial portion of the Mueller Report. The two paragraphs in the agency declaration that discuss "pending prosecutions" do not explain how the specific types of information withheld would interfere with the different types of criminal prosecutions that the Government is pursuing. Brinkmann Decl. ¶¶ 45–46. This lack of detail is problematic because the Mueller Report is clearly different than the typical investigative records at issue in an Exemption 7(A) case.

Most Exemption 7(A) cases concern the types of records normally found in an investigative file: witness statements, summaries of communications, indexes of evidentiary material, transcripts of interviews, or other direct evidence. *See, e.g., Kidder*, 517 F. Supp. 2d at 28–30. In cases concerning criminal prosecutions or investigations, the categories of records might include FBI interview summaries (FD–302s), *see, e.g., CREW I*, 746 F.3d at 1089–90; FBI rap sheets, *see, e.g., Reporters Committee*, 489 U.S. 749; or copies of evidence and derivative communications incorporating evidence, *see, e.g.*, *Kidder*, 517 F. Supp. 2d at 28.

The consequences of disclosure of each of these categories of investigatory records are different depending on the nature and stage of the enforcement proceeding at issue. That is why it is not sufficient for an agency to merely assert that disclosure will harm law enforcement proceedings; the agency must demonstrate how each category of documents would interfere with the specific type of enforcement proceeding at issue. *CREW I*, 746 F.3d at 1098. That is also why the types of records withheld under Exemption 7(A) are different in civil enforcement proceedings as compared to criminal enforcement proceedings and why the records exempt due to an ongoing investigation are different than the records exempt due to a pending criminal prosecution.

Most of the cases that the DOJ relies upon—and the risks of interference identified in those decision—are not on point because those cases concerned different types of records and civil (rather than criminal) enforcement proceedings. In *Robbins*, 437 U.S. 214, the Supreme Court considered whether the recently-amended Exemption 7 required the National Labor Relations Board ("NLRB") "to disclose, prior to its hearing on an unfair labor practice complaint, statements of witnesses whom the Board intends to call at the hearing." *Id*. at 216. The Court ultimately determined that, while "reasonable arguments can be made on both sides," the statements of witnesses in "pending unfair labor practice proceedings are exempt from FOIA disclosure at least until completion of the Board's hearing." *Id*. at 236. This decision is notable both because of its limited scope and its *sui generis* character. The Court limited its holding to the pre-hearing release of witness statements in an NLRB enforcement proceeding because of specific legislative history concerning release of NLRB investigatory records and because of the unique risk of witness intimidation in the employer-employee context. These temporal and subject-matter limitations are key to the understanding of the scope and application of Exemption 7(A).

Similarly, in *Alyeska Pipeline Services Company v. EPA*, 856 F.2d 309 (D.C. Cir. 1988), a company sought disclosure of evidence gathered by the Environmental Protection Agency ("EPA") during the course of an ongoing "investigation into possible violations of a number of environmental laws." *Id.* at 311. The court found that the EPA met its burden under Exemption 7(A) because it demonstrated that "the mere identification of the specific records submitted would reveal the scope and direction of the investigation to the requester. . . . [B]ecause the materials handed over to EPA were selectively chosen, identification of the documents would expose the particular types of allegedly illegal activities being investigated." *Id.* at 312. The court's decision in *Alyeska Pipeline* was thus limited to the issue of disclosure of evidence during the course of an ongoing investigation into violations of environmental law.

The DOJ also cites *Kay*, 976 F. Supp. 23, which concerned a request for disclosure of "interviews, statements, declarations and/or depositions of numerous individuals concerning

plaintiff's radio operations" while the plaintiff was "under investigation by the FCC to determine whether his radio license should be revoked." *Id*. at 30–31. Like the other cases cited by DOJ, the enforcement proceeding at issue in *Kay* was a civil regulatory action and not a criminal prosecution arising from a special counsel's investigation. The risks associated with disclosure of a regulatory agency's investigative files prior to the conclusion of a civil enforcement action are inherently different than those associated with disclosure of a report summarizing findings underlying a criminal prosecution.

Like in *CREW I*, 746 F.3d 1082, and *North*, 881 F.2d 1088, two FOIA cases that similarly involved the records from a special counsel investigation—Special Counsel Fitzgerald's investigation of the Valarie Plame Wilson matter in *CREW I* and Independent Counsel Walsh's investigation of the Iran/Contra Affair *North*—the Government has not demonstrated how disclosure of the material that EPIC has requested could harm pending or prospective criminal law enforcement proceedings. Indeed, the agency's Exemption 7(A) claim is significantly weaker in this case than it was in *CREW I* and *North* because the Mueller Report itself is not the type of law enforcement record that courts have traditionally recognized as posing a risk to an enforcement proceeding if disclosed.

In *North*, three individuals charged with crimes arising out of the Iran/Contra Affair by Independent Counsel Walsh sought the release of documents from the Office of Independent Counsel ("OIC") that they had been unable to obtain through discovery in their criminal cases. *North*, 881 F.2d at 1091–92. The Government argued that "a criminal defendant may not use FOIA to obtain documents unavailable to him through criminal discovery," but the court rejected that argument. *Id*. at 1099. As then-Circuit Judge Ruth Bader Ginsburg explained, the judge in the underlying criminal cases "retains full control over the evidence admitted or lines of inquiry pursued in the criminal case. If any evidence or question is irrelevant to the trial, the court can simply keep it out." *Id*. at 1100. "The fact that a defendant in an ongoing criminal proceeding may obtain documents via FOIA that he could not procure through discovery, or at least before

19

he could obtain them through discovery, does not in and of itself constitute interference with a law enforcement proceeding." *North*, 881 F.2d at 1097.

The broad pleading and discovery obligations imposed on the Government in every criminal prosecution, Fed. R. Crim. P. 16, also cut against the theory of interference typically presented by an agency in an Exemption 7(A) case concerning a civil enforcement action. Unlike in a civil enforcement action, *e.g., Robbins*, 437 U.S. 214, the defendants in a criminal case have broad access to evidence and other investigatory materials through discovery and mandatory disclosures. It is therefore quite unlikely that disclosure of records under the FOIA could interfere with a criminal prosecution. In *North*, for example, the criminal defendants were able to glean plenty of information about the "scope, limits, and direction" of the Government's prosecution through the indictment and the subsequent pre-trial discovery. *See North*, 881 F.2d at 1092 n.6 ("Judge Gesell ordered the OIC to provide the defendants with all communications from the OIC to Congress relating to immunity, copies of judicial orders granting immunity to witnesses, copies of grand jury instructions concerning exposure to immunized testimony, redacted press clippings used by the OIC, and redacted portions of congressional testimony that had been seen by OIC staff members.").

The DOJ's stated concern about revealing information about the ongoing prosecutions is too generic to satisfy the burden under Exemption 7(A). Each of the cases referred to in the agency declaration is distinct, and any information related to those prosecutions would need to be analyzed separately to determine whether it could be subject to Exemption 7(A).

    **B.**    **The DOJ has improperly withheld information about "investigative focus and scope" and the "fruits of investigatory operations" that is not properly subject to Exemption 7(E).**

Exemption 7(E) protects from disclosure records that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). And while the statute does not

impose a "highly specific burden of showing how the law will be circumvented," the agency

cannot rely on "vaguely worded categorical description[s]." *New Orleans*, 373 F. Supp. 3d at 64–

65. As this Court recently explained:

> Although the standard for making this showing "is a fairly low hurdle in this
> Circuit, [ ] it is not a toothless [one]," and "the [g]overnment cannot simply cite
> Exemption 7(E) and expect the court to rubber stamp its withholdings." *Long II*,
> 279 F. Supp. 3d at 234; *Campbell*, 164 F.3d at 32 (a court's review of an agency's
> withholding under Exemption 7(E) is not "vacuous"). Rather, "[c]ourts have a
> responsibility to ensure that an agency is not simply manufacturing an artificial risk
> and that the agency's proffered risk assessment is rooted in facts." *Long v. ICE*, 149
> F. Supp. 3d 39, 53 (D.D.C. 2015) (Long I). "At a minimum, the [g]overnment must
> show that its stated expectation of risk is reasonable." *Long II*, 279 F. Supp. 3d at
> 234. And, "[a]n affidavit that contains merely a categorical description of redacted
> material coupled with categorical indication of anticipated consequences of
> disclosure is clearly inadequate." *Campbell*, 164 F.3d at 30 (internal citation and
> quotation marks omitted).

*Id.* at 66. But clearing the "low hurdle" of risk of circumvention of the law alone is not sufficient

for an agency to meet its burden under Exemption 7(E); the agency must first show that

production of the records at issue would *disclose techniques and procedures* for law enforcement

investigations. *EPIC v. CBP*, 160 F. Supp. 3d 354, 359 (D.D.C. 2016). A "near-verbatim

recitation of the statutory standard is inadequate." *CREW*, 746 F.3d at 1102 (D.C. Cir. 2014).

The DOJ attempts to rely in this case on the same sort of vague, categorical descriptions

of redacted material that this Court has repeatedly rejected. The declaration contains two scant

paragraphs discussing the agency withholdings labeled as (b)(7)(E)-2 that repeatedly use the

terms "techniques," "procedures," and "information" without ever explaining how release of the

redacted material would disclose specific techniques or procedures. Brinkmann Decl. ¶¶ 87–88.

The explanations offered by the DOJ do not logically or plausibly establish that techniques and

procedures would be disclosed by release of the redacted material. For example, just because a

document discusses "how, when, where, and why specific investigative techniques and

procedures were utilized" does not mean that release of the document would disclose the

underlying techniques or procedures themselves. Brinkmann Decl. ¶ 87.

Here, the DOJ has not only failed to provide adequate detail to enable the Court to evaluate its Exemption 7(E) claim; the agency has also misconstrued the scope of the exemption. The purpose of Exemption 7(E) is not to limit disclosure of records that might "reveal investigative focus and scope" or the "fruits of investigative operations." Def.'s Mem. 29. None of those terms appear in the statute, and none of them fit within the definitions of "techniques" or "procedures." In fact, the agency could only cite to one case concerning Exemption 7(E) that mentioned the phrase "investigative focus," and that case did so only in passing. The court in *Poitras v. DHS*, 303 F. Supp. 3d 136 (D.D.C. 2018), did not analyze in detail whether a law enforcement agency's "investigative focus" is a technique or procedure or cite to any authority for the withholding of information about "investigative focus" under Exemption 7(E). But it is clear that the focus of a particular investigation is not a "technique," nor is it a "procedure." The material marked by the DOJ as (b)(7)(E)-2 is far outside the scope of Exemption 7(E). Moreover, the fact that the agency always asserts that exemption in *conjunction* with (b)(7)(A) raises suspicion. Brinkmann Decl. Ex. D, 1 Mueller, *supra*, at 16–19, 30–31, 36–38, 50–51, 142, ECF No. 54-5 [hereinafter *Redacted Report Vol. I*]. The agency's aim is to get two bites at the apple for its Exemption 7(A) claims, which will otherwise expire in turn as each prosecution reaches its final stage. *CREW I*, 746 F.3d at 1099 (noting that Exemption 7(A) material can only be withheld if the underlying law enforcement proceeding is "pending at the time of [the court's] decision").

## C.     The DOJ has improperly withheld information about Roger Stone and his associates.

The DOJ's assertion of Exemption 7(B) to withhold information concerning Roger Stone is speculative, conclusory, and—as a result—unlawful. The Court should reject it. As the D.C. Circuit has explained, "Exemption 7(B) requires a showing '(1) that a trial or adjudication is pending or truly imminent; and (2) that it is more probable than not that disclosure of the material sought would seriously interfere with the fairness of those proceedings.'" *Chiquita Brands Int'l Inc. v. SEC*, 805 F.3d 289, 294 (D.C. Cir. 2015) (quoting *Washington Post Co. v.*

*DOJ*, 863 F.2d 96, 102 (D.C. Cir. 1988)). This is a high bar. On the rare occasions that Exemption 7(B) has been litigated, courts have consistently rejected its use. *See, e.g.*, *Chiquita Brands*, 805 F.3d at 296 ("[T]he Commission reasonably applied Exemption 7(B) and concluded that disclosure of the records ... will not 'seriously interfere with the fairness' of the Florida proceedings."); *Chiquita Brands Int'l, Inc. v. SEC*, 10 F. Supp. 3d 1, 6 (D.D.C. 2013) ("[T]he SEC rationally determined that there is no evidence in the record demonstrating a likelihood of harm sufficient to invoke Exemption 7(B)."); *Dow Jones Co. v. FERC*, 219 F.R.D. 167, 175 (C.D. Cal. 2003) ("[T]he Court finds that defendant has failed to meet its burden under Exemption 7(B)."); *Alexander & Alexander Servs., Inc. v. SEC*, No. CIV. A. 92-1112-JHG, 1993 WL 439799, at *11 (D.D.C. Oct. 19, 1993) ("Alexander has failed to meet its burden of showing how release of particular documents would deprive it of the right to a fair trial."); *Wayland v. NLRB*, 627 F. Supp. 1473, 1478 (M.D. Tenn. 1986) ("[T]he Court concludes that defendants have not shown that disclosure of the mailgram would deprive an individual of a fair trial or impartial adjudication.").

For the same reasons, the DOJ's assertion of Exemption 7(B) also fails. In support of its withholdings under 7(B), the agency theorizes that the disclosure of information concerning Roger Stone "*could* influence potential jurors" and "*could* seriously interfere with the fairness of his impending jury trial." Def.'s Mem. 25–26 (emphases added). But this mere "speculation about potential publicity and its effect on a future jury . . . does not satisfy the level of certainty required by FOIA Exemption 7(B)." *Chiquita Brands*, 10 F. Supp. 3d at 5. As the district court explained in *Chiquita Brands*:

> The relevant test is not whether pretrial publicity "could" impact fairness or impartiality. . . . Exemption 7(B) expressly requires that disclosure "would" compromise the fairness of a proceeding. Id. With respect to the Florida Litigation, there is no certainty about the degree of publicity that may result from disclosure. Furthermore, as the Supreme Court has held, "'pretrial publicity—even persuasive, adverse publicity—does not inevitably lead to an unfair trial.'" *Skilling v. United States*, 561 U.S. 358, 130 (2010) (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976)). Here, Chiquita has failed to show why common judicial safeguards such as voir dire would be insufficient to ensure fairness where there is a "large, diverse pool of potential jurors." Id. at 2915.

*Chiquita Brands*, 10 F. Supp. 3d at 5. So too here. The DOJ has failed to demonstrate (1) that any of the information redacted under 7(B) would meaningfully increase the voluminous publicity that Roger Stone's case is already receiving; (2) that this new publicity, if any, would be adverse; (3) that such publicity, if adverse, would influence potential jurors; and (4) that this influence, if any, could not be cured through voir dire or other common judicial safeguards. Nor does the DOJ explain how the redacted passages materially differ from the extensive information already released in Mr. Stone's indictment—and by Mr. Stone himself—such that disclosure would perceptibly alter the public's view of Mr. Stone or the charges against him. In sum, the agency's conclusory assertion that 7(B) applies falls far short of what the exemption requires.

The DOJ's attempt to prop up its 7(B) claim with a court order also fails. By its very terms, the order cited by the agency only prohibits "[c]ounsel for the parties and the witnesses [from] making statements to the media or in public settings that pose a substantial likelihood of material prejudice to [Mr. Stone's] case." Order at 3, *United States v. Stone*, 19-18 (D.D.C. Feb. 15, 2019), ECF No. 36. But counsel in the *Stone* case are not involved in this FOIA matter; disclosing records already in the agency's possession does not constitute "making [a] statement[]"; and the agency has not shown that release of the redacted material would cause material prejudice to Mr. Stone's case. *Id.* Thus, even if the court's order binding the parties in *Stone* could influence the outcome of this separate FOIA case, the order is irrelevant.

Finally, the agency asserts that Exemption 7(B) applies because information concerning Roger Stone is "governed" by Local Criminal Rule 57.7 and because disclosure would "run[] afoul" of the "spirit" of the order in the Stone case. Def.'s Mem. 25–26; see also Brinkmann Decl. ¶ 54. But Exemption 7(B) does not carve out such exceptions to the FOIA's disclosure mandate. Again, the only circumstance in which 7(B) permits withholding is when disclosure "would deprive a person of a right to a fair trial." 5 U.S.C. § 552(b)(7)(B). Neither local rules nor the DOJ's subjective view of the "spirit" of a court order can broaden the narrow exemption that Congress has drawn under 7(B). Accordingly, the Court should reject the agency's reliance on Exemption 7(B).

**D.    The DOJ has improperly withheld information about the President's family members, close associates, and other public figures under Exemptions 6 and 7(C).**

The DOJ has invoked Exemption 6 and 7(C) in combination to withhold substantial portions of the Mueller Report. Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) is a law enforcement counterpart to Exemption 6 that applies when "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "When examining an assertion of Exemption 7(C), a court must 'balance the [ ] privacy interest against the public interest in disclosure,'" but courts must at all times "bear in mind that FOIA mandates a strong presumption in favor of disclosure, and that the statutory exemptions, which are exclusive, are to be narrowly construed." *CREW II*, 854 F.3d 675 (D.C. Cir. 2017) (quoting *CREW I*, 746 F.3d at 1091; *ACLU v. DOJ*, 655 F.3d 1, 5 (D.C. Cir. 2011)). Where the records at issue were compiled for law enforcement purposes, court need only address Exemption 7(C) because "there is no need to consider the higher bar of Exemption 6." *New Orleans*, 373 F. Supp. 3d at 55.

The agency bears the burden under Exemptions 7(C) and 6 of (1) identifying and determining whether there is a privacy interest in the information; (2) evaluating the public interest in disclosing the information; and (3) balancing the privacy interest with the public interest. *See Ripskis v. HUD*, 746 F.2d 1, 2 (D.C. Cir. 1984); *Reporters Comm. for Freedom of Press*, 489 U.S. at 762. "Because the myriad of considerations involved in the Exemption 7(C) balance defy rigid compartmentalization, per se rules of nondisclosure based upon the type of document requested, the type of individual involved, or the type of activity inquired into, are generally disfavored." *CREW II*, 854 F.3d at 682–83 (quoting *Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir. 1984)). As such, Exemption 7(C) claims are "simply not well-suited to categorical determinations." *Id.* at 683. For these reasons, the D.C. Circuit reversed a grant of summary

judgment on 7(C) and held in *CREW II* that "[w]ith respect to those individuals with diminished privacy interests, the withholding of information pursuant to Exemptions 6 and 7(C) must be subjected to a particularized weighing of the public and privacy interests." *Id.*

But the DOJ has provided nothing more than broad categorical claims, even in the face of the numerous public figures implicated in this investigation, including the President, the President's associates, members of the President's family (including those who serve in the administration), current and former members of the administration, and other public officials. Without balancing, or even addressing, the competing public and privacy interests in the disclosure of information about these public figures, the agency cannot carry that burden in this case.

The DOJ has asserted that its withholdings pursuant to Exemptions 6 and 7(C) in the redacted Muller Report fall into four categories. Brinkmann Decl. ¶ 62. The DOJ's first category includes the "[n]ames, social media account information, and other contact information of unwitting third parties" (coded as (b)(6)/(7)(C)-1). Brinkmann Decl. ¶ 63. The DOJ's second category as includes "[n]ames and personally-identifiable information about individuals not charged by the SCO" (coded as (b)(6)/(7)(C)-2). Brinkmann Decl. ¶ 68. The DOJ's third category includes "non-public information pertaining to Roger Stone and/or his pending criminal case in the United States District Court for the District of Columbia." (coded as (b)(6)/(7)(C)-3). Brinkmann Decl. ¶ 72. This category covers both "information pertaining to Mr. Stone" and information pertaining to "other individuals discussed in connection" with Stone's criminal case. *Id.* The DOJ's fourth category includes the "[n]ames, social media account information, contact information, and other personally-identifiable information of individuals merely mentioned in the Report" (coded as (b)(6)/(7)(C)-4). Brinkmann Decl. ¶ 76.

EPIC does not challenge the withholdings of personal information of unwitting third parties in the Report (category 1), as the required balancing analysis weighs against disclosure for such individuals. But the DOJ has not adequately justified its withholdings of information marked under the other three categories (categories 2, 3, and 4). The agency has failed to

describe these withholdings in detail and has failed to justify the withholding of information about public figures, including the President's family, associates, and government officials. Some of the DOJ's redactions in these categories also concern public figures who have actively solicited publicity and media attention for their connection with the administration. Notably, Mr. Stone had to be ordered by the judge in his own criminal case not to make public statements or pursue further publicity about himself. *See* Order, *United States v. Stone*, No. 19-18.

The categorical rule under Exemption 7(C) does not apply to public figures or to individuals who have been "charged, convicted, or otherwise implicated in connection with [a] public corruption investigation." *CREW II*, 854 F.3d at 681; *accord Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995). Each of the public figures and individuals who has been implicated in the Mueller Report, in related investigations into Russian interference in the 2016 presidential election, and in efforts to obstruct those investigations has "a diminished privacy interest" in information contained in the Report. *CREW II*, 854 F.3d at 682. These diminished privacy interests, coupled with the overwhelming public interest in release of the full Report, weigh in favor of the disclosure of the redacted information. Even for private persons, the FOIA does not permit an agency to withhold all material in an investigatory record "solely on the grounds that the record includes some information which identifies a private citizen." *Nation Magazine*, 71 F.3d at 896. Such a "blanket exemption would reach far more broadly than is necessary to protect the identities of individuals mentioned in law enforcement files, [where] it would be contrary to FOIA's overall purpose of disclosure, and thus is not a permissible reading of Exemption 7(C)." *Id.*

The DOJ has not described the withholdings or the privacy interests of the different individuals discussed in the Mueller Report in sufficient detail to carry its burden under Exemption 6 or 7(C). In *100Reporters LLC v. DOJ*, the court noted that the evidence presented in support of its assertion of Exemption 7(C) "is relatively sparse, and DOJ does little to differentiate the privacy interests of different individuals, or even different groups." 248 F. Supp. 3d 115, 163 (D.D.C. 2017) (finding that the agency did not properly justify its withholdings

under Exemptions 6 and 7(C)). Like the DOJ in *100Reporters LLC*, the agency here does not
differentiate the privacy interests of different individuals or the public interest in disclosure.
Instead, the agency's affidavit broadly applies the same justifications to all individuals regardless
of whether they are public figures or incidental private persons; whether they are relatives of the
President or individuals unknown to the public; and whether they are individuals actively
seeking public attention or individuals unwittingly drawn into the investigation. Without
assessing the competing privacy and public disclosure claims *as to particular individuals*, the
agency cannot conduct the balancing test required. Thus, the agency has failed to properly justify
its withholdings under Exemption 7(C).

The Special Counsel's two-year investigation led to several criminal indictments and
revelations about contacts between individuals associated with the president and Russia. Some of
these individuals include prominent public figures that have released information about
themselves in connection to the Special Counsel's investigation. The President's son, Donald
Trump Jr., is a public figure who has been implicated in the Special Counsel's investigation in
numerous ways. Trump Jr. has testified before the Senate Intelligence Committee twice and
before the Senate Judiciary about the Moscow Trump Tower meeting. Makini Brice & Mark
Hosenball, *Trump Jr. Says 'Nothing to Correct' After Closed Interview with Senate Committee*,
Reuters (June 12, 2019).[24] Trump Jr. has affirmatively waived the privacy of his correspondence
related to the 2016 June Trump Tower meeting by publishing his email chain with publicist Rob
Goldstone. Donald Trump Jr. (@DonaldJTrumpJr), Twitter (July 11, 2017).[25] Mr. Trump also
published private direct message correspondences with WikiLeaks where WikiLeaks offered him
a password to an anti-Trump website that was "about to launch." Donald Trump Jr.
(@DonaldJTrumpJr), Twitter (Nov. 13, 2017).[26] These messages are directly related to the

---

[24] https://www.reuters.com/article/us-usa-trump-congress-son/trump-jr-says-nothing-to-correct-after-closed-interview-with-senate-committee-idUSKCN1TD1U6.

[25] https://twitter.com/donaldjtrumpjr/status/884789418455953413?lang=en.

[26] https://twitter.com/donaldjtrumpjr/status/930228239494209536?lang=en.

potential violations of the Computer Fraud and Abuse Act discussed in the heavily redacted

pages 179 and 180 of the Mueller Report. *Redacted Report Vol. I* at 179–80.

Roger Stone and his associates have also publicly disclosed information related to Mr.

Stone's indictment. Recently, prosecutors alleged that Stone repeatedly violated a gag order by

continuing to post on social media about the Special Counsel investigation and his case. Spencer

S. Hsu & Manuel Roig-Franzia, *Prosecutors Say New Roger Stone Instagram Posts Violate Gag

Order, Ask Judge to Hold Hearing to Consider Jailing Him*, Wash. Post (June 20, 2019).[27] One

of Stone's most notable associates, Jerome Corsi, has publicly spoken about his relationship with

Roger Stone and confirmed to multiple media outlets that he is "Person 1" in Stone's indictment.

Nathan Layne, *Corsi, 'Person 1' in Roger Stone Indictment, Says He's Done Nothing Wrong*,

Reuters (Jan. 25, 2019).[28] Mr. Corsi even released drafts of his plea agreement and indictment

after refusing to sign a plea deal with the Special Counsel's office. Anna Schecter, *Mueller Has

Emails from Stone Pal Corsi About WikiLeaks Dem Email Dum*p, NBC News (Nov. 27, 2018)

(publishing both the draft plea agreement and statement of offense).[29]

While public figures retain privacy interests, these individuals do in some circumstances

have "less privacy interest than others[.]" *Common Cause v. NARA*, 628 F.2d 179, 184 (D.C. Cir.

1980). The *Common Cause* court noted that certain "special circumstances"—including the fact

that the individuals at issue in the case were "candidates for federal office, not private

citizens"—supported the conclusion that those individuals "may have been 'public figures'" with

diminished privacy interests. Courts have recognized that an individual's status as a "public

figure" could in some cases "tip the 7(C) balance in favor of disclosure." *Fund for Constitutional

Gov't v. NARA*, 656 F.2d 856, 865 (D.C. Cir. 1981). That rule would apply in this case to the

---

[27] https://www.washingtonpost.com/local/legal-issues/prosecutors-say-new-roger-stone-instagram-posts-violate-gag-order-ask-judge-to-hold-hearing-to-consider-jailing-him/2019/06/20/8830e9a0-9398-11e9-b58a-a6a9afaa0e3e_story.html.

[28] https://www.reuters.com/article/us-usa-trump-russia-corsi/corsi-person-1-in-roger-stone-indictment-says-hes-done-nothing-wrong-idUSKCN1PJ28C.

[29] https://www.nbcnews.com/politics/justice-department/mueller-has-emails-stone-pal-corsi-about-wikileaks-dem-email-n940611.

public figures (including Donald Trump Jr., Jared Kushner, Michael Flynn, Roger Stone, and others) listed in Appendix B of the Report. *See* Brinkmann Decl. Ex. D, Mueller, *supra*, app. B at B-1–B-14, ECF No. 54-5.

Moreover, there has likely never been an Exemption 7(C) case where the public interest has weighed so heavily in favor of disclosure. The DOJ concedes that there is "intense public interest surround the [Special Counsel's] work[.]" Brinkmann Decl. ¶¶ 65, 73, 77. The D.C. Circuit has "repeatedly recognized a public interest in the manner in which the DOJ carries out substantive law enforcement policy" *CREW I*, 746 F.3d at 1093. According to this Court, "there is a cognizable public interest in knowing how a government agency goes about investigating high-ranking officials." *Judicial Watch, Inc. v. NARA*, 214 F. Supp. 3d 43, 61 (D.D.C. 2016), *aff'd*, 876 F.3d 346 (D.C. Cir. 2017). Disclosure of this information would reveal how the Special Counsel handled the investigation into Russian election interference and how the Special Counsel investigated President Trump, his family members, and his associates. Several expert commentators were surprised that the Special Counsel chose not to conduct interviews with members of the President's family. *E.g.*, Elie Mystal, *Robert Mueller Obstructed His Own Investigation As Much as Donald Trump*, The Nation (Apr. 18, 2019) ("Mueller subpoenaed no Trump family member—people who had knowledge of the Trump campaign's operations but could not hide behind sitting-president privilege.").[30] Others were surprised by the decision not to charge certain individuals. *E.g.*, Adam K. Raymond, N.Y. Mag., *Rick Hasen on Why Mueller Should Have Gone After Don Jr.* (Apr. 18, 2019).[31]

While this Court generally "afford[s] some deference" to law enforcement agencies claiming Exemption 7(C), the Court's review of such claims "is not vacuous." *New Orleans*, 373 F. Supp. 3d at 56. To defeat the privacy interest, the requester "must (1) 'show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and (2) 'show the information is likely to advance that interest.'"

---

[30] https://www.thenation.com/article/mueller-report-obstruction-trump/.

[31] http://nymag.com/intelligencer/2019/04/rick-hasen-mueller-don-jr.html.

*Judicial Watch, Inc.*, 214 F. Supp. 3d at 61 (quoting *Boyd v. Exec. Office for U.S. Att'ys*, 87 F. Supp. 3d 58, 73 (D.D.C. 2015)).

Here the agency has conceded the unique and broad public interest in the release of information related to the Special Counsel's investigation. The release of this information will allow the public to fully scrutinize the scope of Russian interference in the 2016 presidential election. The possibility that the Attorney General is shielding the names of the President's family members and other public figures, who may have played a role in the Russian interference, is of great concern. The DOJ is not permitted to withhold information concerning "illegal activity" by government officials under Exemption 7(C). *Nation Magazine*, 71 F.3d at 896. In such circumstances, the public interest in disclosure outweighs any privacy interests.

Further, a privacy presumption that personal information of individuals contained in law enforcement records are exempt under Exemption 7(C) "does not apply where an individual has voluntarily disclosed his involvement in the records at issue." *Showing Animals Respect & Kindness v. U.S. Dep't of Interior*, 730 F. Supp. 2d 180, 191 (D.D.C. 2010). Agencies cannot rely on Exemption 7(C) to withhold "information that has been 'officially acknowledged' or is in the 'public domain.'" *Davis v. DOJ,* 968 F.2d 1276, 1279 (D.C. Cir. 1992). Some of the redacted material in the Mueller Report is in fact within the public domain, and the DOJ cannot rely on Exemption 7(C) to withhold such information. For example, the title of a CNN news article on page 128 of Volume II footnote 888 is partially redacted to withhold the phrase "Roger Stone associate," but the news article is publicly available online. *See Redacted Report Vol. II* 128 n.888; Sara Murray & Eli Watkins, *Roger Stone Associate Says He Won't Agree to Plea Deal*, CNN (Nov. 26, 2018).[32] Within the same footnote, Jerome Corsi's name is unredacted. This exemplifies how DOJ's categorical reasoning leads to absurd results.

---

[32] https://www.cnn.com/2018/11/26/politics/jerome-corsi-plea-deal-robert-mueller/index.html.

**E.     The DOJ has improperly withheld information that is not predecisional or otherwise exempt from disclosure under Exemption 5.**

The DOJ, in seeking to withhold the Special Counsel's explanations for several charging decisions, fundamentally misunderstands the deliberative process privilege and the status of the Mueller Report. Accordingly, the agency's assertion of Exemption 5 fails in its entirety.

As the opening line of the Mueller Report explains, "This report is submitted to the Attorney General pursuant to 28 C.F.R. § 600.8(c)[.]" That regulation, in turn, states:

> **(c) Closing documentation.** At the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel.

*Id.* The meaning of this provision is clear: a report issued under section 600.8(c) is a *closing* document that explains decisions *already reached*. *Id.*; *accord* Brinkmann Decl. ¶ 12 ("The Special Counsel's Report to the Attorney General contains detailed explanations of the basis for the decisions made by the Special counsel to pursue indictments in some instances, and not to pursue charges in others."). As such, the Mueller Report is wholly ineligible for a privilege which "requires that materials be both predecisional *and* deliberative." *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 867 (D.C. Cir. 2010) (emphasis in original).

Time and again, courts have held that final documents and reports are categorically beyond the scope of the deliberative process privilege. As the Supreme Court has noted, "courts have uniformly drawn a distinction between predecisional communications, which are privileged; and communications made after the decision and designed to explain it, which are not." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151–52 (1975) (internal citations omitted); *see also Tax Analysts v. IRS*, 294 F.3d 71, 80 (D.C. Cir. 2002) ("[The deliberative process privilege] does not . . . apply to final statements of agency policy or to statements that explain actions that an agency has taken. In other words, it protects 'predecisional communications' reflecting an agency's internal deliberations, but not communications that explain a decision that has already been made."); *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) ("The deliberative process privilege does not shield documents that simply state or explain a decision

the government has already made[.]”); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1204 (D.C. Cir. 1991) (“[T]he rationale of the deliberative process privilege does not apply to an agency’s explanation of its final action[.]”); *Taxation With Representation Fund v. IRS,* 646 F.2d 666, 677 (D.C. Cir. 1981) (“Exemption 5 does not apply to . . . final opinions that have the force of law, or which explain actions that an agency has already taken.”); *Judicial Watch, Inc. v. DOD*, 245 F. Supp. 3d 19, 31 (D.D.C. 2017) (citing *Judicial Watch, Inc. v. DOD*, 365 F.3d 1108, 1113–14 (D.C. Cir. 2004)) (“Unlike the presidential communications privilege, which covers both final post-decisional and pre-decisional materials, the deliberative process privilege protects all executive branch officials but covers only pre-decisional materials.”), *aff’d*, 913 F.3d 1106 (D.C. Cir. 2019).

This baseline requirement—that records be predecisional to come within the deliberative process privilege—is dispositive in this case. “A document is ‘predecisional’ if it precedes, in temporal sequence, the ‘decision’ to which it relates.” *Abtew v. DHS*, 808 F.3d 895, 898–99 (D.C. Cir. 2015) (quoting *Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987)); *see also Coastal States Gas Corp. v. Dep’t of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (pre-decisional documents are “generated *before* the adoption of an agency policy”). The Mueller Report postdates, rather than precedes, the decisions to which it relates. Accordingly, it cannot be redacted under Exemption 5.

Undeterred, the DOJ attempts to circumvent the “predecisional” prong by muddying the relevant chronology. First, the agency argues that much of the withheld material qualifies for the deliberative process privilege because it “describes . . . prosecutorial decision-making processes that led to, and preceded, the Special Counsel’s charging decisions[.]” Def.’s Mem. 48, 51–52, ECF No. 54; *see also* Brinkmann Decl. ¶¶ 32, 35. But the agency appears confused about the record in dispute. It is the Special Counsel’s complete, *postdecisional* report that EPIC seeks in the instant briefing—not earlier records of the agency’s deliberations. The Mueller Report is not predecisional simply because it summarizes the basis of the conclusions regarding charging. 28 C.F.R. § 600.8(c). Under this view of (b)(5), the rationale and evidence supporting the

conclusions contained in all final reports of federal agencies could be withheld. Rather, the law is clear: information can no longer qualify for the deliberative process privilege once it is incorporated into a final agency document. *See Sears*, 421 U.S. at 161 ("[I]f an agency chooses expressly to . . . incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption other than Exemption 5."); *accord Abtew*, 808 F.3d at 898–99; *Afshar v. U.S. Dep't of State*, 702 F.2d 1125, 1139–40 (D.C. Cir. 1983). The cases cited by the DOJ, which pertain solely to records generated *before* a prosecution decision was made, are therefore inapposite. Def.'s Mem. 49–50.

Second, the agency insists that that the Special Counsel's accounting of his non-prosecution decisions is predecisional because the DOJ could theoretically bring the same charges at an unspecified point in the future. Def.'s Mem. 51; *see also* Brinkmann Decl. ¶ 36. But this fact is irrelevant. The Mueller Report is an explanation of "the prosecution [and] declination decisions reached *by the Special Counsel*." 28 C.F.R. § 600.8(c) (emphasis added). Even if another component of the DOJ were to revive certain charges at a later date, nothing can turn back time and change the Special Counsel's decision not to prosecute for his own part. *Cf. Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 745 F.3d 1219, 1222 (D.C. Cir. 2014) (quoting *Role Models Am., Inc. v. White*, 317 F.3d 327, 331 (D.C. Cir. 2003)) ("[F]inal agency action 'need not be the last administrative action contemplated by the statutory scheme.'"). The ink is already dry on the Special Counsel's prosecutorial decisions, all of which predate the completion of the Mueller Report.

Finally, the DOJ's various policy-based arguments do nothing salvage its assertion of Exemption 5. The agency protests that disclosure of the redacted material "would risk significant harm" to DOJ decisionmaking processes, Def.'s Mem. 47, and would "compromise[]" the DOJ's prosecutorial interests, Def.'s. Mem. 51. But the Supreme Court takes a different view, having concluded that the disclosure of final agency documents which "look[] back on and explain[] . . . a decision already reached . . . poses a negligible risk of denying to agency decisionmakers the

34

uninhibited advice which is so important to agency decision." *Sears*, 421 U.S. at 152 n.19. And even if the DOJ's policy arguments had merit, the FOIA only permits withholding under Exemption 5 and the deliberative process privilege if the material is both deliberative *and* predecisional—which the Mueller Report is not. Courts may not "second-guess that congressional judgment on a case-by-case basis," as the DOJ would have the Court do here. *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 464 (D.C. Cir. 2014) (quoting *McKinley v. Bd. of Governors of the Fed. Reserve System*, 647 F.3d 331, 339 (D.C. Cir. 2011)).

Because no part of the Mueller Report is a predecisional document, the agency's assertion of the deliberative process privilege must fail.

**F.      The DOJ has failed to justify its withholdings of alleged grand jury information under Exemption 3 and Federal Rule of Criminal Procedure 6(e).**

The DOJ's withholding of alleged grand jury material fails as a matter of law because the agency cannot identify a particular "nexus between disclosure [of each redacted passage] and revelation of a protected aspect of the grand jury's investigation." *Judicial Watch, Inc.*, 214 F. Supp. 3d at 53 (quoting *Lopez v. DOJ*, 393 F.3d 1345, 1350 (D.C. Cir. 2005)). Instead, the DOJ generically argues that every single redaction of "grand jury information"—about 350 of them across 80 pages of the Report—is necessary to protect the secrecy of witness names or testimony under Federal Rule of Criminal Procedure 6(e) and Exemption 3. Def.'s Mem. 12–13. This undifferentiated claim falls far short of the "specific detail" required to withhold material responsive to EPIC's FOIA Request. *DiBacco*, No. 17-5048, 2019 WL 2479443, at *4 (quoting *DiBacco*, 795 F.3d at 196).

"'Although Rule 6(e) prohibits disclosure of 'matter[s] occurring before [a] grand jury,' it should not be read in a manner that creates 'a veil of secrecy . . . over all matters occurring in the world that happen to be investigated by a grand jury.'" *Judicial Watch, Inc.*, 214 F. Supp. 3d at 53 (quoting *Senate of P.R.,* 823 F.2d at 582). Importantly, "'[t]here is no *per se* rule against disclosure of any and all information which has reached the grand jury chambers . . . .' Rather,

'the touchstone is whether disclosure would tend to reveal some secret aspect of the grand jury's investigation,' such as 'the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors and the like.'" *Id.* (quoting *Senate of P.R.*, 823 F.2d at 582). Where an agency seeks to redact responsive material under Rule 6(e), its affidavit must "describe[] the justifications for withholding the information with specific detail, demonstrate[] that the information withheld logically falls within [Exemption 3], and [not be] contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *DiBacco*, No. 17-5048, 2019 WL 2479443, at *4 (quoting *DiBacco*, 795 F.3d at 196).

Here, the DOJ simply fails to do what the FOIA requires. Rather than identifying the particular "nexus" for each invocation of Rule 6(e)—for example, whether the redaction is intended to keep a witness's identity secret or to avoid confirming that particular testimony was given—the agency impermissibly relies on an across-the-board claim. *Judicial Watch, Inc.*, 214 F. Supp. 3d at 53 (quoting *Lopez*, 393 F.3d at 1350). The DOJ flatly declares that "[a]ll of the information withheld concerns the inner workings of federal grand juries" because it "concerns" some combination of witnesses, information that might identify witnesses, the fact that witnesses were subpoenaed or testified, and/or information provided by witnesses to the grand jury. Brinkmann Decl. ¶ 18. But the reader is left to guess which nexus might apply to which withholding, as the agency fails to provide this required enumeration.

Moreover, "[t]he mere fact" the witnesses testified or "were subpoenaed fails to justify withholding under Rule 6(e)." *Labow v. DOJ*, 831 F.3d 523, 530 (D.C. Cir. 2016). The DOJ must instead demonstrate—in "specific detail," *DiBacco*, 795 F.3d at 196—that all of "the material withheld pursuant to exemption (b)(3) cannot be disclosed without compromising the secrecy of a grand jury's deliberations." *Labow*, 831 F.3d at 530. Here, as in *Labow*, the agency's conclusory assertion of Rule 6(e) makes it impossible to "know whether the [passages] at issue somehow necessarily evince their connection to a grand jury, much less do so in a

36

manner that could not be dealt with through redactions." *Labow*, 831 F.3d at 530. Without this information, the DOJ's reliance on Exemption 3 and Rule 6(e) cannot stand.

Even if the DOJ had adequately justified its withholding of particular grand jury information, the agency's assertion of Rule 6(e) to conceal sentence- and paragraph-long passages of the Report is highly implausible. *See, e.g.*, *Redacted Report Vol. I* at 101, 111, 140, 143, 148, 153–54, 166. Under the FOIA, information that has "merely been presented to the grand jury" must be segregated for release from information that would directly "reveal something about the grand jury's identity, investigation, or deliberation." *Labow*, 831 F.3d at 529. By redacting whole narrative sections of the Report—rather than excising specific language that might directly divulge the work of a grand jury—the agency has violated its obligation to reasonably segregate non-exempt material.

Ironically, the overbreadth of the DOJ's longer redactions is confirmed by other, shorter redactions in the Report. At times, the agency appears to grasp the surgical precision with which Rule 6(e) must be wielded. *See, e.g.*, Brinkmann Decl. ¶ 18 ("[O]nly that information which explicitly discloses matters occurring before a federal grand jury—the disclosure of which would reveal a secret aspect of the grand jury's investigation—has been withheld pursuant to [Rule 6(e) and Exemption 3]"). For example, the following sentence from the Report is disclosed in its entirety: "According to Goldstone, around January 2017, Kaveladze contacted him again to set up another meeting, but Goldstone did not make the request." *Redacted Report Vol. I* at 121. Yet the DOJ simultaneously redacts the footnote associated with this passage on the view that the footnote contains grand jury information. *Id.* at 121 n.753. In doing so, the agency concedes that material which "happen[s] to [have] be[en] investigated by a grand jury" (e.g., narrative material included in the Report) can be reasonably segregated from information that would expressly "reveal the direction of the grand jury's investigation" (e.g., a citation which could, in theory, disclose that the same narrative material was before a grand jury).[33] *Labow*, 831 F.3d at 529. And

---

[33] This assumes, for the sake of argument, that footnote 753 is exempt under Exemption 3 and Rule 6(e)—something that the DOJ has failed to establish.

this same pattern of redactions—divulging narrative material that was apparently considered by a grand jury while withholding language that might directly confirm that fact—is repeated again and again throughout the redacted Report. *See Redacted Report Vol. I* at 67–70, 72, 82, 91, 93, 96–99, 101–04, 110, 111–114, 116–123, 126, 139–140, 142, 143, 146–48, 150–56, 163–66, 168–70, 172; *Redacted Report Vol. II* at 18, 105.

By contrast, where the DOJ has withheld entire narrative sentences and paragraphs of the Report under Rule 6(e), the agency shows no attention to segregating non-exempt information. It is highly improbable, for example, that every phrase or word of the paragraph-length redactions on pages 101, 143, and 148 of Volume I would "reveal some secret aspect of the grand jury's investigation," *Judicial Watch, Inc.*, 214 F. Supp. 3d at 53 (quoting *Senate of P.R.*, 823 F.2d at 582), or "necessarily evince [a] connection to a grand jury[.]" *Labow*, 831 F.3d at 530. Rather, these (and other) passages can almost certainly be redacted in a way that discloses narrative material without expressly establishing any connection to a grand jury—just as the agency implicitly purports to do dozens of times throughout the Report. Put simply: the DOJ's overbroad assertions of Exemption 3 are "contradicted" by abundant "contrary evidence in the record" and should be discounted. *DiBacco*, 795 F.3d at 196.

Because the DOJ has failed to provide the necessary detail to withhold any grand jury information, and because the agency repeatedly redacts material on this basis with too broad a brush, the Court should reject the agency's reliance on Exemption 3 and Rule 6(e).

## IV.  THE COURT SHOULD CONDUCT IN CAMERA REVIEW OF THE MUELLER REPORT TO ASSESS THE VALIDITY OF THE AGENCY'S WITHHOLDINGS.

In order to resolve the parties' cross-motions for partial summary judgment, the Court should conduct in camera review of the unredacted Mueller Report and independently assess the validity of the DOJ's withholdings. As the Court has already noted, "the Attorney General has created an environment that . . . is going to cause a significant portion of the American public to be concerned about whether there is transparency" with respect to the Mueller Report, such that "there's going to have to be some type of probing on [the Court's] behalf as to whether or not

appropriate redactions have been made." Hr'g Tr. 14:22–24, *Leopold*, No. 19-957-RBW. The materials put forward by the DOJ in support of its motion—which are scant on detail and notably lacking a *Vaughn* index—do little to allay that ongoing concern. Accordingly, in camera review is "needed in order to make a responsible de novo determination on the claims of exemption" in this case. *James Madison Project v. DOJ*, 302 F. Supp. 3d 290, 299 (D.D.C. 2018) (quoting *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978)); *see also Georgia-Pac. Corp. v. IRS*, 517 F. Supp. 2d 65, 74 (D.D.C. 2007) (quoting *Boyd*, 475 F.3d 381, 391 (D.C. Cir. 2007)) (exercising the court's "broad discretion" to conduct in camera review of withheld documents); *Citizens for Responsibility & Ethics in Wash. v. NARA*, 583 F. Supp. 2d 146, 161 (D.D.C. 2008) (same).

Although the decision to conduct in camera review of documents in a FOIA case rests with the discretion of the Court, 5 U.S.C. § 552(a)(4)(B), the D.C. Circuit has emphasized that "in some circumstances, district courts should conduct in camera review of allegedly FOIA-exempt documents, as, for example, where the affidavits are too conclusory to permit de novo review of the agency exemption decision or where there is tangible evidence of agency bad faith." *Mobley v. CIA*, 806 F.3d 568, 588 (D.C. Cir. 2015) (citing *Carter v. Dep't of Commerce*, 830 F.2d 388, 393–92 (D.C. Cir. 1987)). In camera review is particularly appropriate "when the number of withheld documents is relatively small, and 'when the dispute turns on the contents of the withheld documents, and not the parties' interpretations of those documents.'" *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998) (quoting *Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996)). Each of these criteria is met here.

First, the DOJ's affidavits are "too conclusory to permit de novo review of the agency exemption decision[s.]" *Mobley*, 806 F.3d at 588 (citing *Carter*, 830 F.2d at 393–92). Rather than providing a *Vaughn* index with a redaction-by-redaction (or even a page-by-page) explanation of why the agency believes it can withhold particular material, the DOJ's motion rests entirely on an across-the-board affidavit that is short on "specific detail." *DiBacco*, No. 17-5048, 2019 WL 2479443, at *4 (quoting *DiBacco*, 795 F.3d at 196). For example, in asserting the agency's right to withhold material under Exemption 3 and Federal Rule of Criminal

Procedure 6(e), the DOJ's affidavit fails to identify a particular "nexus between disclosure [of any particular redacted passage] and revelation of a protected aspect of the grand jury's investigation." *Judicial Watch, Inc.*, 214 F. Supp. 3d at 53 (quoting *Lopez*, 393 F.3d at 1350); *see also* Brinkmann Decl. ¶¶ 17-18. Instead, the agency lists multiple reasons that alleged grand jury material is withheld throughout the Report, never explaining which redactions are supported by which rationale. *Id.* ¶ 18. This level of generality does not permit the Court to determine whether, in fact, the material underneath the redactions qualifies for protection under Rule 6(e). But in camera review would.

Second, the DOJ's dubious handling of the public release of the Mueller Report provides "tangible evidence of agency bad faith" in this matter. *Mobley*, 806 F.3d at 588 (citing *Carter*, 830 F.2d at 393–92). The Attorney General's attempts to spin the findings and conclusions of the Report have been challenged publicly by the author of the Report. Ex. 4. The Attorney's General's characterization of the report has also been contradicted directly by the content of the Report. *See, e.g.*, Charlie Savage, *How Barr's Excerpts Compare to the Mueller Report's Findings*, N.Y. Times (Apr. 20, 2019) (explaining how the Attorney General's "use of Mr. Mueller's words" in his March 24, 2019 letter to Congress "turned the special counsel's meaning on its head"). In announcing that the redacted Mueller Report was made available to the White House Counsel and President Trump's personal lawyers days before its wide release, the Attorney General also contradicted representations made by the DOJ in this very case. *Compare Transcript: Attorney General William Barr's Press Conference Remarks Ahead of Mueller Report Release*, Politico (Apr. 18, 2019), *with* Brinkmann Decl. ¶ 31, ECF No 19-1 (claiming that the DOJ could not release the Mueller Report "any earlier than the timeframe the Attorney General has already provided"). And in April, the Attorney General misleadingly indicated in his statements to Congress that the primary category of information withheld from the public version of the Mueller Report would be grand jury material subject to Federal Rule of Criminal Procedure 6(e). *Transcript: Attorney General Bill Barr Faces Questions on Capitol Hill*, CNN (Apr. 9, 2019) ("I identified four areas that I feel should be redacted. . . . The first is grand jury

information, [6e] material."). In fact, the overwhelming majority of withholdings—69%—were designated as "harm to ongoing matter" upon the initial public release of the Report and are now being withheld under the heading of Exemption 7(A). *See* K.K. Rebecca Lai et al., *supra*.[34] Grand jury material constitutes less than 20% of the material withheld. *Id.* Given this pattern of misrepresentations concerning the contents of the Mueller Report, the Court would be well within its "broad discretion" to conduct in camera review and independently assess the DOJ's withholdings. *Georgia-Pac. Corp.*, 517 F. Supp. 2d at 74 (quoting *Boyd*, 475 F.3d at 391).

Third, in camera review would only require the Court to review limited portions of a single, albeit sizable, document. And much of the Court's review of the Report would focus on the "contents of the withheld [material]" rather than "the parties' interpretations of th[at material].'" *Spirko*, 147 F.3d at 996 (quoting *Quinon*, 86 F.3d at 1228). For example, the parties' dispute over the applicability of Exemption 3 and Rule 6(e) turns on the baseline question of whether the redacted material is, in fact, grand jury information. The parties have no dispute over the *interpretation* of that material—nor could they, absent more detail from the DOJ about the nature of its 6(e) redactions. Given the relative simplicity of conducting in camera review in this case, such review would likely "save time" and resources. *Quinon*, 86 F.3d at 1228 (quoting *Carter*, 830 F.2d at 393).

Finally, in camera review is particularly important where, as here, there is an urgency to resolve the matter quickly. In an ordinary FOIA case, a court might order an agency to submit a *Vaughn* index or declaration when the agency has failed to justify the withholding of information. But this case concerns "extremely important" records—and in particular, one extremely important record—that should be disclosed "as expeditiously as humanly possible." Hr'g Tr. 20:22, 26:12, ECF No. 25. An iterative process of *Vaughn* indices and declarations would unduly delay that result and would not obviate the need to eventually conduct in camera review.

---

[34] https://www.nytimes.com/interactive/2019/04/19/us/politics/redacted-mueller-report.html.

To avoid that risk, and to ensure the public that it has been provided with all of the information it is entitled to, the Court should conduct in camera review of the Mueller Report to determine whether the agency has lawfully asserted the claimed exemptions. *See Georgia-Pac. Corp.*, 517 F. Supp. 2d at 74; *CREW*, 583 F. Supp. 2d at 161.

## CONCLUSION

For the above reasons, this Court should grant EPIC's Motion for Partial Summary Judgment and deny the Government's Motion for Partial Summary Judgment.

Respectfully Submitted,
MARC ROTENBERG, D.C. Bar #422825
EPIC President and Executive Director

/s/ Alan Butler
ALAN BUTLER, D.C. Bar #1012128
EPIC Senior Counsel

JOHN DAVISSON, D.C. Bar #1531914
EPIC Counsel

ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
    Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*[35]

Dated: June 24, 2019

---

[35] EPIC Open Government Counsel Enid Zhou, a member of the California bar whose admission is pending in the District of Columbia, contributed to this memorandum.

# EXHIBIT LIST

Letter from William P. Barr, Att'y Gen., to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, et al. (Mar. 24, 2019)........................................................... Ex. 1

Rosenstein Order, U.S. Dep't of Justice, Office of the Deputy Att'y Gen., Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017).......................... Ex. 2

Letter from William P. Barr, Att'y Gen., U.S. Dep't of Justice, to Lindsey Graham, Chairman, Senate Comm. on the Judiciary, et al. (Mar. 22, 2019) ............................. Ex. 3

Letter from Robert S. Mueller III, Special Counsel to William P. Barr, Att'y Gen., U.S. Dep't of Justice (Mar. 27, 2019) ......................................................................... Ex. 4

Letter from John Davisson, EPIC Counsel, to Douglas Hibbard, Chief, Initial Request Staff, Office of Info. Policy, U.S. Dep't of Justice (Nov. 5, 2018)................. Ex. 5

# Exhibit 1



# The Attorney General
### Washington, D.C.

March 24, 2019

The Honorable Lindsey Graham
Chairman, Committee on the Judiciary
United States Senate
290 Russell Senate Office Building
Washington, D.C. 20510

The Honorable Jerrold Nadler
Chairman, Committee on the Judiciary
United States House of Representatives
2132 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Dianne Feinstein
Ranking Member, Committee on the Judiciary
United States Senate
331 Hart Senate Office Building
Washington, D.C. 20510

The Honorable Doug Collins
Ranking Member, Committee on the Judiciary
United States House of Representatives
1504 Longworth House Office Building
Washington, D.C. 20515

Dear Chairman Graham, Chairman Nadler, Ranking Member Feinstein, and Ranking Member Collins:

As a supplement to the notification provided on Friday, March 22, 2019, I am writing today to advise you of the principal conclusions reached by Special Counsel Robert S. Mueller III and to inform you about the status of my initial review of the report he has prepared.

### *The Special Counsel's Report*

On Friday, the Special Counsel submitted to me a "confidential report explaining the prosecution or declination decisions" he has reached, as required by 28 C.F.R. § 600.8(c). This report is entitled "Report on the Investigation into Russian Interference in the 2016 Presidential Election." Although my review is ongoing, I believe that it is in the public interest to describe the report and to summarize the principal conclusions reached by the Special Counsel and the results of his investigation.

The report explains that the Special Counsel and his staff thoroughly investigated allegations that members of the presidential campaign of Donald J. Trump, and others associated with it, conspired with the Russian government in its efforts to interfere in the 2016 U.S. presidential election, or sought to obstruct the related federal investigations. In the report, the Special Counsel noted that, in completing his investigation, he employed 19 lawyers who were assisted by a team of approximately 40 FBI agents, intelligence analysts, forensic accountants, and other professional staff. The Special Counsel issued more than 2,800 subpoenas, executed nearly 500 search warrants, obtained more than 230 orders for communication records, issued almost 50 orders authorizing use of pen registers, made 13 requests to foreign governments for evidence, and interviewed approximately 500 witnesses.

The Special Counsel obtained a number of indictments and convictions of individuals and entities in connection with his investigation, all of which have been publicly disclosed. During the course of his investigation, the Special Counsel also referred several matters to other offices for further action. The report does not recommend any further indictments, nor did the Special Counsel obtain any sealed indictments that have yet to be made public. Below, I summarize the principal conclusions set out in the Special Counsel's report.

**Russian Interference in the 2016 U.S. Presidential Election.** The Special Counsel's report is divided into two parts. The first describes the results of the Special Counsel's investigation into Russia's interference in the 2016 U.S. presidential election. The report outlines the Russian effort to influence the election and documents crimes committed by persons associated with the Russian government in connection with those efforts. The report further explains that a primary consideration for the Special Counsel's investigation was whether any Americans – including individuals associated with the Trump campaign – joined the Russian conspiracies to influence the election, which would be a federal crime. The Special Counsel's investigation did not find that the Trump campaign or anyone associated with it conspired or coordinated with Russia in its efforts to influence the 2016 U.S. presidential election. As the report states: "[T]he investigation did not establish that members of the Trump Campaign conspired or coordinated with the Russian government in its election interference activities."[1]

The Special Counsel's investigation determined that there were two main Russian efforts to influence the 2016 election. The first involved attempts by a Russian organization, the Internet Research Agency (IRA), to conduct disinformation and social media operations in the United States designed to sow social discord, eventually with the aim of interfering with the election. As noted above, the Special Counsel did not find that any U.S. person or Trump campaign official or associate conspired or knowingly coordinated with the IRA in its efforts, although the Special Counsel brought criminal charges against a number of Russian nationals and entities in connection with these activities.

The second element involved the Russian government's efforts to conduct computer hacking operations designed to gather and disseminate information to influence the election. The Special Counsel found that Russian government actors successfully hacked into computers and obtained emails from persons affiliated with the Clinton campaign and Democratic Party organizations, and publicly disseminated those materials through various intermediaries, including WikiLeaks. Based on these activities, the Special Counsel brought criminal charges against a number of Russian military officers for conspiring to hack into computers in the United States for purposes of influencing the election. But as noted above, the Special Counsel did not find that the Trump campaign, or anyone associated with it, conspired or coordinated with the Russian government in these efforts, despite multiple offers from Russian-affiliated individuals to assist the Trump campaign.

---

[1]   In assessing potential conspiracy charges, the Special Counsel also considered whether members of the Trump campaign "coordinated" with Russian election interference activities. The Special Counsel defined "coordination" as an "agreement—tacit or express—between the Trump Campaign and the Russian government on election interference."

**Obstruction of Justice.** The report's second part addresses a number of actions by the President – most of which have been the subject of public reporting – that the Special Counsel investigated as potentially raising obstruction-of-justice concerns. After making a "thorough factual investigation" into these matters, the Special Counsel considered whether to evaluate the conduct under Department standards governing prosecution and declination decisions but ultimately determined not to make a traditional prosecutorial judgment. The Special Counsel therefore did not draw a conclusion – one way or the other – as to whether the examined conduct constituted obstruction. Instead, for each of the relevant actions investigated, the report sets out evidence on both sides of the question and leaves unresolved what the Special Counsel views as "difficult issues" of law and fact concerning whether the President's actions and intent could be viewed as obstruction. The Special Counsel states that "while this report does not conclude that the President committed a crime, it also does not exonerate him."

The Special Counsel's decision to describe the facts of his obstruction investigation without reaching any legal conclusions leaves it to the Attorney General to determine whether the conduct described in the report constitutes a crime. Over the course of the investigation, the Special Counsel's office engaged in discussions with certain Department officials regarding many of the legal and factual matters at issue in the Special Counsel's obstruction investigation. After reviewing the Special Counsel's final report on these issues; consulting with Department officials, including the Office of Legal Counsel; and applying the principles of federal prosecution that guide our charging decisions, Deputy Attorney General Rod Rosenstein and I have concluded that the evidence developed during the Special Counsel's investigation is not sufficient to establish that the President committed an obstruction-of-justice offense. Our determination was made without regard to, and is not based on, the constitutional considerations that surround the indictment and criminal prosecution of a sitting president.[2]

In making this determination, we noted that the Special Counsel recognized that "the evidence does not establish that the President was involved in an underlying crime related to Russian election interference," and that, while not determinative, the absence of such evidence bears upon the President's intent with respect to obstruction. Generally speaking, to obtain and sustain an obstruction conviction, the government would need to prove beyond a reasonable doubt that a person, acting with corrupt intent, engaged in obstructive conduct with a sufficient nexus to a pending or contemplated proceeding. In cataloguing the President's actions, many of which took place in public view, the report identifies no actions that, in our judgment, constitute obstructive conduct, had a nexus to a pending or contemplated proceeding, and were done with corrupt intent, each of which, under the Department's principles of federal prosecution guiding charging decisions, would need to be proven beyond a reasonable doubt to establish an obstruction-of-justice offense.

### *Status of the Department's Review*

The relevant regulations contemplate that the Special Counsel's report will be a "confidential report" to the Attorney General. *See* Office of Special Counsel, 64 Fed. Reg. 37,038,

---

[2] *See A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (2000).

37,040-41 (July 9, 1999). As I have previously stated, however, I am mindful of the public interest in this matter. For that reason, my goal and intent is to release as much of the Special Counsel's report as I can consistent with applicable law, regulations, and Departmental policies.

Based on my discussions with the Special Counsel and my initial review, it is apparent that the report contains material that is or could be subject to Federal Rule of Criminal Procedure 6(e), which imposes restrictions on the use and disclosure of information relating to "matter[s] occurring before [a] grand jury." Fed. R. Crim. P. 6(e)(2)(B). Rule 6(e) generally limits disclosure of certain grand jury information in a criminal investigation and prosecution. *Id.* Disclosure of 6(e) material beyond the strict limits set forth in the rule is a crime in certain circumstances. *See, e.g.*, 18 U.S.C. § 401(3). This restriction protects the integrity of grand jury proceedings and ensures that the unique and invaluable investigative powers of a grand jury are used strictly for their intended criminal justice function.

Given these restrictions, the schedule for processing the report depends in part on how quickly the Department can identify the 6(e) material that by law cannot be made public. I have requested the assistance of the Special Counsel in identifying all 6(e) information contained in the report as quickly as possible. Separately, I also must identify any information that could impact other ongoing matters, including those that the Special Counsel has referred to other offices. As soon as that process is complete, I will be in a position to move forward expeditiously in determining what can be released in light of applicable law, regulations, and Departmental policies.

\*     \*     \*

As I observed in my initial notification, the Special Counsel regulations provide that "the Attorney General may determine that public release of" notifications to your respective Committees "would be in the public interest." 28 C.F.R. § 600.9(c). I have so determined, and I will disclose this letter to the public after delivering it to you.

Sincerely,

William P. Barr
Attorney General

# Exhibit 2



**Office of the Deputy Attorney General**
Washington, D.C. 20530

## ORDER NO. 3915-2017

### APPOINTMENT OF SPECIAL COUNSEL
### TO INVESTIGATE RUSSIAN INTERFERENCE WITH THE
### 2016 PRESIDENTIAL ELECTION AND RELATED MATTERS

By virtue of the authority vested in me as Acting Attorney General, including 28 U.S.C. §§ 509, 510, and 515, in order to discharge my responsibility to provide supervision and management of the Department of Justice, and to ensure a full and thorough investigation of the Russian government's efforts to interfere in the 2016 presidential election, I hereby order as follows:

(a)     Robert S. Mueller III is appointed to serve as Special Counsel for the United States Department of Justice.

(b)     The Special Counsel is authorized to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including:

     (i)     any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and

     (ii)    any matters that arose or may arise directly from the investigation; and

     (iii)   any other matters within the scope of 28 C.F.R. § 600.4(a).

(c)     If the Special Counsel believes it is necessary and appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters.

(d)     Sections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations are applicable to the Special Counsel.

___5/17/17___
Date

Rod J. Rosenstein
Acting Attorney General

# Exhibit 3



# The Attorney General
Washington, D.C.

March 22, 2019

The Honorable Lindsey Graham
Chairman, Committee on the Judiciary
United States Senate
290 Russell Senate Office Building
Washington, D.C. 20510

The Honorable Jerrold Nadler
Chairman, Committee on the Judiciary
United States House of Representatives
2132 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Dianne Feinstein
Ranking Member, Committee on the Judiciary
United States Senate
331 Hart Senate Office Building
Washington, D.C. 20510

The Honorable Doug Collins
Ranking Member, Committee on the Judiciary
United States House of Representatives
1504 Longworth House Office Building
Washington, D.C. 20515

Dear Chairman Graham, Chairman Nadler, Ranking Member Feinstein, and Ranking Member Collins:

I write to notify you pursuant to 28 C.F.R. § 600.9(a)(3) that Special Counsel Robert S. Mueller III has concluded his investigation of Russian interference in the 2016 election and related matters. In addition to this notification, the Special Counsel regulations require that I provide you with "a description and explanation of instances (if any) in which the Attorney General" or acting Attorney General "concluded that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued." 28 C.F.R. § 600.9(a)(3). There were no such instances during the Special Counsel's investigation.

The Special Counsel has submitted to me today a "confidential report explaining the prosecution or declination decisions" he has reached, as required by 28 C.F.R. § 600.8(c). I am reviewing the report and anticipate that I may be in a position to advise you of the Special Counsel's principal conclusions as soon as this weekend.

Separately, I intend to consult with Deputy Attorney General Rosenstein and Special Counsel Mueller to determine what other information from the report can be released to Congress and the public consistent with the law, including the Special Counsel regulations, and the Department's long-standing practices and policies. I remain committed to as much transparency as possible, and I will keep you informed as to the status of my review.

Finally, the Special Counsel regulations provide that "the Attorney General may determine that public release of" this notification "would be in the public interest." 28 C.F.R. § 600.9(c). I have so determined, and I will disclose this letter to the public after delivering it to you.

Sincerely,

William P. Barr
Attorney General

# Exhibit 4



**U.S. Department of Justice**

*The Special Counsel's Office*

---

*Washington, D.C. 20530*

March 27, 2019

*Recieved*
*OAG*
*March 28, 2019*

The Honorable William P. Barr
Attorney General of the United States
Department of Justice
Washington, D.C.

Re:   Report of the Special Counsel on the Investigation Into Russian Interference in the
      2016 Presidential Election and Obstruction of Justice (March 2019)

Dear Attorney General Barr:

I previously sent you a letter dated March 25, 2019, that enclosed the introduction and executive summary for each volume of the Special Counsel's report marked with redactions to remove any information that potentially could be protected by Federal Rule of Criminal Procedure 6(e); that concerned declination decisions; or that related to a charged case. We also had marked an additional two sentences for review and have now confirmed that these sentences can be released publicly.

Accordingly, the enclosed documents are in a form that can be released to the public consistent with legal requirements and Department policies. I am requesting that you provide these materials to Congress and authorize their public release at this time.

As we stated in our meeting of March 5 and reiterated to the Department early in the afternoon of March 24, the introductions and executive summaries of our two-volume report accurately summarize this Office's work and conclusions. The summary letter the Department sent to Congress and released to the public late in the afternoon of March 24 did not fully capture the context, nature, and substance of this Office's work and conclusions. We communicated that concern to the Department on the morning of March 25. There is now public confusion about critical aspects of the results of our investigation. This threatens to undermine a central purpose for which the Department appointed the Special Counsel: to assure full public confidence in the outcome of the investigations. *See* Department of Justice, Press Release (May 17, 2017).

While we understand that the Department is reviewing the full report to determine what is appropriate for public release—a process that our Office is working with you to complete—that process need not delay release of the enclosed materials. Release at this time would alleviate the misunderstandings that have arisen and would answer congressional and public questions about the nature and outcome of our investigation. It would also accord with the standard for public

2

release of notifications to Congress cited in your letter. *See* 28 C.F.R. § 609(c) ("the Attorney General may determine that public release" of congressional notifications "would be in the public interest").

Sincerely yours,



Robert S. Mueller, III
Special Counsel

Enclosures

# Exhibit 5

# epic.org

**Electronic Privacy Information Center**
1718 Connecticut Avenue NW, Suite 200
Washington, DC 20009, USA

📞 +1 202 483 1140
🖨 +1 202 483 1248
🐦 @EPICPrivacy
🌐 https://epic.org

VIA FACSIMILE

November 5, 2018

Douglas Hibbard
Chief, Initial Request Staff
Office of Information Policy
Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, D.C., 20530-0001
Fax: (202) 514-1009

Dear Mr. Hibbard,

      This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a), and is submitted on behalf of the Electronic Privacy Information Center ("EPIC") to the Department of Justice's ("DOJ") Office of Information Policy ("OIP").

      EPIC seeks documents, in the possession of the agency, concerning the investigation by Special Counsel Robert S. Mueller into Russian interference in the 2016 United States presidential election and related matters.

<u>Documents Requested</u>

      EPIC requests the following records concerning the Special Counsel investigation into Russian interference with the presidential election:[1]

(1)(a)  All "report[s]" and "closing documentation" prepared under 28 C.F.R. § 600.8(c), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

  (b)  All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" or "closing documentation" under 28 C.F.R. § 600.8(c);

(2)(a)  All "report[s]" concerning "the status of the investigation" prepared under 28 C.F.R. § 600.8(a)(2), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

---

[1] U.S. Dep't of Justice, Office of the Deputy Attorney General, Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017), https://www.justice.gov/opa/press-release/file/967231/download [hereinafter Appointment Order].

   (b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "report" concerning "the status of the investigation" under 28 C.F.R. § 600.8(a)(2);

(3)(a)   All records "expla[ining] . . . any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b), whether or not such records were actually provided to the Attorney General or Acting Attorney General;

   (b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned "explanation for any investigative or prosecutorial step" under 28 C.F.R. § 600.7(b);

(4)(a)   All records prepared under 28 C.F.R. § 600.9(a) to "notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress" of a development in the Special Counsel investigation, whether or not such records were actually transmitted to any member of Congress;

   (b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned notification under 28 C.F.R. § 600.9(a);

(5)(a)   All referrals by the Special Counsel, Attorney General, or Acting Attorney General for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c), whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

   (b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned referral for "administrative remedies, civil sanctions or other governmental action outside the criminal justice system" under 28 C.F.R. § 600.4(c);

(6)(a)   All "report[s]," "recommendation[s]," and other "compilation[s] of information" prepared for the eventual consideration of one or more members of Congress,[2] whether or not such records were actually transmitted to any party outside of the Special Counsel's Office;

   (b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or planned report, recommendation, or compilation of the type described in Category (6)(a) of this request;

(7)(a)   All other reports summarizing or describing, for one or more persons outside of the Special Counsel's Office, (i) any of the Special Counsel's evidence, findings, decisions, actions, or planned actions, or (ii) any developments in the Special Counsel investigation; and

---

[2] *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219, 1221, 1226 (D.D.C. 1974), *aff'd sub nom. Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974).

   (b)   All drafts, outlines, exhibits, and supporting materials associated with any actual or
         planned report of the type described in Category (7)(a) of this request.

EPIC does not seek records which have already been disclosed to the public in their complete
and unredacted form (i) in the course of an open judicial proceeding; (ii) available at
https://www.justice.gov/sco; or (iii) available at https://www.justice.gov/news.

<u>Background</u>

   EPIC's FOIA request, and the Special Counsel investigation to which it pertains, arise
out of the Russian government's coordinated campaign to interfere with the 2016 U.S.
presidential election.

*Russian Interference in the 2016 U.S. Presidential Election*

   In 2016, the Russian government carried out a multi-pronged attack on the U.S.
Presidential Election to destabilize U.S. democratic institutions and aid the candidacy of Donald
J. Trump. As explained in the declassified 2017 Intelligence Community Assessment ("ICA") on
Russian election interference:[3]

> We assess with high confidence that Russian President Vladimir Putin ordered an
> influence campaign in 2016 aimed at the US presidential election, the consistent
> goals of which were to undermine public faith in the US democratic process,
> denigrate Secretary Clinton, and harm her electability and potential presidency. We
> further assess Putin and the Russian Government developed a clear preference for
> President-elect Trump. When it appeared to Moscow that Secretary Clinton was
> likely to win the election, the Russian influence campaign then focused on
> undermining her expected presidency.
>
> We also assess Putin and the Russian Government aspired to help President-elect
> Trump's election chances when possible by discrediting Secretary Clinton and
> publicly contrasting her unfavorably to him.[4]

   The ICA—along with the reports, investigations, and prosecutions that have ensued—
establishes that Russia interfered with the 2016 election on at least four fronts.

   First, "Russia's intelligence services conducted cyber operations against targets
associated with the 2016 US presidential election, including targets associated with both major

---

[3] Office of the Dir. of Nat'l Intelligence, ICA 2017-01D, *Intelligence Community Assessment: Assessing
Russian Activities and Intentions in Recent US Elections* (Jan. 6, 2017),
https://www.dni.gov/files/documents/ICA_2017_01.pdf [hereinafter *Intelligence Community
Assessment*]; *see also* EPIC, *EPIC v. ODNI (Russian Hacking)* (Dec. 18, 2017),
https://www.epic.org/foia/odni/russian-hacking/ (EPIC FOIA lawsuit to obtain full Intelligence
Community Assessment on which declassified version was based).
[4] *Intelligence Community Assessment*, *supra* note 3, at 1.

US political parties."[5] These operations included the "exfiltrat[ion of] large volumes of data" from the Democratic National Committee ("DNC") and "the compromise of the personal e-mail accounts of Democratic Party officials and political figures."[6]

Second, Russian intelligence services "used the Guccifer 2.0 persona, DCLeaks.com, and WikiLeaks to release US victim data obtained in cyber operations publicly and in exclusives to media outlets."[7] These disclosures included data extracted by Russian intelligence from DNC networks.[8] Subsequent investigation has also revealed that senior Trump campaign officials engaged in multiple meetings with Russian intermediaries offering to provide "dirt" on Hillary Clinton, including "thousands of emails" obtained by Russia.[9]

Third, "Russian intelligence accessed elements of multiple state or local electoral boards" in an ongoing effort to assess "US electoral processes and related technology and equipment."[10]

Fourth, "Russia's state-run propaganda machine—comprised of its domestic media apparatus, outlets targeting global audiences such as RT and Sputnik, and a network of quasi-government trolls—contributed to the influence campaign by serving as a platform for Kremlin messaging to Russian and international audiences."[11] As part of this propaganda push, the Russian government spent millions of dollars and employed hundreds of people to flood Facebook and Twitter with fraudulent users, posts, articles, groups, and targeted advertisements.[12]

---

[5] *Id.* at 2.

[6] *Id.*; *see also* EPIC, *EPIC v. FBI (Russian Hacking)* (May 22, 2018), https://epic.org/foia/fbi/russian-hacking/ (EPIC FOIA lawsuit revealing FBI's failure to follow its own victim notification procedures in response to Russian cyberattacks against U.S. officials).

[7] *Intelligence Community Assessment*, *supra* note 3, at 2–3.

[8] *Id.* at 3.

[9] Statement of the Offense at ¶ 14, *United States v. Papadopoulos*, No. 17-182 (D.D.C. Oct. 5, 2017) ("The Professor told defendant PAPADOPOULOS . . . that 'They [the Russians] have dirt on her'; 'the Russians had emails of Clinton'; 'they have thousands of emails.'"); *see also* House Permanent Select Committee on Intelligence, *Status of the Russia Investigation (Minority Report)* (Mar. 13, 2018), https://democrats-intelligence.house.gov/uploadedfiles/final_-_minority_status_of_the_russia_investigation_with_appendices.pdf (noting that the "stated purpose" of "the June 9, 2016 Trump Tower meeting with Russian emissaries" was to "provide damaging information on Hillary Clinton").

[10] *Intelligence Community Assessment*, *supra* note 3, at 3; *see also* EPIC, *EPIC v. DHS* (Aug. 17, 2018), https://epic.org/foia/dhs/cybersecurity/russian-interference/default.html (EPIC FOIA lawsuit revealing Department of Homeland Security response to Russian cyberattacks on election infrastructure).

[11] *Intelligence Community Assessment*, *supra* note 3, at 3–4.

[12] Indictment at ¶¶ 3–6, 10, *United States v. Internet Res. Agency*, No. 18-32 (D.D.C. Feb. 16, 2018); *see also* Statement from EPIC to U.S. Senate Select Comm. on Intelligence, Sep. 4, 2018, https://epic.org/testimony/congress/EPIC-SSCI-ForeignSocialMedia-Sept2018.pdf (calling for greater transparency concerning Russian manipulation of news and information on social networks during and after the 2016 election).

In the twenty-two months since the Intelligence Community Assessment was published, the ICA's findings have been repeatedly confirmed by federal inquiries[13] and investigative reporting.[14] The Senate Intelligence Committee, after an "an in-depth review" of the ICA and associated intelligence, determined that "the conclusions of the ICA are sound" and noted "that collection and analysis subsequent to the ICA's publication continue to reinforce its assessments."[15]

*Criminal Investigations into Russian Election Interference*

On January 20, 2018—two weeks after the public release of the Intelligence Community Assessment—Donald J. Trump was inaugurated as the 45th President of the United States. On March 2, 2017, Attorney General Jeff Sessions, who had been a prominent supporter of Mr. Trump during the campaign, recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."[16] As a result, the responsibilities of the Attorney General for any such investigation passed to the Deputy Attorney General.[17]

On March 20, 2017, James B. Comey, then-Director of the Federal Bureau of Investigation ("FBI"), confirmed to the House Permanent Select Committee on Intelligence that the FBI was conducting an investigation into "the Russian government's efforts to interfere in the 2016 presidential election," including "the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts."[18] Mr. Comey noted that the investigation would include "an assessment of whether any crimes were committed."[19]

---

[13] Senate Select Comm. on Intelligence, *The The Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent U.S. Elections* (July 3, 2018), https://www.burr.senate.gov/imo/media/doc/SSCI%20ICA%20ASSESSMENT_FINALJULY3.pdf [hereinafter Senate Intelligence Report].

[14] *E.g.*, Scott Shane & Mark Mazzetti, *The Plot to Subvert an Election: Unraveling the Russia Story So Far*, N.Y. Times (Sep. 20, 2018), https://www.nytimes.com/interactive/2018/09/20/us/politics/russia-interference-election-trump-clinton.html; Philip Bump, *A Broad Debunking of Trump's Claims About Russian Interference and the Mueller Investigation*, Wash. Post (June 28, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/28/a-broad-debunking-of-trumps-claims-about-russian-interference-and-the-mueller-investigation/.

[15] Senate Intelligence Report, *supra* note 13, at 7.

[16] Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement on Recusal (Mar. 2, 2017), https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal; *see also* 28 C.F.R. § 45.2(a).

[17] *Id.*; *see also* 28 U.S.C. § 508 ("In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office[.]").

[18] *Russian Active Measures Investigation: Hearing Before the H. Permanent Select Comm. on Intelligence*, 115th Cong. (2017) (Statement of James B. Comey, Dir., Fed. Bureau of Investigation), https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation.

[19] *Id.*

On May 9, 2017, President Trump removed Director Comey from office and terminated his employment.[20] Two days later, in a nationally-televised NBC News interview, President Trump stated:

> I was going to fire Comey knowing, there was no good time to do it. And in fact when I decided to just do it, I said to myself, I said you know, this Russia thing with Trump and Russia is a made up story, it's an excuse by the Democrats for having lost an election that they should have won.[21]

On May 17, 2017, Deputy Attorney General Rod J. Rosenstein—in his capacity as Acting Attorney General—appointed Robert S. Mueller III "to serve as Special Counsel for the United States Department of Justice."[22] Mr. Rosenstein authorized Mr. Mueller to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017," including "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump"; "any matters that arose or may arise directly from the investigation"; and "any other matters within the scope of 28 C.F.R. § 600.4(a)."[23] Mr. Rosenstein also authorized Mr. Mueller "to prosecute federal crimes arising from the investigation of these matters" where "it is necessary and appropriate[.]"[24]

Since Mr. Mueller was appointed, the Special Counsel has brought criminal charges against 33 individuals and three organizations,[25] including:

- Former National Security Adviser Michael Flynn, who pleaded guilty to making false statements to the FBI;[26]
- Former Trump campaign manager Paul Manafort, who was convicted of multiple counts of tax fraud and bank fraud[27] and pleaded guilty to conspiracy against the United States and other charges;[28]

---

[20] Letter from Donald J. Trump, President of the United States, to James B. Comey, Dir., Fed. Bureau of Investigation (May 9, 2017), https://www.gpo.gov/fdsys/pkg/DCPD-201700325/pdf/DCPD-201700325.pdf.

[21] Adam Edelman, *Trump says He Didn't Fire Comey 'Because of Russia,' Contradicting Past Statements*, NBC News (May 31, 2018), https://www.nbcnews.com/politics/donald-trump/trump-says-he-didn-t-fire-comey-because-russia-contradicting-n878836.

[22] Appointment Order, *supra* note 1, ¶ (a).

[23] *Id.* ¶ (b).

[24] *Id.* ¶ (c).

[25] U.S. Dep't of Justice, *Special Counsel's Office* (Sep. 14, 2018), https://www.justice.gov/sco.

[26] Plea Agreement, *United States v. Flynn*, No. 17-232 (Dec. 1, 2017), https://www.justice.gov/file/1015121/download.

[27] U.S. Dep't of Justice, *Special Counsel's Office*, *supra* note 25 ("On Aug. 21, 2018, a federal jury found Manafort guilty on eight counts: counts 1-5, subscribing to a false individual income tax return for tax years 2010-2014; count 12, failure to file reports of foreign bank and financial accounts for year 2012; count 25, bank fraud; and count 27, bank fraud.").

[28] Plea Agreement, *United States v. Manafort*, No. 17-201 (Sep. 14, 2018), https://www.justice.gov/file/1094151/download.

- Former Trump deputy campaign manager Rick Gates, who pleaded guilty to conspiracy against the United States and making a false statement to the FBI;[29]
- Former Trump campaign foreign policy adviser George Papadopolous, who pleaded guilty to making false statements to the FBI;[30]
- The Internet Research Agency, Concord Management and Consulting LLC, and thirteen Russian nationals, who are charged with conspiracy against the United States and related offenses for flooding social media platforms with fraudulent content to interfere with U.S. political processes;[31] and
- Twelve other Russian nationals, who are charged with conspiracy to commit computer crimes and other offenses for hacking Democratic Party computer networks and email accounts linked to the Clinton campaign.[32]

*The Special Counsel Report(s)*

In addition to the criminal offenses charged by the Special Counsel, major news organizations[33] and President Trump's own attorneys[34] have stated that Mr. Mueller intends to

---

[29] Plea Agreement, *United States v. Gates*, No. 17-201 (Feb. 23, 2018), https://www.justice.gov/file/1038801/download.

[30] Plea Agreement, *United States v. Papadopolous*, No. 17-182 (Oct. 5, 2017), https://www.justice.gov/file/1007341/download.

[31] Indictment, *United States v. Internet Research Agency LLC,* No. 18-32 (Feb. 16, 2018), https://www.justice.gov/file/1035477/download.

[32] Indictment, *United States v. Netyksho*, No. 18-215 (July 13, 2018), https://www.justice.gov/file/1080281/download.

[33] *E.g.*, Charlie Savage, *Legal Experts Urge Release of Watergate Report to Offer Mueller a Road Map*, N.Y. Times (Sep. 14, 2018), https://www.nytimes.com/2018/09/14/us/politics/mueller-report-grand-jury-watergate.html ("The leading theory is that Mr. Mueller will write a report for his supervisor at the Justice Department. . . . But there is historical precedent for another model. Echoing a move by the Watergate prosecutor in March 1974, the grand jury with which Mr. Mueller has been working could try to send a report about the evidence it has gathered directly to the House Judiciary Committee."); Jeffrey Toobin, *How Rudy Giuliani Turned Into Trump's Clown,* New Yorker (Sep. 10, 2018), https://www.newyorker.com/magazine/2018/09/10/how-rudy-giuliani-turned-into-trumps-clown ("Mueller will file a concluding report with Rod Rosenstein, the Deputy Attorney General, at the end of the investigation[.]"); Michael S. Schmidt & Maggie Haberman, *Mueller Examining Trump's Tweets in Wide-Ranging Obstruction Inquiry*, N.Y. Times (July 26, 2018), https://www.nytimes.com/2018/07/26/us/politics/trump-tweets-mueller-obstruction.html ("If Mr. Mueller does not plan to make a case in court, a report of his findings could be sent to Congress, leaving it to lawmakers to begin impeachment proceedings.").

[34] *E.g.*, Memorandum from John M. Dowd, Att'y for President Trump, to Robert S. Mueller, Special Counsel (Jan. 29, 2018), *reprinted in The Trump Lawyers' Confidential Memo to Mueller, Explained*, N.Y. Times (June 2, 2018), https://www.nytimes.com/interactive/2018/06/02/us/politics/trump-legal-documents.html ("It is our understanding that the reason behind the request for the interview is to allow the Special Counsel's office to complete its report."); @RudyGiuliani, Twitter (Aug. 15, 2018, 9:58 AM), https://twitter.com/RudyGiuliani/status/1029728984446193664 ("DOJ should require Mueller to submit his report before September 7."); Peter Nicholas, *Rudy Giuliani Says Trump Lawyers Are Prepared to Counter Mueller*, Wall Street J. (Aug. 12, 2018), https://www.wsj.com/articles/rudy-giuliani-says-trump-lawyers-are-prepared-to-counter-mueller-1534110560 ("President Trump's lawyers believe they can

---

transmit one or more report(s) detailing the Special Counsel's findings (the "Mueller Report(s)"). The precise number, character, and subject matter of the Mueller Report(s) are not publicly known, though at least one such report is said to address allegations that President Trump obstructed justice by attempting to block a criminal probe into Russian election interference.[35]

There are several legal authorities under which the Special Counsel, Attorney General, or Acting Attorney General might issue a report or otherwise release information concerning the Special Counsel's investigation. First, under 28 C.F.R. § 600.8(c), the Special Counsel is required to provide the Attorney General or Acting Attorney General with a report at the conclusion of the investigation:

> **(c) Closing documentation.** At the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel.[36]

Second, under 28 C.F.R. § 600.8(a)(2), the Special Counsel is required to provide annual status reports to the Attorney General or Acting Attorney General:

> **(2)** Thereafter, 90 days before the beginning of each fiscal year, the Special Counsel shall report to the Attorney General the status of the investigation, and provide a budget request for the following year. The Attorney General shall determine whether the investigation should continue and, if so, establish the budget for the next year.[37]

Third, under 28 C.F.R. § 600.7(b), the Attorney General or Acting Attorney General may request an explanation for any investigative or prosecutorial step taken by the Special Counsel:

> **(b)** The Special Counsel shall not be subject to the day-to-day supervision of any official of the Department. However, the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued. In conducting that review, the Attorney General will give great weight to the views of the Special Counsel. If the Attorney General concludes that a proposed action by a

---

weather a 'negative' report from special counsel Robert Mueller and are prepared to rebut the conclusions, Rudy Giuliani, one of Mr. Trump's attorneys, said in an interview.").

[35] Carol D. Leonnig & Robert Costa, *Mueller Told Trump's Attorneys the President Remains Under Investigation But is Not Currently a Criminal Target*, Wash. Post (Apr. 3, 2018), https://www.washingtonpost.com/politics/mueller-told-trumps-attorneys-the-president-remains-under-investigation-but-is-not-currently-a-criminal-target/2018/04/03/d7832cf0-36c1-11e8-acd5-35eac230e514_story.html ("The special counsel also told Trump's lawyers that he is preparing a report about the president's actions while in office and potential obstruction of justice, according to two people with knowledge of the conversations.").

[36] 28 C.F.R. § 600.8(c); *see also* Appointment Order, *supra* note 1, ¶ (d) ("Sections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations are applicable to the Special Counsel.").

[37] 28 C.F.R. § 600.8(a)(2).

Special Counsel should not be pursued, the Attorney General shall notify Congress as specified in § 600.9(a)(3).[38]

Fourth, under 28 C.F.R. § 600.9(a), the Attorney General or Acting Attorney General is required to notify certain members of Congress of key developments in the Special Counsel's investigation:

> **(a)** The Attorney General will notify the Chairman and Ranking Minority Member of the Judiciary Committees of each House of Congress, with an explanation for each action —
>
> > **(1)** Upon appointing a Special Counsel;
> >
> > **(2)** Upon removing any Special Counsel; and
> >
> > **(3)** Upon conclusion of the Special Counsels investigation, including, to the extent consistent with applicable law, a description and explanation of instances (if any) in which the Attorney General concluded that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued.[39]

Fifth, under 28 C.F.R. § 600.4(c), the Special Counsel may take "necessary action" to pursue penalties "outside the criminal justice system" in consultation with the Attorney General or Acting Attorney General:

> **(c) Civil and administrative jurisdiction.** If in the course of his or her investigation the Special Counsel determines that administrative remedies, civil sanctions or other governmental action outside the criminal justice system might be appropriate, he or she shall consult with the Attorney General with respect to the appropriate component to take any necessary action. A Special Counsel shall not have civil or administrative authority unless specifically granted such jurisdiction by the Attorney General.[40]

Sixth, the Special Counsel may use its "full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney"[41] to transmit "report[s]," "recommendation[s]," or other "compilation[s] of information" to Congress via the grand jury process.[42] This procedure was used by Special Counsel Leon Jaworski in 1974 to convey "material in the Grand Jury's possession having a material bearing on matters within the

---

[38] 28 C.F.R. § 600.7(b).

[39] 28 C.F.R. § 600.9(a).

[40] 28 C.F.R. § 600.4(c).

[41] 28 C.F.R. § 600.6.

[42] *In re Report & Recommendation*, 370 F. Supp. at 1221, 1226.

primary jurisdiction of the United States House of Representatives Committee on the Judiciary relating to questions of impeachment."[43]

Finally, the Special Counsel, Attorney General, and/or Acting Attorney General may rely on their general powers under 28 C.F.R. § 600.1 *et seq.* (and on other legal authorities) to disclose developments, evidence, findings, decisions, actions, or planned actions from the Special Counsel's investigation.

EPIC, through this FOIA request, seeks all of the above categories of records and supporting materials generated by or related to Special Counsel Mueller's investigation.

<u>EPIC's Interest in the Special Counsel Investigation</u>

EPIC has a particular interest in the release of records related to Special Counsel Mueller's investigation because those records will inform EPIC's project on Democracy and Cybersecurity, which was launched in response the interference in the 2016 Presidential Election.[44] As part of EPIC's Democracy and Cybersecurity project, EPIC has filed suits seeking public release of President Trump's tax returns and to correct numerous misstatements of fact concerning the President's financial ties to Russia.

*EPIC v. IRS I (Donald Trump's Tax Records)*

In *EPIC v. IRS I,* EPIC argues that the Internal Revenue Service ("IRS") has the authority, under § 6103(k)(3) of the Internal Revenue Code,[45] to disclose the President's returns to correct numerous misstatement of fact concerning his financial ties to Russia.[46] For example, President Trump falsely tweeted that "Russia has never tried to use leverage over me. I HAVE NOTHING TO DO WITH RUSSIA – NO DEALS, NO LOANS, NO NOTHING."[47] Yet, numerous news organizations have covered President Trump's ties to Russian businesses and government.[48] The case is currently pending in the D.C. Circuit.

---

[43] Report & Recommendation at 1, *In re Report & Recommendation*, 370 F. Supp. at 1221 (Mar. 1, 1974) (capitalization altered), https://www.archives.gov/files/research/investigations/watergate/roadmap/docid-70105890.pdf; *see also* 105 Cong. Rec. H9,670 (daily ed. Oct. 6, 1998) (statement of Rep. Jackson-Lee) ("[I]t will be recalled the Watergate special prosecution force did not send to Congress an argumentative or inflammatory document, but rather a simple road map which merely summarized and identified the location of relevant evidence.").

[44] *See* EPIC, *Democracy and Cybersecurity: Preserving Democratic Institutions*, https://www.epic.org/democracy/.

[45] 26 U.S.C. § 6103(k)(3).

[46] *See* EPIC, *EPIC v. IRS (Donald Trump's Tax Records)*, https://www.epic.org/foia/irs/trump-taxes/.

[47] Donald J. Trump (@realDonaldTrump), Twitter (July 26, 2016), https://twitter.com/realdonaldtrump/status/758071952498159616?lang=en.

[48] See e.g., Tom Hamburger, Rosalind S. Helderman, & Michael Birnbaum, *Inside Trump's Financial Ties to Russian and His Unusual Flatters of Vladimir Putin*, Wash. Post (June 17, 2016), https://www.washingtonpost.com/politics/inside-trumps-financial-ties-to-russia-and-his-unusual-flattery-of-vladimir-putin/2016/06/17/dbdcaac8-31a6-11e6-8ff7-7b6c1998b7a0_story.html; *Despite Denial, Trump's Connections to Russia Go Back Years*, CBS News (July 29, 2016),

*EPIC v. IRS II (Trump Offers-in-Compromise)*

In *EPIC v. IRS II*, EPIC filed suit to compel the IRS to release certain tax records pertaining to President Trump's more than 300 associated business entities.[49] EPIC requested all "offers-in-compromise" used to satisfy a tax debt owed by President Trump or one of his businesses. Under § 6103(k)(1) of the Internal Revenue Code, taxpayer "return information shall be disclosed to all members of the general public to the extent necessary to permit inspection of any accepted offer-in-compromise[.]"[50] These records are public as a matter of law. The case is currently pending in the U.S. Federal Court for the District of Columbia.

Request for Expedition

EPIC is entitled to expedited processing of this request.[51] Under the DOJ's FOIA regulations, a request "shall be processed on an expedited basis" when (1) there is an "urgency to inform the public about an actual or alleged federal government activity," and (2) where the request is "made by a person who is primarily engaged in disseminating information."[52] This request satisfies both conditions.

First, there is an "urgency to inform the public about an actual or alleged federal government activity."[53] The actual federal government activities are (1) the Special Counsel's investigation of Russian interference in the 2016 U.S. presidential election, and (2) the U.S. government's response to Russian election interference, as reflected in the requested records of the Special Counsel.[54] The requested records also pertain to President Trump's alleged obstruction of justice while in office.[55]

The urgency to inform the public about these government activities is clear from the voluminous press coverage of,[56] and immense public interest in,[57] Mr. Mueller's investigation

---

https://www.cbsnews.com/news/election-2016-donald-trump-ties-to-russia-go-back-years-dnc-email-hack/; John Hardwood, *Trump Calls the Special Counsel's Probe a 'Witch Hunt,' but His Links to Russia Go Back a Long Time*, CNBC (May 23, 2018), https://www.cnbc.com/2018/05/23/trump-links-to-russia-an-explanation.html.

[49] See EPIC, *EPIC v. IRS II (Trump Offers-in-Compromise)*, https://epic.org/foia/irs/trump-taxes-ii/.

[50] 26 U.S.C. § 6103(k)(1).

[51] 5 U.S.C. § 552(a)(6)(E)(v)(II); 28 C.F.R. § 16.5(e)(1).

[52] 28 C.F.R. § 16.5(e)(1), (e)(1)(ii).

[53] *Id.*

[54] *See* Appointment Order, *supra* note 1.

[55] *See* Leonnig & Costa, *supra* note 35 ("The special counsel also told Trump's lawyers that he is preparing a report about the president's actions while in office and potential obstruction of justice, according to two people with knowledge of the conversations.").

[56] *See, e.g.*, *Robert Mueller — F.B.I. Director*, N.Y. Times (Nov. 1, 2018), https://www.nytimes.com/topic/person/robert-mueller-mdash-fbi-director (listing over 570 articles concerning Robert Mueller since his appointment as Special Counsel on May 17, 2017).

[57] *See, e.g.*, Morning Consult & Politico, *National Tracking Poll* (Oct. 30, 2018), https://www.politico.com/f/?id=00000166-cb61-d184-ad67-ff67dddd0000 (finding that over 66% of respondents were aware of, and had developed an opinion on, Special Counsel Mueller); Robert Mueller, Google Trends (Nov. 2, 2018), https://trends.google.com/trends/explore?date=today%205-

and findings. Americans are deeply concerned about the scope of Russian interference in the 2016 presidential election; the U.S. government's response to that interference; the involvement of particular individuals in that interference, including possibly President Trump; the susceptibility of U.S. election systems and democratic institutions to future foreign interference; and the integrity of the Special Counsel investigation itself.[58] The Mueller Report(s) and supporting materials are critical to the public's understanding of these issues.

Second, EPIC is an organization "primarily engaged in disseminating information."[59] As the Court explained in *EPIC v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003), "EPIC satisfies the definition of 'representative of the news media'" entitling it to preferred fee status under FOIA.[60]

EPIC is also entitled to expedited processing because EPIC's request involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence."[61] In addition to the extraordinary media attention given to the work of the Special Counsel,[62] the requested records concern the potential involvement of the President in a foreign campaign to influence an election that he won; the possible obstruction of justice by the President while in office; the federal government's capacity to defend U.S. election systems and democratic institutions against foreign attacks; and the discharge of a high-profile Special Counsel investigation.[63] These matters unquestionably bear on the integrity of the government and affect public confidence.

In submitting this request for expedited processing, I certify that this explanation is true and correct to the best of my knowledge and belief.[64]

---

y&geo=US&q=Robert%20Mueller (showing a more than 100-fold increase in U.S. Google searches for Robert Mueller following his appointment as Special Counsel).

[58] *See, e.g.*, NPR/PBS NewsHour/Marist, *The United States' Relationship with Russia* 10, 12–13, 17 (July 25, 2018), http://maristpoll.marist.edu/wp-content/uploads/2018/07/NPR_PBS-Nature-of-the-Sample-and-Tables_The-US-Relationship-with-Russia_July-2018_181807241048.pdf (finding that 69% of respondents believed Russian interference occurred in the 2016 election, 63% believed Russian interference impacted the 2016 election, 53% believed President Trump had done something illegal or unethical "in his dealings with Russia and Russian President Vladimir Putin," and 57% expected Russia to interfere in the 2018 election); Suffolk University, *Suffolk University/USA Today National Poll Shows Faith in Mueller's Russia Investigation but Not in Trump Denials* (Aug. 29, 2018), https://www.suffolk.edu/news/77724.php ("A majority of Americans (55 percent) trust special counsel Robert Mueller and his investigation into alleged Russian meddling in the 2016 election, but 59 percent don't trust President Donald Trump's denial that his campaign was involved, according to a new Suffolk University/USA TODAY national poll.").

[59] 28 C.F.R. § 16.5(e)(1)(ii).

[60] 241 F. Supp. at 15.

[61] 28 C.F.R. § 16.5(e)(1)(iv).

[62] *Search Results: "Robert Mueller" and "Russia"*, Google News (Nov. 2, 2018), https://www.google.com/search?tbm=nws&q=%22Robert+Mueller%22+and+%22Russia%22 (identifying 941,000 news results containing both "Robert Mueller" and "Russia").

[63] *See* Shane & Mazzetti, *supra* note 14.

[64] *See* 5 U.S.C. § 552(a)(6)(E)(vi); 28 C.F.R. § 16.5(e)(3).

<u>Request for News Media Fee Status and Fee Waiver</u>

EPIC is a "representative of the news media" for fee classification purposes, as the Court held in *EPIC v. Department of Defense*.[65] Based on EPIC's status as a "news media" requester, EPIC is entitled to receive the requested record with only duplication fees assessed.[66]

Further, any duplication fees should also be waived because disclosure of the requested information "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest" of EPIC, the requester.[67] The DOJ evaluates the three factors to determine whether this requirement is met: (i) the "subject of the request must concern identifiable operations or activities of the Federal Government"; (ii) disclosure must be "likely to contribute significantly to public understanding of those operations or activities"; and (iii) "disclosure must not be primarily in the commercial interest of the requester."[68] EPIC's request satisfies all three factors.

First, the requested Mueller Report(s) and supporting materials clearly "concern[] identifiable operations or activities of the Federal Government,"[69] namely: (1) the Special Counsel's investigation of Russian interference in the 2016 U.S. Presidential Election; (2) the U.S. government's response to Russian election interference; and (3) possible obstruction of justice by President Trump while in office.[70]

Second, disclosure would be "likely to contribute significantly to public understanding of those operations or activities."[71] Disclosure would be "meaningfully informative about government operations or activities" because—apart from the charging documents already filed by Mr. Mueller—little is known about the Special Counsel's substantive findings concerning Russian election interference; the Trump campaign's involvement in that interference; the U.S. government's response to that interference; and possible obstruction of justice by President Trump.

Disclosure will also "contribute to the understanding of a reasonably broad audience of persons interested in the subject," because DOJ components must "presume that a representative of the news media," such as EPIC, "will satisfy this consideration."[72] The requested Mueller Report(s) and supporting materials will reach a large audience through EPIC's widely read website, https://epic.org, where EPIC routinely posts government documents obtained under the FOIA.

---

[65] 241 F. Supp. 2d 5.

[66] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[67] 28 C.F.R. § 16.10(k)(1); *see also* § 552(a)(4)(A)(iii).

[68] 28 C.F.R. §§ 16.10(k)(2)(i)–(iii).

[69] *Id.* § 16.10(k)(2)(i).

[70] *See* Appointment Order, *supra* note 1; Leonnig & Costa, *supra* note 35.

[71] 28 C.F.R. §§ 16.10(k)(2)(ii)(A)–(B).

[72] *Id.* § 16.10(k)(2)(ii)(B)

Third, disclosure of the requested information is not "primarily in the commercial interest" of EPIC.[73] EPIC has no "commercial interest . . . that would be furthered by the requested disclosure."[74] EPIC is a registered non-profit organization committed to open government, privacy, and civil liberties.[75] Moreover, DOJ components "ordinarily will presume that where a news media requester has satisfied [the public interest standard], the request is not primarily in the commercial interest of the requester."[76] As described above, EPIC is a news media requester and satisfies the public interest standard.

For these reasons, a fee waiver should be granted to EPIC's request.

<u>Conclusion</u>

Thank you for your consideration of this request. I anticipate your determination on our request within ten calendar days.[77] For questions regarding this request, I can be contacted at 202-483-1140 x120 or FOIA@epic.org.

Respectfully submitted,

<u>/s John Davisson</u>
John Davisson
EPIC Counsel

<u>/s Enid Zhou</u>
Enid Zhou
EPIC Open Government Counsel

---

[73] *Id.* §§ 16.10(k)(2)(iii)(A)–(B).
[74] *Id.* §§ 16.10(k)(2)(iii)(A).
[75] EPIC, *About EPIC* (2018), https://epic.org/epic/about.html.
[76] 28 C.F.R. § 16.10(k)(2)(iii)(B).
[77] 5 U.S.C. § 552 (a)(6)(E)(ii)(I).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ELECTRONIC PRIVACY INFORMATION CENTER,

    Plaintiff,

    v.                                                                        Civ. Action No. 19-810 (RBW)

UNITED STATES DEPARTMENT OF JUSTICE,

    Defendant.

---

**[PROPOSED] ORDER**

Upon consideration of the parties' cross-motions for partial summary judgment, and upon in camera review of the record in dispute, it is hereby

**ORDERED** that Plaintiff's Cross Motion for Summary Judgment is **GRANTED**; and

**ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**.

Defendant has until **[30 days after this order]** to produce to the Plaintiff all reasonably segregable portions of the Mueller Report designated for disclosure in the accompanying Memorandum Opinion.


Dated: _____


                                  _____
                                    Hon. Reggie B. Walton
                                    United States District Judge