**IN THE U.S. DISTRICT COURT**
**FOR THE DISTRICT OF D.C.**

| | | |
|---|---|---|
| JASON LEOPOLD and BUZZFEED INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 19-cv-957 (RBW) |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, et. al., | ) | |
| | ) | |
| Defendants. | ) | |
| | | |
| ELECTRONIC PRIVACY INFORMATION CENTER, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 19-cv-810 (RBW) |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS JASON LEOPOLD'S AND BUZZFEED INC.'S COMBINED MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARYJUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND ..............................................................................1

III.  GENERAL LEGAL STANDARDS AND BURDEN OF PROOF ....................13

IV.   DOJ HAS NOT PROVEN ITS EXEMPTION 7(A) OR 7(B) CLAIMS ..........14

      A. DOJ Has Not Proven Its Self-Contradictory 7(A) and 7(B) Claims Over Every
         Bit of Information About Roger Stone, Nor Its Claim That the *Stone* Protective
         Order Prohibits Release of Everything Related to Stone ..............................................14

      B. DOJ Has Not Proven the Remaining Exemption 7(A) Claims ....................................20

V.    DOJ HAS NOT PROVEN ITS GRAND JURY CLAIMS UNDER EXEMPTION 3 ....22

VI.   DOJ HAS NOT PROVEN ITS SOURCES AND METHODS CLAIMS UNDER
      EXEMPTIONS 3 OR 7(E) ..................................................................................32

      A. DOJ's Generic Exemption 7(E) Claims are Inadequate and Require *In
         Camera* Inspection ..................................................................................................32

      B. DOJ's Exemption 3 Claims Are Similarly Inadequate and Require *In Camera*
         Review .......................................................................................................................35

VII.  DOJ HAS NOT PROVEN ITS EXEMPTION 6 AND 7(C) CLAIMS ............36

      A. The Tremendous Public Interest in Disclosure in Fully Understanding the
         Work and Decisions of the Special Counsel and Attorney General ............................36

      B. No Privacy Interests Outweigh This Tremendous Public Interest ..............................40

VIII. DOJ HAS NOT PROVEN ITS EXEMPTION 5 CLAIMS ................................46

IX.   CONCLUSION ...................................................................................................50

## TABLE OF AUTHORITIES

*Cases*

*Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895 (D.C. Cir. 2015).......................................46

*ACLU v. DOJ*, 655 F.3d 1 (D.C. Cir. 2011) .................................................................................45

*ACLU v. DOJ*, 750 F.3d 927 (D.C. Cir. 2014) ............................................................................45

*Albuquerque Pub. Co. v. DOJ*, 726 F. Supp. 851 (D.D.C. 1989)................................................34

*Archibald v. DOJ*, 950 F. Supp. 2d 80 (D.D.C. 2013)................................................................36

*Bagwell v. DOJ*, 311 F. Supp. 3d 223 (D.D.C. 2018).................................................................17

*Banks v. DOJ*, 757 F. Supp. 2d 13 (D.D.C. 2010)......................................................................41

*Bartko v DOJ*, 898 F.3d 51 (D.C. Cir. 2018)...............................................................1, 11, 38, 50

*Blackwell v. FBI*, 646 F.3d 37 (D.C. Cir. 2011) .........................................................................32

*Boehm v. FBI.*, 948 F. Supp. 2d 9 (D.D.C. 2013).......................................................................41

*Boyd v. DOJ*, 475 F.3d 381 (D.C. Cir. 2007) .............................................................................13

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................................................16

*Brick v. DOJ*, 358 F. Supp. 3d 37 (D.D.C. 2019) ......................................................................36

*Brown v. FBI*, 873 F. Supp. 2d 388 (D.D.C. 2012) ....................................................................34

*Butterworth v. Smith*, 494 U.S. 624 (1990)................................................................................30

*BuzzFeed Inc. v. U.S. Dep't of Ed.*, 18-cv-01535-CRC, Dkt. # 24 (June 13, 2019)...............25, 44

*Chiquita Brands Int'l, Inc. v. SEC*, 10 F. Supp. 3d 1 (D.D.C. 2013)  ..........................................18

*CIA v. Sims*, 471 U.S. 159 (1985) ..............................................................................................33

*Citizens for Responsibility & Ethics in Washington v. DOJ,* 746 F.3d 1082
(D.C. Cir. 2014) ................................................................................................................ *passim*

*Clemente v. FBI*, 741 F. Supp. 2d 64 (D.D.C. 2010).................................................................32

*Coleman v. FBI*, 13 F. Supp. 2d 75 (D.D.C. 1998).....................................................................41

*Crooker v. ATF*, 789 F.2d 64 (D.C. Cir. 1986)..............................................................16

*Dep't of Air Force v. Rose*, 425 U.S. 352 (1976) ...................................................25, 44

*DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989) ........................13

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211 (1979)...............................30

*Electronic Privacy Information Center v. DOJ*, 296 F. Supp. 3d 109 (D.D.C. 2017)..................36

*Electronic Privacy Information Center v. Office of the DNI*, 982 F. Supp. 2d 21
(D.D.C. 2013) ....................................................................................................................36

*Elliott v. FBI*, 2007 WL 1302595 (D.D.C. May 2, 2007)..............................................41

*FCC v. AT&T Inc.*, 562 U.S. 397 (2011) ........................................................................42

*Founding Church of Scientology of Washington, D.C., Inc. v. NSA*, 610 F.2d 824
(D.C. Cir. 1979) ................................................................................................................34

*Friends of Blackwater v. U.S. Dep't of Interior*, 391 F. Supp. 2d 115 (D.D.C. 2005)..................13

*Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856
(D.C. Cir. 1981) ................................................................................................................25

*Gosen v. U.S. Citizenship and Immigration Servs.*, 75 F. Supp. 3d 279 (D.C. Cir. 2014) ...........34

*Government Accountability Project v. DOJ*, 852 F. Supp. 2d 14 (D.D.C. 2012)..........................47

*Harrison v. Executive Office for U.S. Attorneys*, 377 F. Supp. 2d 141 (D.D.C. 2005) ...............45

*Houser v. U.S. Dep't of Health & Human Servs.*, 270 F. Supp. 3d 237 (D.D.C. 2017)...............13

*In re Grand Jury Impaneled Oct. 2, 1978 (79-2)*, 510 F. Supp. 112 (D.D.C. 1981) ....................29

*In re Motions of Dow Jones & Co.*, 142 F.3d 496 (D.C. Cir. 1998)..............................22

*Islamic Shura Council of S. Cal. v. FBI*, 779 F. Supp. 2d 1114 (C.D. Cal. 2011) .......................12

*Jimenez v. FBI*, 928 F. Supp. 21 (D.D.C. 1996) ............................................................47

*Johnson v. FBI*, 118 F. Supp. 3d 784 (E.D. Pa. 2015) ..................................................16

*Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 214 F. Supp. 3d 43
(D.D.C. 2016) ........................................................................................................13, 24, 43

*Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 876 F.3d 346 (D.C. Cir. 2017).....43, 44

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93
(D.D.C. 2019) ...................................................................................13, 17, 48, 49

*Judicial Watch, Inc. v. U.S. Dep't of State*, 344 F. Supp. 3d 77 (D.D.C. 2018) ............................12

*Kishore v. DOJ*, 575 F. Supp. 2d 243 (D.D.C. 2008) ...................................................................41

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009)............................................................35

*Mayer Brown, LLC v. IRS.*, 562 F.3d 1190 (D.C. Cir. 2009) ......................................................34

*McGehee v. DOJ*, 800 F. Supp. 2d 220 (D.D.C. 2011) ................................................................41

*Media Res. Ctr. v. DOJ*, 818 F. Supp. 2d 131 (D.D.C. 2011) .....................................................13

*Morley v. CIA.*, 508 F.3d 1108 (D.C. Cir. 2007) ........................................................................34

*Murphy v. FBI*, 490 F. Supp. 1138 (D.D.C. 1980) ......................................................................29

*Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157 (2004) ...........................36, 37, 38, 42

*Neill v. DOJ*, No. 93-5292, 1994 WL 88219 (D.C. Cir. Mar. 9, 1994) ......................................16

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978)........................................................13

*North v. Walsh*, 881 F.2d 1088 (D.C. Cir. 1989)...................................................................16, 17

*Petrucelli v. DOJ*, 51 F. Supp. 3d 142 (D.D.C. 2014)................................................................14

*Ray v. Turner*, 587 F.2d 1187 (D.C. Cir. 1978).........................................................................35

*Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62 (D.D.C. 2018) .........................................48

*SafeCard Services, Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991)..........................................36, 37

*Schlesinger v. CIA*, 591 F. Supp. 60 (D.D.C. 1984) ...................................................................36

*Senate of the Commw. of P.R. on Behalf of Judiciary Comm. v. DOJ,* 823 F.2d 574
(D.C. Cir. 1987) ...........................................................................................................22

*Shapiro v. DOJ*, 153 F. Supp. 3d 253 (D.D.C. 2016).............................................................33, 34

*Shapiro v. DOJ*, 239 F. Supp. 3d 100 (D.D.C. 2017)..................................................................33

*Skilling v. U.S.*, 561 U.S. 358 (2010) ........................................................................................18

*Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) ...............13

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007) ...............................................16

*Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 1997) .......................................................46

*U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 561 (E.D. Va. 2010) ...............................18

*Washington Post Co. v. DOJ*, 863 F.2d 96 (D.C. Cir. 1988) .........................................18

*Whitaker v. CIA*, 31 F. Supp. 3d 23 (D.D.C. 2014) ........................................................35

**Other**

120 Cong. Rec. 36626 (1974) ............................................................................................33

162 Cong. Rec. H3714-01, H3717162 (2016) ................................................................48

28 C.F.R. § 600.6 ..............................................................................................................47

28 C.F.R. § 600.8(c) .........................................................................................................46

5 U.S.C. § 552(a)(8)(A)(i) ..........................................................................................17, 48

5 U.S.C. § 552(b)(7)(E) ...................................................................................................32

DOJ Guide to the FOIA, Exemption 5 .......................................................................47, 48

DOJ Guide to the FOIA, Litigation Considerations ...................................................13, 14

H.R. Rep. 93-1380 (1975) ................................................................................................33

H.R. Rep. No. 114-391 (2016) ........................................................................................49

LCrR 57.7(b)(1) ...............................................................................................................18

LCrR 57.7(b)(3) ...............................................................................................................18

S. Rep. No. 114–4 (2015) ................................................................................................49

## I.    INTRODUCTION

In the words of Richard Nixon, when government information is kept overly secret, "the people soon become ignorant of their own affairs, distrustful of those who manage them, and—eventually—incapable of determining their own destinies."  Ex. Ord. No. 11652, Mar. 8, 1972, 37 F.R. 5209.  In this case, on the one hand, the Attorney General's statements around the Mueller Report have led to distrust of both the accuracy of those statements and the impartiality of the Attorney General's decision not to charge the President with obstruction of justice.  And on the other, serious and specific assertions have been made about the legality of the investigation and its origins, so much so that the Attorney General has authorized an investigation into these very issues.  "FOIA, at its core, operates on the assumption that it is for the public to know and then to judge." *Bartko v DOJ*, 898 F.3d 51, 69 (D.C. Cir. 2018) (quotation and citation omitted).

For that reason, it is rightfully and indisputably the government's legal burden to prove that every bit of official information it keeps secret is squarely within the scope of a narrowly construed exemption.  The Department of Justice has proven no such thing here, and so under the Freedom of Information Act, the Court should order the release of a largely unredacted Report.  At the very least, the Court should exercise its discretion and review the unredacted Report *in camera* before ruling.

## II.    FACTUAL BACKGROUND

Under Supreme Court precedent, the facts that are relevant to this case are those that would justify a reasonable person to believe that some kind of impropriety might have occurred in the Special Counsel's investigation or the Attorney General's activities related to it.

With that in mind, the President of the United States has made (or retweeted) the following statements, among others:

The Mueller investigation is ***totally conflicted, illegal and rigged***! Should never have been allowed to begin, except for the Collusion and many crimes committed by the Democrats. Witch Hunt!

https://twitter.com/realDonaldTrump/status/1097280840156020736 (emphasis added).[1]

While the disgusting Fake News is doing everything within their power not to report it that way, at least 3 major players are intimating that the Angry Mueller Gang of Dems is ***viciously telling witnesses to lie about facts*** & they will get relief. This is our Joseph McCarthy Era!

https://twitter.com/realDonaldTrump/status/1067775022331236352 (emphasis added).

"Lisa Page Testimony- NO EVIDENCE OF COLLUSION BEFORE MUELLER APPOINTMENT." @FoxNews by Catherine Herridge. Therefore, the case should never have been allowed to be brought. It is a ***totally illegal*** Witch Hunt!

https://twitter.com/realDonaldTrump/status/1041694123382726656 (emphasis added).

As has been incorrectly reported by the Fake News Media, I never told then White House Counsel Don McGahn to fire Robert Mueller, even though I had the legal right to do so. If I wanted to fire Mueller, I didn't need McGahn to do it, I could have done it myself. Nevertheless,...Mueller was NOT fired and was respectfully allowed to finish his work ***on what I, and many others, say was an illegal investigation*** (there was no crime), ***headed by a Trump hater who was highly conflicted, and a group of 18 VERY ANGRY Democrats***. DRAIN THE SWAMP!...Despite the fact that ***the Mueller Report was "composed" by Trump Haters and Angry Democrats***, who had unlimited funds and human resources, the end result was No Collusion, No Obstruction. Amazing!

https://twitter.com/realDonaldTrump/status/1121380133137461248; https://twitter.com/

realDonaldTrump/status/1121382698742841344; https://twitter.com/realDonaldTrump/status/

1121385795481423873 (emphasis added).

Think of it. I became President of the United States in one of the most hard fought and consequential elections in the history of our great nation. From long before I ever took office, I was under a sick & ***unlawful investigation*** concerning what has become known as the Russian.... ....Hoax. My campaign ***was being seriously spied upon*** by intel agencies and the Democrats. This never happened before in American history, and it all turned out to be a total scam, a Witch Hunt, that yielded No Collusion, No Obstruction. This must never be allowed to happen again!

---

[1] All internet citations in this brief were last accessed on June 24, 2019.

https://twitter.com/realDonaldTrump/status/1127529870014201856; https://twitter.com/

realDonaldTrump/status/1127529871025090562 (emphasis added).

> Everything the Democrats are asking me for is based on an ***illegally started investigation*** that failed for them, especially when the Mueller Report came back with a NO COLLUSION finding. Now they say Impeach President Trump, even though he did nothing wrong, while they "fish!"

https://twitter.com/realdonaldtrump/status/1131136429545934850 (emphasis added).

> Alan Dershowitz: "These are not crimes. He (Mueller) has no authority to be a roving Commissioner. I don't see any evidence of crimes." ***This is an illegal Hoax that should be ended immediately. Mueller refuses to look at the real crimes on the other side.*** Where is the IG REPORT?

https://twitter.com/realdonaldtrump/status/1068339979250675712 (emphasis added).

> ***The illegal Mueller Witch Hunt*** continues in search of a crime. There was never collusion with Russia, except by the Clinton campaign, so the 17 Angry Democrats are looking at anything they can find. Very unfair and BAD for the country. ALSO, not allowed under the LAW!

https://twitter.com/realdonaldtrump/status/1041330897948160002 (emphasis added).

> So, if there was knowingly & acknowledged to be "zero" crime when the Special Counsel was appointed, and if the appointment was made based on the Fake Dossier (paid for by Crooked Hillary) and now disgraced Andrew McCabe (he & all stated no crime), then the Special Counsel...***should never have been appointed*** and there should be no Mueller Report. This was an ***illegal & conflicted investigation in search of a crime***. Russian Collusion was nothing more than an excuse by the Democrats for losing an Election that they thought they were going to win...THIS SHOULD NEVER HAPPEN TO A PRESIDENT AGAIN!

https://twitter.com/realDonaldTrump/status/1106552621152780289; https://twitter.com/

realDonaldTrump/status/1106554458383806467; https://twitter.com/realDonaldTrump/status/

1106554754715533313 (emphasis added).

> Isn't it amazing that the people who were closest to me, by far, and knew the Campaign better than anyone, ***were never even called to testify before Mueller***. The reason is that the ***18 Angry Democrats*** knew they would all say 'NO COLLUSION' and only very good things!

https://twitter.com/realDonaldTrump/status/1120409894799253504 (emphasis added).

(Retweeting) Let's be clear, neither Mueller, Obama FBI, DOJ, CIA, Deep State, etc ever had good faith basis to pursue @realDonaldTrump on Russia. Russia collusion was a hoax & *a criminal abuse*, which is why @JudicialWatch will continue to fight for truth in fed court.

https://twitter.com/TomFitton/status/1109966858403409920 (emphasis added).

There is No Collusion! The Robert Mueller *Rigged* Witch Hunt, headed now by 17 (increased from 13, including an Obama White House lawyer) Angry Democrats, was started by a fraudulent Dossier, paid for by Crooked Hillary and the DNC. Therefore, the Witch Hunt is an *illegal* Scam!

https://twitter.com/realDonaldTrump/status/1023653191974625280 (emphasis added).

Robert Mueller came to the Oval Office (along with other potential candidates) seeking to be named the Director of the FBI. He had already been in that position for 12 years, I told him NO. The next day he was named Special Counsel - A total *Conflict of Interest*. NICE!

https://twitter.com/realDonaldTrump/status/1134120831389392896 (emphasis added).

"Donald Trump *was being framed*, he fought back. That is not Obstruction." @JesseBWatters  I had the right to end the whole Witch Hunt if I wanted. I could have fired everyone, including Mueller, if I wanted. I chose not to. I had the RIGHT to use Executive Privilege. I didn't!

https://twitter.com/realDonaldTrump/status/1118990550235877376 (emphasis added).

The Greatest Presidential Harassment in history. After spending $40,000,000 over two dark years, with unlimited access, people, resources and cooperation, *highly conflicted* Robert Mueller would have brought charges, if he had ANYTHING, but there were no charges to bring!

https://twitter.com/realDonaldTrump/status/1134057302821150722 (emphasis added).

(Retweeting Tweet linking to report by Rep. Louie Gohmert) What I have accumulated here is absolutely shocking upon the realization that #Mueller's disreputable, twisted history speaks to the character of the man placed in a position to *attempt to legalize a coup against a lawfully-elected President*.

https://twitter.com/replouiegohmert/status/989223733113114625 (emphasis added).

For two years all the Democrats talked about was the Mueller Report, because they knew that it was *loaded up with 13 Angry Democrat Trump Haters*, later increased to 18. But despite the *bias*, when the Report came out, the findings were No Collusion and facts that led to ....No Obstruction. []

https://twitter.com/realDonaldTrump/status/1137854623337893890; https://twitter.com/

realDonaldTrump/status/1137854625472765952 (emphasis added).

> The Mueller Report, despite being written **by Angry Democrats and Trump Haters**, and with unlimited money behind it ($35,000,000), didn't lay a glove on me. I DID NOTHING WRONG. If the partisan Dems ever tried to Impeach, I would first head to the U.S. Supreme Court. Not only...... .....are there no "High Crimes and Misdemeanors," there are no Crimes by me at all. All of the Crimes were committed by Crooked Hillary, the Dems, the DNC and **Dirty Cops** - and we caught them in the act! We waited for Mueller and WON, so now the Dems look to Congress as last hope!

https://twitter.com/realDonaldTrump/status/1121023509029892096; https://twitter.com/

realDonaldTrump/status/1121025624632647682 (emphasis added).

> The Trump Haters and **Angry Democrats** who wrote the Mueller Report were devastated by the No Collusion finding! Nothing but a total **"hit job"** which **should never have been allowed to start** in the first place!

https://twitter.com/realDonaldTrump/status/1119943293297623040 (emphasis added).

> The Phony Witch Hunt continues, but Mueller and his gang of Angry Dems are **only looking at one side**, not the other. Wait until it comes out how horribly & viciously they are treating people, **ruining lives for them refusing to lie**. Mueller is a **conflicted prosecutor gone rogue**...The Fake News Media builds Bob Mueller up as a Saint, when in actuality he is the exact opposite. He is doing TREMENDOUS **damage to our Criminal Justice System**, where he is only looking at one side and not the other. Heroes will come of this, and it won't be Mueller and his...**terrible Gang of Angry Democrats**. Look at their past, and look where they come from. The now $30,000,000 Witch Hunt continues and they've got nothing but ruined lives. Where is the Server? Let these terrible people go back to the Clinton Foundation and "Justice" Department!

https://twitter.com/realDonaldTrump/status/1067395266511347713; https://twitter.com/

realDonaldTrump/status/1067398375337791488; https://twitter.com/realDonaldTrump/

status/1067404517841518593 (emphasis added).

> Bob Mueller (who is a much different man than people think) and his out of control band of Angry Democrats, don't want the truth, **they only want lies**. The truth is very bad for their mission!

https://twitter.com/realDonaldTrump/status/1069621305245409281 (emphasis added).

The inner workings of the Mueller investigation are a total mess. They have found no collusion and have gone absolutely nuts. They are screaming and shouting at people, *horribly threatening them to come up with the answers they want*. They are a disgrace to our Nation[.]

https://twitter.com/realDonaldTrump/status/1063042585802039296 (emphasis added).

"There's no fairness here, if you're a Democrat or a friend of Hillary you get immunity or off scott free. If you're connected to Donald Trump, you get people like Robert Mueller & Andrew Weissman, and his team of partisans, coming after you with a vengeance and *abusing their... positions of power*. That's part of the story of the Russia Hoax. Christopher Steele is on the payroll of Hillary Clinton & the FBI, & when they fired him for lying, they continued to use him. Violation of FBI regulations. Kept trying to verify the unverifiable." @GreggJarrett

https://twitter.com/realDonaldTrump/status/1036052758389051392; https://twitter.com/

realDonaldTrump/status/1036054534450229250 (emphasis added).

Study the late Joseph McCarthy, because we are now in period with Mueller and his gang that make Joseph McCarthy look like a baby! *Rigged* Witch Hunt!

https://twitter.com/realDonaldTrump/status/1031154974942810114 (emphasis added).

"Fox News has learned that Bruce Ohr wrote Christopher Steele following the firing of James Comey saying that he was afraid the anti-Trump Russia probe will be exposed." Charles Payne  @FoxBusiness   How much more does Mueller have to see? They have blinders on - *RIGGED*!

https://twitter.com/realDonaldTrump/status/1030582354308411392 (emphasis added).

This is a terrible situation and Attorney General Jeff Sessions should stop this *Rigged* Witch Hunt right now, before it continues to stain our country any further. Bob Mueller is *totally conflicted*, and his 17 Angry Democrats that are doing his dirty work are a disgrace to USA!

https://twitter.com/realDonaldTrump/status/1024646945640525826 (emphasis added).

Is Robert Mueller ever going to release his *conflicts of interest* with respect to President Trump, including the fact that we had a very nasty & contentious business relationship, I turned him down to head the FBI (one day before appointment as S.C.) & Comey is his close friend..

https://twitter.com/realDonaldTrump/status/1023662510371741696 (emphasis added).

(Retweeting) As Pelosi House slithers towards impeachment of @RealDonaldTrump, Mueller Report exposed as *lying hit job* on Trump.

@JudicialWatch exposing Deep State *seditious coup cabal* with 50 plus federal lawsuits.

https://twitter.com/TomFitton/status/1139494827370962946 (emphasis added).

Mueller was NOT fired and was respectfully allowed to finish his work on what I, and many others, say was an illegal investigation (there was no crime), headed by a Trump hater who was highly conflicted, and a group of 18 VERY ANGRY Democrats. DRAIN THE SWAMP!

https://twitter.com/realDonaldTrump/status/1121382698742841344.

John Solomon: Factual errors and major omissions in the Mueller Report show that it is totally biased against Trump.

https://twitter.com/realDonaldTrump/status/1136887902451982336.

Liz Cheney: Statements by agents investigating Trump 'could well be *treason'*

https://twitter.com/realDonaldTrump/status/1133009099212247042 (emphasis added).

"Mueller's report was pure, political garbage!" @SeanHannity

https://twitter.com/realDonaldTrump/status/1136890966533660674.

So we now find out that it was indeed the unverified and Fake Dirty Dossier, that was paid for by Crooked Hillary Clinton and the DNC, that was *knowingly & falsely submitted to FISA* and which was responsible for starting the totally *conflicted* and discredited Mueller Witch Hunt!

https://twitter.com/realdonaldtrump/status/1021341698734030848 (emphasis added).

Andrew McCarthy - "I said this could never happen. This is so bad that they should be *looking at the judges* who signed off on this stuff, not just the people who gave it. It is so bad it screams out at you." On the whole FISA scam which led to the *rigged* Mueller Witch Hunt!

https://twitter.com/realdonaldtrump/status/1021007656511852544 (emphasis added).

Peter Strzok worked *as the leader of the Rigged Witch Hunt* for a long period of time - he got it started and was only fired because the gig was up. But remember, he took his orders from Comey and McCabe and they took their orders from you know who. Mueller/Comey best friends!

https://twitter.com/realdonaldtrump/status/1012312287280074754 (emphasis added).

Why was the FBI's sick loser, Peter Strzok, *working on the totally discredited Mueller team of 13 Angry & Conflicted Democrats*, when Strzok was giving

- 7 -

Crooked Hillary a free pass yet telling his lover, lawyer Lisa Page, that "we'll stop" Trump from becoming President? Witch Hunt!

https://twitter.com/realdonaldtrump/status/1008510118395293699 (emphasis added).

Much of the bad blood with Russia is caused by the ***Fake & Corrupt Russia Investigation***, headed up by the all Democrat loyalists, or people that worked for Obama. Mueller is ***most conflicted*** of all (except Rosenstein who signed FISA & Comey letter). No Collusion, so they go crazy!

https://twitter.com/realdonaldtrump/status/984053549742067712 (emphasis added).

According to the President of the United States, a majority of Americans in fact believe

that the Mueller investigation was improper:

New Fox Poll: 58% of people say that the FBI broke the law in investigating Donald J. Trump.

https://twitter.com/realDonaldTrump/status/1129342171612626944.

Wow! A Suffolk/USA Today Poll, just out, states, "50% of Americans AGREE that Robert Mueller's investigation is a Witch Hunt." @MSNBC  Very few think it is legit! We will soon find out?

https://twitter.com/realDonaldTrump/status/1107659841538015232.

And the President and others have asserted that scrutiny into the Mueller investigation

and its origins is justified:

Mueller, and the A.G. based on Mueller findings (and great intelligence), have already ruled No Collusion, No Obstruction. These were crimes committed by Crooked Hillary, the DNC, Dirty Cops and others! INVESTIGATE THE INVESTIGATORS!

https://twitter.com/realDonaldTrump/status/1117748268820201472.

Yes, I think spying [on the Trump campaign] did occur [. . . . and there was] probably a failure among a group of leaders there at the upper echelon [of the FBI]. . . . I feel I have an obligation to make sure that government power is not abused.[2]

---

[2] But, adding to the public confusion, FBI Director Christopher Wray responded to Barr's remarks by stating, "Well, it's not the term I would use," which, in turn, the President said was "a ridiculous answer" by Wray.  Jordyn Hermani, *Trump calls Wray's anti-spying remarks*

*William Barr's Testimony Before the Senate Appropriations Subcommittee on Commerce, Justice, Science, and Related Agencies*, CNN Newsroom (Apr. 10, 2019, 10:30 AM), http://edition.cnn.com/TRANSCRIPTS/1904/10/cnr.04.html.

> "These guys, ***the investigators, ought to be in jail***. What they have done, working with the Obama intelligence agencies, is simply unprecedented. This is one of the greatest political hoaxes ever perpetrated on the people of this Country, and Mueller is a coverup." Rush Limbaugh

https://twitter.com/realDonaldTrump/status/1097247455006068738 (emphasis added).

At the same time, the President has asserted that the redacted Report has exonerated him from wrongdoing:

> "A very ***exculpatory*** section of the Mueller Report: NO CONSPIRACY, COORDINATION or COLLUSION with the Trump Campaign and the Russians. You can't be more clear than that!" @GreggJarrett

https://twitter.com/realDonaldTrump/status/1120402937782636547 (emphasis added).

On the other hand, there have been serious and specific accusations by other government officials about improprieties in the DOJ's handling and characterization of the Report:

> Attorney General Barr's actions raise significant questions about his decision not to recuse himself from overseeing the Special Counsel's investigation, whether his actions with respect to the release of the report complied with Department of Justice policies and practices, and whether he has demonstrated sufficient impartiality to continue overseeing the fourteen criminal matters related to the Special Counsel's investigation that were referred principally to other components of the Department of Justice and the Federal Bureau of Investigation. In light of these concerns, we respectfully request that the Office of the Inspector General and the Office of Professional Responsibility immediately begin investigations of these issues. . . .

> Attorney General Barr's actions following the completion of Special Counsel Mueller's report raise further questions regarding his impartiality towards the Special Counsel's investigation and the appropriateness of his conduct as the chief law enforcement officer of the United States. . . .

---

*'ridiculous,'* Politico (May 14, 2019, 12:29 PM), https://www.politico.com/story/2019/05/14/trump-christopher-wray-anti-spying-1320538.

> The [Barr] letter asserts, without any justification, that the Special Counsel's decision not to reach "any legal conclusions leaves it to the Attorney General to determine whether the conduct described in the report constitutes a crime."

Letter from Sen. M. Hirono et al to DOJ Inspector General and Office of Professional Responsibility (April 30, 2019), https://www.hirono.senate.gov/imo/media/doc/2019.04.30%20Letter%20to%20DOJ%20OIG%20 and%20OPR.pdf.

And legal experts and government officials have questioned why Mueller declined to prosecute certain powerful Trump campaign officials, including the President's son, in connection with soliciting and receiving election assistance from a foreign power:

> We now know the special counsel considered whether Trump Jr. and Manafort committed such a crime before ultimately declining to prosecute. We also now know that Mueller made some key errors during that decision-making process.

> To begin with, the special counsel's report says that Trump Jr. "declined to be voluntarily interviewed" about the meeting. The special counsel should have called Trump Jr. before the grand jury, as he did with other witnesses. It seems likely that he declined to do so as not to incur the wrath of the president. . . .

> Trump Jr.'s grand jury testimony would have been especially important given one of the key reasons Mueller declined to prosecute the president's son for this crime: lack of willfulness . . . .

> Mueller also made the ridiculous argument that it is possible Russian "dirt" on Clinton could have been worth less than $25,000, the threshold to punish Trump Jr.'s cooperation as a felony.

Richard L. Hansen, *All the Mistakes Mueller Made in Declining to Prosecute Donald Trump Jr.*, Slate (Apr. 18, 2019, 1:55 PM), https://slate.com/news-and-politics/2019/04/donald-trump-jr-mueller-report-campaign-finance.html.

> INCONCEIVABLE: Mueller wrote: "'coordination' does not have a settled definition in federal criminal law" and then proceeded to make up a definition contrary to longstanding federal campaign finance law by requiring an "agreement" between the Trump campaign and Russians.

https://twitter.com/ThePaulSRyan/status/1118917364152786944.

> "Mueller is bending over backwards here to avoid finding willfulness [by Donald Trump, Jr.]," said Marjorie Cohn, a former professor at Thomas Jefferson School of Law in San Diego and former president of the National Lawyers Guild. "There is rarely direct evidence of mental state."

Bob Elgelko, *Why wasn't Donald Trump Jr. indicted? Look to Mueller's 'exercise of caution,'* S.F. Chron. (May 2, 2019, 12:32 PM), https://www.sfchronicle.com/politics/article/Why-wasn-t-Donald-Trump-Jr-indicted-Look-to-13814184.php.

> Senate Judiciary Committee member Senator Richard Blumenthal said it was a "mystery" why special counsel Robert Mueller did not decide to prosecute President Donald Trump's eldest son Donald Trump Jr. in light of a "montage" of evidence against him in the redacted report released Thursday.

Jessica Kwong, *Why Mueller Didn't Indict Donald Trump Jr. is a 'Mystery,' Given 'Montage of Evidence Against Him': Democratic Senator*, Newsweek (Apr. 19, 2019, 11:39 AM) https://www.newsweek.com/mueller-indict-donald-trump-jr-1401182.

After the Report was released, the Attorney General offered to provide a copy to a group of 12 members of Congress from both parties (including one staff member for each) redacting only alleged grand jury material.  Kyle Cheney and Marianne Levine, *Just 2 lawmakers have seen less-redacted Mueller report*, Politico (Apr. 30, 2019, 6:11 PM), https://www.politico.com/story/2019/04/30/mueller-report-redacted-1295105.  Most declined to do so (including all of the Democratic members), but two Republican Senators who reviewed it said that "[s]ome of the redactions could actually be implied from other parts of the report that were not redacted" and "I don't know why they redacted half of what they redacted." *Id.*

Finally, because DOJ is asking the public to accept its representations about what was redacted and why, without *in camera* review by this Court, it bears mention that more than one court has found DOJ to have engaged in prosecutorial misconduct in criminal cases, egregious FOIA violations, or dishonesty to the court in FOIA litigation. *See Bartko v. DOJ*, 898 F.3d 51, 59-61, 65-66, 68  (D.C. Cir. 2018) (finding multiple FOIA violations in DOJ's response to FOIA

request by man "convicted in a case beset by [federal] prosecutorial misfeasance" as part of a "slew of disturbing recent cases" in which "the government [believes] that it can withhold with impunity material that it is constitutionally required to disclose"; holding that "government has not come close to showing" requirements for asserted exemptions, offered "vaporous justification" for its position, relied on a declaration that was "not even in the ballpark," made "no apparent effort to weigh any privacy interest against the countervailing public interest in the disclosure of information concerning allegations of government attorneys' misconduct," put forth "exaggerated reliance on Exemption 7(C)," and made "sweeping[] assert[ions] that the disclosure of any record regarding any allegation of misconduct would be an unwarranted invasion of [a prosecutor's] privacy"); *Judicial Watch, Inc. v. U.S. Dep't of State*, 344 F. Supp. 3d 77, 79-80 (D.D.C. 2018) ("At best, State's attempt to pass-off its deficient search as legally adequate during settlement negotiations was negligence born out of incompetence. At worst, career employees in the State and Justice Departments colluded to scuttle public scrutiny of Clinton, skirt FOIA, and hoodwink this Court.  The current Justice Department made things worse. . . . Counsel's responses strain credulity. And even before this recent chicanery, the Court found enough signs of government wrongdoing to justify discovery, including into whether Clinton used her private email to intentionally flout FOIA."); *Islamic Shura Council of S. Cal. v. FBI*, 779 F. Supp. 2d 1114, 1117 (C.D. Cal. 2011) ("The Government's *in camera* submission raises a very disturbing issue. The Government previously provided false and misleading information to the Court. The Government represented to the Court in pleadings, declarations, and briefs that it had searched its databases and found only a limited number of documents responsive to Plaintiffs' FOIA request and that a significant amount of information within those

documents was outside the scope of Plaintiffs' FOIA request. The Government's representations were then, and remain today, blatantly false.").

### III.    GENERAL LEGAL STANDARDS AND BURDEN OF PROOF

FOIA limits agencies' ability to keep records secret and reflects a policy favoring disclosure. *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 754 (1989). A central purpose of FOIA is to "check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Thus, FOIA requires transparency unless a statutory exemption applies. *Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001). Agencies must prove that withheld information is exempt, *Boyd v. DOJ*, 475 F.3d 381, 385 (D.C. Cir. 2007), and all exemptions are narrowly construed, *Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 214 F. Supp. 3d 43, 51 (D.D.C. 2016), *aff'd* 876 F.3d 346 (D.C. Cir. 2017). Courts review agency determinations *de novo. Houser v. U.S. Dep't of Health & Human Servs.*, 270 F. Supp. 3d 237, 240 (D.D.C. 2017).

Summary judgment for the government in a FOIA case is appropriate only when it "proves that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." DOJ, DOJ Guide to the FOIA ("DOJ FOIA Guide"), Litigation Considerations, https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/litigation-considerations.pdf, at 105; *Media Res. Ctr. v. DOJ*, 818 F. Supp. 2d 131, 137 (D.D.C. 2011); *Friends of Blackwater v. U.S. Dep't of Interior*, 391 F. Supp. 2d 115, 119 (D.D.C. 2005). To meet this burden, an agency generally must provide a "detailed description of the information withheld" (*i.e.*¸ a *Vaughn* Index), which must be "sufficiently detailed" and disclose "as much information as possible without thwarting the exemption's purpose." *Judicial Watch, Inc. v. U.S. Dep't of Commerce*,

- 13 -

375 F. Supp. 3d 93, 98 (D.D.C. 2019) (internal citations and quotation omitted).  Supporting affidavits and declarations must be "clear, specific, reasonably detailed," and describe the withheld information "in a factual and nonconclusory manner," all in the absence of any "evidence of agency bad faith."  DOJ FOIA Guide, Litigation Considerations, at 106.  Legal conclusions are disregarded.  *Id*. at 108; *Petrucelli v. DOJ*, 51 F. Supp. 3d 142, 169 (D.D.C. 2014).

## IV.    DOJ HAS NOT PROVEN ITS EXEMPTION 7(A) OR 7(B) CLAIMS

BuzzFeed does not challenge the threshold requirement under Exemption 7 that the Report was compiled for law enforcement purposes.  But DOJ has failed to prove its blanket claims that release could reasonably be expected to interfere with any law enforcement proceedings or that it would deny Roger Stone a fair trial.

### A.    DOJ Has Not Proven Its Self-Contradictory 7(A) and 7(B) Claims Over Every Bit of Information About Roger Stone, Nor Its Claim That the *Stone* Protective Order Prohibits Release of Everything Related to Stone

DOJ asserts that all of the information it withheld under Exemption 7(B) pertains to the Roger Stone trial. Dkt. # 54 at 24.  In every single instance in which Exemption 7(B) is asserted, however, DOJ has simultaneously asserted Exemption 7(A) (as well as Exemption 7(C)-3, which is discussed later on in this brief). *See, e.g.*, Dkt. #54-4 at 5, 36, 44, 52, 178, 189; Dkt. #54-5 at 128-30, 146-47.  As this makes clear, information is being withheld on the theory that release of each particular bit would both improperly help Mr. Stone (somehow notwithstanding his *Brady* rights) **and** deny him a fair trial. While perhaps there could theoretically be some isolated exceptions (DOJ certainly has not identified them), DOJ's claim that release of the same information would simultaneously help the government and a criminal defendant in the same trial is incongruous.

- 14 -

Also clear is that DOJ has indiscriminately redacted nearly everything about Stone. DOJ's Exemption 7(B) assertions show that Volume I Sections III.D ("Trump Campaign and the Dissemination of Hacked Materials"), V.C.3.c, and V.C.4.b.v of the Report relate to Stone, yet DOJ has overwhelmingly redacted these sections, including even Stone's name. A word search of the Report for "Stone" yields very little, despite his well-known role in the Trump campaign's activities related to the release of stolen DNC emails by WikiLeaks. Conversely, DOJ released the questions the Special Counsel asked the President of the United States about Stone and the President's responses, somehow without the same simultaneous help-the-defendant/hurt-the-defendant concerns that led to its otherwise nearly exhaustive redaction of information related to Stone.

DOJ's improperly heavy-handed approach continues in its sole supporting declaration. The declaration contains only a two-paragraph section under Exemption 7(A) for "Pending Prosecutions." Dkt. # 54-3 at ¶¶ 45-46. These paragraphs neither discuss any specific redactions (even categorically) nor any specific pending prosecutions, including Stone's. *Id.* Rather, the declarant offers only the following generic assertions that could made in any pending case:

> Because these identified cases remain ongoing, they would undoubtedly be harmed by a premature release of the prosecution's evidence or information against the Defendants. Release of this information would reveal the scope, limits, and direction of the investigations and prosecutions, which would allow the indicted individuals and others (e.g., unindicted co-conspirators) to circumvent efforts to bring them to justice by giving them an unprecedented insight into the strengths and weaknesses of the investigations and resulting information and evidence utilized in their indictments and criminal cases. Disclosing information beyond what has generally been officially, publicly disclosed regarding the evidence and information known to the Department also risks that adversarial third parties, including hostile foreign powers, could use that information to fabricate or destroy evidence, tamper with, improperly influence or intimidate witnesses, in an effort to disrupt the criminal justice process.
>
> Release of this information would provide a comprehensive picture of the Special Counsel's and other DOJ components' investigations that could be utilized by the Defendants or adversarial third parties to thwart the pursuit of justice, interfering

with the Department of Justice's prosecution of these pending law enforcement cases. Such release would also be incompatible with court orders and rules prohibiting the disclosure of information relevant to ongoing criminal cases and restricting discovery for sensitive information about ongoing national security investigations.

*Id.* As intimidating as this may sound, the declaration fails to explain ***how*** these things would happen and does not even attempt to connect these purported concerns to any specific pieces of information that have been redacted. Had Congress intended to make all information related to a pending law enforcement proceeding exempt, as opposed to only information that could reasonably be expected to interfere with such proceeding, it surely would have said so. *See also Brady v. Maryland*, 373 U.S. 83, 87 (1963) (criminal defendant has constitutional right to disclosure of exculpatory evidence); *North v. Walsh*, 881 F.2d 1088, 1097 (D.C. Cir. 1989) (the fact that a criminal defendant could obtain records through FOIA before discovery in a criminal case does not constitute interference under Exemption 7(A)); *Johnson v. FBI*, 118 F. Supp. 3d 784, 796 (E.D. Pa. 2015) (holding that it would be "impossible" for Exemption 7(A) to apply to records that were disclosed and made part of the public record pursuant to *Brady*).

Taken together, all of this makes clear that the government has simply and robotically withheld almost every piece of information about Roger Stone based on every conceivable exemption, without undertaking any specific analysis of how any particular exemption applies to any particular bit of information.

Case law simply does not allow this. *E.g. Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1114 (D.C. Cir. 2007) (government must provide "specific information about the impact of the disclosures" and holding that "on the record before us it is impossible to determine whether disclosure would in fact impede" investigation); *Neill v. DOJ*, No. 93-5292, 1994 WL 88219, at *1 (D.C. Cir. Mar. 9, 1994) (conclusory affidavit lacked specificity of description necessary to ensure meaningful review of agency's Exemption 7(A) claims); *Crooker v. ATF*, 789 F.2d 64,

65-67 (D.C. Cir. 1986) (government failed to demonstrate that disclosure would interfere with enforcement proceedings); *Bagwell v. DOJ*, 311 F. Supp. 3d 223, 232 (D.D.C. 2018) ("the agency must specifically articulate ***how*** disclosure would" interfere with a proceeding); *North*, 881 F.2d at 1097 ("the government must show that disclosure of those documents would, in some particular, discernible way, disrupt, impede, or otherwise harm the enforcement proceeding"); *cf. Citizens for Responsibility & Ethics in Washington v. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014) (rejecting wholesale withholding of information about Tom DeLay under privacy exemptions).

Nor does DOJ's approach comply with the 2016 "foreseeable harm" amendment. 5 U.S.C. § 552(a)(8)(A)(i). Under that provision, DOJ is required to "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld" and cannot rely on "boiler plate" assertions or "speculative or abstract fears." *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019); S. Rep. No. 114–4, at 8 (2015).

Worse still, DOJ claims that it "is prohibited by [Judge Jackson's] order from releasing information in the Report ***pertaining to Mr. Stone***." Dkt. # 54 at 54 (emphasis added). That is not what Judge Jackson ordered:

> Counsel for the parties and the witnesses must refrain from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to this case[.]

> [A]ll interested participants in the matter, including the parties, any potential witnesses, and counsel for the parties and the witnesses, must refrain, when they are entering or exiting the courthouse, or they are within the immediate vicinity of the courthouse, from making statements to the media or to the public that pose a substantial likelihood of material prejudice to this case or are intended to influence any juror, potential juror, judge, witness or court officer or interfere with the administration of justice.

*U.S. v. Stone,* No. 1:19-cr-18, Order, ECF No. 36, at 3-4 (D.D.C. Feb. 15, 2019) ("Feb. 15 Stone Order"). This makes abundantly clear that Judge Jackson has ***not*** found it necessary to impose DOJ's total secrecy around Mr. Stone, but only to prohibit statements "that pose a substantial likelihood of material prejudice." Indeed, this was the very standard that the DOJ itself proposed in *Stone*, and contrary to DOJ's Exemption 7(B) assertions here in the alleged interest of Mr. Stone's fair trial rights, Stone objected to ***any*** restrictions at all. *See U.S. v. Stone,* No. 1:19-cr-18, Gov't Mot., at 2 (D.D.C. June 20, 2019) ("Gov't June 20 Mot.") ("Stone filed a response opposing 'any order' under Rule 57.7(c). [citation]  The government filed a response stating that it did not oppose a narrowly-tailored order restricting extrajudicial statements that are substantially 'likely to interfere with the rights of the accused to a fair trial by an impartial jury.'"). *See also, e.g., Washington Post Co. v. DOJ*, 863 F.2d 96, 102 (D.C. Cir. 1988) (government must prove that "it is more probable than not that disclosure of the material sought would seriously interfere with the fairness of those proceedings"); *Chiquita Brands Int'l, Inc. v. SEC*, 10 F. Supp. 3d 1, 5 (D.D.C. 2013) ("the relevant test is not whether pretrial publicity 'could' impact fairness or impartiality"; government must show "why common judicial safeguards such as *voir dire* would be insufficient to ensure fairness"); *Skilling v. U.S.*, 561 U.S. 358, 384 (2010) ("pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial"); *U.S. ex rel. Davis v. Prince*, 753 F. Supp. 2d 561, 568 (E.D. Va. 2010) ("The magistrate judge appropriately denied the request for a blanket gag order. Broad gag orders are restraints on expression and raise First Amendment concerns."); LCrR 57.7(b)(1) (restricting statements only if "there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice"); LCrR 57.7(b)(3) (listing only discreet categories of information specifically prohibited from dissemination in all cases).

Further still, in a public court filing, DOJ argued that "[t]he Court observed that Stone had been charged not only with lying to Congress but also with witness tampering, and that 'the evidence detailed in the indictment alone is quite compelling.'" Gov't June 20 Mot. at 3.  If that sort of statement can be made publicly without risking Stone's fair trial rights—and it clearly can—then surely DOJ's blanket FOIA secrecy is unfounded.

Nor does Judge Jackson's minute order of February 21 change the analysis: that order is limited "to Roger J. Stone, Jr." and his surrogates, and it was entered after Mr. Stone published a picture of Judge Jackson with crosshairs near her head and the statement that "[t]hrough legal trickery Deep State hitman Robert Mueller has guaranteed that my upcoming show trial is before Judge Amy Berman Jackson, an Obama appointed Judge who dismissed the Benghazi charges against Hillary Clinton and incarcerated Paul Manafort prior to his conviction for any crime. #fixisin."  *See* https://twitter.com/davidmackau/status/1097576910488510464.  It has no bearing on the issues here, which presumably do not involve such inflammatory statements by the government in the Report, and it surely cannot be the case that Mr. Stone's alleged contempt has somehow provided a basis to restrict the public's right to information under FOIA.

For all of these same reasons, DOJ has also failed to establish that under the "improper withholding" doctrine it is prohibited by Judge Jackson's orders from releasing any and all "information in the Report pertaining to Mr. Stone." *See* Dkt. # 54 at 54. That prohibition applies only where there is "a substantial likelihood of material prejudice to this case," which DOJ has not shown.  But in addition, DOJ ignores that the orders are limited to statements by "counsel for the parties and the witnesses" and say nothing about release of pre-existing agency records by the DOJ Office of Information Policy under FOIA.

If all of that was not enough to reject DOJ's blanket and internally inconsistent 7(A) and 7(B) claims, DOJ also ignores the substantial amount of information that the DOJ has already released in the indictment.  *U.S. v. Stone*, No. 1:19-cr-18, Indictment, ECF No. 1 (Jan. 24, 2019). Mr. Stone was indicted for false statements, witness tampering, and obstruction, but the indictment elegantly lays out, in great detail, the background of Mr. Stone's involvement with the release of the stolen DNC emails as part of his work on the Trump campaign.  *Id.* at 3-9. Obviously BuzzFeed has not seen the unredacted passages of the Report, but given the breadth of the redactions, logic strongly suggests that an *in camera* comparison of the unredacted Report against the indictment will reveal substantial amounts of public information being improperly withheld.  And as further evidence of that likelihood, DOJ has redacted text in the Report that is supported by a citation to a publicly available Presidential tweet, where the surrounding context in the Report seems to show pretty clearly that the redacted portion merely quotes or blandly describes the public tweet. Dkt. # 54-5 at 151 n.1061.

In light of this panoply of deficiencies, at the very least, the Court should review the Report *in camera*, and if DOJ elects to persist in its blind and blanket exemption claims over everything about Stone, the Court should consider ordering in-court testimony from DOJ subject to cross-examination to test DOJ's implausible claims.  The Roger Stone prosecution is not the comprehensive roadblock to the public's statutory right to timely information under FOIA that DOJ would have it be.

**B.     DOJ Has Not Proven the Remaining Exemption 7(A) Claims**

Beyond the Roger Stone material, DOJ has redacted an extremely broad amount of other information under Exemption 7(A).  *See* Dkt. # 54-4 at 15-51 (largely redacting entire pages). DOJ generically claims that all these redactions are necessary to protect, in some non-specific way untethered to any particular passages or any particular matters, against obstruction of the

generic mass of multiple pending investigations and prosecutions it has listed. Dkt. # 54-3 at ¶¶ 42-51. Yet in addition to the case law cited above requiring specificity in the government's Exemption 7(A) claims, the DOJ itself has acknowledged that "[i]t is well established that in order to satisfy the 'pending/prospective' requirement of Exemption 7(A), an agency must be able to point to a specific pending or contemplated law enforcement proceeding" and that "the government must also establish that some distinct harm could reasonably be expected to result if the record or information requested were disclosed." DOJ FOIA Guide, Exemption 7(A), https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/exemption-7A-2009.pdf, at 524-26. DOJ's generic assertions here fail to meet these standards.

Moreover, in one instance, material was redacted from the FOIA version of the Report that was not redacted in the version released by the Attorney General earlier, providing at least some insight into the breadth of DOJ's Exemption 7(A) assertions. A comparison of those versions shows the following:



Dkt. # 54-4 at 16.



131 & 204.

Robert S. Mueller, III, Report on The Investigation Into Russian Interference In the 2016 Presidential Election (Mar. 2019), https://www.documentcloud.org/documents/ 5955118-The-Mueller-Report.html. Absolutely nothing in DOJ's brief or declaration discusses these kinds of document citations or discloses some category of redacted information that would include them,

let alone establishes that releasing them would somehow harm a pending investigation.  Once again, this counsels strongly in favor of *in camera* inspection.

Finally, DOJ has redacted names and some other information from Appendix D of Volume II of the Report, which lists "transferred, referred, and completed cases."  Dkt. # 54-5 at App'x D.  BuzzFeed does not dispute that if the target of an investigation is unaware that he or she is a target, such information could fall within Exemption 7(A).  But in many instances, it is unclear from Appendix D whether that is the case, especially because Appendix D labels some of the redacted matters as "investigation ongoing" but not others.

## V.    DOJ HAS NOT PROVEN ITS GRAND JURY CLAIMS UNDER EXEMPTION 3

As DOJ concedes, not all material surrounding the grand jury, or even presented to the grand jury, is protected under Rule 6(e).  Rather, it is only information that "would reveal a secret aspect of the grand jury's investigation" that may be withheld.  Dkt. # 54-3 at ¶ 18; *see also In re Motions of Dow Jones & Co.*, 142 F.3d 496, 505 (D.C. Cir. 1998) (grand jury information that is publicly known "has lost its character as Rule 6(e) material" (citation and quotation omitted)); *Senate of the Commw. of P.R. on Behalf of Judiciary Comm. v. DOJ,* 823 F.2d 574, 584 (D.C. Cir. 1987) (Ginsburg, J.) (mere presentation of exhibits to grand jury was insufficient on its own to establish secrecy under FOIA and Rule 6(e)).

DOJ has failed to distinguish between the identity of grand jury witnesses already known to have testified (and thus by DOJ's own admission beyond the scope of Rule 6(e)) and those who are allegedly secret.  There are many people who have already been identified as grand jury witnesses, through self-identification, government court filings, or otherwise.  *U.S. v. Manafort*, 17-cr-201, Dkt. # 460, at 2 (Dec. 7, 2018) (redacting other information but disclosing that Manafort "was called to testify before the grand jury on two occasions"); *The Latest: Witness In*

*Mueller Investigation Held Overnight*, Fox News (June 4, 2019),[3] ("[George] Nader's grand jury testimony came after a December 2016 meeting at New York's Trump Tower that he attended with presidential son-in-law Jared Kushner, former chief strategist Steve Bannon and Mohammed bin Zayed, crown prince of Abu Dhabi."); Spencer S. Hsu, *Andrew Miller, an Aide to Roger Stone, Will Testify Before Mueller Grand Jury After Months-Long Subpoena Fight*, Wash. Post (May 29, 2019);[4] *CNN v. FBI*, 17-cv-1167, Dkt. # 79-2, at ¶ 5 (April 8, 2019) ("Former FBI Director James B. Comey is a witness in the pending investigation."); Manuel Roig-Franzia and Rosalind S. Helderman, *Two More Associates of Roger Stone Testify Before Mueller Grand Jury*, Wash. Post (Nov. 6, 2018)[5] (identifying David Lugo and Tyler Nixon as grand jury witnesses based on their confirmation to the Post); Ronn Torossian, *Grand Jury Witness: Mueller Probe Is a Witch Hunt*, Newsmax (April 6, 2018) (first-person account of grand jury testimony by witness Ronn Torossian)[6]; Aaron Blake, *Steve Bannon's mysterious grand jury subpoena*, Wash. Post (Jan. 17, 2018)[7]; Paul Sperry, *'Scorched Earth': Mueller's Targets Speak Out*, RealClear Investigations (June 6, 2019)[8] (identifying as grand jury witnesses Jerome Corsi, Jason Fishbein, and Carter Page); Jeremy Herb, *Manafort spokesperson testifies before grand jury*, CNN (Sept. 15, 2017)[9] ("Jason Maloni, former Trump campaign chairman

---

[3] https://www.foxnews.com/us/the-latest-witness-in-mueller-investigation-held-overnight.

[4] https://www.washingtonpost.com/local/legal-issues/andrew-miller-an-aide-to-roger-stone-will-testify-before-mueller-grand-jury-after-months-long-subpoena-fight/2019/05/29/1c446e86-8233-11e9-bce7-40b4105f7ca0_story.html?noredirect=on&utm_term=.6dfd48d331c7.

[5] https://www.washingtonpost.com/politics/two-more-associates-of-roger-stone-testify-before-mueller-grand-jury/2018/11/06/cb9637d0-e1ec-11e8-ab2c-b31dcd53ca6b_story.html?noredirect=on&utm_term=.6f4cdaa1f2ec.

[6] https://www.newsmax.com/ronntorossian/mueller-grand-jurytrump/2018/04/06/id/853022/.

[7] https://www.washingtonpost.com/news/the-fix/wp/2018/01/17/steve-bannons-mysterious-and-potentially-pivotal-grand-jury-subpoena/?utm_term=.c7740940f6b8.

[8] https://www.realclearinvestigations.com/articles/2019/05/30/scorched_earth_lives_upturned_muellers_targets_speak_out.html

[9] https://www.cnn.com/2017/09/15/politics/paul-manafort-spokesman-jason-maloni/index.html.

Paul Manafort's spokesman, testified Friday at the US District Court in DC to before a grand jury as part of special counsel Robert Mueller's investigation.   Arriving at the courthouse, Maloni was asked if he was ready to testify. 'Hell yeah,' he responded, giving a thumbs up."); Josh Gerstein, *Manafort Real Estate Agent Testified Before Grand Jury in Russia Probe*, Politico (Oct. 27, 2017)[10] ("Wayne Holland of Alexandria, Virginia-based McEnearney Associates, appeared before the Washington-based grand jury after a federal judge rejected the firm's lawyer's bid to quash subpoenas for testimony and records about various real estate transactions."); Eliza Relman, *We just got our latest hint that Hope Hicks has a detailed diary— and that could be of interest to investigators*, Bus. Insider (Mar. 19, 2018)[11] ("Most recently, Mueller subpoenaed Sam Nunberg, a former aide to Trump who initially said he would refuse to appear before a federal grand jury or turn over his communications with other aides but later agreed to cooperate.").

While BuzzFeed is of course not privy to the redacted information, in many instances it appears rather clear that the redacted information pertains to these already-known grand jury witnesses, or their identities seem apparent from the Report itself.  *See* Dkt. # 54-4 at 91, 93 (Clovis); *id.* at 95-97, 102, 166 (Page); *id.* at 130, 140, 143 (Manafort); *id.* at 146 (Aven); *id.* at 147 n. 989 (Nader).   And unlike the agency in *Judicial Watch, Inc. v. National Archives & Records Administration,* 214 F. Supp. 3d 43, 57 (D.D.C. 2016), *aff'd*, 876 F.3d 346 (D.C. Cir. 2017), there is no indication here that DOJ compared the withheld grand jury information to what is already public.

---

[10] https://www.politico.com/story/2017/10/27/paul-manafort-realtor-russia-probe-robert-mueller-244261.
[11] https://www.businessinsider.com/does-hope-hicks-have-a-diary-trump-2018-3.

In addition, DOJ has withheld "identifying information" other than names.  But DOJ has not explained what "identifying information" means or how this non-name information could actually be used to identify any individuals as grand jury witnesses.  Moreover, this type of claim should be subject to *in camera* inspection.  *Cf. Dep't of Air Force v. Rose*, 425 U.S. 352, 380–81 (1976) (requiring *in camera* inspection for indirect identification claim under privacy exemptions); *BuzzFeed Inc. v. U.S. Dep't of Ed.*, 18-cv-01535-CRC, Dkt. # 24 (June 13, 2019) (same).

In addition to names and "identifying information," DOJ has withheld information that it says was presented to the grand jury.  A tremendous amount of information has already been disclosed about the investigation, including throughout the Report.  DOJ has failed to establish that any of this Rule 6(e)-withheld information is actually secret.  Nor has it explained how this information would somehow reveal some unknown strategy or direction of the investigation, or how disclosure of the information on its own would reveal that the information was even presented to the grand jury.  *See Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 870 (D.C. Cir. 1981) (Rule 6(e) inquiry is "whether revelation in the particular context would ***in fact*** reveal what was before the grand jury" (emphasis added)).  While DOJ has not specified which redactions fall into this category, presumably they are the main-text (vs. footnote) redactions on pages 55, 85, 93, 94, 96-98, 100-102, 111, 112, 114, 116-18, 120, 122, 130, 136, 137, 139, 140, 143, 148, 150, 151-55, 165-167, 194, and 199 of Volume I of the Report, and pages 13, 46, 97, and C-2 of Volume II.

In many instances, it is difficult to understand how the information could be exempt, or why it was withheld when related information was released:

▮▮▮ (b) (3)                          the statement drafted by Trump Organization representatives was (b)(3)-1
▮▮▮ (b) (3)                ⁷⁶⁸  He proposed a different statement, asserting that he had been
asked "by [his] client in Moscow – Emin Agalarov – to facilitate a meeting between a Russian
attorney (Natalia Veselnitzkaya [sic]) and Donald Trump Jr.  The lawyer had apparently stated
that she had some information regarding funding to the DNC from Russia, which she believed Mr.
Trump Jr. might find interesting."⁷⁶⁹  Goldstone never released either statement.⁷⁷⁰

Dkt. # 54-4 at 122.

            After the June 9 meeting concluded, Goldstone apologized to Trump Jr.⁷⁴³  According to
Goldstone, he told Trump Jr. ▮▮(b) (3)▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮⁷⁴⁴ and     (b)(3)-1
told  Emin  Agalarov  in  a  phone  call  that  the  meeting  was  about  adoption ▮(b) (3)
▮▮⁷⁴⁵ (b) (3)▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮⁴⁶  Aras Agalarov asked Kaveladze to
report in after the meeting, but before Kaveladze could call, Aras Agalarov called him.⁷⁴⁷  With
Veselnitskaya next to him, Kaveladze reported that the meeting had gone well, but he later told
Aras Agalarov that the meeting about the Magnitsky Act had been a waste of time because it was
not with lawyers and they were "preaching to the wrong crowd."⁷⁴⁸

*Id.* at 120.

            Papadopoulos's message came at a time when Clovis perceived a shift in the Campaign's approach
toward Russia—from one of engaging with Russia through the NATO framework and taking a
strong stance on Russian aggression in Ukraine, ▮(b) (3)▮▮▮▮▮▮▮▮     (b)(3)-1
▮▮▮▮▮▮▮▮▮▮▮▮▮▮⁴³⁰

*Id.* at 85.

            In 2008, Page founded Global Energy Capital LLC (GEC), an investment management and
advisory firm focused on the energy sector in emerging markets.³¹⁹ ▮(b) (3)       (b)(3)-1
▮▮▮▮⁵²⁰  The company otherwise had no sources of income, and
Page was forced to draw down his life savings to support himself and pursue his business
venture.⁵²¹  Page asked Yatsenko to work with him at GEC as a senior advisor on a contingency
basis, ▮▮(b) (3)▮▮▮▮▮▮
▮▮▮⁵²²

            In 2008, Page met Alexander Bulatov, a Russian government official who worked at the
Russian Consulate in New York.⁵²³  Page later learned that Bulatov was a Russian intelligence
officer,▮(b) (3)▮▮▮▮▮▮▮▮▮▮▮▮⁵²⁴     (b)(3)-1

*Id.* at 96.

            On June 3, 2016, Emin Agalarov called Goldstone, Emin's then-publicist.⁶⁶⁹  Goldstone is
a music and events promoter who represented Emin Agalarov from approximately late 2012 until
late 2016.⁶⁷⁰   While representing Emin Agalarov, Goldstone facilitated the ongoing contact
between the Trumps and the Agalarovs—including an invitation that Trump sent to Putin to attend
the 2013 Miss Universe Pageant in Moscow.⁶⁷¹ ▮(b) (3)▮▮▮▮
                                                                            (b)(3)-1
▮▮▮▮▮▮⁶⁷²  Goldstone understood ▮(b) (3)▮▮▮▮▮▮▮ a
Russian political connection, and Emin Agalarov indicated that the attorney was a prosecutor.⁶⁷³
Goldstone recalled that the information that might interest the Trumps involved Hillary Clinton
▮(b) (3)▮▮▮▮▮▮▮▮⁶⁷⁴ ▮(b) (3)▮▮

- 26 -

*Id.* at 111.

> Manafort's role in it, and assessed Trump's prospects for victory.[895]   Manafort did not
> acknowledge instructing Gates to send Kilimnik internal data, **(b) (3)**
> [896]

**(b)(3)-1**

*Id.* at 137.

> After the brief second meeting concluded, Nader and Dmitriev discussed what had
> transpired.[1078]  Dmitriev told Nader that he was disappointed in his meetings with Prince for two
> reasons:  first, he believed the Russians needed to be communicating with someone who had more
> authority within the incoming Administration than Prince had.[1079]  Second, he had hoped to have
> a discussion of greater substance, such as outlining a strategic roadmap for both countries to
> follow.[1080]  Dmitriev told Nader that **(b) (3)**            Prince's comments **(b) (3)**
> **(b) (3)**                    were insulting **(b) (3)**                 [1081]

**(b)(3)-1**

*Id.* at 155.

> Aven replied to Burt's email on the same day, saying "Thank you.  All clear."[1184]
> According to Aven, this statement indicated that he did not want the outreach to continue.[1185]  Burt
> spoke to Aven some time thereafter about his attempt to make contact with the Trump team,
> explaining to Aven that the current environment made it impossible. **(b) (3)**
> [1186] Burt did not recall discussing Aven's request with Simes again, nor did
> [1187]

**(b)(3)-1**

*Id.* at 165.



**(b)(3)-1**

Dkt. # 54-4 at 102.



**(b)(3)-1**

*Id.* at 103.

> \$40,000.[915]  Manafort's identification of Yanukovych as "the guy who gave you your biggest black
> caviar jar" is consistent with Kilimnik being in Moscow—where Yanukovych resided—when
> Kilimnik wrote "I met today with the guy," and with a December 2016 email in which Kilimnik
> referred to Yanukovych as "BG," **(b) (3)**              [916]  Manafort replied to Kilimnik's July 29
> email, "Tuesday [August 2] is best . . . Tues or weds in NYC."[917]

**(b)(3)-1**

*Id.* at 139.

> Aven **(b) (3)**        told Putin he would take steps to protect himself and the Alfa-Bank
> shareholders from potential sanctions, and one of those steps would be to try to reach out to the
> incoming Administration to establish a line of communication.[986]  Aven described Putin
> responding with skepticism about Aven's prospect for success.[987]  According to Aven, although

**(b)(3)-1**

*Id.* at 147.

Other passages appear to be discussions of the Special Counsel's decisions, not matters occurring before the grand jury:

> Trump Jr., Manafort, and Kushner participated on the Trump side, while Kaveladze, Samochornov, Akhmetshin, and Goldstone attended with Veselnitskaya.[722]  The Office spoke to every participant except Veselnitskaya and Trump Jr., the latter of whom declined to be voluntarily interviewed by the Office **(b) (3)**                                                                    **(b)(3)-1**

*Id.* at 117.

> We also sought a voluntary interview with the President.  After more than a year of discussion, the President declined to be interviewed. **(b) (3)**                                     **(b)(3)-1**
> _____ During the course of our discussions, the President did agree to answer written questions on certain Russia-related topics, and he provided us with answers.  He did not similarly agree to provide written answers on obstruction topics or questions on events during the transition.  Ultimately, while we believed that

Dkt. # 54-5 at 13.

> At the time of the President's one-on-one meeting with Comey, no grand jury subpoenas had been issued as part of the FBI's investigation into Flynn.  But Flynn's lies to the FBI violated federal criminal law, **(b) (3)**                                              , and resulted in Flynn's **(b)(3)-1** prosecution for violating 18 U.S.C. § 1001.  By the time the President spoke to Comey about

*Id.* at 46.



> Recognizing that the President would not be interviewed voluntarily, we considered whether to issue a subpoena for his testimony.  We viewed the written answers to be inadequate. But at that point, our investigation had made significant progress and had produced substantial evidence for our report.  We thus weighed the costs of potentially lengthy constitutional litigation, with resulting delay in finishing our investigation, against the anticipated benefits for our investigation and report.  As explained in Volume II, Section II.B., we determined that the

*Id.* at C-2.

In addition to these deficiencies, DOJ's position ignores that when information is sought for its own intrinsic value, as opposed to trying to learn what took place before the grand jury, and where no serious threat to the functioning of the grand jury would result from disclosure,

that information is outside the scope of Rule 6(e)'s secrecy provisions.  *E.g., In re Grand Jury Impaneled Oct. 2, 1978 (79-2)*, 510 F. Supp. 112, 115 (D.D.C. 1981) ("Since the Subcommittee is looking into the Public Integrity Section's performance and not the grand jury itself, these record analyses would seem to fall into that category of unprotected documents that have a significance of their own here as part of the Public Integrity Section's investigation of Robert Vesco.").  The primary and overwhelming import of any purported grand jury information here is not the activities of the grand jury, but a total and fully accurate understanding, beyond any question or dispute, of the evidence before the Special Counsel and Attorney General when they—not the grand jury—variously determined that the President and his associates did not collude with the Russian government in our election and either reached no charging decision regarding the President for DOJ policy and constitutional reasons (Special Counsel) or made that decision and affirmatively declined to charge the President with obstruction of justice for lack of evidence (Attorney General).

Similarly, Rule 6(e) does not apply where "release fails to elucidate the inner workings of the grand jury."  *Murphy v. FBI*, 490 F. Supp. 1138, 1141 (D.D.C. 1980).  In the specific circumstances here, the scope and direction of the investigation is already laid out in detail in the Report and the specific appointment of the Special Counsel. Thus, none of the withheld information seems likely to reveal anything meaningful about the strategy or direction of the grand jury or the investigation, and thus, Rule 6(e) does not apply.

Finally, though this Court likely need not even reach this question, BuzzFeed disputes the continued validity of any Rule 6(e) case law to the extent it applies to all grand jury material with no further showing required.  *See* Dkt. # 54 at 12.  The Supreme Court has explained that grand jury secrecy is justified by specific and discreet interests:

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 219 (1979).  Rule 6(e) should not be interpreted to apply in the first instance unless at least one of these interests is actually served by the Rule's secrecy provisions as to the specific information at issue.  *Cf. Butterworth v. Smith*, 494 U.S. 624, 633-34 (1990) (interests in preventing escape and the importuning of grand jurors inapplicable after conclusion of grand jury investigation; interest in protecting witnesses from suborning of perjury "marginal at best" in light of disclosure obligations under Federal Rules of Criminal Procedure; and reputational interest in protecting the exonerated insufficient to overcome witnesses' First Amendment rights to disclose their own testimony); Ric Simmons, *Re-Examining the Grand Jury: Is There Room for Democracy in the Criminal Justice System?*, 82 B.U. L. Rev. 1, 72 (2002) ("Unlike the grand jury itself, the mandated secrecy for grand jury proceedings is truly a historical artifact that no longer serves any useful purpose.").

Where a grand jury investigation has ended, where the scope of its investigation is well-known and has been detailed both in the appointment of a special counsel and in a report released by the Attorney General (and, some have said, used by the Attorney General to advocate on behalf of the subject of that investigation[12]), where the people who were subject to the

---

[12] *See Transcript: Attorney General William Barr's Press Conference Remarks Ahead of Mueller Report Release*, Politico (Apr. 18, 2019, 10:30 AM), https://www.politico.com/story/2019/04/18/transcript-barr-press-conference-1280949 (Attorney General, "offer[ing] a few comments" in press conference held before the Report was made available, including: "In assessing the President's actions discussed in the report, it is important to bear in mind the context. President Trump faced an unprecedented situation. As he entered into office, and sought

investigation are public figures and the investigation involves efforts to undermine our democratic system and potential obstruction of justice by the President of the United States, where a main subject of the investigation has affirmatively claimed that he has been "exonerated" by the Report, where the government is not attempting to use compelled grand jury testimony in another criminal or civil matter, and where witnesses were brought before the grand jury by compulsion (as opposed to voluntarily), none of the purposes of grand jury secrecy actually apply, and so the information should not qualify for protection under Rule 6(e). Notably, with the exception of a tiny number of redactions on pages 176, 194, and 199 of Volume I of the Report, Defendants did not assert the exemptions applicable where release of information would harm any pending investigation; might deny anyone the right to a fair trial; would disclose unique law enforcement or intelligence techniques; or would be an invasion of

---

to perform his responsibilities as President, federal agents and prosecutors were scrutinizing his conduct before and after taking office, and the conduct of some of his associates. At the same time, there was relentless speculation in the news media about the President's personal culpability. Yet, as he said from the beginning, there was in fact no collusion. And as the Special Counsel's report acknowledges, there is substantial evidence to show that the President was frustrated and angered by a sincere belief that the investigation was undermining his presidency, propelled by his political opponents, and fueled by illegal leaks. Nonetheless, the White House fully cooperated with the Special Counsel's investigation, providing unfettered access to campaign and White House documents, directing senior aides to testify freely, and asserting no privilege claims. And at the same time, the President took no act that in fact deprived the Special Counsel of the documents and witnesses necessary to complete his investigation. Apart from whether the acts were obstructive, this evidence of non-corrupt motives weighs heavily against any allegation that the President had a corrupt intent to obstruct the investigation."); *see also* Letter from Special Counsel Robert Mueller to Attorney General William Barr (March 27, 2019) (*available at* https://www.washingtonpost.com/context/special-counsel-mueller-s-letter-to-attorney-general-barr/e32695eb-c379-4696-845a-1b45ad32fff1/?utm_term=.d8ac6eaa43d9) ("The summary letter the Department sent to Congress and released to the public late in the afternoon of March 24 did not fully capture the context, nature, and substance of this Office's work and conclusions."); Ian Schwartz, *Barr: Mueller Memo "A Bit Snitty," "Probably Written By A Member Of His Staff,"* RealClear Politics (May 1, 2019), https://www.realclearpolitics.com/video/2019/05/01/barr_mueller_letter_a_bit_snitty_probably_written_by_a_member_of_his_staff.html.

privacy. Instead they rely on grand jury secrecy for its own sake. That should be insufficient to justify secrecy over this important information in this case.

## VI. DOJ HAS NOT PROVEN ITS SOURCES AND METHODS CLAIMS UNDER EXEMPTIONS 3 OR 7(E)

### A. DOJ's Generic Exemption 7(E) Claims are Inadequate and Require *In Camera* Inspection

Exemption 7(E) permits the government to withhold information compiled for law enforcement purposes only if release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure would reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The D.C. Circuit has applied the "risk of circumvention" language in 7(E) to law enforcement techniques and procedures. *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011). Although 7(E) "sets a 'low bar for the agency to justify withholding,' the agency must at least provide *some* explanation of what procedures are involved and how they would be disclosed." *Citizens for Responsibility and Ethics in Washington v. DOJ*, 746 F.3d 1082, 1102 (D.C. Cir. 2014) (quoting *Blackwell*, 646 F.3d at 42, emphasis in original). Thus, DOJ "cannot rely upon [a] vaguely worded categorical description," but "must provide evidence from which the Court can deduce something of the nature of the techniques in question." *Clemente v. FBI*, 741 F. Supp. 2d 64, 88 (D.D.C. 2010).

Yet DOJ has done precisely what these cases do not allow: it alleges that "the specific circumstances concerning" the "techniques and procedures" at issue absolve it of providing even a rudimentary description. Dkt. # 54-3 at ¶ 84. Instead DOJ repeats the statutory phrase "techniques and procedures" without elaboration, generically alleging that "detailed information about the circumstances of their use" would allegedly "enable wrongdoers." *Id.*; Dkt. # 54-3 at

¶¶ 83-84. But, "[a] near-verbatim recitation of the statutory standard is inadequate" because "[w]e are not told what procedures are at stake." *CREW*, 746 F.3d at 1102.

"[T]he purpose of Exemption 7(E) is to prevent the public from learning about the existence of confidential law enforcement techniques, not to prevent it from learning about the use of already-disclosed law enforcement techniques." *Shapiro v. DOJ*, 153 F. Supp. 3d 253, 273 (D.D.C. 2016). DOJ concedes that some of the techniques it withheld "may generally be known to the public," but still withholds them anyway. Dkt. # 54-3 at ¶ 83; *see Shapiro*, 153 F. Supp. 3d at 273 (citing H.R. Rep. 93-1380 at 12 (1975) (Exemption 7(E) "should not be interpreted to include routine techniques and procedures already well known to the public")); *see also* 120 Cong.Rec. 36626 (1974) (remarks of Representative Reid) ("[t]he courts, in my view, have the duty to look behind any claim of exemption, which all too often in the past has been used to cover up inefficiency or embarrassment even in foreign policy matters, which, many times are fully known by other countries but not printable in our own [sic] supposedly the most democratic and most open in the world"). Put differently, DOJ merely states that the undisclosed techniques and procedures are, in fact, techniques and procedures, and thus does "not seek to protect individual mosaic tiles, which when placed together could reveal protected information, but rather seeks to amass a haystack in which to hide" broader categories of information. *See Shapiro v. U.S. Dept. of Justice*, 239 F. Supp. 3d 100, 113 (D.D.C. 2017) (internal quotations omitted).

Of course, intelligence agencies "have power to withhold superficially innocuous information on the ground that it might enable an observer to discover the identity of an intelligence source." *CIA v. Sims*, 471 U.S. 159, 178 (1985). But this does not give the government carte blanche to withhold "already disclosed law enforcement techniques" on the

basis of their relation to an investigation.  *Shapiro*, 153 F. Supp. 3d at 273; *see also Morley v. CIA*, 508 F.3d 1108, 1115 (D.C. Cir. 2007) ("conclusory and generalized allegations of exemptions are unacceptable" (quotation and citation omitted)).

Further, some of the redactions leave no indication as to how the material is likely exempt, suggest that it is not exempt when read in context, or may indicate selective application:



Dkt. # 54-4 at 31.

*Id.* at 23.

"[I]f the court is unable to sustain nondivulgence on the basis of affidavits, *in camera* inspection may well be in order."  *Founding Church of Scientology of Washington, D.C., Inc. v. NSA,* 610 F.2d 824, 830 (D.C. Cir. 1979).  Indeed, the circumstances for withholding concededly "known" law enforcement techniques may render *in camera* review plainly "necessary and appropriate."  *Id.*  Thus, many courts have adjudicated 7(E) claims after an *in camera* review. *See Gosen v. U.S. Citizenship and Immigration Servs.*, 75 F. Supp. 3d 279, 290 (D.C. Cir. 2014) (basing a determination of whether documents fell under 7(E) on an *in camera* review); *Mayer Brown, LLC v. IRS.*, 562 F.3d 1190, 1192 (D.C. Cir. 2009) (noting that the district court ruled on a motion for summary judgment after an *in camera* review); *Brown v. FBI*, 873 F. Supp. 2d 388, 407 (D.D.C. 2012) ("If a party wishes to claim secrecy and not describe the techniques in any way, it is free to submit the documents to *in camera* inspection."); *Albuquerque Pub. Co. v. DOJ,*

726 F. Supp. 851, 857 (D.D.C. 1989) (ordering an *in camera* review because the "agency provide[d] the Court with insufficient information about the nature of the techniques").

Likewise, the Court should conduct an *in camera* review here.

**B.     DOJ's Exemption 3 Claims Are Similarly Inadequate and Require *In Camera* Review**

For redactions coded as 7(E)-1, DOJ has also asserted Exemption 3 and the National Security Act.   BuzzFeed does not dispute that the NSA is an Exemption 3 statute, but nonetheless, DOJ must furnish the Court with affidavits that "describe the justification for nondisclosure with specific detail[.]"  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009).  When that detail is lacking, a court may determine that "*in camera* inspection is needed in order to make a responsible *de novo* determination on the claims of the exemption." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978).  As explained in *Ray*, the legislative history "does not support" the conclusion that "*in camera* inspection is seldom, if ever, necessary or appropriate" under Exemption 3.   *Id.*   That is because notwithstanding the deference courts afford agency determinations in this context, the courts "still ha[ve] an independent role to play in the FOIA analysis." *Whitaker v. CIA,* 31 F. Supp. 3d 23 (D.D.C. 2014).

Here, the sole substantive affidavit paragraph relied on by DOJ merely states that DOJ "protected unclassified sources and methods relating to investigative and information gathering techniques used in investigations into interference activities emanating from Russia in the 2016 presidential election," which "reflects material identified by the intelligence and law enforcement communities as potentially compromising sensitive sources, methods, or techniques, the release of which could cause harm to ongoing intelligence gathering or law enforcement activities," and which "would present the potential for individuals and foreign agents to develop and implement countermeasures to evade detection, which would result in the loss of significant intelligence

information." Dkt. # 54-3 at ¶ 23. This is far from "specific detail," and thus, the Court should exercise its discretion and review DOJ's Exemption 3 redactions *in camera*. *See, e.g., Electronic Privacy Information Center v. Office of the DNI*, 982 F. Supp. 2d 21, 31 (D.D.C. 2013); *Electronic Privacy Information Center v. DOJ*, 296 F. Supp. 3d 109, 113 (D.D.C. 2017); *Schlesinger v. CIA*, 591 F. Supp. 60, 70 (D.D.C. 1984); *Brick v. DOJ*, 358 F. Supp. 3d 37, 42 (D.D.C. 2019).

## VII.    DOJ HAS NOT PROVEN ITS EXEMPTION 6 AND 7(C) CLAIMS

### A.    The Tremendous Public Interest in Disclosure in Fully Understanding the Work and Decisions of the Special Counsel and Attorney General

The fact that information implicates a privacy interest does not, on its own, mean that the information is exempt under FOIA. Rather, as DOJ concedes, Exemptions 6 and 7(C) apply only when the claimed privacy interests outweigh the public interest in disclosure. Dkt. # 54 at 32; *see also, e.g., Archibald v. DOJ*, 950 F. Supp. 2d 80, 88 (D.D.C. 2013) ("The threat to a privacy interest is alone not sufficient to withhold disclosure under Exemption 7(C)."). DOJ does not dispute that, as a cornerstone legal proposition, the public interest favors disclosure where information significantly contributes to the public's understanding of the operations or activities of the government, or, as a factual matter, that there in an "intense public interest" in the Special Counsel Office's work at issue here. Dkt. # 54 at 33, 36, 38; *see also, e.g., Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 171–72 (2004) ("FOIA is often explained as a means for citizens to know what their Government is up to. This phrase should not be dismissed as a convenient formalism." (internal quotation and citation omitted)).

Nonetheless, DOJ ignores binding case law and attempts to impose a burden on BuzzFeed that goes well beyond currently applicable legal standards. Relying on *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991), DOJ claims that BuzzFeed must prove

that release of the privacy-redacted information "is necessary" to "confirm or refute compelling evidence" that DOJ "is engaged in illegal activity."  Dkt. # 54 at 32.  Under binding Supreme Court precedent that post-dates *SafeCard* by over a decade, however, the actual standard is far less draconian:

> We hold that, where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.

*Favish*, 541 U.S. at 174; *see also id.* at 173 ("The Court of Appeals [improperly] required no particular showing that any evidence points with credibility to some actual misfeasance or other impropriety.").  In *Favish*, it was important to the Court that "five different inquiries into the [Vince] Foster matter reached the same conclusion," thus rendering the requester's claims about impropriety in the Foster death investigation implausible and unsupported for the purposes of public interest under the privacy exemptions.  *Id.* at 175.  DOJ fails to cite *Favish*, other than for a single unrelated legal proposition.

The distinctions between these standards are stark and dispositive in two ways.  First, BuzzFeed need not provide "compelling evidence" of government impropriety; it need only go beyond a "bare suspicion" and "produce evidence that would ***warrant a belief*** by a reasonable person that the alleged Government impropriety ***might*** have occurred."  *Id.* at 174 (emphasis added).  And second, the impropriety need not be "illegal activity," but only "that responsible officials acted negligently or otherwise improperly in the performance of their duties."  *Id.*

Further, the D.C. Circuit addressed a related issue five years ago in *Citizens for Responsibility & Ethics in Washington v. DOJ,* 746 F.3d 1082 (D.C. Cir. 2014)—a case that DOJ, again, cites only for unrelated propositions.  Relying on *Favish*, the court in *CREW*

- 37 -

addressed the applicability of Exemption 7(C) to records about the FBI's corruption investigation into former House Majority Leader Tom DeLay and lobbyist Jack Abramoff. *Id.* at 1087. The D.C. Circuit reversed the district court's categorical privacy determinations, noting that disclosure of the FBI investigative records at issue "could shed light on how the FBI and the DOJ handle the investigation and prosecution of crimes that undermine the very foundation of our government," as well as the "diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion." *Id.* at 1093. "Indeed, we have repeatedly recognized a public interest in the manner in which the DOJ carries out substantive law enforcement policy," in addition to the separate kind of public interest recognized in *Favish. Id.* (collecting cases). The court further observed that the fact that the investigation implicated a "prominent" public official "further raises the stakes." *Id.* at 1095; *see also Bartko v. DOJ,* 898 F.3d 51, 69 (D.C. Cir. 2018) (public interest "crescendos when the misfeasance of a federal prosecutor with the power to employ the full machinery of the state in scrutinizing any given individual is at stake" (citation and quotation omitted)).

Under these standards, BuzzFeed has more than adequately shown a tremendous—indeed, unprecedented—public interest in disclosure. According to a source no less authoritative than the President of the United States, the Mueller investigation was "biased," the result of "conflicts of interest," and "rigged." *See supra* Section II. It was "an investigation in search of a crime" and originated from a dossier "knowingly and falsely submitted to FISA," where someone "should be looking at the judges who signed off." *Id.* The Special Counsel "viciously [told] witnesses to lie about facts," "horribly threatening them to come up with the answers [the Special Counsel] wants," while important witnesses "were never even called to testify." *Id.* The investigation was an effort to "frame" the President and an "attempt to legalize a coup." *Id.*

It was headed by "a Trump hater" who had "gone rogue" and did "tremendous damage to our criminal justice system," and the Report was composed by "Angry Democrats." *Id.* Statements by agents "could well be treason," and Mr. Mueller and his team "ought to be in jail." *Id.* While all of this is more than enough to "warrant" a belief by a "reasonable person" that something improper "might" have occurred in the investigation, even under the DOJ's "illegal conduct" standard, the President of the United States has repeatedly and specifically informed the public that the investigation was "unlawful" and "illegal." *Id.*

Some have simply written off these statements as the words of a prevaricator who would say anything to discredit an investigation against him, but the DOJ has offered zero evidence to that effect. If the Presidency itself is to retain credibility as an institution, this Court cannot simply ignore these repeated, detailed statements by the President, or the claims by the Attorney General that the federal government may have spied on Mr. Trump's campaign, warranting a federal investigation into the issue. Not only would a reasonable person be justified in believing the President and the Attorney General, but according to polls cited by the President, over half the country has reached precisely that conclusion. *Id.*

But there is more.

As discussed above, other government officials and legal experts have raised serious questions about the Special Counsel's decisions not to charge various people, including the President's son, and not to call Trump Jr. or the President before the grand jury. *See supra* Section II. As one United States Senator has said, it is a "mystery" why the Special Counsel declined to prosecute Donald Trump, Jr. in light of a "montage" of evidence against him. *Id.* And further still, a reasonable person would be justified in believing a dozen United States Senators, and to some extent the Special Counsel himself, in concluding that the Attorney

General—who has seen the full unredacted Report and made the original redaction decisions—
might have improperly characterized the Report and improperly advocated on behalf of the
President for political or other reasons. *Id.*

Put simply, while the purpose of the Special Counsel is to give the American people
confidence that an investigation into a sitting President is conducted fairly, the end result from all
of this has been quite the opposite.   To help restore public trust and alleviate the climate of
distrust and venom that has set upon us, including the "partisan attacks" decried by the DOJ in its
brief, full transparency is justified and necessary so that the public not be left with important
unanswered questions. Dkt. # 54-3 at ¶ 65.

### B.      No Privacy Interests Outweigh This Tremendous Public Interest

Against this prodigious public interest in disclosure, DOJ must demonstrate a truly
monumental privacy interest to tip the scales in favor of secrecy.   DOJ has offered nothing of the
sort, and relies on generic privacy assertions that, in many instances, are too vague to allow the
public or this Court even to understand what specific interest or theory is being asserted.

Before turning to specific privacy claims, a review of the redactions suggests that DOJ
was arbitrarily selective in protecting purported privacy.   For example, DOJ states it withheld
records of those investigated but not charged, but it released discussions of Carter Page, George
Papadopoulos, and Jeff Sessions being investigated for various crimes for which they were not
ultimately charged.   Dkt. # 54-4 at 183, 192, 197.   It also withheld the names of press institutions
contacted by Russians, but names The Smoking Gun as exactly that.   *Id.* at 42.

Other claims are dubious on their face.   DOJ withheld information about a reporter who
was allegedly "tricked" by the Russians, Dkt. # 54-4 at 29 n.83, yet there is no indication the
reporter was actually tricked or did anything in response to being contacted by the Russians at
all.   *See* Dkt. # 54-4 at 42.   DOJ also withheld various names as insignificant "mere mentions,"

but two of these names were important enough to list in the Report's glossary. Dkt. # 54-5 at B-5. DOJ even redacted information that it conceded in the same breath is publicly available. Dkt. # 54-4 at 41 n.140. This facially overbroad and arbitrary application of exemptions necessitates *in camera* review.

As to the specific sub-categories DOJ delineates, first, DOJ points to the "names, social media account information, and other contact information that could reveal the identities of third parties who were unknowingly involved in election interference efforts carries out by Russian nationals." Dkt. # 54 at 35. In violation of *Vaughn*'s specificity requirements, however, it is unclear exactly what this means: as best BuzzFeed can tell, these are likely people who received emails or social media contacts from Russian-controlled fake accounts and perhaps liked or retweeted things they posted on social media. DOJ points to no case law addressing this situation, so instead it characterizes these people as "crime victims," without explaining how any crimes were committed ***against these individuals***. It then relies on cases finding a privacy interest for victims of sex trafficking, the Jonestown Massacre, sexual assault of a juvenile, murder, rape, and kidnapping—a hopelessly far cry from unknowingly reading or retweeting Russian-made fake content, or whatever it is that DOJ means by "interacted or engaged with the IRA's social media activities." Dkt. # 54 at 35-36 (citing *Boehm v. FBI*, 948 F. Supp. 2d 9, 30 (D.D.C. 2013); *McGehee v. DOJ*, 800 F. Supp. 2d 220, 233 (D.D.C. 2011); *Banks v. DOJ*, 757 F. Supp. 2d 13, 19 (D.D.C. 2010); *Kishore v. DOJ*, 575 F. Supp. 2d 243, 256 (D.D.C. 2008); *Elliott v. FBI*, 2007 WL 1302595, at *6 (D.D.C. May 2, 2007); *Coleman v. FBI*, 13 F. Supp. 2d 75, 79 (D.D.C. 1998)). Indeed, some have said that the President himself on the one hand, and his political opponents on the other, routinely tweeted false information or "fake news," and it surely

cannot be the case that there is any significant privacy interest in retweeting such things when they turn out to be untrue.

DOJ also included within this category of alleged privacy interests the names of Facebook groups. Dkt. # 54 at 36 n.19.   DOJ cites no precedent for the idea that such a group has any privacy interest whatsoever, *see FCC v. AT&T Inc*., 562 U.S. 397, 405-07 (2011) (non-human corporate entities have no privacy interests under FOIA), and fails to explain how the public could identify any individual person associated with such groups at the relevant time or how their specific privacy would be harmed by knowing that a Russian agent somehow interacted with the group itself.

Second, DOJ withheld "names and personally-identifiable information about individuals not charged by the Special Counsel's office."   Dkt. # 54 at 37.   The Special Counsel's declination decisions are at the very core of the massive public interest discussed above because they would help the public not only to understand DOJ criminal justice policy when it comes to investigations into politically power people, *see CREW*, 746 F.3d at 1095, but also whether the investigation was an illegal witch hunt, on the one hand, or the result of punch-pulling against Donald Trump, Jr. or others in an effort to avoid a confrontation with the President that would slow down the issuance of a Report that was seemingly intended only to determine whether Congress should consider impeachment proceedings. *See Favish*, 541 U.S. at 174; Dkt. # 54-5 at 13 (explaining decision not to subpoena the President was based on fear of "substantial delay"); *id.* at § III.B.2 (titled "Separation-of-Powers Principles Support the Conclusion that Congress May Validly Prohibit Corrupt Obstructive Acts Carried Out Through the President's Official Powers."); *Full Transcript on Mueller's Statement on the Russia Investigation*, N.Y. Times (May 29, 2019),  https://www.nytimes.com/2019/05/29/us/politics/ mueller-transcript.html (stating that

"a president cannot be charged with a federal crime while he is in office" and that "the Constitution requires a process other than the criminal justice system to formally accuse a sitting president of wrongdoing").

In support of its claim that there is insufficient public interest in understanding completely the evidence before the Special Counsel and Attorney General when they reached their declination decisions (or at least some of those decisions, since DOJ has released that kind of information for Carter Page, Jeff Sessions, and others), DOJ relies primarily on *Judicial Watch, Inc. v. National Archives & Records Administration*, 876 F.3d 346, 350 (D.C. Cir. 2017), which involved a request from a conservative education and advocacy organization for decades-old draft indictments of Hillary Clinton in the run-up to the last Presidential election.  But the decision in *Judicial Watch* simply highlights why the privacy exemptions are unjustified here.

To start, unlike in *Judicial Watch*, here the "political branches of the federal government have" ***not*** "assessed the evidence and documented their proceedings and findings in publicly available reports."  *Judicial Watch*, 876 F.3d at 350.  But even more importantly, as this Court explained in its affirmed opinion, Judicial Watch implausibly claimed a public interest in the "activities of a discrete and now defunct government agency that has not been in existence for nearly two decades" and did "not allege misconduct on the part of either the Archives or the Office of the Independent Counsel or present compelling evidence that either agency has engaged in improper activity," but rather, and contrary to case law on the privacy exemptions, engaged merely in "an attempt to obtain information that 'bears on Mrs. Clinton's honesty, credibility, and trustworthiness[.]'"  *Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 214 F. Supp. 3d 43, 62 (D.D.C. 2016), *aff'd,* 876 F.3d 346 (D.C. Cir. 2017).  Finally, far from being "unavailable to explain its decision not to seek an indictment," the Special Counsel is not

only available, but according to the DOJ, has provided exactly that explanation in the redacted portions of the Report. *Judicial Watch*, 876 F.3d at 350; *see* Dkt. # 54 at 50.

Lastly on this category of information, DOJ has included information other than names, which it claims would, in some unspecified manner, allow for the identification of such persons. *See* Dkt. # 54 at 37.  Even if DOJ was correct on its underlying privacy claim, which it is not, under Supreme Court precedent, before accepting DOJ's conclusion about indirect identification, this Court must conduct an *in camera* inspection, *see Dep't of Air Force v. Rose*, 425 U.S. 352, 380–81 (1976); *BuzzFeed Inc. v. U.S. Dep't of Ed.*, 18-cv-01535-CRC, Dkt. # 24 (June 13, 2019), and DOJ must also establish how the release of this information would be an incremental privacy invasion given what DOJ concedes is already publicly known, *see* Dkt. # 54 at 38.

Third, DOJ withheld "information concerning a subject of the investigation."  Dkt. # 54 at 40.  For this category, DOJ explained that the material pertains to Roger Stone, and, to some undisclosed extent, some other unidentified people "discussed in connection with the facts related to Mr. Stone's criminal case."  *Id.*  DOJ's arguments on this point are largely redundant of those in which it simultaneously argues under Exemptions 7(A) and 7(B) that release would have two opposite results: (1) hurt the government's case against Stone, and (2) deprive Stone of a fair trial.  Those arguments under Exemption 7(C) should be rejected for the same reasons BuzzFeed provides in response to DOJ's Exemption 7(A) and 7(B) claims, as well as the significant public interest in understanding why Roger Stone was charged but Donald Trump, Jr. was never even brought before the grand jury.  *See CREW*, 746 F.3d at 1093 (acknowledging public interest in information that "may show whether prominent and influential public officials are subjected to the same investigative scrutiny and prosecutorial zeal as local aldermen and little-known lobbyists").  And given that DOJ contends that all of this information "will be

served in the ordinary course, through the public disclosures made at trial" anyway, Dkt. # 54 at 41, DOJ's claim that release of this information would be an invasion of privacy is nonsensical. It has certainly not identified any incremental privacy violation from release of that information now, while the Report is still relatively fresh in the public square.

Further, Exemption 7(C) is primarily concerned with the privacy interest of those who are investigated, ***but not charged***. *ACLU v. DOJ*, 750 F.3d 927, 932 (D.C. Cir. 2014); *ACLU v. DOJ*, 655 F.3d 1, 7 (D.C. Cir. 2011). DOJ cites *Harrison v. Executive Office for U.S. Attorneys* for the proposition that Exemption 7(C) generally protects the identities of criminal defendants, but that is not what the case held. 377 F. Supp. 2d 141, 147 (D.D.C. 2005). Rather, the court there found that on the specific facts of the case Exemption 7(C) exempted the identities of the criminal defendants because their disclosure would reveal the identities of third parties and the plaintiff had "not identified a public benefit to disclosure." *Id*. Obviously Mr. Stone has been charged, and he has no apparent concern about any pre-trial publicity hurting him anyway, given his proclivity for social media comments about his case and the Special Counsel's work.

Finally, DOJ withheld "names, social media account information, contact information, and other personally identifiable information about individuals merely mentioned in the Report." Dkt. # 54 at 42. Presumably this information has some meaningful connection to the investigation or else it would not have been included in the Report, and thus, there is a public interest in its release for the reasons discussed above. And because, with the exception of referrals, these people were never investigated, their privacy interests are not particularly strong in the first place.

With regard to referrals, the President has told the American people that the entire investigation was an "illegal" "witch hunt" in which the Special Counsel's office was politically

motivated and had conflicts of interest, and a reasonable person would be justified in relying on the words of the President of the United States to conclude that if he said impropriety occurred in an executive agency, it might have.   There is no reason to distinguish between the Special Counsel's charging decisions and his decisions to refer people for potential prosecution elsewhere.

DOJ has not overcome the substantial public interest in disclosure.

### VIII.    DOJ HAS NOT PROVEN ITS EXEMPTION 5 CLAIMS

DOJ bears the burden of proving that Exemption 5 (like all others) applies to the withheld records.  *Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997).  For a record to qualify for the deliberative process privilege, it "must be both pre-decisional and deliberative."  *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).  DOJ has explained that it relied on Exemption 5 to make wholesale withholdings of the reasons for some of the charging and declination decisions in Section V of the Report, Dkt. # 54 at 47, and various instances of the "application of criminal law to specific evidentiary facts" for charges that "were contemplated but not pursued." *Id.* at 51.  DOJ's arguments fail for a number of reasons.

First, the Report is not predecisional: it is the ***decision*** of the Special Counsel on what crimes to charge or not and the bases for those decisions.  28 C.F.R. § 600.8(c) ("At the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel.").  As the DOJ explains in its own FOIA Guide, citing Supreme Court case law, agency actions "taken by the responsible decisionmaker in an agency's decision-making process which has the practical effect of disposing of a matter before the agency [are] 'final' for purposes of FOIA."   DOJ FOIA Guide, Exemption 5, https://www.justice.gov/sites/default/files/ oip/legacy/2014/07/23/exemption5.pdf, at 15.  And "if a final decision is accompanied by an

- 46 -

explanation from the decisionmaker discussing the basis of the decision, that explanation would be considered part of the final decision and must be disclosed." *Id.* at 22. These doctrines plainly apply to the Special Counsel's Report. Similarly, these passages in the Report "implement an established policy of an agency," and therefore are postdecisional. *Id.* at 20-21; Dkt. # 54-4 at 174 ("The Appointment Order authorized the Special Counsel's Office 'to prosecute federal crimes arising from [its] investigation' of the matter assigned to it. In deciding whether to exercise this prosecutorial authority, the Office has been guided by the Principles of Federal Prosecution set forth in the Justice (formerly U.S. Attorney's) Manual."). None of the cases cited by DOJ permitted the withholding of final decisions; instead, they all involved things like email chains and "the steps in the decisionmaking at the U.S. Attorney's office," *see, e.g., Jimenez v. FBI*, 928 F. Supp. 21, 28-29 (D.D.C. 1996), and in *Government Accountability Project v. DOJ*, the court specifically noted that the requester had been "provided a copy of the final decision" when it ruled the requester was not entitled to an underlying predecisional email chain or other such things, 852 F. Supp. 2d 14, 25-26 (D.D.C. 2012).

Further, while the above principles are dispositive against DOJ, case law also makes clear that information is "far more likely" to be exempt where the "author lacks legal decision authority" or where it involves communication "from a subordinate to a superior official." DOJ FOIA Guide, Exemption 5, at 23, 25 (quotation and citation omitted). DOJ cannot dispute that Mr. Mueller had the legal authority to decide what charges to bring and did not issue his report as a subordinate making recommendations to the true decisionmaker. *See* 28 C.F.R. § 600.6 ("Subject to the limitations in the following paragraphs, the Special Counsel shall exercise, within the scope of his or her jurisdiction, the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney. Except as provided

in this part, the Special Counsel shall determine whether and to what extent to inform or consult with the Attorney General or others within the Department about the conduct of his or her duties and responsibilities.").

Second, the Report also is not deliberative.  Again looking to the DOJ's own FOIA Guide, "deliberative" means that the document must reflect "the give-and-take of the consultative process."  DOJ FOIA Guide, Exemption 5, at 25-26.  DOJ identifies neither any give nor any take in the Report, and the context surrounding the redactions and DOJ's descriptions of them are inconsistent with a claim that these redacted passages include the varying opinions expressed by subordinate members of the Special Counsel's Office about whether to charge or not.

Third, even if these redacted passages were predecisional and deliberative, which they are not, under the 2016 amendments to the FOIA statute, DOJ must prove either (1) a legal prohibition against release, or (2) that "the agency reasonably foresees that disclosure would harm an interest protected by an exemption[.]"  5 U.S.C. § 552(a)(8)(A)(i).  In passing these amendments, "Congress sought to establish a 'presumption of openness' in FOIA."  *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 72–73 (D.D.C. 2018).  This was "based on the recognition that 'from the beginning, agencies have taken advantage of these exemptions to withhold any information that might technically fit.'"  *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) (quoting 162 Cong. Rec. H3714-01, H3717162 (2016) (noting that although some agencies "have made an effort to comply with the letter of the law, very few have complied with the spirit of the law"). To satisfy this heightened requirement, the agency must "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld." *Id.* (quoting H.R.

Rep. No. 114-391, at 9 (2016)). "Boilerplate" language is insufficient. *Id*.  Similarly, "mere speculative or abstract fears . . . are an insufficient basis for withholding information."  S. Rep. No. 114–4, at 8 (2015).  As elsewhere in the exemption analysis, the government bears the burden of proof on foreseeable harm. *Judicial Watch, Inc.*, 375 F. Supp. 3d at 97.

The declaration put forth by DOJ does not "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld." Dkt. # 54-3 at ¶¶ 26-38.  In fact, the only time the word harm even appears in the DOJ's sole declaration when addressing Exemption 5 records is when it states in conclusory fashion that "where the Report provides privileged, internal analysis or detailed assessments of the strength of evidence, potential factual hurdles, or viability of legal action which preceded the Special Counsel's charging decisions, that information has been withheld as disclosure would risk significant harm to the integrity of the Department's decision-making process." Dkt. # 54-3 at ¶ 30.  Beyond that, the declaration merely opines that disclosure could possibly provide individuals with a "road map as to how the Department assesses novel issues or application of the law" (which is not even the harm contemplated by the deliberative process exemption); that if the records were disclosed "attorneys would be wary about providing comprehensive legal analysis and viewpoints from all angles critical to ensure the quality of the decision-making process"; and that "staff would be hesitant to memorialize the thinking behind their decisions for fear that by so doing, the deliberations that went into those decisions would be publicly disclosed."   Dkt. # 54 at 52; Dkt. # 54-3 at ¶¶ 30, 37.  Just as in *Judicial Watch*, these "general explanations," "fall short of articulating 'a link between the specified harm and specific information contained in the material withheld.'" 375 F. Supp. 3d at 100 (quoting H.R. Rep. No. 114-391, at 9).

Finally, it bears noting that the unredacted portions of the Report speak at great length about many charging and declination decisions, including former Attorney General Jeff Sessions and the President of the United States.  *See* Dkt. # 54-5 at 160-182.  DOJ has failed to explain how it could safely release ***that*** information without any Exemption 5 harm, but not the rest.

## IX.    CONCLUSION

Over the last two years, government officials have vigorously, and often brutally, made opposing claims about the Mueller investigation, its origins, and its conclusions.  There can be no dispute that the need for transparency that is fundamental to the Freedom of Information Act, and the requirement that the government prove its exemption claims definitively, is at its apex in this case.   The inconsistencies, inadequacies, and self-contradictions throughout DOJ's arguments simply serve to illustrate the public interest in complete disclosure of the Report so the public can judge the extent to which the investigation was an illegal witch hunt, on the one hand, the result of improper punch-pulling on the other, or, in fact, entirely proper.  *Bartko v DOJ*, 898 F.3d 51, 69 (D.C. Cir. 2018).

The Court should grant summary judgment for BuzzFeed, and at the very least, conduct an *in camera* review of the unredacted Report before ruling on DOJ's exemption claims.

RESPECTFULLY SUBMITTED,

*Matthew V. Topic*

_____

Attorneys for Plaintiffs

Matthew Topic
Joshua Burday
Merrick Wayne
LOEVY & LOEVY

311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900
foia@loevy.com
DC Bar Nos. IL0037 and IL0042