**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                )
ELECTRONIC PRIVACY                              )
INFORMATION CENTER,                             )
                                                )
        Plaintiff,                      )
                                                )
        v.                              )     Civil Action No. 19-cv-810 (RBW)
                                                )
UNITED STATES DEPARTMENT OF                     )
JUSTICE,                                        )
                                                )
        Defendant.                      )
_____ )
                                                )
JASON LEOPOLD, BUZZFEED, INC.,                  )
                                                )
        Plaintiffs,                     )
                                                )
        v.                              )     Civil Action No. 19-cv-957 (RBW)
                                                )
UNITED STATES DEPARTMENT OF                     )
JUSTICE, et al.                                 )
                                                )
        Defendants.                     )
_____ )

**DEPARTMENT OF JUSTICE'S REPLY IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT
WITH RESPECT TO THE "MUELLER REPORT" AND
<u>OPPOSITION TO PLAINTIFFS' CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     DOJ Properly Withheld Federal Grand Jury Information Under Exemption 3. ................. 2

II.    DOJ Properly Withheld Intelligence Sources and Methods Information Under
Exemptions 3 and 7(E). ............................................................................................... 8

     A.    DOJ Has Met Its Light Burden to Show that the Withheld Information Pertains
to Intelligence Sources and Methods and Must Be Withheld Under the National
Security Act. ..................................................................................................... 8

     B.    DOJ Properly Withheld Information Concerning Investigative Techniques and
Procedures Under Exemption 7(E). ................................................................ 11

            1.    Information that Would Reveal Techniques and Procedures
Authorized for and Used in National Security Investigations Is
Properly Withheld Under Exemption 7(E). ............................................... 11

            2.    Details About Techniques and Procedures that Would Reveal
Investigative Focus and Scope, and Circumstances, Methods and
Fruits of Investigatory Operations Are Properly Withheld Under
Exemption 7(E). ....................................................................................... 16

III.   DOJ Properly Withheld Information Pertaining to Ongoing Investigations,
Pending Prosecutions, and an Imminent Trial Under Exemptions 7(A), 7(B), and a
Court Order. ............................................................................................................... 20

     A.    The Withheld Information Concerning Ongoing Investigations and Pending
Prosecutions Falls Squarely Within Exemption 7(A). .................................... 20

     B.    Release of Information Related to Roger Stone Would Seriously Interfere with
the Fairness of his Imminent Trial and Would Violate the *Stone* Court Order. ...... 28

IV.   DOJ Properly Withheld Privacy Information Protected by Exemptions 6 and 7(C),
as well as Deliberations Concerning Charging Decisions Under Exemption 5 ............... 31

     A.    Personal Privacy Interests Outweigh the Public Interest in Disclosure. .................. 31

            1.    Identifying Information of Unwitting Third Parties is Properly
Protected Under Exemption 7(C). ............................................................. 33

            2.    Identifying Information of Individuals Who Were Not Charged by
the Special Counsel's Office Is Properly Protected Under
Exemption 7(C). ...................................................................................... 34

       3.      Information Related to Roger Stone, His Pending Criminal Case, and Associated Individuals Is Properly Protected Under Exemption 7(C). .................................................................................................. 40

       4.      Identifying Information of Individuals Who Were Merely Mentioned in the Report Is Properly Protected Under Exemption 7(C). .................................................................................................. 42

  B.  Deliberations Leading to a Decision to Initiate or Forego Prosecution are Properly Withheld Under Exemption 5. .................................................................... 43

V.  *In Camera* Review is Neither Necessary Nor Appropriate. ........................................... 53

CONCLUSION ................................................................................................................... 54

# TABLE OF AUTHORITIES

**CASES**

*Access Reports v. Dep't of Justice,*
    926 F.2d 1192 (D.C. Cir. 1991)..........................................................................44, 50

*ACLU v. Dep't of Def.,*
    628 F.3d 612 (D.C. Cir. 2011)................................................................................ 11

*ACLU v. Dep't of Justice,*
    655 F.3d 1 (D.C. Cir. 2011)..............................................................................35, 41

*ACLU v. Dep't of Justice,*
    750 F.3d 927 (D.C. Cir. 2014)................................................................................ 37

*Afshar v. Dep't of Justice,*
    702 F.2d 1125 (D.C. Cir. 1983)............................................................................... 7

*Alyeska Pipeline Serv. Co. v. EPA,*
    856 F.2d 309 (D.C. Cir. 1988)............................................................................... 25

*Am. Ass'n of Women, Inc. v. Dep't of Justice,*
    167 F. Supp. 3d 136 (D.D.C. 2016)........................................................................ 10

*Am. Immigration Lawyers Ass'n v. Dep't of Homeland Sec.,*
    852 F. Supp. 2d 66 (D.D.C. 2012).......................................................................... 14

*Assembly of State of Cal. v. Dep't of Commerce,*
    968 F.2d 916 (9th Cir. 1992)(as amended Sept. 17, 1992)........................................ 53

*Associated Press v. Dep't of Def.,*
    554 F.3d 274 (2d Cir. 2009) ................................................................................. 36

*Ass'n of Retired R.R. Workers, Inc., v. U.S. R.R. Retirement Bd.,*
    830 F.2d 331 (D.C. Cir. 1987).................................................................................. 2

*Barnard v. Dep't of Homeland Sec.,*
    598 F. Supp. 2d 1 (D.D.C. 2009)........................................................................... 14

*Bayala v. U.S. Dep't of Homeland Sec.,*
    264 F. Supp. 3d 165 (D.D.C. 2017)........................................................................ 17

*Blackwell v. FBI,*
    680 F. Supp. 2d 79 (D.D.C. 2010)........................................................................... 4

*Blackwell v. FBI,*
    646 F.3d 37 (D.C. Cir. 2011)......................................................................... *passim*

*Blanton v. Dep't of Justice*,
  63 F. Supp. 2d 35 (D.D.C. 1999) ........................................................ 15

*Boyd v. Criminal Div. of U.S. Dep't of Justice*,
  475 F.3d 381 (D.C. Cir. 2007) ........................................................... 25

*Boyd v. Exec. Office for U.S. Att'ys*,
  87 F. Supp. 3d 58 (D.D.C. 2015) ......................................................... 3

*Brady v. Maryland*,
  373 U.S. 83 (1963) .......................................................................... 26

*Butler v. Drug Enf't Admin.*,
  No. 05-1798 (JDB), 2006 WL 398653 (D.D.C. Feb. 16, 2006) ................ 6, 19, 27, 39

*Campbell v. Dep't of Justice*,
  164 F.3d 20 (D.C. Cir. 1998)(as amended Mar. 3, 1999) ...................... 20, 31

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*,
  40 F.R.D. 318 (D.D.C. 1966) ............................................................. 44

*Carter v. Dep't of Commerce*,
  830 F.2d 388 (D.C. Cir. 1987) ........................................................... 54

*Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*,
  658 F. Supp. 2d 217 (D.D.C. 2009) ..................................................... 45

*Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*,
  746 F.3d 1082 (D.C. Cir. 2014) ................................................. 12, 17, 35, 36

*Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*,
  854 F.3d 675 (D.C. Cir. 2017) ........................................................ 31, 32

*Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*,
  249 F.R.D. 1 (D.D.C. 2008) ............................................................... 50

*Computer Professionals for Soc. Resp. v. Secret Serv.*,
  72 F.3d 897 (D.C. Cir. 1996) ............................................................. 38

*Cottone v. Reno*,
  193 F.3d 550 (D.C. Cir. 1999) ............................................................. 7

*Crawford-El v. Britton*,
  523 U.S. 574 (1998) ......................................................................... 38

*Crooker v. Bureau of Alcohol, Tobacco & Firearms*,
  789 F.2d 64 (D.C. Cir. 1986) ............................................................. 24

iv

*Ctr. for Nat'l Sec. Studies v. Dep't of Justice*,
　331 F.3d 918 (D.C. Cir. 2003).................................................................. 10

*Davis v. Dep't of Justice*,
　968 F.2d 1276 (D.C. Cir. 1992)................................................... 7, 38, 41

*Davis v. Dep't of Justice*,
　970 F. Supp. 2d 10 (D.D.C. 2013)........................................................ 26

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
　532 U.S. 1 (2001) ................................................................................... 52

*DiBacco v. Dep't of the Army*,
　No. 17-5048, 2019 WL 2479443 (D.C. Cir. June 14, 2019) ................... 10

*Dudman Comm's Corp. v. Dep't of Air Force*,
　815 F.2d 1565 (D.C. Cir. 1987)............................................................. 44

*Edelman v. Sec. & Exch. Comm'n*,
　172 F. Supp. 3d 133 (D.D.C. 2016)....................................................... 46

*Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*,
　Civ. A. No. 04-1625, 2006 WL 6870435 (D.D.C. Dec. 22, 2006)..................... 46, 47

*Elec. Frontier Found. v. Dep't of Justice*,
　826 F. Supp. 2d 157 (D.D.C. 2011)....................................................... 50

*Elec. Frontier Found. v. Dep't of Justice*,
　No. 17-CV-1039 (DLF), 2019 WL 1714433 (D.D.C. Apr. 17, 2019) ................... 14

*Elec. Privacy Info. Ctr. v. Office of Dir. of Nat'l Intelligence*,
　281 F. Supp. 3d 203 (D.D.C. 2017)....................................................... 10

*Elec. Privacy Info. Ctr. v. Office of the Dir. of Nat'l Intelligence*,
　982 F. Supp. 2d 21 (D.D.C. 2013) ........................................................... 9

*Fisher v. Dep't of Justice*,
　772 F. Supp. 7 (D.D.C. 1991), *aff'd*, 968 F.2d 92 (D.C. Cir. 1992)......................... 14

*Fitzgibbon v. CIA*,
　911 F.2d 755 (D.C. Cir. 1990)..................................................... 34, 41, 42

*Ford Motor Co. v. United States*,
　94 Fed. Cl. 211 (2010)........................................................................... 46

*Founding Church of Scientology of Wash., D.C. v. NSA*,
　610 F.2d 824 (D.C. Cir. 1979)............................................................... 14

*Freeman v. Dep't of Justice*,
   723 F. Supp. 1115 (D. Md. 1988) ............................................................................. 45

*Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*,
   485 F. Supp. 1 (D.D.C. 1978), *aff'd in part and remanded*,
   656 F.2d 856 (D.C. Cir. 1981) ............................................................... 45, 49, 52

*Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*,
   656 F.2d 856 (D.C. Cir. 1981) ....................................................................... *passim*

*Gatson v. FBI*,
   No. CV 15-5068, 2017 WL 3783696 (D.N.J. Aug. 31, 2017) ........................... 17, 18

*Hayden, v. Nat'l Sec. Agency*,
   608 F.2d 1381 (D.C. Cir. 1979) ........................................................................ 53, 54

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) .......................................................................... 44, 53

*Isiwele v. Dep't of Health & Human Servs.*,
   85 F. Supp. 3d 337 (D.D.C. 2015) ........................................................................ 13

*Jackson v. U.S. Att'ys Office, Dist. of N.J.*,
   293 F. Supp. 2d 34 (D.D.C. 2003) ........................................................................ 49

*James Madison Project v. CIA*,
   605 F. Supp. 2d 99 (D.D.C. 2009) ........................................................................ 10

*Juarez v. Dep't of Justice*,
   518 F.3d 54 (D.C. Cir. 2008) ............................................................................ 23, 25

*Judicial Watch, Inc. v Dep't of Commerce*,
   375 F. Supp. 3d 93 (D.D.C. 2019) ........................................................................ 27

*Judicial Watch, Inc. v. Dep't of Energy*,
   412 F.3d 125 (D.C. Cir. 2005) .............................................................................. 44

*Judicial Watch, Inc. v. Dep't of Justice*,
   800 F. Supp. 2d 202 (D.D.C. 2011) ................................................................. *passim*

*Judicial Watch, Inc. v. Dep't of Treasury*,
   796 F. Supp. 2d 13 (D.D.C. 2011), *aff'd*, 876 F.3d 346 (D.C. Cir. 2017) .......... 45, 48

*Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*,
   214 F. Supp. 3d 43 (D.D.C. 2016) ............................................................... 3, 4, 5, 7

*Judicial Watch Inc. v. Nat'l Archives & Records Admin.*,
   876 F.3d 346 (D.C. Cir. 2017) ........................................................................... 3, 36

*Kay v. FCC*,
   976 F. Supp. 23 (D.D.C. 1997) ............................................................... 25

*Labow v. Dep't of Justice*,
   831 F.3d 523 (D.C. Cir. 2016) ................................................................. 5

*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) ................................................ 11, 28, 43, 53

*Liounis v. Dep't of Justice*,
   No. CV 17-1621(CKK), 2018 WL 5817352 (D.D.C. Nov. 7, 2018) ............ 4

*Looks Filmproduktionen GmbH v. CIA*,
   199 F. Supp. 3d 153 (D.D.C. 2016) ........................................................ 53

*Lopez v. Dep't of Justice*,
   393 F.3d 1345 (D.C. Cir. 2005) ............................................................... 5

*Mapother v. Dep't of Justice*,
   3 F.3d 1533 (D.C. Cir. 1993) .................................................... 23, 25, 44

*Marshall v. FBI*,
   802 F. Supp. 2d 125 (D.D.C. 2011) ........................................................ 26

*McCann v. Dep't of Health & Human Servs.*,
   828 F. Supp. 2d 317 (D.D.C. 2011) ........................................................ 13

*Mead Data Cent., Inc. v. Dep't of Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) .......................................................... 44, 46

*Metro. St. Louis Sewer Dist. v. EPA*,
   No. 4:10-CV-2103 (CEJ), 2012 WL 685334 (E.D. Mo. Mar. 2, 2012) ...... 46

*Murphy v. Exec. Office for U.S. Att'ys*,
   789 F.3d 204 (D.C. Cir. 2015) ................................................................. 4

*N. Dartmouth Properties, Inc. v. Dep't of Hous. & Urban Dev.*,
   984 F. Supp. 65 (D. Mass. 1997) ........................................................... 46

*Nation Mag. v. Customs Serv.*,
   71 F.3d 885 (D.C. Cir. 1995) ................................................................. 35

*Nat'l Archives & Records Admin v. Favish*,
   541 U.S. 157 (2004) .......................................................................... 37, 38

*Nat'l Sec. Counselors v. CIA*,
   320 F. Supp. 3d 200 (D.D.C. 2018) ........................................................ 10

*NLRB v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1978) ................................................................................ 23, 25

*NLRB v. Sears Roebuck & Co.*,
  421 U.S. 132 (1975) ........................................................................ 46, 47, 50

*North v. Walsh*,
  881 F.2d 1088 (D.C. Cir. 1989) ................................................................ 26

*Paisley v. CIA*,
  712 F.2d 686 (D.C. Cir. 1983), *vacated in part on other grounds*,
  724 F.2d 201 (D.C. Cir. 1984) .................................................................. 44

*Peay v. Dep't of Justice*,
  No. CIV A 04-1859 CKK, 2007 WL 788871 (D.D.C. Mar. 14, 2007) ...................... 7

*People for the Ethical Treatment of Animals v. Nat'l Insts. of Health*,
  745 F.3d 535 (D.C. Cir. 2014) ................................................................... 36

*PHE, Inc. v. Dep't of Justice*,
  983 F.2d 248 (D.C. Cir. 1993) ................................................................... 17

*Pub. Citizen, Inc. v. Dep't of Educ.*,
  Civ. A. No. 18-1047 (CKK), 2019 WL 2211118 (D.D.C. May 22, 2019) ............... 46

*Putnam v. Dep't of Justice*,
  873 F. Supp. 705 (D.D.C. 1995) ................................................................ 24

*Sack v. Dep't of Def.*,
  823 F.3d 687 (D.C. Cir. 2016) ............................................................. 13, 14

*SafeCard Servs. v. SEC*,
  926 F.2d 1197 (D.C. Cir. 1991) ................................................................... 6

*Schoenman v. FBI*,
  573 F. Supp. 2d 119 (D.D.C. 2008) ...................................................... 36, 41

*Schrecker v. Dep't of Justice*,
  349 F.3d 657 (D.C. Cir. 2003) ................................................................... 43

*Senate of the Com. of P.R. on Behalf of Judiciary Comm. v. Dep't of Justice*,
  823 F.2d 574 (D.C. Cir. 1987) ................................................... 3, 44, 45, 49

*Shapiro v. Dep't of Justice*,
  239 F. Supp. 3d 100 (D.D.C. 2017) ...................................................... 15, 17

*Shapiro v. Dep't of Justice*,
  893 F.3d 796 (D.C. Cir. 2018) ................................................................... 14

*Sheridan v. U.S. Office of Pers. Mgmt.*,
    278 F. Supp. 3d 11 (D.D.C. 2017) ............................................................... 13, 18

*Shores v. FBI*,
    185 F. Supp. 2d 77 (D.D.C. 2002) ...................................................................... 41

*Stern v. FBI*,
    737 F.2d 84 (D.C. Cir. 1984) ............................................................................. 35

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ...................................................................... 2, 14

*Tax Analysts v. Dep't of Justice*,
    845 F.2d 1060 (D.C. Cir. 1988), *aff'd*, 492 U.S. 136 (1989) .................................. 31

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*,
    489 U.S. 749 (1989) ........................................................................... 32, 34, 41

*Vazquez v. Dep't of Justice*,
    887 F. Supp. 2d 114 (D.D.C. 2012) .................................................................... 14

*Wash. Post Co. v. Dep't of Justice*,
    863 F.2d 96 (D.C. Cir. 1988) ............................................................................. 28

*Weisberg v. Dep't of Justice*,
    745 F.2d 1476 (D.C. Cir. 1984) .................................................................... 14, 41

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) ............................................................................. 7

**STATUTES**

5 U.S.C. § 552 ........................................................................................... *passim*

50 U.S.C. § 3024 ............................................................................................... 8

**RULES**

Fed. R. Civ. P. 6 ............................................................................................... 2

**REGULATIONS**

28 C.F.R. § 50.2 ............................................................................................. 39

28 C.F.R. § 600.7 ........................................................................................... 50

28 C.F.R. § 600.8 ........................................................................................... 24

28 C.F.R. § 600.9 ........................................................................................... 51

## OTHER AUTHORITIES

Attorney General Holder's Mem. for Heads of Exec. Dep'ts & Agencies Concerning the
     Freedom of Information Act (Mar. 19, 2009),
     http://www.usdoj.gov/ag/foia-memo-march2009.pdf ................................................................. 52

*Black's Law Dictionary* (11th ed. 2019) ....................................................................................... 30

Freedom of Information Act,
     74 Fed. Reg. 4683 (Jan. 21, 2009) ........................................................................................... 52

H.R. Rep. No. 114-391 (Jan. 7, 2016) ..................................................................................... 51, 52

Office of Special Counsel,
     64 Fed. Reg. 37,038 (July 9, 1999) ........................................................................................... 48

*Oxford English Dictionary* (3d ed. 2012) ..................................................................................... 30

S. Rep. No. 114-4 (Feb. 23, 2015) ......................................................................................... 27, 51

*Special Counsel Robert S. Mueller III Makes Statement on Investigation into Russian
     Interference in the 2016 Presidential Election* (May 29, 2019),
     https://www.justice.gov/opa/speech/special-counsel-robert-s-mueller-iii-makes-
     statement-investigation-russian-interferenceSpecial Counsel .................................................... 39

## INTRODUCTION

If the Court were to read only Plaintiffs' briefs, it would be left with the impression that the Department of Justice ("DOJ") heavily and indiscriminately redacted the Special Counsel's Report On The Investigation Into Russian Interference In The 2016 Presidential Election (the "Mueller Report" or "Report"). Nothing could be further from the truth. Over 90% of the Report was released. Of the remainder, DOJ redacted only that information that pertained to grand jury proceedings; intelligence sources, methods, and techniques; ongoing criminal and national security investigations and prosecutions; and personal privacy, including deliberations concerning charging decisions, under Exemptions 3, 5, 6, and 7 of the Freedom of Information Act ("FOIA").

Plaintiffs Jason Leopold and BuzzFeed, Inc. (collectively, "Leopold") challenge each and every redaction. *See* Leopold Mem., Dkt. 73-1. Plaintiff Electronic Privacy Information Center ("EPIC") challenges every redaction, except intelligence sources and methods under Exemptions 3 and 7(E) and privacy information for individuals who were unwittingly used by interference efforts emanating from Russia under Exemptions 6 and 7(C). *See* EPIC Mem., Dkt. 71-1. *Amicus* Citizens for Responsibility and Ethics in Washington ("CREW") challenges the deliberations concerning charging decisions under Exemption 5. *See* CREW Br., Dkt. 79.

As illustrated in the declaration of Vanessa Brinkmann, Senior Counsel in DOJ's Office of Information Policy ("OIP") and the FOIA-marked Report, DOJ has provided reasonably specific explanations that more than justify the withholdings under Exemptions 3, 5, 6, and 7. The declaration also demonstrates that DOJ conducted a line-by-line review of the withheld material and released all reasonably segregable non-exempt information subject to FOIA, thus complying with its segregability obligations. The Court should, therefore, deny Plaintiffs' cross-motions for summary judgment and grant DOJ's motion for summary judgment.

**ARGUMENT**

**I.      DOJ Properly Withheld Federal Grand Jury Information Under Exemption 3.**

DOJ withheld federal grand jury information, which is prohibited from disclosure by Federal Rule of Criminal Procedure 6(e), under Exemption 3 (marked as "(b)(3)-1" on the Report). Brinkmann Decl. ¶¶ 16–18, Dkt. 54-3.

With regard to Exemption 3, "the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Ass'n of Retired R.R. Workers, Inc., v. U.S. R.R. Retirement Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987).   EPIC does not contest that Rule 6(e) is a qualifying statute under Exemption 3.   *See* EPIC Mem. 35–38.   In contrast, Leopold "disputes the continued validity of any Rule 6(e) case law," Leopold Mem. 29–32, but the Court should summarily reject this argument because it is contrary to binding D.C. Circuit precedent, *see Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1113 (D.C. Cir. 2007) ("Federal Rule of Criminal Procedure 6(e) . . . counts as a statute for purposes of Exemption 3."); *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 868 (D.C. Cir. 1981) (same).   Therefore, the sole issue before the Court is whether the withheld material falls within the coverage of Rule 6(e).   *See Fund for Constitutional Gov't*, 656 F.2d at 868.

Ms. Brinkmann's declaration establishes that it does.   Although EPIC argues that "DOJ has failed to provide the necessary detail to withhold any grand jury information," EPIC Mem. 38, Ms. Brinkmann attested that DOJ withheld "the names and/or identifying information of individuals who were subpoenaed or actually testified before a federal grand jury (or information that might reveal that the witness was subpoenaed or testified before the grand jury) and information provided by those individuals in their grand jury testimony."   Brinkmann Decl. ¶ 18. Even EPIC admits that Rule 6(e) protects from disclosure "'the identities of witnesses . . . [and] the substance of testimony'"—exactly what was withheld from the Report.   EPIC Mem. 36

(quoting *Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 214 F. Supp. 3d 43, 53 (D.D.C. 2016), *aff'd*, 876 F.3d 346 (D.C. Cir. 2017)); *see also Fund for Constitutional Gov't*, 656 F.2d at 867, 869 (stating that the scope of the secrecy that must be afforded grand jury material "is necessarily broad" and that, consequently, "it encompasses . . . the disclosure of information which would reveal the identities of witnesses or jurors, the substance of the testimony, the strategy or direction of the investigation, the deliberations or questions of the jurors, and the like") (citation omitted).

Despite recognizing that Rule 6(e) protects this information from disclosure, EPIC contends that DOJ has failed to provide a nexus between disclosure and revelation of a protected aspect of the grand jury's investigation.  EPIC Mem. 35.  Similarly, Leopold argues that Rule 6(e) does not apply "because the scope and the direction of the investigation is already laid out in detail in the Report and the specific appointment of the Special Counsel."  Leopold Mem. 29.  But Ms. Brinkmann attested that DOJ withheld "only that information which explicitly discloses matters occurring before a federal grand jury—the disclosure of which would reveal a secret aspect of the grand jury's investigation."  Brinkmann Decl. ¶ 18.

Courts have repeatedly recognized that "information such as the names of grand jury witnesses . . . tend to reveal the secret workings of the grand jury."  *Judicial Watch*, 214 F. Supp. 3d at 53 (citation omitted); *Fund for Constitutional Gov't*, 656 F.2d at 869; *Senate of the Com. of P.R. on Behalf of Judiciary Comm. v. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987).  "So too does grand jury testimony."  *Judicial Watch*, 214 F. Supp. 3d at 53 (citing *Boyd v. Exec. Office for U.S. Att'ys*, 87 F. Supp. 3d 58, 83 (D.D.C. 2015) ("[G]rand jury testimony is precisely the type of information that the provision is designed to protect."); *Fund for Constitutional Gov't*, 656 F.2d at 869; *Senate of the Com. of P.R.*, 823 F.2d at 582.  Where, as here, an agency withholds

identifying information of grand jury witnesses and testimony before the grand jury and the agency's declarant attests that disclosure of that information would reveal a secret aspect of the grand jury's investigation, *see* Brinkmann Decl. ¶ 18, courts have not required additional details to establish a nexus between the withheld information and the revelation of a protected aspect of the grand jury's investigation, *see, e.g.*, *Blackwell v. FBI*, 680 F. Supp. 2d 79, 93 (D.D.C. 2010), *aff'd*, 646 F.3d 37 (D.C. Cir. 2011) (upholding agency's assertion of Exemption 3 over "information that would identify grand jury witnesses" where the declarant attested that "only that information which explicitly discloses matters occurring before a Federal Grand Jury has been withheld pursuant to Exemption (b)(3)"); *Liounis v. Dep't of Justice*, No. CV 17-1621(CKK), 2018 WL 5817352, at *6 (D.D.C. Nov. 7, 2018) (upholding the agency's assertion of Exemption 3 over a grand jury transcript where the declarant attested that it "pertain[ed] to [the] secrecy and scope of grand jury proceedings"); *see also Murphy v. Exec. Office for U.S. Att'ys*, 789 F.3d 204, 205–06, 210 (D.C. Cir. 2015) (finding that Rule 6(e) is "properly invoked" as a justification for withholding under Exemption 3 "if the disclosed material would *tend* to reveal some secret aspect of the grand jury's investigation, including the identities of witnesses" and noting that "[a] tendency need only make a result more likely") (citation omitted).

EPIC nevertheless argues that DOJ is required to specify the nexus between disclosure and revelation of a protected aspect of the grand jury's investigation for each and every redaction. EPIC Mem. 35–37.  But EPIC cites to no case where a court has required that level of specificity for the type of information withheld here.  EPIC quotes *Judicial Watch* for the proposition that DOJ must "identify a particular 'nexus between disclosure [of each redacted passage] and revelation of a protected aspect of the grand jury's investigation.'"  *Id.* at 35 (quoting *Judicial Watch*, 214 F. Supp. 3d at 53).  But EPIC's use of brackets to add that language is significant, as

nowhere in that opinion did the Court require that level of granular detail.  *See generally Judicial Watch*, 214 F. Supp. 3d at 52–56.  Instead, the Court merely stated that "there must be a 'nexus between disclosure and revelation of a protected aspect of the grand jury's investigation.'" *Judicial Watch*, 214 F. Supp. 3d at 53 (quoting *Lopez v. Dep't of Justice*, 393 F.3d 1345, 1350 (D.C. Cir. 2005)).  And EPIC also relies on *Labow v. Department of Justice* to argue that "'[t]he mere fact' the witnesses testified or 'were subpoenaed fails to justify withholding under Rule 6(e)." EPIC Mem. 36 (quoting *Labow v. Dep't of Justice*, 831 F.3d 523, 530 (D.C. Cir. 2016)).  But, again, EPIC's selective use of quotation marks is telling, as *Labow* concerned only "records subpoenaed by a grand jury," not the identities of witnesses who were subpoenaed or testified before a grand jury.  *Labow*, 831 F.3d at 529.

EPIC also argues that DOJ failed to segregate non-exempt information, speculating that "the agency's assertion of Rule 6(e) to conceal sentence- and paragraph-long passages of the Report is highly implausible."  EPIC Mem. 37–38; *see also* Leopold Mem. 25–28 (making a similar argument).  The Mueller Report details a lengthy investigation that resulted in numerous criminal and national security investigations and prosecutions.  *See* Brinkmann Decl. ¶¶ 43–44.  It can hardly be surprising that the Report contains citations to and descriptions of grand jury testimony, and that descriptions of testimony could be sentences or paragraphs long.  *See id.* ¶ 18. Leopold argues that certain information "appear to be discussions of the Special Counsel's decisions, not matters occurring before the grand jury."  Leopold Mem. 28.  But, even assuming Leopold properly characterized these passages in the Report, one would expect the Special Counsel to consider testimony provided to the grand jury.

In any event, Ms. Brinkmann attested that "[o]nly information that was explicitly connected to the operation of the federal grand jury, and thus which could not be disclosed without

clearly revealing the inner workings of grand jury proceedings, was protected pursuant to Exemption 3." Brinkmann Decl. ¶ 18. Ms. Brinkmann further attested that "[i]nformation that, while possibly relevant to the federal grand jury investigations related to the Report, could nonetheless be released without compromising the secrecy of the corresponding grand jury proceedings, has been disclosed." *Id.*; *see also id.* ¶ 24 (stating that "if any information could be released without violating grand jury secrecy rules, that information was released"). This is apparent upon a review of the Report. Far from redacting broad swaths of information under Exemption 3, DOJ redacted only parts of paragraphs—and even parts of sentences—where possible. *See, e.g.*, *id.* Exh. D (Report Vol. I at 112, 116, 122, 139, 151). Indeed, examples of this precision are shown in Leopold's brief. *See* Leopold Mem. 26–28.

EPIC even acknowledges that DOJ redacted at least part of the grand jury material with "surgical precision." EPIC Mem. 37. Rather than taking this as evidence that the agency has conducted a thorough review of the Report and released all non-exempt information, however, EPIC speculates that where DOJ "has withheld entire narrative sentences and paragraphs of the Report under Rule 6(e), the agency shows no attention to segregating non-exempt information." *Id.* at 38. But this baseless speculation is insufficient to rebut the presumption of good faith accorded to DOJ's declaration. *Butler v. Drug Enf't Admin.*, No. 05-1798 (JDB), 2006 WL 398653, at *2 (D.D.C. Feb. 16, 2006) (citing *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)). Again, as Ms. Brinkmann attested, "[n]o further, non-exemption information may be segregated for public release without violating grand jury secrecy rules." Brinkmann Decl. ¶ 91.

Leopold speculates that the redacted information is publicly known and argues that because it is not secret, DOJ improperly withheld this information. Leopold Mem. 22–24. "Although the government may not rely on a FOIA exemption to withhold information that has been 'officially

acknowledged' or is in the 'public domain,' plaintiff has the initial burden of showing prior disclosure by 'point[ing] to specific [publicly disclosed] information identical to that being withheld.'"[1] *Peay v. Dep't of Justice*, No. CIV A 04-1859 CKK, 2007 WL 788871, at *3 (D.D.C. Mar. 14, 2007) (quoting *Afshar v. Dep't of Justice*, 702 F.2d 1125, 1130–34 (D.C. Cir. 1983); *Davis v. Dep't of Justice*, 968 F.2d 1276, 1279 (D.C. Cir. 1992)) (alterations in original). "[O]fficial acknowledgment must meet three criteria: First, the information requested must be as specific as the information previously released.  Second, the information requested must match the information previously disclosed . . .  Third, . . . the information requested must already have been made public through an official and documented disclosure."  *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)).

Leopold fails to meet his burden because, although he claims that the identities of various witnesses before the grand jury are not secret, he cites mainly to news articles and fails to specify which part of the article, if any, is an official disclosure by the Government.  *See* Leopold Mem. 22–24; *see also Davis*, 968 F.2d at 1280 (finding that the burden was on the plaintiff to point to specific information within the newspaper articles that was presented in the courtroom).  The only official documents cited by Leopold are two court filings.  But one court filing states merely that "Former FBI Director James B. Comey is a witness in the pending investigation," not that he provided testimony before a grand jury.  Notice, Exh. B ¶ 5, *CNN v. FBI*, 17-cv-1167 (D.D.C. Apr. 8, 2019), Dkt. 79-2.  And although the other court filing acknowledges that "[Paul] Manafort . . . was called to testify before the grand jury on two occasions, October 26 and November 2, 2018,"

---

[1] Although Leopold implies that the burden is on the Government to "compare[] the withheld grand jury information to what is already public," Leopold Mem. 24 (citing *Judicial Watch*, 214 F. Supp. 3d at 57), the D.C. Circuit has determined that "the party advocating disclosure bears the initial burden of production; for were it otherwise, the government would face the daunting task of proving a negative: that requested information had not been previously disclosed," *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999).

it does not provide any details regarding the substance of his testimony.  Government's Submission in Support of Its Breach Determination, *United States v. Manafort*, No. 17-cr-201 (D.D.C. Dec. 7, 2018), Dkt. 460.  Citations to grand jury testimony would necessarily divulge the substance of the testimony.  As Ms. Brinkmann attested, revealing any additional information "would reveal a secret aspect of the grand jury's investigation."  Brinkmann Decl. ¶ 18.

Finally, Leopold argues that Rule 6(e) does not apply because he is seeking the redacted information "for its own intrinsic value, as opposed to trying to learn what took place before the grand jury."  Leopold Mem. 28–29.  But "[t]he relevant inquiry is not whether the party seeking the information has an interest other than in its role in a grand jury investigation but whether revelation in the particular context would in fact reveal what was before the grand jury."  *Fund for Constitutional Gov't*, 656 F.2d at 870.  Thus, the sole question before the Court is whether the withheld information falls within Rule 6(e).  *Id.* at 868.  As explained above, it does.

## II.     DOJ Properly Withheld Intelligence Sources and Methods Information Under Exemptions 3 and 7(E).

### A.     DOJ Has Met Its Light Burden to Show that the Withheld Information Pertains to Intelligence Sources and Methods and Must Be Withheld Under the National Security Act.

DOJ withheld information pertaining to intelligence sources and methods, which is prohibited from disclosure by the National Security Act of 1947, 50 U.S.C. § 3024(i)(1), under Exemption 3 (marked as "(b)(3)-2" on the Report).  Brinkmann Decl. ¶¶ 16, 19–24.

EPIC does not contest that DOJ properly withheld information pertaining to intelligence sources and methods under Exemption 3.  *See* EPIC Mem. 35–38 (contesting only withholdings of grand jury information under Exemption 3).  Accordingly, EPIC has conceded that these withholdings under Exemption 3 were proper, and DOJ is entitled to summary judgment against EPIC on these withholdings.

Leopold, however, contests DOJ's redactions for intelligence sources and methods under Exemption 3. Leopold Mem. 32–36. As previously explained, Exemption 3 permits withholdings when a relevant statute "refers to particular types of matters to be withheld," 5 U.S.C. § 552(b)(3), such as the "intelligence sources and methods" protected by the National Security Act. *See* DOJ Mem. 11, 13–15, Dkt. 54. Because Leopold "does not dispute that the [National Security Act] is an Exemption 3 statute," Leopold Mem. 35, the sole issue before the Court is whether the Report "contain[s] 'intelligence sources and methods' within the meaning of the Act." *Elec. Privacy Info. Ctr. v. Office of the Dir. of Nat'l Intelligence*, 982 F. Supp. 2d 21, 29 (D.D.C. 2013). Ms. Brinkmann's declaration establishes that it does.

Ms. Brinkmann explained that "unclassified sources and methods relating to investigative and information gathering techniques used in investigations into interference activities emanating from Russia in the 2016 presidential election" were withheld pursuant to Exemptions 3 and 7(E). Brinkmann Decl. ¶ 23. Ms. Brinkmann further explained that "the context in which these techniques and procedures are discussed reveals specific details about when during an investigation a specific technique or procedure might be utilized, the types of information that might be sought from the use of the technique, and the concurrent limitations on its use and/or utility." *Id.* ¶ 84. Disclosure of this information may reveal "how the techniques and procedures are implemented," including whether and how various techniques and procedures are used together. *Id.* ¶ 85. DOJ cannot provide "greater specificity without yielding sufficient information to enable wrongdoers, including hostile foreign powers, to potentially evade detection." *Id.* ¶ 83.

Leopold nevertheless contends that DOJ has not provided sufficient detail to demonstrate that information withheld under the National Security Act pertains to "intelligence sources and methods." *See* Leopold Mem. 35–36. But given the sensitivity of such information, and the

significant deference accorded to the DOJ in this context, no further detail is necessary. *See Elec. Privacy Info. Ctr. v. Office of Dir. of Nat'l Intelligence*, 281 F. Supp. 3d 203, 213 (D.D.C. 2017) (holding that an intelligence agency's protection of sources and methods is "a 'near-blanket FOIA exemption'"). Indeed, courts in this circuit routinely uphold the use of Exemption 3 with far less description than that offered by DOJ here. *See, e.g., Am. Ass'n of Women, Inc. v. Dep't of Justice*, 167 F. Supp. 3d 136, 143 (D.D.C. 2016) (upholding Exemption 3 withholdings taken to protect "intelligence sources and methods"); *James Madison Project v. CIA*, 605 F. Supp. 2d 99, 114 (D.D.C. 2009) (upholding Exemption 3 withholdings asserted to safeguard, among other things, CIA "special practices and procedures"); *Nat'l Sec. Counselors v. CIA*, 320 F. Supp. 3d 200, 215 (D.D.C. 2018) (upholding Exemption 3 withholding asserted to protect, among other things, "investigative techniques and information regarding how the Office of Inspector General conducts its investigations"). And the cases cited by Leopold merely state that the courts reviewed the documents *in camera*; they do not describe the level of specificity necessary in a declaration for a court to rule on Exemption 3 withholdings absent *in camera* review. *See* Leopold Mem. 36.

Moreover, as the D.C. Circuit recently reiterated, courts "have consistently deferred to executive affidavits predicting harm to national security, and have found it unwise to undertake searching judicial review." *DiBacco v. Dep't of the Army*, No. 17-5048, 2019 WL 2479443, at *4 (D.C. Cir. June 14, 2019) (citing *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003)). Indeed, Ms. Brinkmann has made plain here that disclosure of information withheld under Exemptions 3 and 7(E) could "cause harm to ongoing intelligence gathering or law enforcement activities" and "would present the potential for individuals and foreign agents to develop and implement countermeasures to evade detection, which would result in the loss of significant intelligence information." Brinkmann Decl. ¶ 23. Specifically, disclosure of

information pertaining to intelligence techniques and procedures would have "significant ramifications for their use in other pending and future national security investigations" because it "would give sophisticated criminals, including foreign agents of the type discussed in the Report, information necessary to change their behavior and implement effective countermeasures to circumvent FBI's investigative and intelligence-gathering efforts, as well as techniques of its intelligence community partners." *Id.* ¶¶ 83, 85.

Accordingly, given Ms. Brinkmann's detailed description of the withheld information and the deference afforded to "executive affidavits predicting harm to national security," DOJ has met its "light" burden to establish that the withheld material relates to intelligence sources and methods and was thus properly withheld under Exemption 3. *Am. Civil Liberties Union v. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011).

> **B.    DOJ Properly Withheld Information Concerning Investigative Techniques and Procedures Under Exemption 7(E).**
>
> **1.    Information that Would Reveal Techniques and Procedures Authorized for and Used in National Security Investigations Is Properly Withheld Under Exemption 7(E).**

All of the intelligence sources and methods information withheld under Exemption 3 is also protected by Exemption 7(E) (marked as "(b)(7)(E)-1" on the Report).  Brinkmann Decl. ¶¶ 16 n.8, 82 n.20, 86.  If the Court upholds the withholdings under Exemption 3, it need not consider the applicability of Exemption 7(E) to this information.  *See Larson v. Dep't of State*, 565 F.3d 857, 862–63 (D.C. Cir. 2009).

If the Court reaches the issue, Exemption 7(E)—like all subparts of Exemption 7—permits the Government to withhold certain information compiled for law enforcement purposes.  *See* DOJ Mem. 16–18.  Neither EPIC nor Leopold dispute that the Mueller Report was compiled for law enforcement purposes.  *See* EPIC Mem. 15–31; Leopold Mem. 14.  Thus, the Court should find

that DOJ met the threshold requirement for invoking Exemption 7.

Exemption 7(E) permits withholdings if release "would disclose techniques and procedures for law enforcement investigations, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).

EPIC does not contest that DOJ properly withheld information that could reveal techniques and procedures authorized for and used in national security investigations under Exemption 7(E). EPIC Mem. at 20–22 (contesting only the Exemption 7(E) withholdings marked as "(b)(7)(E)-2" on the Report).  Accordingly, EPIC has conceded that these withholdings under Exemption 7(E) were proper, and DOJ is entitled to summary judgment against EPIC on these withholdings.

Leopold, however, contests DOJ's assertion of Exemption 7(E) over this information. Citing to *Citizens for Responsibility & Ethics in Washington v. Department of Justice*, 746 F.3d 1082, 1102 (D.C. Cir. 2014) (*CREW I*), Leopold argues that DOJ must provide some explanation as to what techniques and procedures were withheld under Exemption 7(E).  Leopold Mem. 32– 33.  But DOJ did disclose that the information withheld pertains to "FBI intelligence gathering techniques and procedures," Brinkmann Decl. ¶ 86, and, specifically, "investigative and information gathering techniques used in investigations into [election] interference activities emanating from Russia," *id.* ¶ 23.  This is plainly more information than was disclosed in *CREW I*, where the D.C. Circuit found that the DOJ's assertion of Exemption 7(E) "to protect procedures and techniques used by FBI [agents] during the investigation" was "inadequate" because it was merely a "near-verbatim recitation of the statutory standard."  746 F.3d at 1102.

Moreover, "[t]he requirement that records 'would disclose techniques and procedures for law enforcement investigations or prosecutions,' . . . is met" not only "where a record would

disclose details about a law enforcement technique or procedure itself," but also where a record "would disclose information regarding 'when . . . agencies are likely to employ' certain techniques or procedures." *Sheridan v. U.S. Office of Pers. Mgmt.*, 278 F. Supp. 3d 11, 19 (D.D.C. 2017) (quoting 5 U.S.C. § 552(b)(7)(E); *Sack v. Dep't of Def.*, 823 F.3d 687, 694 (D.C. Cir. 2016)) (citing *Blackwell v. FBI*, 646 F.3d 37, 41–42 (D.C. Cir. 2011)). "And it is also satisfied if the record would disclose assessments about whether certain techniques or procedures 'are effective.'" *Id.* (quoting *Sack*, 823 F.3d at 694).

That is precisely the type of information DOJ withheld under Exemption 7(E). As set forth above, DOJ withheld information about the use of "investigative and information gathering techniques." Brinkmann Decl. ¶ 23; *see also id.* ¶¶ 83–86. This information included details about what types of information might be sought from the use of the techniques, when and how these techniques were used in the Special Counsel's investigation (including the circumstances in which different techniques are used together), and when and how those techniques might be used in future counterintelligence and counterterrorism investigations. *Id.* ¶¶ 83–85. The withheld information also included details about the effectiveness, capabilities, and limitations of these techniques. *Id.* ¶¶ 84–85. Courts have upheld withholdings under Exemption 7(E) with far fewer details than are offered by the agency here. *See, e.g.*, *Isiwele v. Dep't of Health & Human Servs.*, 85 F. Supp. 3d 337, 360 (D.D.C. 2015) (upholding withholding under Exemption 7(E) of "information concerning the use of electronic database systems, communications and instructions for Agency personnel related to possible interactions with applicants, and information gathering techniques for preventing and investigating immigration fraud"); *McCann v. Dep't of Health & Human Servs.*, 828 F. Supp. 2d 317, 324 (D.D.C. 2011) (upholding an assertion of Exemption 7(E) to withhold documents containing "procedures, techniques, and guidelines for investigating potential

violations of the HIPAA Privacy Rule by hybrid entities"); *Fisher v. Dep't of Justice*, 772 F. Supp. 7, 12 (D.D.C. 1991), *aff'd*, 968 F.2d 92 (D.C. Cir. 1992) (upholding an assertion of Exemption 7(E) "to withhold information compiled for law enforcement purposes, the disclosure of which would reveal investigative techniques and procedures, thereby impairing the FBI's future effectiveness . . . [b]ecause disclosure of the information within the context of the documents at issue could alert subjects in drug investigations about techniques used to aid the FBI").

Leopold also argues that DOJ cannot withhold publicly known techniques and procedures under Exemption 7(E). Leopold Mem. 33–34. "The exemption does not ordinarily protect 'routine techniques and procedures already well known to the public.'" *Elec. Frontier Found. v. Dep't of Justice*, No. 17-CV-1039 (DLF), 2019 WL 1714433, at *3 (D.D.C. Apr. 17, 2019) (quoting *Founding Church of Scientology of Wash., D.C. v. NSA*, 610 F.2d 824, 832 n.67 (D.C. Cir. 1979)). But "[t]here is no principle . . . that requires an agency to release all details concerning . . . techniques simply because some aspects of them are known to the public." *Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 23 (D.D.C. 2009). The exemption thus "protect[s] 'confidential details of . . . program[s]' if only their 'general contours [are] publicly known.'" *Elec. Frontier Found.*, 2019 WL 1714433, at *3 (quoting *Sussman*, 494 F.3d at 1112) (citing *Shapiro v. Dep't of Justice*, 893 F.3d 796, 801 (D.C. Cir. 2018). And "it protects 'commonly known procedures' if disclosure could 'reduce or nullify their effectiveness.'" *Id.* at *6 (quoting *Vazquez v. Dep't of Justice*, 887 F. Supp. 2d 114, 116 (D.D.C. 2012)) (citing *Sack*, 823 F.3d at 694); *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1492 n.27 (D.C. Cir. 1984)); *Am. Immigration Lawyers Ass'n v. Dep't of Homeland Sec.*, 852 F. Supp. 2d 66, 78 (D.D.C. 2012) ("While Exemption 7(E)'s protection is generally limited to techniques or procedures that are not well-known to the public, even commonly known procedures may be protected from disclosure if the disclosure could reduce or

nullify their effectiveness.").

That is the case here.  "Although some of the techniques and procedures themselves may generally be known to the public," Brinkmann Decl. ¶ 83, the "detailed information about the circumstances of their use—including how, when, and why such techniques and procedures are employed, and the capabilities of these techniques and procedures—are not publicly known," *id.* ¶ 84.  And the "techniques and procedures, more specifically, the specific circumstances concerning their use, are meant to operate clandestinely." *Id.*  Ms. Brinkmann attested that no additional information could be provided "without yielding sufficient information to enable wrongdoers, including hostile foreign powers, to potentially evade detection." *Id.* ¶ 83.  Because the manner and circumstances of the investigative and information gathering techniques described in the Mueller Report are not generally known to the public, DOJ properly withheld that information under Exemption 7(E).  *See Blanton v. Dep't of Justice*, 63 F. Supp. 2d 35, 50 (D.D.C. 1999) (upholding the agency's assertion of Exemption 7(E) and stating that "[w]hile the techniques themselves have already been identified by the FBI, the documents in question involve the manner and circumstances of the various techniques that are not generally known to the public").

Finally, to the extent that DOJ must show that disclosure of this information risks circumvention of the law, Leopold offers no serious contention that DOJ has not met this "relatively low bar." *See Blackwell*, 646 F.3d at 42.  Leopold argues only that merely withholding techniques and procedures "does 'not seek to protect individual mosaic tiles, which when placed together could reveal protected information.'"  Leopold Mem. 33 (quoting *Shapiro v. Dep't of Justice*, 239 F. Supp. 3d 100, 113 (D.D.C. 2017)).  But DOJ is not merely withholding techniques and procedures, but rather the detailed circumstances in which those techniques and procedures are used and the effectiveness of those techniques and procedures.  *See Brinkmann Decl. ¶¶ 83–

85. "When aggregated, as is it here, this information will illustrate an investigative roadmap of how law enforcement conducts a national security investigation," and "[d]isclosure of such a roadmap here, and over time, would give sophisticated criminals, including foreign agents of the type discussed in the Report, information necessary to change their behavior and implement effective countermeasures to circumvent the FBI's investigative and intelligence-gathering efforts, as well as techniques of its intelligence community partners." *Id.* ¶ 85. This detailed description is plainly sufficient for DOJ to meet is "relatively low bar." *See Blackwell*, 646 F.3d at 42.

> **2.    Details About Techniques and Procedures that Would Reveal Investigative Focus and Scope, and Circumstances, Methods and Fruits of Investigatory Operations Are Properly Withheld Under Exemption 7(E).**

Both Leopold and EPIC contest the Exemption 7(E) withholdings for techniques and procedures that would reveal investigative focus and scope, and circumstances, methods, and fruits of investigatory operations (marked as "(b)(7)(E)-2" on the Report). *See* Leopold Mem. 32–35; EPIC Mem. 20–22. Similar to Leopold's arguments regarding the other category of Exemption 7(E) redactions, EPIC argues that DOJ's declaration too vague because it refers only to generic "'techniques,' 'procedures,' and 'information,'" and does not explain "how release of the redacted material would disclose specific techniques or procedures." EPIC Mem. 21. But Ms. Brinkmann explained that the material pertains to "investigative or information gathering techniques," Brinkmann Decl. ¶ 88, and that "[r]elease of this information would disclose the methods employed by investigators and prosecutors in the collection and analysis of information, including how and from which sources they collected particular types of information and the methodologies employed to analyze it once collected," *id.* ¶ 87. And release would also "disclose the exact circumstances under which the techniques were utilized; the methods of investigative or information gathering employed, including the specific dates and times and targets of information

gathering techniques; and the actual fruits of the investigative operations relied upon by the [Special Counsel's Office]." *Id.*   ¶ 88.   This detailed description of the investigative and information gathering techniques is far from a "recitation of the statutory standard" that courts have found to be "inadequate." *CREW I*, 746 F.3d at 1102.

EPIC also argues that "the agency has also misconstrued the scope of the exemption" because the words "investigative focus and scope" and "fruits of investigative operations" do not appear in the statute and are not themselves "techniques" or "procedures" and cannot be withheld under Exemption 7(E). EPIC Mem. 22. But EPIC ignores that DOJ is protecting details about "information or information gathering techniques," the disclosure of which "would reveal investigative focus and scope, and circumstances, methods and fruits of investigatory operations." Brinkmann Decl. ¶ 82. Courts have recognized that an agency may withhold material regarding information-gathering and analysis techniques under Exemption 7(E). *See, e.g.*, *PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993) (upholding the agency's Exemption 7(E) assertion over, *inter alia*, "sources of information available to Agents investigating obscenity violations"); *Bayala v. U.S. Dep't of Homeland Sec.*, 264 F. Supp. 3d 165, 178 (D.D.C. 2017) (upholding the agency's reliance on Exemption 7(E) to withhold information about, *inter alia*, "information gathering techniques"); *Gatson v. FBI*, No. CV 15-5068, 2017 WL 3783696, at *14 (D.N.J. Aug. 31, 2017) (upholding the FBI's reliance on Exemption 7(E) to withhold "documents to protect the procedures and techniques used to collect and analyze information acquired for investigative purposes").

Courts also have upheld agency withholdings under Exemption 7(E) to protect from disclosure the scope and focus of investigations. *See, e.g.*, *Shapiro*, 239 F. Supp. 3d at 114 (upholding the FBI's assertion of Exemption 7(E), where disclosure of records "would likely

reflect important information about the scope of the FBI's [domestic terrorism] program in the United States, the scope and focus of its investigative efforts, and strategies it plans to pursue in preventing and disrupting domestic terrorist activity"); *Gatson*, 2017 WL 3783696, at *14 (upholding the Government's assertion of Exemption 7(E) to withhold "records to keep confidential the focus of particular FBI investigations" because "[d]isclosure of the broader investigative focuses and how they are connected to other investigations would show the scope of the FBI's strategies in combatting crime").

And, as explained above in Part II.B.1, Exemption 7(E) encompasses not only the techniques and procedures themselves, but also information regarding the circumstances of their use and the effectiveness of the techniques. *See Sheridan*, 278 F. Supp. 3d at 19. This is precisely the type of information DOJ withheld under Exemption 7(E). *See* Brinkmann Decl. ¶¶ 87–88.

EPIC also appears to contend that DOJ failed to show that disclosure of the information withheld in this category could reasonably be expected to risk circumvention of the law. EPIC Mem. 20–21. But EPIC ignores Ms. Brinkmann's assertion that disclosure would

> enable the subjects of other investigations to identify the precise timing and circumstances when these or similar currently-used techniques and procedures are being employed, evaluate the capabilities of these techniques and procedures, and take evasive actions or countermeasures to circumvent their effectiveness. This would provide valuable information to investigative targets concerning the circumstances in which specific techniques were used, thereby diminishing the relative utility of these techniques and undermining the usefulness of the information collected. . . .   Any release of the circumstances under which these techniques and procedures were implemented would undermine the FBI's and prosecutors' effectiveness, as well as those of intelligence community partners, in ongoing investigations and prosecutions and its future use.

Brinkmann Decl. ¶¶ 87–88. This detailed description shows that disclosure risks circumvention of the law, and EPIC does not explain why this description is insufficient for DOJ to meet the "relatively low bar." *See Blackwell*, 646 F.3d at 42.

Finally, EPIC notes that "the agency always asserts that exemption in conjunction with (b)(7)(A)," which "raises suspicion" and shows that "[t]he agency's aim is to get two bites at the apple for its Exemption 7(A) claims." EPIC Mem. 22. The Court should reject this baseless accusation outright. It is hardly surprising that information concerning investigative techniques and procedures relates to pending prosecutions or investigations and would thus be protected under both Exemptions 7(A) and 7(E). In any event, a review of the Report reveals numerous instances where DOJ redacted information pursuant to Exemption 7(A) but not 7(E). *See, e.g.*, Brinkmann Decl. Exh. D (Report Vol. II at 133, 151, App'x D at B-3, B-10, D-2–D-6). Ms. Brinkmann thoroughly reviewed the Report and attested that the material redacted pursuant to Exemption 7(E) comprises "details about the use of a variety of sensitive techniques and procedures utilized by the FBI agents and prosecutors investigating Russian interference in the 2016 presidential election and in other cases." Brinkmann Decl. ¶ 87. Ms. Brinkmann further attested that "[o]nly the precise information which would reveal non-public details about the Department's law enforcement techniques and procedures, the disclosure of which would risk circumvention of the law by criminal actors and hostile foreign powers, was protected on the basis of Exemption 7(E)." *Id.* ¶ 89. EPIC's bare allegation that DOJ's "aim is to get two bites at the apple" is insufficient to rebut the presumption of good faith accorded to DOJ's declaration.[2] *See Butler*, 2006 WL 398653, at *2.

The only argument Leopold makes regarding this category of DOJ's withholdings under Exemption 7(E) is that some of the redacted material "suggest[s] that it is not exempt when read

---

[2] EPIC's allegation also ignores that, as here, information may be exempt from release under multiple exemptions. Indeed, EPIC does not contest that the information withheld pursuant to the National Security Act under Exemption 3 was also properly withheld under Exemption 7(E).

in context, or may indicate selective application."[3]  Leopold Mem. 34.  Although Leopold then

quotes from the Report, he does not explain how those quotes suggest that the redacted material is

not exempt.  *See id.*  And Ms. Brinkmann has attested that the withheld material falls within

Exemption 7(E).  *See* Brinkmann Decl. ¶¶ 87–89.  Leopold's bare assertion is insufficient to

overcome the presumption of good faith afforded to Ms. Brinkmann's declaration.

*     *     *

Accordingly, and given the deference owed to DOJ in its decision to invoke Exemption 7,

the Court should find that DOJ properly invoked Exemption 7(E) over this information and grant

summary judgment in its favor.  *See Campbell v. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998)

(as amended Mar. 3, 1999) (stating that where an agency "specializes in law enforcement, its

decision to invoke exemption 7 is entitled to deference").

III.   **DOJ Properly Withheld Information Pertaining to Ongoing Investigations, Pending Prosecutions, and an Imminent Trial Under Exemptions 7(A), 7(B), and a Court Order.**

A.   **The Withheld Information Concerning Ongoing Investigations and Pending Prosecutions Falls Squarely Within Exemption 7(A).**

DOJ withheld under Exemption 7(A) information relating to a number of ongoing

investigations and pending prosecutions, where disclosure of that information could reasonably be

expected to interfere with those proceedings.  *See* Brinkmann Decl. ¶¶ 42–51.  Both EPIC and

Leopold argue that DOJ has provided insufficient explanation of how the specific types of withheld

information would interfere with pending proceedings.[4]  *See* EPIC Mem. 17; Leopold Mem. 16–

---

[3] In the section of Leopold's brief addressing Exemption 7, Leopold cites to and discusses Ms. Brinkmann's declaration only as it relates to redactions marked as (b)(7)(E)-1 in the Report.  *See* Leopold Mem. 33–35.  To the extent that Leopold's arguments apply to the material marked as (b)(7)(E)-2 in the Report, DOJ incorporates its response as set forth above in Part II.B.1.

[4] Leopold also identifies one instance where the FOIA-marked Report contained a slightly longer redaction than was contained on the public release of the Report.  *See* Leopold Mem. 21.  (The publicly released Report included a citation, whereas the FOIA-marked version redacted it.)  Leopold argues that this discrepancy is evidence of "the

20

17.

Even a cursory review of Ms. Brinkmann's declaration shows that this is not the case.  First, Ms. Brinkmann identified eight pending prosecutions, Brinkmann Decl. ¶ 44, and explained that release of information related to those prosecutions could result in the "fabricat[ion] and destr[uction] [of] evidence" and efforts to "tamper with, improperly influence, or intimidate witnesses," *id.* ¶ 45.  Release also would provide to indicted individuals and unindicted co-conspirators "an unprecedented insight into the strengths and weaknesses of the investigation and . . . [the] evidence utilized in their indictments and criminal cases." *Id.* ¶ 45.  Indicted individuals and unindicted co-conspirators could use this insight to circumvent efforts to bring them to justice. *Id.*

Ms. Brinkmann also described ongoing criminal and national security investigations related to the work of the Special Counsel's Office or targeting related actors (the details of which are not public), *id.* ¶¶ 44, 47, and explained that release of information related to those investigations "would risk influencing, compromising, or tainting information that may be obtained by other sources, risking fabrication or falsification of future testimony, destruction or alteration of evidence, or attempts to intimidate or influence potential sources," *id.* ¶ 48.  Release of information relating to ongoing investigations would also reveal "information or activities that are (or are not) of interest to investigators, areas where there may be gaps in investigators' knowledge about such information or activities that could be exploited by targets and hostile foreign powers, who investigators have already spoken with (or who they have not spoken with), what evidence or intelligence has been gathered (or not gathered), what exactly was said (or not)

---

breadth of DOJ's Exemption 7(A) assertions." *Id.*  But, as Ms. Brinkmann explained in her second declaration, this was an inadvertent error.  Exh. 1 (Brinkmann Second Decl. ¶ 7).  The corrected version attached to Ms. Brinkmann's declaration does not redact the citation.  *Id.* at Exh. A.

or gathered (or not), and whether individuals or entities are (or are not) of investigative interest."
*Id.* ¶ 48.  And "disclosing the specific techniques and procedures used by investigators and the specific circumstances of their use, beyond those which have already been made public, would adversely impact the Department's ongoing criminal and national security investigations would "create the risk of targets, subject, and adversaries—including, in the case of national security investigations, hostile foreign powers—undermining or developing countermeasures to thwart these techniques." *Id.* ¶ 49.

Lastly, disclosure of information in violation with court orders and rules concerning pretrial publicity would harm pending prosecutions.  *Id.* ¶¶ 46, 50.  This is no hypothetical harm—the Court in *United States v. Concord Management & Consulting LLC* recently ruled that the "government violated Rule 57.7" by releasing the Report because it consisted of a "public statement[] that linked the defendants' alleged activities to the Russian government and provided an opinion about the defendants' guilt and the evidence against them."  Mem. Op. & Order at 10, *United States v. Concord Mgmt. & Consulting LLC*, No. 18-cr-32-2 (DLF) (D.D.C. July 1, 2019), Dkt. 148.  Upon making this finding, the Court "caution[ed] the government that any future violations of Rule 57.7 or the Court's May 29, 2019 Order will trigger a range of potential sanctions." *Id.* at 20.  Thus, the harm from releasing the material withheld under Exemption 7(A) is not theoretical.

Despite Ms. Brinkmann's specific identification of pending prosecutions and ongoing investigations and the harms that could result from the release of information related to those proceedings, EPIC and Leopold argue that DOJ did not tie each and every redaction to a specific enforcement proceeding and to a specific harm that could result from release of that redacted

information.  EPIC Mem. 15–20; Leopold Mem. 15–17, 20–22.[5]

Courts, however, do not require this level of specificity.  Indeed, the Supreme Court has recognized that the language of Exemption 7(A) "appears to contemplate that certain generic determinations might be made."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978) (rejecting the respondent's argument that the FOIA requires the Government to "specifically demonstrate in each case that disclosure of the particular witness' statement would interfere with a pending enforcement proceeding").  As just one example of the level of detail required, in *Juarez v. Department of Justice*, the D.C. Circuit upheld the assertion of Exemption 7(A) over the Drug Enforcement Agency's "Form 6s, the forms the agency uses to record investigative information" because the "affidavits assert that the release of any portion of the withheld documents would compromise the investigation as it could lead to destruction of evidence and disclosure of potential witnesses' identities as well as DEA's investigative techniques."  518 F.3d 54, 58 (D.C. Cir. 2008).  And in *Mapother v. Department of Justice*, the D.C. Circuit found that the agency properly withheld an index of the documents in an active case file because "it identifies the gleanings from a mass of potential evidence that the agency considers probative of its case," and, as such, "its disclosure is apt to provide critical insights into its legal thinking and strategy."  3 F.3d 1533, 1543 (D.C. Cir. 1993).

Plaintiffs rely on case law concerning categorical withholding under Exemption 7(A).  *See* EPIC Mem. 15–17; Leopold Mem. 16–17.  Those cases hold that an agency may not take a "blanket exemption" over an entire investigatory file without explaining how release of documents within the file could harm an ongoing investigation or prosecution.  *See Robbins Tire*, 437 U.S. at

---

[5] In his brief, Leopold combines his arguments regarding Exemptions 7(A) and 7(B) and a court order as they relate to Roger Stone.  *See* Leopold Mem. 14–20.  It is therefore difficult to ascertain whether certain arguments relate to Exemption 7(A), 7(B), the *Stone* Court order, or some combination.  This brief attempt responds to Leopold's arguments in the appropriate sections.

236; *see also Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 789 F.2d 64, 66 (D.C. Cir. 1986) (finding that the agency could not withhold an entire investigatory file under Exemption 7(A) where the agency's affidavit recites only that the records responsive to the request are in a law enforcement file); *Putnam v. Dep't of Justice*, 873 F. Supp. 705, 713 (D.D.C. 1995) (same). But those cases involve FOIA requests for numerous documents, whereas here, there is just one document at issue—the Mueller Report. Plaintiffs cite to no case in which a court has disapproved of a categorical approach to redactions in one document.

And for good reason. As EPIC recognizes, the purpose of the categorical approach is to "allow[] the court to trace a rational link between the nature of the document and the alleged likely interference." *Crooker*, 789 F.2d at 67; *see* EPIC Mem. 16. Here, the nature of the Mueller Report is apparent—it "explain[s] the prosecution or declination decisions [the Special Counsel] reached." 28 C.F.R. § 600.8; *see also* Brinkmann Decl. Exh. D (Report Vol. I at 1, Vol. II at 1). In explaining these decisions, as is apparent from the unredacted sections of the Report, the Report describes evidence, such as witness statements, and discusses the scope and limits of the investigation. *See generally id.* Exh. D (Report Vol. I, Report Vol. II). As Ms. Brinkmann attested, release of this information as it pertains to pending prosecutions and investigations would allow indicted individuals, targets of investigation, and others to circumvent efforts to bring them to justice in the manner described above. Brinkmann Decl. ¶¶ 45–50.

EPIC also contends that the cases DOJ relied upon in its motion for summary judgment to show that witness and evidence tampering are the types of interference at which Exemption 7(A) is directed, are inapposite because they are civil, rather than criminal, proceedings. *See* EPIC Mem. 17–20. But the Supreme Court in *Robbins* and the D.C. Circuit in *Alyeska Pipeline Service Co. v. Environmental Protection Agency* did not limit their holdings to civil cases. *See Robbins*,

437 U.S. at 236, 239–41; *Alyeska Pipeline Serv. Co. v. EPA*, 856 F.2d 309, 312–13 (D.C. Cir. 1988). In any event, the D.C. Circuit has made similar findings when the pending investigations related to criminal cases and has quoted *Alyeska* in doing so. *See, e.g.*, *Boyd v. Criminal Div. of U.S. Dep't of Justice*, 475 F.3d 381, 386 (D.C. Cir. 2007) (affirming the withholding of records related to "potential criminal proceedings" under Exemption 7(A) where "disclosure of the information could reasonably be expected to reveal to the targets 'the size, scope, and direction of [the] investigation,' and allow them to destroy or alter evidence, fabricate fraudulent alibis, and take other actions to frustrate the government's case" (quoting *Alyeska*, 856 F.2d at 312)); *Juarez*, 518 F.3d at 58 (affirming the withholding of investigative reports concerning a money laundering investigation under Exemption 7(A) where disclosure "would compromise the investigation as it could lead to destruction of evidence and disclosure of potential witnesses' identities"). And although EPIC argues otherwise, *see* EPIC Mem. 17–20, there is clearly more of a risk of witness tampering and evidence fabrication for ongoing criminal cases—where the defendant faces incarceration and/or significant fines—than for civil or administrative matters.

DOJ also relied upon *Kay v. FCC*, 976 F. Supp. 23, 39 (D.D.C. 1997), to show that release of evidence or information against the criminal defendants would reveal the scope, limits, and direction of the investigations and prosecutions and thus provide insight to criminal defendants to allow them to circumvent the Government's efforts to bring them to justice. DOJ Mem. 20–21. EPIC likewise contends that the case is inapposite because it is a civil proceeding. EPIC Mem. 18–19. But EPIC ignores that DOJ also cited to a case involving pending criminal proceedings for this same proposition. *See* DOJ Mem. 20–21 (citing *Mapother*, 3 F.3d at 1543). And other cases involving criminal matters, such as *Boyd*, have made the same finding. *See Boyd*, 475 F.3d at 386. Thus, although EPIC attempts to draw a distinction between civil and criminal proceedings,

when it comes to harms resulting from a release of information related to those proceedings, this is a distinction without a difference.

EPIC further criticizes DOJ for relying on supposedly inapposite case law, *see* EPIC Mem. 17–20, but it is actually Plaintiffs that do so. EPIC and Leopold rely on *North v. Walsh* to argue that "[t]he fact that a defendant in an ongoing criminal proceeding may obtain documents via FOIA that he could not procure through discovery, or at least before he could obtain them through discovery, does not in and of itself constitute interference with a law enforcement proceeding." EPIC Mem. 19–20 (quoting *North*, 881 F.2d 1088, 1097 (D.C. Cir. 1989)); Leopold Mem. 16. But that is not why DOJ withheld the information; rather, DOJ withheld information under Exemption 7(A) because release would result in the numerous harms discussed above. *See* Brinkmann Decl. ¶¶ 45–50.

Similarly, Plaintiffs argue that because the withheld information will have be disclosed to the criminal defendants in accordance with the Federal Rules of Criminal Procedure and the Government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), release of the information would not harm the pending prosecutions. *See* EPIC Mem. 19–20; Leopold Mem. 16. But "disclosure obligations under FOIA and disclosure obligations in criminal proceedings are separate matters, governed by different standards." *Marshall v. FBI*, 802 F. Supp. 2d 125, 136 (D.D.C. 2011). Plaintiffs' belief that certain information will be or should have been disclosed during a criminal case does not mean that an agency is obliged to release information that is otherwise exempt to the public under FOIA. *See Davis v. Dep't of Justice*, 970 F. Supp. 2d 10, 17 (D.D.C. 2013). And, in any event, Ms. Brinkmann attested that "premature release" of that information would cause the harms discussed above. Brinkmann Decl. ¶ 45.

Leopold also argues that DOJ has failed to articulate a "foreseeable harm" of disclosure,

as required by the FOIA Improvement Act of 2016, 5 U.S.C. § 552(a)(8)(A)(i).[6]  Leopold Mem.

17.  But that amendment does not apply to Exemption 7, which already incorporates a harm

standard in the text of the exemption.  *See* S. Rep. No. 114-4, at 9 (Feb. 23, 2015) ("Other narrowly-

drawn exemptions for information compiled for law enforcement purposes within Exemption 7

already incorporate a reasonable foreseeability of harm standard within the text of the exemption.

This legislation is not meant to displace these exemptions.").  The one case Leopold cites, *Judicial*

*Watch, Inc. v Department of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019), addresses the

amendment as it relates to Exemption 5 and is thus inapposite.

Finally, Leopold cites to Roger Stone's indictment and argues that some of the 7(A)

information is public.  Leopold Mem. 20, 21; *cf.* EPIC Mem. 24 (raising a similar argument in the

context of 7(B)).  But Ms. Brinkmann recognized that "[a] substantial amount of information

pertaining to ongoing and current enforcement proceedings has been disclosed . . . in public

indictments," and attested that "OIP has thoroughly reviewed the information that remains

withheld from release on the basis of Exemption 7(A), and has determined releasing any further

information could reasonably be expected to interfere with enforcement proceedings."  Brinkmann

Decl. ¶ 51.  Leopold's speculation that the withheld material contains information set forth in

Mr. Stone's indictment is insufficient to overcome the presumption of good faith accorded to

Ms. Brinkmann's declaration.  *See Butler*, 2006 WL 398653, at *2.

Accordingly, and given the deference owed to DOJ when it invokes Exemption 7, the Court

should find that DOJ properly invoked Exemption 7(A) over this information and grant summary

---

[6] Leopold also criticizes DOJ for a supposedly contradictory position of withholding information related to Mr. Stone under Exemption 7(A) because it would hurt the Government's case at trial while withholding that same information under 7(B) because it would deprive him of a fair trial.  Leopold Mem. 14, 44.  But Leopold fails to recognize that release of information discussing Mr. Stone's conduct could both prejudice a jury—thus depriving him of a fair trial— and reveal to him the evidence collected against him—thus harming the Government's case at trial.

judgment in its favor.  *See Campbell*, 164 F.3d at 32.

**B.      Release of Information Related to Roger Stone Would Seriously Interfere with the Fairness of his Imminent Trial and May Violate the *Stone* Court Order.**

As an initial matter, information pertaining to Roger Stone withheld under Exemption 7(B) is also protected by Exemption 7(A).  If the Court upholds the withholdings under Exemption 7(A), it need not consider the applicability of Exemption 7(B) to this information.  *See Larson*, 565 F.3d at 862–63.

If the Court reaches the issue, DOJ withheld information pertaining to Roger Stone and/or his pending criminal case in the U.S. District Court for the District of Columbia under Exemption 7(B).  Brinkmann Decl. ¶¶ 52–57.  Because neither EPIC nor Leopold contest that Mr. Stone's trial is imminent, *see* EPIC Mem. 22–24; Leopold Mem. 14–20, the sole issue before the Court is whether release of the information withheld under Exemption 7(B) "would seriously interfere with the fairness" of Mr. Stone's trial, *Wash. Post Co. v. Dep't of Justice*, 863 F.2d 96, 102 (D.C. Cir. 1988).

EPIC argues that it is "mere speculation" that release of information from the Mueller Report pertaining to Mr. Stone will generate pretrial publicity and have an effect on a future jury.[7] EPIC Mem. 23 (citation omitted).  This is a curious assertion, given that EPIC itself recognizes that "there is immense public interest in the Special Counsel's Report" and that "[t]he public interest in the Report is ongoing."  EPIC Mem. 10; *see also* EPIC Mem. in Support of Mot. for

---

[7] EPIC also cites to DOJ's motion for summary judgment and argues that because the brief states that the release of information "could" influence potential jurors and seriously interfere with the fairness of Mr. Stone's impending jury trial, DOJ has failed to meet the standard for withholding information under Exemption 7(B).  EPIC Mem. 23 (citing DOJ Mem. 25, 26).  While it is true that on those two pages of the brief, it states "could" rather than "would," this was an inadvertent scrivener's error.  This is apparent from review of another page of the brief, where it states that "given the 'high-profile media coverage and intense public scrutiny' of the *Stone* case since his indictment in January 2019, disclosure of the information in the Report about Mr. Stone or his case *would* seriously interfere with the fairness of that trial."  DOJ Mem. 24 (quoting Brinkmann Decl. ¶ 54) (emphasis added).  More importantly, Ms. Brinkmann's declaration, which serves as the basis for this Court's review of the propriety of the withholdings, states that "OIP has invoked Exemption 7(B) to protect those portions of the Report that we have determined would, more probably than not, seriously interfere with the fairness of Mr. Stone's impending jury trial."  Brinkmann Decl. ¶ 56.

Prelim. Inj. 1, Dkt. 7-1 ("Few, if any, government documents in the recent history of the United States have commanded more attention than the 'Mueller Report' . . . ."); *id.* at 23–24 (noting that "a search results page from Google News identif[ied] 941,000 news articles containing the terms 'Robert Mueller' and 'Russia'"); *id.* at 26 ("[T]he public and the news media have focused extraordinary attention on Russian election interference; the Special Counsel investigation into such interference; the potential involvement of the President in a foreign campaign to influence the 2016 election; and possible obstruction of justice by the President while in office.").

In any event, the *Stone* Court found that the case has "already received and is going to continue to receive a great deal of public attention" and entered an order barring counsel for the parties from making statements that pose a substantial likelihood of material prejudice to that case. Tr. of Status Conf. at 16:2–4, *United States v. Stone*, 1:19-cr-00018 (D.D.C. Feb. 1, 2019), Dkt. 23; Order at 3, *United States v. Stone,* 1:19-cr-00018 (D.D.C. Feb. 15, 2019), Dkt. 36, *amended by* Minute Order (Feb. 21, 2019) (hereinafter, "*Stone* Order") (noting the "widespread media coverage this case has already received"). And Ms. Brinkmann likewise recognized that "[t]he prosecution of Mr. Stone has been at the center of high-profile media coverage and intense public scrutiny since he was indicted in January 2019." Brinkmann Decl. ¶ 54. Therefore, contrary to EPIC's assertions, there is ample evidence to show that release of information related to Mr. Stone would result in significant pretrial publicity.

EPIC criticizes DOJ for attempting to "prop up" its assertion of Exemption 7(B) by relying on the *Stone* Order. EPIC Mem. 24. But it is hardly unreasonable for DOJ to take into consideration statements and orders issued by the judge presiding over Mr. Stone's case; after all, it is that judge who has the most familiarity with the pretrial publicity surrounding Mr. Stone's case. And it is significant that, in light of that publicity, the *Stone* Court imposed an order pursuant

to Local Criminal Rule 57.7 directing counsel for the parties to "refrain from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to [Mr. Stone's] case." *Stone* Order at 3.  The *Stone* Court entered this order "to safeguard the defendant's right to a fair trial [and] to ensure that the Court has the ability to seat a jury that has not been tainted by pretrial publicity." *Id.*  In considering the *Stone* Court's findings and in recognition of the "extraordinary media attention surrounding his case," DOJ determined that no additional information from the Report could be released without "seriously interfer[ing] with the fairness of Mr. Stone's impending jury trial."  Brinkmann Decl. ¶ 56; *see also id.* ¶ 73 (noting "the intense public interest surrounding the [Special Counsel's Office's] work as well as the public and media attention surrounding this individual's ongoing court case, and the significant attention that any new fact made public will receive").

    EPIC and Leopold both argue that DOJ has misinterpreted the *Stone* Order in various ways. EPIC Mem. 24; Leopold Mem. 17–19.  First, Leopold argues that the *Stone* Order did not impose "total secrecy around Mr. Stone" and instead only prohibited statements that "pose a substantial likelihood of material prejudice."  Leopold Mem. 18.  But Ms. Brinkmann understood the contours of the *Stone* Order when determining which information should be withheld.  *See* Brinkmann Decl. ¶¶ 54, 90.  Second, EPIC argues that "counsel in the *Stone* case are not involved in this FOIA matter," EPIC Mem. 24, but Government counsel is involved in both cases.  Finally, EPIC and Leopold both argue that the Report does not constitute a "statement" under the *Stone* Order.  EPIC Mem. 24; Leopold Mem. 19.  But a "statement" includes a "formal and exact presentation of facts," such as the Mueller Report.  STATEMENT, *Black's Law Dictionary* (11th ed. 2019); *see also* STATEMENT, *Oxford English Dictionary*, (3d ed. 2012) (defining "statement" as "[a] formal written or oral account of facts, theories, opinions, events, etc., (now) esp. as requested by authority, or

issued to the media"). Indeed, the *Concord* Court recently found that the Report constituted a "public statement" under Local Rule 57.7. *See* Mem. Op. & Order at 10, *United States v. Concord Mgmt. & Consulting LLC*, No. 18-cr-32-2 (DLF) (D.D.C. July 1, 2019), Dkt. 148.

In any event, Plaintiffs read the *Stone* Order too narrowly. The *Stone* Court was concerned with pretrial publicity and ensuring that Mr. Stone receives a fair trial. *See Stone* Order; *see also* Minute Order (Feb. 21, 2019). Given the publicity that will occur if additional information from the Report is released, Brinkmann Decl. ¶¶ 56, 73, Ms. Brinkmann determined that "[a]ny further release of the protected information would risk running afoul of the letter and the spirit of the court's rulings concerning public statements by the parties," *id.* ¶ 54; *see also id.* ¶ 54 n.14 (discussing the Minute Order).

Accordingly, and given the deference owed to DOJ when it invokes Exemption 7, the Court should find that DOJ properly invoked Exemption 7(B) over this information and grant summary judgment in its favor. *See Campbell*, 164 F.3d at 32. The Court should likewise find that DOJ properly withheld the information pursuant to the *Stone* Order and grant summary judgment for DOJ. *See Tax Analysts v. Dep't of Justice*, 845 F.2d 1060, 1064 n.7 (D.C. Cir. 1988) ("[A]gency records are not 'improperly withheld' when a lawful injunction by a federal court prohibits agency compliance with a FOIA request."), *aff'd*, 492 U.S. 136 (1989).

## IV.    DOJ Properly Withheld Privacy Information Protected by Exemptions 6 and 7(C), as well as Deliberations Concerning Charging Decisions Under Exemption 5.

### A.    Personal Privacy Interests Outweigh the Public Interest in Disclosure.

As a general matter, EPIC argues that "Exemption 7(C) claims are 'simply not well-suited to categorical determinations.'" EPIC Mem. 25–26 (quoting *Citizens for Ethics & Responsibility in Wash. v. Dep't of Justice*, 854 F.3d 675, 683 (D.C. Cir. 2017) (*CREW II*)). But the Supreme Court has found that "categorical decisions may be appropriate and individual circumstances

disregarded when a case fits into a genus in which the balance characteristically tips in one direction." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 776 (1989); *see also CREW II*, 854 F.3d at 681–82 (reiterating that the names of individuals "who have not previously been publicly implicated in [an] investigation" "are categorically exempt from disclosure," absent "compelling evidence that the agency is engaged in illegal activity") (citation omitted).

Later in its brief, in an apparent recognition that categorical determinations are appropriate under Exemption 7(C), EPIC argues that "[t]he categorical rule under Exemption 7(C) does not apply to public figures or to individuals who have been 'charged, convicted or otherwise implicated in connection with [a] public corruption investigation.'" EPIC Mem. 27 (quoting *CREW II*, 854 F.3d at 681). But *CREW II* held only that the identities of "individuals who have already been publicly identified—either through agency press releases or testimony in open court—as having been charged, convicted or otherwise implicated in connection with [an] investigation" must be considered on a case-by-case basis because "these individuals have a diminished privacy interest" in the information contained in investigative documents. 854 F.3d at 682. In accordance with this instruction, DOJ separately considered the privacy interests of the one individual (Roger Stone) who has "already been publicly identified" through court filings "as having been charged" in connection with the Special Counsel's investigation. *See* Brinkmann Decl. ¶¶ 62, 72–75. EPIC incorrectly argues that the privacy interests of other individuals must be considered separately because they have all been "implicated" in the investigation. *See* EPIC Mem. 27. Indeed, EPIC cites to nothing to suggest any other individuals whose names have been redacted have been *officially and publicly* charged, convicted or otherwise implicated in connection with the investigation. *See id.*

Consistent with *Reporters* and *CREW II*, DOJ divided the information withheld under 7(C) into four categories.  Far from being too "broad," EPIC Mem. 26–27, DOJ grouped in each category the individuals who share similar privacy interests, separately described the privacy interests of individuals in each of the four categories, and balanced these privacy interests with the public interest in disclosure of information in each of the four categories.  In each instance, the balancing test weighed in favor of non-disclosure.

## 1. Identifying Information of Unwitting Third Parties is Properly Protected Under Exemption 7(C).

For Category 1—the names, social media account information, and other contact information of unwitting third parties who were unknowingly involved in election interference efforts carried out by Russian nationals,[8] Brinkmann Decl. ¶ 63—even EPIC agrees that the "balancing analysis weighs against disclosure for such individuals" and does not challenge those withholdings, EPIC Mem. 26.  Leopold, on the other hand, contests DOJ's redactions of this information for several reasons, none of which has merit.  Leopold Mem. 41–42.  First, quoting only part of Ms. Brinkmann's explanation of this category, Leopold contends that DOJ's description of this category is not sufficiently detailed.  *Id.* at 41.  But Ms. Brinkmann explained that DOJ withheld identifying information of individuals who were "contacted by, or interacted or engaged with the [Internet Research Agency's (IRA)] social media activities," as well as the identifying information of "reporters who . . . were contacted by DCLeaks and Guccifer 2.0 as part of [Main Intelligence Directive of the General Staff's (GRU)] efforts to promote release of the hacked materials."  Brinkmann Decl. ¶ 63.  Leopold fails to explain why additional information is necessary for the Court to evaluate the privacy interest of these individuals.  Indeed, nothing more

---

[8] Indictments returned by the Special Counsel contain allegations, and in the publicly released report, neither the Special Counsel nor the Department were commenting on the guilt or innocence of any charged defendant.  *See* DOJ Mem. 19 n.11; *id.* at 36 n.18; Brinkmann Decl. ¶ 63 n.15.

is needed.

Leopold further argues that DOJ should not have withheld information regarding the names of Facebook groups because companies do not have privacy interests.  Leopold Mem. 42.  But, as Ms. Brinkmann explained, DOJ did not withhold the names of Facebook groups to protect the privacy of Facebook; instead, because "the Facebook groups can be tied to the individuals who are members of and interact within each group," "[t]he Facebook group names have been withheld in order to protect these individuals."  Brinkmann Decl. ¶ 64.

Leopold also argues that these individuals should not be compared to crime victims for purposes of evaluating their privacy interests because no crime has been committed against them. Leopold Mem. 41.  But Ms. Brinkmann explained that because these individuals did not know that the "IRA-controlled accounts and personas" and the "GRU-controlled personas" "were fake," they were "unwittingly utilized by—and in that sense, were essentially victimized by—interference efforts emanating from Russia."  Brinkmann Decl. ¶ 63.  Thus, even if no crimes have been personally committed against these individuals, they were indeed victims.

In any event, Leopold provides no argument as to how releasing the names and identifying information for these individuals would serve the public interest.  *See* Leopold Mem. 41–42. Indeed, he cannot: there is no "reasonably conceivable way" in which release of these individuals' names "would allow citizens to know 'what their government is up to.'"  *Fitzgibbon v. CIA*, 911 F.2d 755, 768 (D.C. Cir. 1990) (quoting *Reporters Comm.*, 489 U.S. at 772)).  The balance therefore tips heavily in favor of non-disclosure, and the Court should grant summary judgment for DOJ.

## 2. Identifying Information of Individuals Who Were Not Charged by the Special Counsel's Office Is Properly Protected Under Exemption 7(C).

Category 2 comprises information identifying individuals who were not charged by the

Special Counsel's Office.  Brinkmann Decl. ¶¶ 68–71.  Leopold does not appear to contest that these individuals have a privacy interest in non-disclosure.  *See* Leopold Mem. 42–44 (arguing only about the public interest in disclosure).  EPIC, however, contends that any public figures included in Category 2 have a "diminished privacy interest" because they have been "implicated" in the Special Counsel's investigation.  EPIC Mem. 27–30.

"[I]ndividuals have a strong interest in not being associated unwarrantedly with alleged criminal activity," *Stern v. FBI*, 737 F.2d 84, 91–92 (D.C. Cir. 1984), and thus have "'an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation,'" *CREW I*, 746 F.3d at 1091 (quoting *Nation Mag. v. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995)).  That interest is particularly great in the case of "individuals who have been investigated but never publicly charged at all," such as the individuals included in Category 2.  *ACLU v. Dep't of Justice*, 655 F.3d 1, 7 (D.C. Cir. 2011).

And that interest is not vitiated in cases where "the individuals are public figures [or] high level government or corporate officials," *Fund for Constitutional Gov't*, 656 F.2d at 864, or in cases where the investigations attracted "national attention," *id.* at 865.  To the contrary, "[t]he degree of intrusion" caused by "revelation of the fact that an individual has been investigated for suspected criminal activity" is "potentially augmented by the fact that the individual is a well[-]known figure and the investigation one which attracts . . . much national attention" because "[t]he disclosure of that information would produce the unwarranted result of placing the [individual] in the position of having to defend [his or her] conduct in the public forum outside of the procedural protections normally afforded the accused in criminal proceedings."  *Id.*  Indeed, in *Judicial Watch, Inc. v. National Archives and Records Administration*, the D.C. Circuit rejected the plaintiff's argument that Hillary Clinton had "minimal" a privacy interest in the contents of a draft indictment

by virtue of her being a public figure, and found instead that "the potential immediate harm to her would appear to be augmented simply because the Independent Counsel's investigation of President and Mrs. Clinton attracted great public attention."  876 F.3d 346, 349–50 (D.C. Cir. 2017).  Accordingly, because all of the individuals included in Category 2 were never charged with a crime, they have a strong interest in avoiding disclosure of the withheld material, and that interest is not diminished by the fact that they are public figures.

EPIC and Leopold argue that certain individuals, such as Donald Trump, Jr., do not have a privacy interest in nondisclosure because they have made public statements related to the Special Counsel's investigation.  EPIC Mem. 28–29; Leopold Mem. 44.  This argument is without merit.  "'[T]he fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of [the requested] information.'  *People for the Ethical Treatment of Animals v. Nat'l Insts. of Health*, 745 F.3d 535, 545 (D.C. Cir. 2014) (citation omitted).  Indeed, in *CREW I*, the D.C. Circuit found that even though former House Majority Leader Tom DeLay made public statements confirming that he had been under investigation, thus "lessen[ing] his interest in keeping secret the *fact* that he was under investigation, he retained a second, distinct privacy interest in the *contents* of the investigative files."  *CREW I*, 746 F.3d at 1092.  Therefore, even if it is public knowledge that certain individuals were investigated by the Special Counsel's Office, those individuals nevertheless retain a distinct privacy interest in the contents of the Report. *See id.*; *see also Judicial Watch*, 876 F.3d at 349.  And Plaintiffs' assertions that certain individuals are seeking publicity is legally irrelevant. *Schoenman v. FBI*, 573 F. Supp. 2d 119, 149 (D.D.C. 2008) ("Plaintiff's claim that he personally 'knows' that the individual at issue would not object to the release of his name is legally irrelevant."); *Associated Press v. Dep't of Def.*, 554 F.3d 274, 287 (2d Cir. 2009) (noting that whether an individual may want to

"voluntarily disclose information publicly does not authorize the government to disclose that information").

Disclosing information in the Report would deprive individuals of the ability to "control[] information concerning criminal charges" that were never brought against them, *ACLU*, 750 F.3d at 929, thereby depriving them of "[t]he presumption of innocence [that] stands as one of the most fundamental principles of our system of criminal justice," *id.* at 933, and "placing [them] in the position of having to defend their conduct in the public forum outside of the procedural protections normally afforded the accused in criminal proceedings," *Fund for Constitutional Gov't*, 656 F.2d at 865.  No less than anyone else, therefore, these individuals have a privacy interest in the nondisclosure of the declination decisions.

Because "release of this type of information represents a severe intrusion on the privacy interests of the individuals in question," it "should yield only where exceptional interests militate in favor of disclosure."  *Id.* at 866.  "[T]he person requesting the information [must] establish a sufficient reason for the disclosure."  *Nat'l Archives & Records Admin v. Favish*, 541 U.S. 157, 172 (2004).  "First, the citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake."  *Id.*  "Second, the citizen must show the information is likely to advance that interest."  *Id.*

EPIC and Leopold argue that the information is necessary to determine whether the Attorney General hid the involvement of the "President's family members and other public figures . . . in the Russian interference," and to determine whether the Special Counsel's Office conducted a "witch hunt" or, conversely, "pulled its punches" by not charging certain individuals.  EPIC Mem. 30–31; Leopold Mem. 36–40.  "Allegations of government misconduct are 'easy to allege,'" however, "'and hard to disprove.'"  *Favish*, 541 U.S. at 175 (quoting *Crawford-El v. Britton*, 523

U.S. 574, 585 (1998)).  "[A] presumption of legitimacy" is thus "accorded to the Government's official conduct."  *Id.* at 174.  For that reason, a FOIA requester "must establish more than a bare suspicion in order to obtain disclosure" in any case in which "a privacy interest [is] protected by Exemption 7(C) and the public interest being asserted is to show that [the] responsible officials acted negligently or otherwise improperly in the performance of their duties."  *Id.*  Because this standard requires the requester to produce "evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred," *id.*, the "'public interest [in disclosure] is insubstantial'" in any case in which "'governmental misconduct is alleged as the justification for disclosure . . . unless the requester puts forward compelling evidence that the agency . . . engaged in illegal activity and shows that the information sought is necessary in order to confirm or refute that evidence.'"  *Computer Professionals for Soc. Resp. v. Secret Serv.*, 72 F.3d 897, 905 (D.C. Cir. 1996) (quoting *Davis*, 968 F.2d at 1282).  Because no such misconduct occurred, Plaintiffs are unable to meet this burden.

Although Plaintiffs argue that the Special Counsel's Office and DOJ "acted negligently or otherwise improperly in the performance of [its] duties," they do not "produce evidence that would warrant a belief by a reasonable person" that any such allegation would have any merit.  *Favish*, 541 U.S. at 174.  EPIC's argument that the Attorney General improperly protected the names of individuals involved in interference efforts, EPIC Mem. 31, and Leopold's assertion that the Attorney General "made the original redaction decisions" to the Report and thus "might have improperly characterized the Report and improperly advocated on behalf of the President for political or other reasons," Leopold Mem. 39–40, are belied by the facts.  Plaintiffs ignore that the Special Counsel and his team (along with members of the intelligence community and the prosecuting offices currently handing matters referenced in the Report) assisted in redacting the

Report for public release and that these redactions were made in accordance with long-standing Department policies.  *See* DOJ Mot., Exh. 6, 7, Dkt. 54-10, 54-11; *see also* 28 C.F.R. § 50.2(b)(iv) ("[W]here background information or information relating to the circumstances of an arrest or investigation would be highly prejudicial or where the release thereof would serve no law enforcement function, such information should not be made public.").  After the public release of the Report, Special Counsel Mueller commented that "we appreciate that the Attorney General made the report largely public.  I do not question the Attorney General's good faith in that decision."  *Special Counsel Robert S. Mueller III Makes Statement on Investigation into Russian Interference in the 2016 Presidential Election* (May 29, 2019), *available at* https://www.justice.gov/opa/speech/special-counsel-robert-s-mueller-iii-makes-statement-investigation-russian-interference.  In addition, the Office of Information Policy conducted its own review to process the Report under the FOIA, and Ms. Brinkmann attested that OIP "coordinat[ed] with the appropriate Department components," "conducted a thorough FOIA review of the information underlying each redaction in the public version of the Report, and determined that the same information was protected pursuant to FOIA Exemptions 3, 5, 6, 7(A), 7(B), 7(C), and/or 7(E)."  Brinkmann Decl. ¶ 13; *see also id.* ¶¶ 11, 91.  Plaintiffs do not question the good faith of Ms. Brinkmann.  *See Butler*, 2006 WL 398653, at *2.

Plaintiffs' arguments concerning the Special Counsel's Office are equally baseless. Leopold cites statements made by the President on Twitter about the Special Counsel's investigation, Leopold Mem. 38–39, but Leopold cites to no evidence that the President had official knowledge that certain individuals were being investigated by the Special Counsel or the scope of any such investigation (outside of information that was publicly reported or provided to attorneys representing him).  Indeed, because the Special Counsel was investigating "whether the

President had obstructed justice in connection with Russia-related investigations," Brinkmann Decl. Exh. D (Report Vol. II at 1), there is no reason to believe that the President would have this knowledge.  And EPIC and Leopold argue that the declination decisions should be disclosed to "reveal how the Special Counsel handled the investigation into Russian election interference and how the Special Counsel investigated President Trump, his family members, and his associates." EPIC Mem. 30; *see also* Leopold Mem. 39–40.  But this argument ignores that the vast majority of the Report is unredacted and already demonstrates how the Special Counsel handled the investigation.  *See generally* Brinkmann Decl. Exh. D (Report, Vol. I, Vol. II).  Notably, in Volume II of the Report, which "summarizes [the] obstruction-of-justice investigation of the President," *id.* (Report, Vol. II at 1), there are *no* redactions to protect the personal privacy for individuals in Category 2; *see id*. (Report, Vol. II at 1–182).  Additional information showing how the Special Counsel handled the investigation has been disclosed "in criminal indictments that were issued by [the Special Counsel's Office] against numerous other individuals and entities."  Brinkmann Decl. ¶ 70.  Given this wealth of information, "disclosure of the identities of uncharged individuals in this one investigation would not significantly enhance the public's understanding of how the Department carries out its duties."  *Id.*  Accordingly, Plaintiffs' allegations of official impropriety are insufficient to overcome the personal privacy interest of the individuals who were not charged by the Special Counsel.

### 3. Information Related to Roger Stone, His Pending Criminal Case, and Associated Individuals Is Properly Protected Under Exemption 7(C).

Category 3 comprises information about Roger Stone, his pending criminal case, and individuals discussed in connection with the facts of Mr. Stone's case.  Brinkmann Decl. ¶¶ 72–75.

Leopold argues that "Exemption 7(C) is primarily concerned with the privacy interest of

those who are investigated, but not charged." Leopold Mem. 45. While individuals who have been investigated but not charged have a significant privacy interest in non-disclosure, *see* Part IV.A.2, individuals who have been charged and awaiting trial have a privacy interest as well. Indeed, individuals retain a privacy interest in avoiding new disclosures about their criminal conduct even where they have been charged and convicted. *See Reporters Comm.*, 489 U.S. at 753; *ACLU*, 655 F.3d at 7. Thus, Mr. Stone has a privacy interest under Exemption 7(C). *See* Brinkmann Decl. ¶ 73.

Similar to their argument concerning Donald Trump, Jr., Plaintiffs argue that Mr. Stone does not have a privacy interest in nondisclosure because he has sought media attention. EPIC Mem. 29; Leopold Mem. 44–45. This argument is without merit for the same reasons discussed in Part IV.A.2. And Plaintiffs ignore that DOJ protected information related to "other individuals discussed in connection with the facts related to Mr. Stone's criminal case" under this category. Brinkmann Decl. ¶ 72. Those individuals have a privacy interest in non-disclosure, *see Davis*, 968 F.2d at 1281, and Plaintiffs do not argue otherwise.

EPIC argues that certain information regarding Mr. Stone is not protected from disclosure because it is publicly available. EPIC Mem. 31. But merely because EPIC has been able to piece together information does not vitiate individuals' privacy interest in non-disclosure of information by DOJ. *See Weisberg*, 745 F.2d at 1491; *Fitzgibbon*, 911 F.2d at 768; *Shores v. FBI*, 185 F. Supp. 2d 77, 83 (D.D.C. 2002); *Schoenman*, 573 F. Supp. 2d at 149.

Finally, EPIC does not argue that there is any particular public interest in the information related to Mr. Stone, and Leopold argues only that there is a "significant public interest in understanding why Roger Stone was charged but Donald Trump, Jr. was never even brought before the grand jury." Leopold Mem. 44. But information concerning the charges brought against

41

Mr. Stone can be found in his indictment, and releasing the information in the Report pertaining to Mr. Stone would not explain possible charging decisions relating to Donald Trump, Jr.  The public interest in disclosure thus does not overcome Mr. Stone's privacy interest.

### 4. Identifying Information of Individuals Who Were Merely Mentioned in the Report Is Properly Protected Under Exemption 7(C).

Category 4 comprises identifying information of individuals merely mentioned in the Report.[9]  *See* Brinkmann Decl. ¶¶ 62, 76–79.  Leopold again criticizes this description as vague, Leopold Mem. 45, but Ms. Brinkmann explained that this category includes "third parties who are mentioned only in association with individuals of interest to the investigation," "individuals who were mentioned in relation to or were victims of GRU hacking and dumping operations," "assorted contact information" for "individuals mentioned throughout the Report," and identifying "information of individuals for whom evidence of potential criminal activity was referred by the Special Counsel to appropriate law enforcement authorities."  Brinkmann Decl. ¶ 76.

Leopold argues that, "with the exception of referrals, these people were never investigated, [so] their privacy interests are not particularly strong in the first place."  Leopold Mem. 45.  To the contrary, however, individuals who are merely mentioned in law enforcement files have a "strong interest" in not being associated with criminal activity.  *Fitzgibbon*, 911 F.2d at 767 ("It is surely beyond dispute that "the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." (citation omitted));  *Fund for Constitutional Gov't*, 656 F.2d at 863 ("[A]n individual whose name surfaces in connection with an investigation may without more, become the subject of rumor and innuendo.").

Finally, Leopold argues that with regard to the referrals, there is a public interest in

---

[9] Although EPIC contests DOJ's withholdings under Category 4, *see* EPIC Mem. 26, EPIC provides no independent argument related to this Category.  Therefore, to the extent that EPIC's arguments regarding Categories 2 and 3 relate to Category 4, DOJ incorporates by reference its responses to those arguments.

determining whether the Special Counsel's investigation was "politically motivated and had conflicts of interest."[10]  Leopold Mem. 45–46.  But Ms. Brinkmann explained that these referrals "surfaced only incidentally during the course of the [Special Counsel's] investigation, where the individuals were not subjects of the SCO investigation, [and] therefore would not significantly enhance the public's understanding of how the Department carries out its duties."  Brinkmann Decl. ¶ 78.  Thus, the value of this information in understanding how the Special Counsel conducted the investigation is minimal, at best, and does not outweigh these individuals' privacy interest in non-disclosure.  *See Schrecker*, 349 F.3d at 661 (stating that the focus is on the "incremental value of the specific information being withheld").

### B.   Deliberations Leading to a Decision to Initiate or Forego Prosecution are Properly Withheld Under Exemption 5.

All of the deliberative information withheld under Exemption 5 is also protected by Exemptions 6 and 7(C), and some of the information is also protected by Exemptions 7(A) and/or 7(B).  *See* Brinkmann Decl. Exh. D (Vol. I at 9, 12, 65, 174, 176–80, 183, 188–91, 194, 196, 197, 199).  If the Court upholds the withholdings under Exemption 6 or 7, it need not consider the applicability of Exemption 5 to this information.  *See Larson*, 565 F.3d at 862–63.

If the Court reaches the issue, Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  As an initial matter, EPIC, Leopold, and CREW do not contest that the information withheld pursuant to Exemption 5 satisfies the "inter/intra-agency" threshold requirement.  *See* EPIC Mem. 32–35; Leopold Mem. 46–50; *see generally* CREW Br.  Thus, the only issues before the Court are whether the withheld material falls within the scope of

---

[10] Leopold makes no argument regarding the public interest in the rest of the information withheld under Category 4. *See* Leopold Mem. 45–46.  The Court should therefore find that Leopold has conceded that there is no public interest in the disclosure of this information.  *See* DOJ Mem. 43–44; Brinkmann Decl. ¶ 78.

the deliberative process privilege and whether DOJ has sufficiently articulated the harm that would result from release.

The deliberative process privilege "allows the government to withhold documents and other materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (quoting, *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)). In assessing whether material is subject to the privilege, "what matters is whether a document will expose the predecisional and deliberative processes of the Executive Branch." *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 131 (D.C. Cir. 2005). Indeed, the deliberative process privilege "serves to protect the deliberative process itself, not merely documents containing deliberative material." *Mapother*, 3 F.3d at 1537; *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977) ("Exemption five is intended to protect the deliberative process of government and not just deliberative material."). And "[t]he 'key question' in identifying 'deliberative' material is whether disclosure of the information would 'discourage candid discussion within the agency.'" *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991) (quoting *Dudman Comm's Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1567–68 (D.C. Cir. 1987)).

As the D.C. Circuit has found, "the process leading to a decision to initiate, or to forego, prosecution is squarely within the scope of th[e] [deliberative process] privilege." *Senate of the Commonwealth of P.R.*, 823 F.2d at 585 n.38; *accord Paisley v. CIA*, 712 F.2d 686, 699 (D.C. Cir. 1983) (stating that the "information-gathering and deliberative process that produces the decision" regarding "whether or not to prosecute someone" "is precisely the type of material to be protected as pre-decisional under Exemption 5"), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir.

1984).  Indeed, "[t]he exemption is tailor-made for the situation in which the Special Prosecutor's Office was assessing the evidence it was compiling" because "expos[ing] this process to public scrutiny would unnecessarily inhibit the prosecutor in the exercise of his traditionally broad discretion to assess [the] case and decide whether or not to file charges."  *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 485 F. Supp. 1, 13 (D.D.C. 1978), *aff'd in part and remanded*, 656 F.2d 856 (D.C. Cir. 1981); *see also Senate of the Commonwealth of P.R.*, 823 F.2d at 585 n.38 (quoting *Fund for Constitutional Gov't*, 485 F. Supp. at 13); *Freeman v. Dep't of Justice*, 723 F. Supp. 1115, 1121 (D. Md. 1988) ("This exemption is 'tailor-made' for a law enforcement agency's or a prosecutor's review and assessment of evidence to determine whether to initiate a prosecution." (quoting *Fund for Constitutional Gov't*, 485 F. Supp. at 13)).

Against this legal backdrop, Plaintiffs and *amicus* CREW incorrectly assert that descriptions of predecisional, deliberative discussions are not protected when the deliberations were memorialized after the decision.  EPIC Mem. 32–35; Leopold Mem. 46–48; CREW Br. 8–14.  As this Court has recognized, "post-decisional documents may still be covered under the deliberative-process privilege to the extent they 'recount or reflect predecisional deliberations.'"  *Judicial Watch, Inc. v. Dep't of Justice*, 800 F. Supp. 2d 202, 218 (D.D.C. 2011) (quoting *Judicial Watch, Inc. v. Dep't of Treasury*, 796 F. Supp. 2d 13, 31 (D.D.C. 2011)).  When post-decisional documents recount or reflect predecisional deliberations, courts have repeatedly upheld agencies' decisions to withhold those documents under the deliberative process privilege.  *See, e.g.*, *id.*; *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 658 F. Supp. 2d 217, 234 (D.D.C. 2009) (finding that because "the information withheld by DOJ recounts the 'ingredients of the decisionmaking process,' . . . the information withheld qualifies as predecisional—despite the fact that the interview in which the information was disclosed took place after the decisions were

made"); *Pub. Citizen, Inc. v. Dep't of Educ.*, Civ. A. No. 18-1047 (CKK), 2019 WL 2211118, at

*11 (D.D.C. May 22, 2019) (finding that because "redactions of the deliberations relating to the

invitee list were proper under the deliberative process privilege," "[i]t would make little sense to

force the release of that same information because it is recounted in a post-decision email"); *Elec.*

*Privacy Info. Ctr. v. Dep't of Homeland Sec.*, Civ. A. No. 04-1625, 2006 WL 6870435, at *7–8

(D.D.C. Dec. 22, 2006) (holding that description of predecisional deliberations set forth after

decision was protected)); *Edelman v. Sec. & Exch. Comm'n*, 172 F. Supp. 3d 133, 159 (D.D.C.

2016); *N. Dartmouth Properties, Inc. v. Dep't of Hous. & Urban Dev.*, 984 F. Supp. 65, 68 (D.

Mass. 1997) (holding that "a document that was generated after the agency's decision was made,

but which nonetheless reiterated the agency's pre-decisional deliberations" was protected).[11]

"Indeed, '[i]t would exalt form over substance to exempt documents in which staff

recommend certain action or offer their opinions on given issues but require disclosure of

documents which only 'report' on what those recommendations and opinions are.'" *Judicial*

*Watch*, 800 F. Supp. 2d at 218 (quoting *Mead Data Cent.*, 566 F.2d at 257). "The rationale for

this conclusion, as the Supreme Court has recognized, is that the future quality of an agency's

decisions could be affected if 'the ingredients of the decisionmaking process are . . . disclosed.'"

*Id.* (quoting *NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 151 (1975)); *see also N. Dartmouth*,

984 F. Supp. at 68 (finding that a description of predecisional deliberations generated after the

decision "must be protected to avoid revealing the 'ingredients of the decision making process'"

and "the deliberative process privilege must apply, so that other agency employees will not be

---

[11] *See also e.g.*, *Metro. St. Louis Sewer Dist. v. EPA*, No. 4:10-CV-2103 (CEJ), 2012 WL 685334, at *5 (E.D. Mo. Mar. 2, 2012) (finding that the agency appropriately withheld emails under Exemption 5 where "disclosure of the contents of the February 2010 emails would reveal information about the course of deliberations leading up to the October 29, 2009, decision"); *Ford Motor Co. v. United States*, 94 Fed. Cl. 211, 223 (2010) (finding that the agency appropriately withheld emails under the deliberative process privilege because they "recount government employees' views of the proposed ruling before it was adopted" and were thus "pre-decisional even though they were created after the decision date").

deterred from expressing their own opinions in the future" (quoting *Sears*, 421 U.S. at 151)); *Elec. Privacy Info. Ctr.*, 2006 WL 6870435, at *8 (finding that protection was necessary because "disclosure of this information could deter agency employees from being candid in the future" regardless of whether information was recorded before or after decision).

The deliberations at issue here are similar to those that were at issue in *Judicial Watch*. In that case, the Department of Justice withheld records under Exemption 5 that concerned DOJ's decision to voluntarily dismiss civil claims in a Voting Rights Act case. *See Judicial Watch*, 800 F. Supp. 2d at 207. Certain withheld records post-dated the decision to dismiss the claims, as well as the date that DOJ filed its motion for voluntary dismissal. *See id.* at 211, 215–19. The records post-dating the decision "include[d] assessments of the facts and evidence, discussions of legal strategy, and characterizations of the DOJ's internal deliberations and decisionmaking process in the . . . litigation." *Id.* at 216. Specifically, some of those records were "created in the course of recounting specific factual and legal aspects of the . . . litigation for . . . briefing officials within the DOJ about the decisionmaking process." *Id.* at 215 (citation omitted). Those records "rehash[ed] the litigation process as they peel back to core decisionmaking processes which unfolded during the course of the . . . case." *Id.* at 216 (citation omitted). Other post-decisional records provided "candid assessments of the evidence, opinions and analyses of the . . . case law, facts, [legal] issues, and various types and scope of relief." *Id.* (citation omitted). Yet another record was a "detailed chronology of the DOJ's involvement . . . in the case that present[ed] an unvarnished presentation of the author's thoughts on litigation decisions, actions, strategies, and recommendations as they developed, as well as ruminations and retrospective analyses on the variety of the decision-making process in several DOJ offices." *Id.* (citation omitted).

DOJ withheld those records under Exemption 5, claiming that the records were protected

from disclosure as attorney work product and under the deliberative process privilege.  *Id.* at 210–

11.  Although the Court determined that the records post-dating the decision were "outside the

scope of the work-product privilege," *id.* at 217, "the Court conclude[d] that these documents were

appropriately withheld under the deliberative-process privilege," *id.* at 217 n.11.  In so finding, the

Court considered the "nature of the post-decisional documents," *id.* at 218, which, as stated above,

included attorneys' "assessment of the facts and evidence, discussions of legal strategy, and

characterizations of the DOJ's internal deliberations and decisionmaking process," *id.* at 216.

"Given the nature of the post-decisional documents," the Court found that they "'recount[ed] or

reflect[ed]  predecisional  deliberations,'"  and  were  thus  "appropriately  withheld  under  the

deliberative process privilege."  *Id.* at 218 (quoting *Judicial Watch*, 796 F. Supp. 2d at 31).

Akin to the documents that were used to brief superiors in *Judicial Watch*, the Report was

created to "explain[]" to the Attorney General "the prosecution or declination decisions reached

by the Special Counsel."  28 C.F.R. § 600.8(c).  The Report was meant to be "confidential," *id.*,

like other "internal documents relating to any federal criminal investigation," Office of Special

Counsel, 64 Fed. Reg. 37,038, 37,041 (Dep't of Justice July 9, 1999) (recognizing that "[i]n major

cases, federal prosecutors commonly document their decisions not to pursue a case, explaining the

factual and legal reasons for the conclusions they have reached").

Given the nature of the Report, DOJ appropriately withheld "descriptive details about [the

Special Counsel's Office's] deliberations leading up to the prosecution and declination decisions

presented in the Report."  Brinkmann Decl. ¶ 33.  The withholdings under Exemption 5 "reflect

the internal processes of the Special Counsel and his staff," *id.* ¶ 32, and recount the "substantive

and  complex  prosecutorial  decision-making  process  that  led  to,  and  preceded,  the  Special

Counsel's conclusions," *id.* ¶ 33.  Ms. Brinkmann explained that the withheld information

"explains the thought processes and application of law to specific facts that were considered by the Special Counsel prior to reaching decisions on the specific matters discussed in the Report that resulted in criminal charges." *Id.* ¶ 30; *see also id.* ¶¶ 35, 38. Thus, because the Report recounts and reflects deliberations preceding the Special Counsel's charging and declination decisions, and because the process leading to a charging or a declination decision "is squarely within the scope of th[e deliberative process] privilege," DOJ properly withheld deliberative material under Exemption 5. *Senate of the Commonwealth of P.R.*, 823 F.2d at 585 n.38; *see also Fund for Constitutional Gov't*, 485 F. Supp. at 13; *Judicial Watch*, 800 F. Supp. 2d at 218.

Leopold and CREW argue that the withheld material is not deliberative because it does not "reflect the give-and-take of the consultative process," Leopold Mem. 48, and "does not present recommendations or advisory opinions," CREW Br. 14–16. But the Report presents "descriptions of legal theories applicable to the evidence gathered by [the Special Counsel's Office] staff, assessments of the strengths of potential defenses, discussions about possible factual hurdles and weight of evidence issues, and evaluation of potential prosecutorial considerations pertinent to the factual scenarios presented." Brinkmann Decl. ¶ 30. These types of assessments are routinely found to be deliberative. *See, e.g.*, *Fund for Constitutional Gov't*, 485 F. Supp. at 13 ("The exemption is tailor-made for the situation in which the Special Prosecutor's Office was assessing the evidence it was compiling."); *Jackson v. U.S. Att'ys Office, Dist. of N.J.*, 293 F. Supp. 2d 34, 40 (D.D.C. 2003) (protecting attorney notes reflecting his "evaluation of the case and reasons the [office] should decline prosecution").

And Leopold's and CREW's understanding of the "deliberative" element is too narrow. As this Court has stated, "[t]he 'key question' in determining whether the material is deliberative in nature 'is whether disclosure of the information would discourage candid discussion within the

agency.'" *Elec. Frontier Found. v. Dep't of Justice*, 826 F. Supp. 2d 157, 166 (D.D.C. 2011) (quoting *Access Reports*, 926 F.2d at 1195).  Here, disclosure of the deliberative information from what was submitted as a "confidential" report to the Attorney General, 28 C.F.R. § 600.8(c), "would risk significant harm to the integrity of the Department's decision-making process," Brinkmann Decl. ¶ 31; *see also id.* ¶¶ 32, 36, 37 (describing the deliberative process within DOJ for prosecution and declination decisions).  In particular, release of the material could chill future prosecutors from candidly describing the strengths and weaknesses of their case out of concern that their assessments would be publicly released.  *Id.* ¶¶ 31, 32, 36, 37.  Accordingly, because disclosure of the material would discourage candid discussion within DOJ, it is deliberative in nature and protected from disclosure under the deliberative process privilege.

CREW also argues that, even if the Report might be entitled to protection under the deliberative process privilege, DOJ is nevertheless required to disclose it because the Attorney General has adopted the Report's conclusion and reasoning as evidenced by his decision not to override the Special Counsel's decisions.  *See* CREW Br. 2, 13–14 (citing 28 C.F.R. § 600.7(b); DOJ Mem. Exh. 4 (letter from the Attorney General (Mar. 22, 2019)), Dkt. 54-8).  The Supreme Court has recognized that a document can lose its deliberative process protection if an "agency chooses *expressly* to adopt or incorporate [it] by reference."  *Sears*, 421 U.S. at 161 (emphasis added).  But "[m]ere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference."  *Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 249 F.R.D. 1, 8 (D.D.C. 2008) (citation omitted) (brackets in original).

The Special Counsel regulation specifically contemplates that the Attorney General would submit his own notification to Congress at the completion of the Special Counsel's work, that is

50

separate and apart from the Special Counsel's "confidential report."  *Compare* 28 C.F.R. § 600.8(c), *with* 28 C.F.R. § 600.9(a)(3); *see also* 64 Fed. Reg. at 37,041.  The Attorney General's notification to Congress cited by CREW merely stated that the Special Counsel "has concluded his investigation" and that "[t]here were no such instances during the Special Counsel's investigation" where the Attorney General "'concluded that a proposed action by the Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be pursued.'"  DOJ Mem. Exh. 4 (letter from the Attorney General (Mar. 22, 2019)), Dkt. 54-8.  CREW has pointed to nothing in the letter showing that the Attorney General adopted the reasoning of the Special Counsel.  *See* CREW Br. 2, 13–14.  Thus, even if the Attorney General reached the same conclusion regarding declinations as the Special Counsel reached, the Court could not assume—in the absence of evidence indicating that the conclusion was reached on the same grounds—that the Attorney General actually adopted the Special Counsel's reasoning.  Accordingly, the Report does not lose its protection under the deliberative process privilege.

Leopold further argues that DOJ has not met its burden to show that release of the withheld information would case a "foreseeable harm," as articulated in the FOIA Improvement Act of 2016, 5 U.S.C. § 552(a)(8).  Leopold Mem. 48–50.  The Act directs agencies to assess "whether an agency has reasonably foreseen a specific, identifiable harm" before making a disclosure determination with respect to certain exemptions.  H.R. Rep. No. 114-391, at 9.  Leopold suggests that this amendment worked a significant change to the government's burden when withholding information under FOIA.  *See* Leopold Mem. 48 (alleging that the Act created a "heightened standard").  But Congress made clear that the amendment simply codified existing government policy that had been in place for the better part of a decade.  H.R. Rep. No. 114-391, at 9 (noting that the policy was established by executive memoranda in 2009); S. Rep. No. 114-4 at 8 (same);

Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 21, 2009) (presidential memorandum).  And

DOJ already employed this standard when defending agency withholdings in litigation.  *See* H.R.

Rep. No. 114-391, at 9; *accord* Attorney General Holder's Mem. for Heads of Exec. Dep'ts &

Agencies Concerning the Freedom of Information Act, at 1–2 (Mar. 19, 2009), *available at*

http://www.usdoj.gov/ag/foia-memo-march2009.pdf.  Further, Congress expressly acknowledged

that this amendment "does not alter the scope of information that is covered under an exemption."

H.R. Rep. No. 114-391, at 10.  Rather, with respect to certain FOIA exemptions,

§ 552(a)(8)(A)(i)(I) simply requires agencies to identify a foreseeable harm to an interest protected

within the existing scope of certain exemptions, in line with prior policy.

DOJ's declaration easily meets this standard.  The deliberative process privilege aims "to

enhance the quality of agency decisions, by protecting open and frank discussion among those who

make them within the Government."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*,

532 U.S. 1, 9 (2001).  Ms. Brinkmann explained that disclosure of the information at issue could

chill deliberations among DOJ attorneys who are evaluating the strengths and weaknesses of

evidence when deciding whether to prosecute future cases and could severely compromise DOJ's

prosecutorial interests should a later decision be made to bring charges against the individuals for

whom prosecution has been declined.  Brinkmann Decl. ¶¶ 31, 36–37.  Indeed, courts have

recognized that "disclosure of information generated during a prosecutor's assessment of particular

cases would be extremely detrimental to the prosecutor's free exercise of discretion."  *Fund for

Constitutional Gov't*, 485 F. Supp. at 14.

Finally, Leopold argues that the because the Government released information regarding

certain charging and declination decisions, there would be no harm in releasing information related

to all the other charging and declination decisions in the Report.  Leopold Mem. 50.  But agencies

may discretionarily release information over which it could apply the privilege while deciding to apply the privilege to, and withhold, other information. *See, e.g.*, *In re Sealed Case*, 121 F.3d at 741 ("[R]elease of a document only waives the[] [deliberative process] privilege[] for the document or information specifically released, and not for related materials."). Ms. Brinkmann recognized that "[g]iven the extraordinary public interest in this matter, the Attorney General authorized release of the vast majority of the Special Counsel's Report, including a considerable amount of information that could have been protected pursuant to Exemption 5 of the FOIA." Brinkmann Decl. ¶ 28. DOJ "should not be penalized for openness." *Assembly of State of Cal. v. Dep't of Commerce*, 968 F.2d 916, 922 n.5 (9th Cir. 1992), *as amended* (Sept. 17, 1992).

## V.    *In Camera* Review is Neither Necessary Nor Appropriate.

The Court should reject Plaintiffs' request that the Court conduct an *in camera* review of the Mueller Report. Summary judgment is appropriate without *in camera* review of the document where affidavits "provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith." *Larson*, 565 F.3d at 870. "When the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate." *Hayden*, *v. Nat'l Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979). "Moreover, where an agency's withholdings implicate national security concerns, such review is particularly a last resort[, and] a court should not resort to it routinely on the theory that it can't hurt." *Looks Filmproduktionen GmbH v. CIA*, 199 F. Supp. 3d 153, 177 (D.D.C. 2016) (citation omitted). Here, DOJ's declaration—read together with the Report that contains additional FOIA markings—provides sufficiently detailed information to show that the redacted information falls within Exemptions 3, 5, 6, and/or 7. And Plaintiffs' speculative assertions of bad faith do not show that "information contained in [DOJ's

declaration] is contradicted by other evidence in the record." *Carter v. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987).   Accordingly, "[*i*]*n camera* review is neither necessary nor appropriate." *Hayden*, 608 F.2d at 1387.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for the Department of Justice, deny Plaintiffs' cross-motions for summary judgment, and deny EPIC's motion and Leopold's request for *in camera* review.


Dated: July 12, 2019                    Respectfully submitted,

                                        HASHIM MOOPPAN
                                        Deputy Assistant Attorney General
                                        Civil Division

                                        ELIZABETH J. SHAPIRO
                                        Deputy Director
                                        Civil Division, Federal Programs Branch

                                        */s/ Courtney D. Enlow*
                                        COURTNEY D. ENLOW
                                        Trial Attorney
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, N.W.
                                        Room 12102
                                        Washington, D.C. 20005
                                        Tel: (202) 616-8467
                                        Email: courtney.d.enlow@usdoj.gov

                                        *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2019, I electronically transmitted the foregoing to the parties and the clerk of court for the United States District Court for the District of Columbia using the CM/ECF filing system.

/s/ Courtney D. Enlow
COURTNEY D. ENLOW
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Room 12102
Washington, D.C. 20005
Tel: (202) 616-8467
Email: courtney.d.enlow@usdoj.gov

# Exhibit 1

Second Declaration of Vanessa Brinkmann, with supporting exhibit,

dated July 12, 2019

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>*Defendant*. | Civil Action No. 19-cv-810 (RBW) |
| JASON LEOPOLD, BUZZFEED, INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, et al.<br><br>*Defendants*. | Civil Action No. 19-cv-957 (RBW) |

## <u>SECOND DECLARATION OF VANESSA R. BRINKMANN</u>

I, Vanessa R. Brinkmann, declare the following to be true and correct:

1.   I am Senior Counsel in the Office of Information Policy (OIP), United States Department of Justice (the Department or DOJ).  In this capacity, I am responsible for supervising the handling of the Freedom of Information Act (FOIA) requests subject to litigation processed by the Initial Request Staff (IR Staff) of OIP.  The IR Staff of OIP is responsible for processing FOIA requests seeking records from within OIP and from within six senior leadership offices of the Department of Justice, specifically the Offices of the Attorney General (OAG),

1

Deputy Attorney General (ODAG), Associate Attorney General (OASG), Legal Policy (OLP), Legislative Affairs (OLA), and Public Affairs (PAO).  Moreover, the IR Staff is responsible for processing FOIA requests seeking certain records from the Special Counsel's Office (SCO).

2.   The IR Staff of OIP determines whether records responsive to requests exist and, if so, whether they can be released in accordance with the FOIA.  In processing such requests, the IR Staff consults with personnel in the senior leadership offices and, when appropriate, in other components within the Department of Justice, as well as with others in the Executive Branch.

3.   I make the statements herein on the basis of personal knowledge, on my review of the information at issue, as well as on information acquired by me in the course of performing my official duties.

4.   This second declaration supplements and incorporates by reference my June 3, 2019 Declaration in support of the Department's Motion for Summary Judgment, see ECF No. 54-3, which described OIP's processing of the confidential "Report on the Investigation Into Russian Interference in the 2016 Presidential Election" ("the Report").

5.   As explained in my June 3, 2019 Declaration, OIP began its FOIA processing of the Report on April 18, 2019, the same day that the Attorney General released the initial, redacted version to Congress and the public.  As part of its FOIA processing and review, OIP reviewed both the unredacted version of the Report as well as the publicly released version with the Attorney General's redactions, and compared them to determine whether the redacted information was exempt from disclosure under the FOIA.  OIP determined that all of the information redacted in the Attorney General's release was exempt from disclosure under the FOIA, often on the basis of multiple overlapping FOIA exemptions.  OIP took great care to mark each redaction in the Report with all applicable FOIA exemption(s) and, later, to further explain

the FOIA withholdings, applied the coded categories as described in my June 3, 2019

Declaration to each redaction in the Report.

6.   OIP prioritized the processing of the confidential Report in order to produce a FOIA-

redacted version of the Report to Plaintiffs as soon as practicable, and completed the FOIA

review of the 448-page Report in just over two weeks.  Subsequent to the release of the FOIA-

processed version of the Report and a further-processed coded version of the Report, OIP

identified a very small number of errors in some of the FOIA markings – consisting of

unintentional mislabeling of a handful of FOIA redactions (i.e. affecting only the "labeling" of

the redactions, and not the information that was actually redacted).  OIP discovered and

corrected these errors after providing a FOIA-marked version of the Report to Plaintiffs on May

6, 2019, but before providing a more detailed FOIA-marked Report to the Court on June 3, 2019.

See ECF No. 54-3, n. 6.  One day after the submission of the declaration, OIP discovered one

additional labeling error to the FOIA-marked version of the Report that was submitted as Exhibit

D to my declaration, and promptly corrected that error.  See ECF No. 55.

7.   OIP now corrects one minor inadvertent over-redaction in which a redaction box

applied by OIP was mistakenly extended over a citation at the end of one footnote.  Specifically,

in footnote 16 on page 16 of Volume I of the Report, OIP inadvertently over-extended a

redaction box to cover a citation ("See SM-2230634, serials 131 & 204.") that was publicly

released by the Attorney General on April 18, 2019.  The slight over-redaction of footnote 16 on

page 16 of Volume I of the Report was simply a mistake.  We have remediated the error, which

has been corrected in the version of the coded report that is posted on the Department's website

at https://www.justice.gov/storage/report_volume1.pdf.  The updated version of Volume I, page

16 of the Report is also attached hereto as Exhibit A.  This page should replace page 16 of

Volume I of the Report that was attached as Exhibit D to the declaration submitted on June 3, 2019, and subsequently updated by the Corrected Exhibit filed on June 4, 2019.  See ECF No. 55-1.

8.   OIP has thoroughly reviewed the Report and released all segregable information.  I am not aware of any other errors that need to be corrected at this time.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


_____
Vanessa R. Brinkmann
Senior Counsel
Office of Information Policy
United States Department of Justice

Executed on this 12th day of July, 2019.

4

# EXHIBIT A

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)



**(b) (7)(A), (b) (7)(E)**

**(b)(7)(E)-2**

Two individuals headed the IRA's management: its general director, Mikhail Bystrov, and its executive director, Mikhail Burchik.  **(b) (7)(A), (b) (7)(E)**

**(b)(7)(E)-2**

**(b) (7)(A), (b) (7)(E)**

As early as the spring of 2014, the IRA began to hide its funding and activities.
**(b) (7)(A), (b) (7)(E)**

**(b)(7)(E)-2**

The IRA's U.S. operations are part of a larger set of interlocking operations known as "Project Lakhta,"**(b) (7)(A), (b) (7)(E)**

**(b)(7)(E)-2**

**(b) (7)(A), (b) (7)(E)**

### B.  Funding and Oversight from Concord and Prigozhin

Until at least February 2018, Yevgeniy Viktorovich Prigozhin and two Concord companies funded the IRA.  Prigozhin is a wealthy Russian businessman who served as the head of Concord.

**(b)(7)(E)-2**

[13] **(b) (7)(A), (b) (7)(E)** **(b) (7)(A), (b) (7)(E), (b) (3)** **(b) (7)(A), (b) (7)(E)** **(b)(3)-2, (b)(7)(E)-1** **(b)(7)(E)-2**

[14] *See, e.g.*, SM-2230634, serials 9, 113 & 180 **(b) (7)(A), (b) (7)(E)**

[15] **(b) (7)(A), (b) (7)(E)** **(b) (7)(A), (b) (7)(E), (b) (3)** **(b)(3)-2, (b)(7)(E)-1**

[16] **(b) (7)(A), (b) (7)(E)**

*See* SM-2230634, serials 131 & 204.

[17] **(b) (7)(A), (b) (7)(E)** **(b) (7)(A), (b) (7)(E), (b) (3)** **(b) (7)(A), (b) (7)(E)** **(b)(3)-2, (b)(7)(E)-1**

[18] **(b) (7)(A), (b) (7)(E)** **(b) (7)(A), (b) (7)(E), (b) (3)** **(b) (7)(A), (b) (7)(E)**

**(b)(3)-2, (b)(7)(E)-1**

**(b)(7)(E)-2**